# EXHIBIT A

# AGREEMENT OF PURCHASE AND SALE

**between**

**Cherry Hill Nursing Home, Ltd.**
**a Rhode Island limited partnership**

***SELLER***

**and**

**Cherry Hill Medical Investors Limited Partnership**
**a Tennessee limited partnership**

***BUYER***

## TABLE OF CONTENTS


| | | |
|---|---|---|
| ARTICLE I | Terms and Definitions | 1 |
| 1.1. | Approval Date | 1 |
| 1.2. | Closing | 1 |
| 1.3. | Cost Reports | 1 |
| 1.4. | Encumbrances | 1 |
| 1.5. | Governmental Approvals | 1 |
| 1.6. | Healthcare Facility | 1 |
| 1.7. | Improvements | 2 |
| 1.8. | Insurance Policies | 2 |
| 1.9. | Intangible Personal Property | 2 |
| 1.10. | Operating Statements | 2 |
| 1.11. | Personal Property | 2 |
| 1.12. | Plans | 2 |
| 1.13. | Purchase Price | 2 |
| 1.14. | Real Property | 2 |
| 1.15. | Service Agreements | 2 |
| 1.16. | Tax Bills | 3 |
| 1.17. | Title Commitment | 3 |
| 1.18. | Title Company | 3 |
| 1.19. | Union Contracts | 3 |
| ARTICLE II | Purchase and Sale | 3 |
| 2.1. | Purchase and Sale | 3 |
| ARTICLE III | Purchase Price | 3 |
| 3.1. | Purchase Price | 3 |
| 3.2. | Payment of Purchase Price | 3 |
| 3.3. | Cash Deposit | 4 |
| ARTICLE IV | Closing; Effective Date | 4 |
| 4.1. | Closing | 4 |
| 4.2. | Effective Date | 4 |
| ARTICLE V | Title; Survey | 4 |
| 5.1. | Title Commitment | 4 |
| 5.2. | Survey | 4 |
| 5.3. | Title Defects | 5 |
| ARTICLE VI | Representations and Warranties | 5 |
| 6.1. | Seller's Representations and Warranties | 5 |
| | 6.1.1. Title | 6 |

6.1.2. Notices . . . . . 6
6.1.3. Contracts . . . . . 6
6.1.4. Governmental Approvals, Compliance . . . . . 6
6.1.5. Defects . . . . . 7
6.1.6. Cost Reports and other Filings . . . . . 7
6.1.7. Census Report . . . . . 7
6.1.8. Condition of Improvements . . . . . 7
6.1.9. Service Agreements . . . . . 8
6.1.10. Encumbrances . . . . . 8
6.1.11. Unrecorded or Equitable Interests . . . . . 8
6.1.12. Utility Lines . . . . . 8
6.1.13. Employees . . . . . 9
6.1.14. Collective Bargaining Agreements and Employee Benefits Plans . . . . . 9
6.1.15. Approvals With Respect to Transaction . . . . . 9
6.1.16. Bankruptcy, etc . . . . . 9
6.1.17. Operating Statements . . . . . 10
6.1.18. Good Standing . . . . . 10
6.1.19. Due Authority . . . . . 10
6.1.20. Information Not Misleading . . . . . 10
6.1.21. Defaults . . . . . 11
6.1.22. Litigation . . . . . 11
6.1.23. Construction of Improvements . . . . . 11
6.1.24. Legal Access . . . . . 11
6.1.25. Public Improvements . . . . . 11
6.1.26. Hazardous Substances . . . . . 11
6.1.27. Right of First Refusal . . . . . 12
6.2. Effect of Buyer's Inspections . . . . . 12
6.3. Buyer's Representations and Warranties . . . . . 12
6.3.1. Good Standing . . . . . 12
6.3.2. Due Authority . . . . . 12
6.3.3. Consents . . . . . 13

ARTICLE VII Seller's Deliveries . . . . . 13
7.1. Seller's Deliveries . . . . . 13
7.1.1. Insurance Policies . . . . . 13
7.1.2. Operating Statements . . . . . 13
7.1.3. Tax Bills . . . . . 13
7.1.4. Plans . . . . . 13
7.1.5. Service Agreements . . . . . 13
7.1.6. Governmental Approvals . . . . . 13
7.1.7. Operating Budgets . . . . . 13
7.1.8. Warranties . . . . . 14
7.1.9. Termite Bonds . . . . . 14
7.1.10. Schedule of Personal Property . . . . . 14

| | | | |
|---|---|---|---|
| | 7.1.11. | Litigation Schedule | 14 |
| | 7.1.12. | List of Employees and Compensation | 14 |
| | 7.1.13. | Union Contracts | 14 |
| | 7.1.14. | Cost Reports | 14 |
| | 7.1.15. | Deficiency Reports | 14 |
| | 7.1.16. | Provider Agreements | 14 |
| | 7.1.17. | Census Reports | 14 |
| | 7.1.18. | Surveys, Title Reports, Environmental Reports | 14 |
| | 7.1.19. | Other Documents | 14 |
| ARTICLE VIII | Conditions Precedent to Closing | | 15 |
| 8.1. | Buyer's Conditions Precedent | | 15 |
| | 8.1.1. | Performance of Covenants | 15 |
| | 8.1.2. | Representations and Warranties | 15 |
| | 8.1.3. | Approval of Information | 15 |
| | 8.1.4. | Engineering Inspection | 15 |
| | 8.1 5. | Operating Records | 15 |
| | 8.1.6. | Appraisal or Fairness Opinion | 15 |
| | 8.1.7. | Title Policy | 16 |
| | 8.1.8. | Opinions | 16 |
| | 8.1.9. | Non-Foreign Affidavit | 16 |
| | 8.1.10. | Site Assessment Report | 16 |
| | 8.1.11. | No Material Adverse Change | 16 |
| | 8.1.12. | Termite Inspection Report | 16 |
| | 8.1.13. | Buyer's Approvals | 16 |
| 8.2. | Buyer's Waiver | | 16 |
| 8.3. | [Section Omitted] | | 16 |
| 8.4. | Buyer's Termination | | 17 |
| 8.5. | Seller's Conditions Precedent | | 17 |
| | 8.5.1. | Performance of Covenants | 17 |
| | 8.5.2. | Representations and Warranties | 17 |
| 8.6. | Seller's Waiver | | 17 |
| ARTICLE IX | Title, Conveyance, Etc | | 17 |
| 9.1. | Closing | | 17 |
| | 9.1.1. | Title to the Property | 17 |
| | 9.1.2. | Owner's Policy of Title Insurance | 18 |
| | 9.1.3. | Governmental Approvals | 18 |
| | 9.1.4. | Assignment of Warranties | 18 |
| | 9.1.5. | Assignment of Service Agreements | 18 |
| | 9.1.6. | Personal Property | 18 |
| | 9.1.7. | Assignment of Trade Names | 19 |
| | 9.1.8. | Notice of Rate Increase | 19 |
| | 9.1.9. | Non-Foreign Affidavit | 19 |
| | 9.1.10. | UCC Certificates | 19 |

| | | | |
|---|---|---|---|
| | 9.1.11 | Census Report | 19 |
| | 9.1.12. | Other Agreements | 19 |
| 9.2. | Prorations | | 19 |
| | 9.2.1. | Utilities | 20 |
| | 9.2.2. | Taxes | 20 |
| | 9.2.3. | Special Assessments | 20 |
| | 9.2.4. | Payroll | 20 |
| | 9.2.5. | Security Deposits | 20 |
| | 9.2.6. | Accounts Payable and Receivable | 20 |
| | 9.2.7. | Closing Costs | 21 |
| 9.3. | Opinions of Seller's Counsel | | 21 |
| | 9.3.1. | Due Authority; Enforceability | 21 |
| | 9.3.2. | Zoning, Environmental | 21 |
| | 9.3.3. | Compliance with Nursing Home Regulations | 22 |
| | 9.3.4. | Other Matters | 22 |

| | | |
|---|---|---|
| ARTICLE X | Obligations of the Seller | 22 |
| 10.1. | Operation of the Healthcare Facilities | 22 |
| 10.2. | Service Agreements | 22 |
| 10.3. | Insurance Policies | 22 |
| 10.4. | Performance of Seller's Obligations | 23 |
| 10.5 | Inventories | 23 |
| 10.6. | Encumbrances | 23 |
| 10.7. | Condition of Healthcare Facilities | 23 |
| 10.8. | Change in Condition | 23 |
| 10.9. | Access to the Healthcare Facility | 24 |
| 10.10. | Covenant Not to Compete | 24 |
| 10.11. | Post-Closing Filings | 24 |
| ARTICLE XI | Damage, Destruction or Condemnation | 24 |
| 11.1. | Fire or Casualty | 24 |
| 11.2. | Condemnation | 24 |
| ARTICLE XII | Brokers | 25 |
| 12.1 | Brokers | 25 |
| ARTICLE XIII | Notices | 25 |
| 13.1. | Notices | 25 |
| ARTICLE XIV | Remedies | 26 |
| 14.1. | Remedies Upon Default | 26 |
| 14.2. | Attorney's Fees | 26 |
| 14.3. | Waiver | 27 |

ARTICLE XV General . . . . . 27
15.1. Time . . . . . 27
15.2. Successors and Assigns . . . . . 27
15.3. Entire Agreement . . . . . 27
15.4. Choice of Law . . . . . 27
15.5. Indemnity . . . . . 27
15.6. Scope of Agreement . . . . . 28
15.7. Survival of Obligations, Representations, and Warranties . . . . . 28
15.8. Assignment By Buyer . . . . . 28
15.9. [Section Omitted] . . . . . 28
15.10. [Section Omitted] . . . . . 28
15.11. Due Authority . . . . . 28
15.12. Headings . . . . . 28
15.13. Counterparts . . . . . 28
15.14. Further Assurances . . . . . 28
15.15. Construction . . . . . 29
15.16. Exhibits . . . . . 29

# AGREEMENT OF PURCHASE AND SALE

BY THIS AGREEMENT OF PURCHASE AND SALE (the *"Agreement"*) entered into this 18TH day of April, 1996, by **Cherry Hill Nursing Home, Ltd.**, a Rhode Island limited partnership, with a principal office and place of business at 2 Cherry Hill Road, Johnson, Rhode Island 02919 (herein, *"Seller"*), and **Cherry Hill Medical Investors Limited Partnership**, a Tennessee limited partnership with a principal place of business at 3570 Keith Street, N.W., Cleveland, Tennessee 37312 (together with any nominee or assignee, *"Buyer"*), hereby agree as follows:

## ARTICLE I

### Terms and Definitions

In addition to the other terms herein defined, the following terms shall have the meanings set forth in this Article I, unless the context otherwise requires:

Section 1.1. Approval Date. The date which is thirty (30) days following the date on which Buyer and Buyer's counsel receive from Seller all the items listed in Article VII herein, which date Seller shall confirm in writing to Buyer and Buyer's counsel following delivery of all such items

Section 1.2 Closing. The consummation of the sale and purchase of the Healthcare Facility pursuant to this Agreement.

Section 1.3. Cost Reports. All cost reports filed by Seller under Medicaid, Medicare or Veteran programs with respect to the operation of the Healthcare Facility for the year to date and for the three (3) most recent fiscal years.

Section 1.4. Encumbrances. Any security interest, lien, security agreement or other agreement, arrangement, contract, commitment, understanding or obligation which affects Seller's title to any of the assets of the Healthcare Facility.

Section 1.5. Governmental Approvals. All certificates of occupancy, licenses, permits, authorizations and approvals required by law or by any governmental authority having jurisdiction over the Healthcare Facility or any portion thereof (including new beds or any recent additions thereto) relative to the construction, occupancy (with appurtenant parking uses), operation, or present use of the Healthcare Facility, including approval under state licensure laws and Medicaid and Medicare programs, and the issuance of a certificate of need, if required.

Section 1.6. Healthcare Facility. The 172 bed nursing care facility known as *Cherry Hill Manor*, including the Real Property , Improvements, Personal Property, and Intangible Personal Property associated with said nursing facility.

Section 1.7. Improvements. All improvements now existing or to be constructed on the Real Property, including the nursing care facility with a total of 172 licensed beds, on-site parking and other amenities, and all mechanical equipment, apparatus and appliances used in connection therewith.

Section 1.8. Insurance Policies. All risk, liability (including professional liability), workmen's compensation and other insurance policies currently in force with respect to the Healthcare Facility.

Section 1.9. Intangible Personal Property. All of the Seller's right, title and interest in any intangible property now or hereafter owned by Seller and used in connection with the Healthcare Facility including, without limitation, all of the Seller's rights under all claims, contracts, leases, Licenses, permits, plans, appraisals, logos, studies, warranties, trade lists, names, trademarks, mailing lists, utility arrangements and other agreements relating to the ownership, operation or occupancy of the Healthcare Facility.

Section 1.10. Operating Statements. All income and expense statements and balance sheets for the Healthcare Facility for the year to date and for the most recently completed three (3) fiscal years, having been prepared in accordance with generally accepting accounting principles, a list of such statements being more fully set forth in Exhibit E attached hereto

Section 1.11. Personal Property. All personal property owned by Seller or hereafter acquired, now or hereafter located on the Real Property and used in connection with the ownership operation or occupancy of the Healthcare Facility, including, without limitation, equipment, medical apparatus, maintenance equipment, vehicles, and medical records of current nursing home patients, a list of such personal property being more fully set forth on Exhibit B attached hereto and by this reference made a part hereof; provided that all property listed as Exhibit B-1 is excluded from the transaction contemplated by this Agreement.

Section 1.12. Plans. All engineering and architectural plans and specifications, drawings, studies and as-built surveys relating to the Healthcare Facility.

Section 1.13. Purchase Price. The Purchase Price to be paid by Buyer for the Healthcare Facility in the manner provided in this Agreement.

Section 1.14. Real Property. The real property known as *Cherry Hill Manor* and located at 2 Cherry Hill Road, Johnson, Rhode Island 02919, consisting of approximately 2 +/- acres of land, more particularly described on Exhibit A attached hereto and by this reference made a part hereof, together with all strips and gores of land lying adjacent to such land and owned by Seller, and all rights, privileges, easements and appurtenances thereto.

Section 1.15. Service Agreements. All agreements of the Healthcare Facility for the provision of services or materials from third parties including, but not limited to, contracts for maintenance, repair, service, pest control, materials and supply contracts; leases; equipment rental agreements; all contracts for repair or capital replacements at the Healthcare Facility; all contracts

for food service, housekeeping, nursing, skilled therapists and the like, financial obligations; employee compensation agreements; and any other contracts relating to or affecting the Healthcare Facility as more fully described in Section 6.1.9, a list of such agreements being set forth in Exhibit C attached hereto.

Section 1.16. Tax Bills. Bill or bills issued for the most recent year for which bills have been issued for all real estate taxes and personal property taxes, and any and all notices pertaining to real estate taxes or assessments applicable to the Healthcare Facility, including any such bills or notices received by Seller after the date of this Agreement.

Section 1.17. Title Commitment. The commitment for issuance of an owner's policy of title insurance issued by the Title Company pursuant to Section 3.1. herein.

Section 1.18. Title Company. Lawyers Title Insurance Corporation.

Section 1.19. Union Contracts. All collective bargaining agreements between Seller and any labor organization for the operation and/or management of the Healthcare Facility, as set forth on Exhibit I.

ARTICLE II

Purchase and Sale

Section 2.1. Purchase and Sale. Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the Healthcare Facility, subject to the terms and conditions set forth herein.

ARTICLE III

Purchase Price

Section 3.1. Purchase Price. Seller agrees to sell and Buyer agrees to purchase the Healthcare Facility for a total purchase price of Ten Million and 00/100 Dollars ($10,000,000.00), payable as set forth below.

Section 3.2. Payment of Purchase Price. The total Purchase Price shall be paid to Seller and/or those persons identified in the non-competition agreements referenced in Section 10.10 herein at Closing, net of all prorations and other credits provided in this Agreement, by either bank check or wire transfer of federal funds.

Seller and Buyer will use all reasonable, good faith efforts to agree prior to Closing to an allocation of the Purchase Price between intangibles (including the non-competition agreements),

land, buildings, personal property and goodwill; provided, however, such failure to agree shall not constitute a default by either party or a failure of any condition precedent to Closing.

Section 3.3. Cash Deposit. Upon the execution of this Agreement the Buyer will deposit with the Title Company Fifty Thousand and 00/100 Dollars ($50,000.00) as a cash deposit which will be held in an interest bearing account by the Title Company and applied towards the Purchase Price at Closing. The Cash Deposit will be returned to the Buyer if the conditions precedent to Closing are not satisfied pursuant to Article VIII of this Agreement.

ARTICLE IV

Closing; Effective Date

Section 4.1. Closing. The Closing shall be held at the offices of the Title Company in the Providence, Rhode Island area, on or before June 1, 1996, provided that all conditions and contingencies set forth in this Agreement have been satisfied or waived. Buyer shall have the right to extend the date of Closing for an additional period not to exceed five (5) days by written notice to Seller, to be given on or before 5:00 P.M. on the day Closing is scheduled. Additionally, Seller shall grant Buyer an extension of up to thirty (30) additional days to obtain licensing and certificate of need approval and/or transfer to purchase the Healthcare Facility, if needed.

Section 4.2. Effective Date. Buyer shall take control of the Healthcare Facility as the Owner and licensed operator thereof on the day of Closing (the *"Effective Date"*).

ARTICLE V

Title; Survey

Section 5.1. Title Commitment. Upon execution of this Agreement, Buyer shall order (and upon receipt deliver a copy to Seller) a Title Commitment, issued by the Title Company, reflecting the status of title to the Real Property and Improvements, and showing marketable, fee simple title in the Seller, subject only to current taxes not yet due, and other matters approved by Buyer. Together with the Title Commitment, the Title Company shall deliver to Buyer legible copies of all instruments shown as exceptions thereon. The Title Commitment shall contain such endorsements and extended coverages as Buyer shall require.

Section 5.2. Survey. Upon execution of this Agreement, Buyer shall order (and upon receipt deliver or cause to be delivered a copy to Seller) a current ALTA/ACSM Class A (Urban) survey of the Real Property (the *"Survey"*), prepared by a professional engineer or land surveyor licensed in the State of Rhode Island and certified thereby to Buyer, Buyer's lender, if any, and to the Title Company on the face of the Survey. Such Survey shall show thereon such information as

Buyer may reasonably require, including, but not limited to, the location of all buildings and improvements on the Real Property, all established building lines, all setbacks from property lines, the location of all utilities, including water and sewer to the point of connection with the public system, all horizontal lengths of buildings, easements both burdening and benefiting the Real Property and Improvements, the right of way and center lines of any street abutting the Real Property, all encroachments and the extent thereof, the number and location of all parking spaces and all means of ingress and egress to and from the Healthcare Facility and to all abutting streets.

Section 5.3. Title Defects. After receiving the Title Commitment and the Survey in conformity with the foregoing requirements, Buyer shall have until the Approval Date to notify Seller in writing of any objection which Buyer may have to any exceptions reported in the Title Commitment or matters shown on the Survey which, in Buyer's sole discretion, do or could adversely affect Seller's interest in, or the operations of, the Healthcare Facility. As a condition to Closing, Seller shall remove from the policy of title insurance to be issued to Buyer any exception and from the Survey any matters, so objected to by the Buyer or, in the alternative, obtain title insurance over such exceptions or survey matters in a form satisfactory to Buyer. If, on or before the Closing, Seller is unable to remove any matters to which Buyer has so objected, Buyer shall have the option to either waive such matters and consummate the transaction contemplated herein, in which event Buyer shall be deemed to have approved such matters, or terminate this Agreement at any time within ten (10) days after Seller notifies Buyer it is unable or unwilling to cure any such matters (which notification may be given at any time). In the event of termination under this section, this Agreement shall be deemed null and void and the parties hereto shall have no further obligations to or recourse against each other. Notwithstanding the foregoing, Seller shall be obligated to cure any of the following objections to title:

(a) All mortgages affecting the Real Property and Improvements;

(b) All past due and valorem taxes and assessments of any kind constituting a lien against the Real Property and/or Improvements to the extent such assessments can be cured by the payment of money;

(c) All mechanic's, materialmen's or similar liens, and

(d) All judgments which have attached to and become a lien against the Real Property and/or Improvements.

ARTICLE VI

Representations and Warranties

Section 6.1. Seller's Representations and Warranties. In addition to the representations and warranties contained elsewhere in this Agreement, Seller makes the following representations and warranties:

6.1.1. Title. Seller has good and marketable title to the Real Property and Improvements, and is the sole owner and has good and marketable title to all the Personal Property, Intangible Personal Property and other assets of the Healthcare Facility. At Closing, Buyer shall acquire hereunder the entire interest in and to the Real Property and Improvements, subject only to the conditions of title approved by Buyer pursuant to Article V herein. All Personal Property is owned by Seller free and clear of any security interest, lien, security agreement or other agreement, arrangements, contracts, commitments, understandings, or obligations (collectively, the *"Encumbrances"*) except Encumbrances referred to in Exhibit J attached hereto, which shall be satisfied at or before Closing. The Healthcare Facility, together with Buyer's rights under the Service Contracts and the Union Contracts, are all of the properties, assets and rights which are necessary to carry on the operation of the Healthcare Facility as presently conducted. After the Closing, Seller will not own or have any interest in any properties, assets or rights which are necessary to carry on the business of the Healthcare Facility as presently conducted.

6.1.2. Notices. Seller has not received any notices from any insurance companies, governmental agencies or any other parties, and is not aware of (i) any condition, defects, inadequacies, or impending requirements with respect to the Healthcare Facility which, if not corrected, would result in termination of insurance coverage or increase its cost, or from governmental agencies or any other parties with respect to any violations of nursing home licensure laws and regulations, Medicare or Medicaid Conditions of Participation, or building codes and/or zoning ordinances or other governmental laws, regulations or orders with respect to the Healthcare Facility, which would cause additional expenditures to be made to bring the Healthcare Facility into compliance with applicable laws, regulations and requirements, (ii) any other matter which would have a material, adverse effect on the Healthcare Facility or their operation as nursing homes as presently conducted, or (iii) any notice of pending or threatened condemnation proceedings with respect to the Healthcare Facility, or any proceedings which could or would cause the change, redefinition or other modification of the zoning classification, building or environmental code requirements applicable to the Healthcare Facility or any part thereof, or any property adjacent to the Healthcare Facility. Seller shall immediately notify Buyer of any violations or conditions of which Seller receives notice, whether written or oral.

6.1.3. Contracts. Seller has not committed nor obligated itself in any manner whatsoever to sell the Healthcare Facility to any party other than Buyer.

6.1.4. Governmental Approvals, Compliance. Seller has received and currently holds all necessary approvals from state, federal and local governmental officials for the operation by Seller of the Healthcare Facility as presently conducted so as to be in compliance with applicable state, federal, state and local governmental requirements, including a certificate of need, if required, and all other applicable requirements entitling the operator of the Healthcare Facility to reimbursement under the Medicare and Medicaid programs. Seller has a license and certificate of need, if applicable, to operate the Healthcare Facility as a 172 bed nursing home

Except as expressly set forth in this Agreement, the Healthcare Facility is in compliance with all applicable federal, state and local laws, ordinances, regulations and orders including, for example, matters relating to the environment, anti-competitive practices, discrimination, employment, health, and safety. Exhibit K contains a list of: (1) all governmental registrations, licenses and permits (none of which are transferable unless otherwise indicated by an asterisk), including, without limitation, all governmental registrations or licenses relating to reimbursement under Medicaid and Medicare and (2) all consents, orders, decrees and other compliance agreements relating to the Healthcare Facility under which Seller or the Healthcare Facility are operating or bound, copies of all of which have been furnished to Buyer.

6.1.5. Defects. Seller has no knowledge of any latent defects, any damage or any dangerous, improper, or unsatisfactory condition existing in or with respect to the Healthcare Facility.

6.1.6. Cost Reports and other Filings. Seller has, for the Healthcare Facility, timely filed all required Cost Reports under Medicaid, Medicare or Veteran programs and has provided Buyer with copies of the most recent three years of said Cost Reports. All Cost Reports have been prepared in accordance and in compliance with all applicable government rules and regulations and with generally accepted accounting principles. All other returns, reports and filings of any kind or nature whatsoever required to be filed by Seller as they relate to the Healthcare Facility, including, without limitation, all federal, state and local tax returns, have been properly completed and timely filed in compliance with all applicable requirements, and all taxes or other obligations which are due and payable have been timely paid. There are no agreements, waivers or other arrangements providing for an extension of time with respect to the assessment of any tax or deficiency against Seller or the Healthcare Facility.

6.1.7. Census Report. Attached to this Contract as Exhibit F is a Census Report of the Healthcare Facility certified as true and correct as of the date of this Agreement showing the name of each patient, the status of each patient (private pay, Medicaid, Medicare) the amount of daily revenue charged to each such patient, each patient's bed and wing number, the amount of each patient's Social Security check, the amount of each patient's fund allowance and the net funds available from each patient.

6.1.8. Condition of Improvements. The Improvements, including curbs, sidewalks, air conditioning, roofs, mechanical, electrical, HVAC equipment, plumbing, drainage and heating systems and other mechanical systems at or servicing the Healthcare Facility and all other facilities and equipment relating thereto, are now, and will be at Closing, in good order and operating condition and fully adequate and sufficient for the operation by Buyer, or its agent or lessee, of a fully equipped, 172 bed nursing home. Seller is not aware of any latent or patent physical or mechanical defects in any of the foregoing.

6.1.9. Service Agreements. The Service Agreements summary, attached hereto as Exhibit C, completely and accurately sets forth all existing service, management, supply, maintenance contracts and similar agreements affecting the Healthcare Facility, or any portion thereof including, for example, any (i) contract involving more than $2,000 in any instance for the future purchase of material, supplies, equipment or services or any contract involving any amount which is unfavorable to Seller under current market conditions, (ii) contract or commitment for the employment of any employee or any other type of contract or understanding with any employee or consultant other than as listed in Exhibit I, (iii) profit-sharing, bonus, incentive, stock option, pension, retirement, stock purchase, health, dental, hospitalization insurance or similar plan, agreement or policy, formal or informal, providing benefits to any current a former director, officer, shareholder or employee except as listed in Exhibit D, (iv) indenture, mortgage, promissory note, loan agreement, guarantee or other agreement or commitment for the borrowing of money, for a line of credit or for a leasing transaction required to be capitalized in accordance with Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board, (v) contract or commitment for expenditures involving more than $10,000 in any instance except in order to operate the Healthcare Facility in the normal and ordinary course of business as presently conducted, (iv) guaranty of the obligations of a third party, and (vii) agreement or arrangement for the sale of any of the assets, property or rights of the Healthcare Facility outside the ordinary course of business or requiring the consent of any party to the transfer or assignment of such assets, property and rights. Each of Seller and the Healthcare Facility has in all material respects performed all the obligations required to be performed by it to date and is not in default or alleged to be in default in any respect under any agreement, lease, contract, commitment, instrument or obligation required to be listed in any Exhibit to this Agreement, and there exists no event, condition or occurrence which, after notice or lapse of time, or both, would constitute such a default by it of any of the foregoing. Copies of all written agreements and written summaries of all oral agreements described in Exhibit C have been provided to Buyer. Each instrument listed on Exhibit C may (unless otherwise noted on Exhibit C) be cancelled by Buyer upon not more than sixty (60) days' notice and without payment of premium or penalty therefor.

6.1.10. Encumbrances. Seller agrees to keep the Healthcare Facility free from any Encumbrances not in existence as of the date of this Agreement including, but not limited to, mechanics' or materialmen's liens which might result from construction of any improvements, and to indemnify and save Buyer harmless from any such Encumbrances and all attorney's fees and other costs and expenses incurred by reason thereof.

6.1.11. Unrecorded or Equitable Interests. There are no unrecorded or undisclosed legal or equitable interests in any of the assets of the Healthcare Facility owned or claimed by any party other than Seller.

6.1.12. Utility Lines. All water, sewer, electric, natural gas, telephone and drainage facility, and all other utilities required for the normal operation of the Healthcare Facility are installed at the Healthcare Facility, are connected with valid permits, and are adequate to

service the Healthcare Facility and to permit full compliance with the requirements of law All utility lines serving the Healthcare Facility are located within the boundaries of the Real Property, across lands dedicated to public use or subject to recorded easements for the same.

6.1.13. Employees. There are no employees of Seller, or of any affiliate of Seller, currently employed in the operation and/or maintenance of the Healthcare Facility, other than as shown on Exhibit D attached hereto. Upon termination of the employment of any employee of the Healthcare Facility by Buyer, Buyer will not incur any liability for any severance or termination pay or other similar payment pursuant to any obligation, agreement or other undertaking of Seller or the Healthcare Facility except as provided in the collective bargaining agreements listed in Exhibit I, or in an agreement listed in Exhibit C or as established by law. Each of the Seller and the Healthcare Facility is in compliance with all federal, state, and local laws and regulations respecting employment and employment practices, terms and conditions of employment and wages and hours. Except as listed on Exhibit I, there is no unfair labor practice complaints against Seller or the Healthcare Facility pending before any governmental agency or strike, dispute, slowdown or stoppage pending or threatened against or involving the Healthcare Facility and no labor representation question exists respecting the employees of the Healthcare Facility and no collective bargaining agreement is currently being negotiated by Seller or the Healthcare Facility. Except as listed on Exhibit I, no grievance or arbitration proceeding is pending relating to any of the employees of the Healthcare Facility. Exhibit D consists of a complete and accurate list of all employees of the Healthcare Facility together with each employee's current job title and aggregate pay rate (bonus and salary).

6.1.14. Collective Bargaining Agreements and Employee Benefits Plans No collective bargaining agreements between Seller and/or the Healthcare Facility and any labor organization apply to the operation and/or management of the Healthcare Facility, other than as shown on Exhibit I attached hereto. No employee benefits plans of any kind provided by Seller and/or the Healthcare Facility apply to any director, shareholder, officer or employee of the Healthcare Facility other than as shown on Exhibit I or Exhibit C.

6.1.15. Approvals With Respect to Transaction. Seller has obtained, or will obtain prior to Closing, all consents, approvals and authorizations from any person, entity or governmental authority required to be obtained by Seller with respect to this Agreement and the consummation of the transaction contemplated herein.

6.1.16. Bankruptcy, etc. No bankruptcy, insolvency, rearrangement or similar action involving the Healthcare Facility, whether voluntary or involuntary, is pending or threatened, and Seller has never:

(a) filed a voluntary petition in bankruptcy;

(b) been adjudicated a bankrupt or insolvent or filed a petition or action seeking any reorganization, arrangement, recapitalization, readjustment, liquidation,

dissolution or similar relief under any Federal bankruptcy act or any other laws;

(c) sought or acquiesced in the appointment of any trustee, receiver or liquidator of all or any substantial part of its or his properties, the Healthcare Facility, personal property or any portion thereof; or

(d) made an assignment for the benefit of creditors or admitted in writing its or his inability to pay its or his debts generally as the same become due.

Seller is not anticipating or contemplating any of the actions set forth in (a) through (d) of this subsection 6.1.16.

6.1.17. Operating Statements. There have been no material adverse changes in the income and expense of the Healthcare Facility between the date of this Agreement and the ending date of the period covered by the Operating Statements furnished to Buyer pursuant to this Agreement and attached hereto as Exhibit E. Seller has no knowledge or information concerning any prospective material adverse change in the income or expenses of the Healthcare Facility, unless indicated on the Operating Statements. Any material adverse changes occurring between the date of this Agreement and Closing hereunder shall be promptly disclosed in writing to Buyer and shall be subject to Buyer's approval.

6.1.18. Good Standing. Seller is a limited partnership organized and in good standing under the laws of the State of Rhode Island.

6.1.19. Due Authority. Seller has all requisite power and authority to execute and deliver this Agreement and to carry out its obligations hereunder and the transactions contemplated hereby. This Agreement has been, and the documents contemplated hereby will be, duly executed and delivered by Seller and constitute the Seller's legal, valid and binding obligations enforceable against Seller in accordance with their terms. The consummation by Seller of the sale of the Healthcare Facility is not in violation of or conflict with, nor does it constitute a default under any term or provision of the organizational documents of Seller, or any of the terms of any agreement or instrument to which Seller is a party, or by which Seller is bound, or of any provision of any applicable law, ordinance, rule or regulation of any governmental authority or of any provision of any applicable order, judgment or decree of any court, arbitrator or governmental authority.

6.1.20. Information Not Misleading. All of the information concerning Seller and the Healthcare Facility and all reports, contracts, financial statements and other items delivered by Seller or Seller's agents or employees pursuant to this Agreement are true, complete (i.e., no material fact has been omitted which would be necessary in order to make the statements contained herein or therein not misleading) and correct in all respects and fairly present the information set forth in a manner that is not misleading.

6.1.21. Defaults. No default or breach exists, or as of the Closing will exist, under any of the documents, covenants, conditions, restrictions, rights of ways or easements affecting the Healthcare Facility or any portion thereof, recorded or unrecorded, under any of the Service Contracts, or the Governmental Approvals.

6.1.22. Litigation. Other than as set forth in Exhibit G attached hereto, there are no pending, or, to Seller's best knowledge, threatened, judicial, municipal or administrative proceedings, consent decrees or judgments with respect to, or in any manner affecting the Healthcare Facility or any portion thereof or in which the Healthcare Facility is or will be a party, or Seller is or will be a party by reason of Seller's ownership of the Healthcare Facility or any portion thereof, including without limitation, collections, condemnations, eminent domain, alleged building code or zoning violations, or personal injuries or property damage alleged to have occurred on the Healthcare Facility or by reason of the construction of the improvements or use and operation of the Healthcare Facility as a nursing home, including, without limitation, malpractice and other claims relating to patients of the Nursing Home; or any present plan or study by any governmental authority, agency or employee thereof which in any way challenges, affects or would challenge or affect the continued authorization of the ownership, construction, use and operation of the Healthcare Facility as a nursing home, or any street or highway servicing or adjacent to the Real Property. Exhibit G contains an accurate summary of the status of all matters shown thereon. Seller shall deliver to Buyer an updated Exhibit G at Closing which shall be true and accurate in all respects.

6.1.23. Construction of Improvements. The Improvements (including curbs, streets, roads, parking areas, sidewalks, landscaping, sewers and other utilities) have been constructed and completed substantially in accordance with: (a) the Plans; (b) all Governmental Approvals; (c) accepted standards of good materials and workmanship; and (d) covenants, restrictions, easements and agreements affecting the Real Property.

6.1.24. Legal Access. There is legal access to the Healthcare Facility at all points identified as being used for such access.

6.1.25. Public Improvements. There are no written or, to Seller's best knowledge, proposed plans to widen, modify, or realign any street or highway or any existing or proposed eminent domain proceedings which would affect the Healthcare Facility in any way whatsoever. There are no presently planned public improvements which would result in the creation of a special improvement or similar lien upon the Real Property.

6.1.26. Hazardous Substances. (a) Seller represents and warrants that currently and as of the Closing, no hazardous substances, as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), pollutants or contaminants as defined in CERCLA, or hazardous waste as defined by the Resource Conservation and Recovery Act ("RCRA"), or other similar applicable federal or state laws and regulations including, but not limited to, asbestos, PCBs and urea formaldehyde, have been generated, released, stored or deposited over, beneath or on the Real Property or on or in any structures

located on the Real Property, from any source whatsoever, by Seller, or, to Seller's knowledge, its predecessors in interest in the Real Property or any other person.

(b) Seller covenants that it will indemnify, hold harmless, and defend Buyer from any and all claims, loss, damage, response costs and expenses arising out of or in any way relating to a breach of these environmental representations including, but not limited to: (i) claims of third parties (including governmental agencies), for damages, penalties, response costs, injunctive or other relief; (ii) expenses, including fees of attorneys and experts, of reporting the existence of hazardous substances or hazardous wastes to any governmental agency; or (iii) any and all expenses or obligations, incurred at, before and after any trial or appeal therefrom or administrative proceeding or appeal therefrom whether or not taxable as costs, including, without limitation, attorney's fees, witness fees (expert and otherwise), deposition costs, copying and telephone charges and other expenses, all of which shall be paid by Seller when accrued.

6.1.27. Right of First Refusal. No rights of first refusal or options regarding the Healthcare Facility exist under the organizational documents of Seller or under any separate agreement by which Seller may be bound or affected.

Section 6.2. Effect of Buyer's Inspections. The effect of the representation and warranties made in this Agreement shall not be diminished or deemed to be waived by any inspections, tests or investigations made by Buyer, its employees, contractors and agents.

Section 6.3. Buyer's Representations and Warranties. Buyer expressly represents and warrants to Seller as follows:

6.3.1. Good Standing. Buyer is a limited partnership duly organized under the laws of the State of Tennessee, is qualified to transact business as a foreign limited partnership under the laws of the State of Washington.

6.3.2. Due Authority. Buyer has all requisite power and authority to execute and deliver this Agreement and to carry out its obligations hereunder and the transactions contemplated hereby. The documents contemplated hereby will be duly authorized by all necessary action on the Buyer's part. This Agreement has been, and the documents contemplated hereby will be, duly executed and delivered by Buyer and constitute its legal, valid and binding obligations enforceable against it in accordance with their terms, and the consummation and performance by Buyer of the transactions contemplated herein will not result in a violation of or be in conflict with or constitute a default under any term or provision of the organizational documents of Buyer, or any of the terms of provisions of any agreement or instrument to which it is a party, or by which it is bound, or of any term of any applicable law, ordinance, rule or regulation of any governmental authority or of any term of any applicable order, judgment or decree of any court, arbitrator or governmental authority.

6.3.3. Consents. No consent, approval, order or authorization of, or declaration or filing with any governmental authority on the part of Buyer is required in connection with the execution and delivery of this Agreement or for the performance of the transactions herein by Buyer, other than approval and/or consent required in connection with transfer of licenses and/or certificates of need to operate the Healthcare Facility.

## ARTICLE VII

### Seller's Deliveries

Section 7.1. Seller's Deliveries. Seller has delivered or will deliver to Buyer the following documents no later than ten (10) days following the execution hereof by all parties. At Seller's request, Buyer will provide a letter acknowledging receipt of all items already delivered to Buyer by Seller:

7.1.1. Insurance Policies. Copies of all Insurance Policies for the past two (2) years, showing no lapses in insurance or workmen's compensation during that period, and copies of all claims and settlements with respect thereto. Seller's liability and personal injury coverage has been on an "occurrence" basis during the two (2) year period prior to the Closing.

7.1.2. Operating Statements. Copies of all Operating Statements. Seller shall deliver to Buyer all Operating Statements prepared in the ordinary course of business and relating to periods prior to Closing, promptly upon preparation thereof.

7.1.3. Tax Bills. Copies of all Tax Bills or a tax search showing all tax bills. In the event that any taxes and assessments for the two (2) most current calendar years have been appealed, Seller shall provide Buyer with copies of all petitions for appeal and evidence of full payment of the cost of any such appeal, including attorney's fees.

7.1.4. Plans. Copies of all Plans, together with copies of any reports or studies (including inspection reports of governmental authorities or insurance carriers) with respect to the construction of the improvements or the physical condition or operation of the Healthcare Facility, and recommended capital improvements thereto, if applicable.

7.1.5. Service Agreements. Copies of all Service Agreements as provided in Section 6.1.9.

7.1.6. Governmental Approvals. Copies of all Governmental Approvals.

7.1.7. Operating Budgets. Copies of the operating and capital budgets for the Healthcare Facility for the current year and the next succeeding calendar year.

7.1.8. Warranties. Copies of all currently effective guarantees, warranties and other documents or instruments evidencing or relating to the Healthcare Facility, including, but not limited to, all warranties and guaranties of contractors, subcontractors, suppliers and materialmen received by Seller or the Healthcare Facility in connection with the construction of the Improvements and the acquisition of the Personal Property.

7.1.9. Termite Bonds. Copies of any termite bond or other warranty relating to pest control at the Healthcare Facility.

7.1.10. Schedule of Personal Property. A list of all Personal Property and Excluded Personal Property.

7.1.11. Litigation Schedule. A description of all pending or threatened litigation or proceeding, as described in Section 6.1.22 herein.

7.1.12. List of Employees and Compensation. A list of all employees of Seller, or any affiliate of Seller, engaged in the operation of the Healthcare Facility, and their respective compensation, as described in Section 6.1.13.

7.1.13. Union Contracts. Copies of all Union Contracts as described in Section 6.1.14.

7.1.14. Cost Reports. Copies of all Cost Reports as described in Section 6.1.6.

7.1.15. Deficiency Reports. All deficiency reports and plans of correction issued by any governmental entity having jurisdiction over the Healthcare Facility during the three (3) years prior to the date hereof.

7.1.16. Provider Agreements. All provider agreements in force with Medicare, Medicaid and any other third party payor.

7.1.17. Census Reports. Copies of all Census Reports as described in Section 6.1.7.

7.1.18. Surveys, Title Reports, Environmental Reports. Copies of all surveys, title reports and environmental reports prepared for, or furnished or available to, Seller relating to all or any part of the Healthcare Facility during the five (5) years prior to the date hereof.

7.1.19. Other Documents. Such other documents to be delivered to Buyer pursuant to this Agreement or attached as an Exhibit hereto.

# ARTICLE VIII

## Conditions Precedent to Closing

Section 8.1. Buyer's Conditions Precedent. It is understood and agreed by the parties hereto that the obligations of Buyer hereunder are expressly contingent upon the satisfaction on or before the date of the Closing, or such other date as herein provided, of all the conditions contained in this Agreement, including, but not limited to, each of the following:

8.1.1. Performance of Covenants. Seller shall have delivered to Buyer, or Buyer has received from the Title Company or the Surveyor, all of the items set forth in Articles V (Title; Survey) and VII (Seller's Deliveries) herein, and or included in any Exhibit attached hereto, and Seller shall have performed all of its covenants contained in this Agreement, including without limitation, its covenants contained in Article IX hereof.

8.1.2. Representations and Warranties. All representations and warranties made by Seller hereunder and/or incorporated in any Exhibit attached hereto, shall be true, complete and accurate as of the date hereof and as of the date of Closing with the same force and effect as though such representations and warranties had been made on and as of the date of Closing.

8.1.3. Approval of Information. On or before the Approval Date, or any other date set forth in this Agreement, Buyer shall have approved, in its sole discretion, the content of all the information delivered to Buyer pursuant to Articles V and VII, or attached as Exhibits hereto, and the results of any inspection, test or examination with respect to the Healthcare Facility performed by Buyer.

8.1.4. Engineering Inspection. On or before the Approval Date, inspection of the Healthcare Facility by an architect, engineer or other professional designated by Buyer (hereinafter *"Buyer's Representative"*), and review and approval by Buyer, in Buyer's sole discretion, of the reports issued by Buyer's Representative. The costs and fees of Buyer's Representative shall be borne by Buyer.

8.1.5. Operating Records. On or before the Approval Date, examination and approval of the operating and financial records of the Healthcare Facility by Buyer. Seller agrees to furnish Buyer with all documents and records requested in connection with said examination and review, including, but not limited to, the Operating Statements and the Service Agreements.

8.1.6. Appraisal or Fairness Opinion. On or before the Approval Date, Buyer shall obtain an appraisal or fairness opinion of a qualified independent appraiser or investment banker. The appraisal or fairness opinion will address the value of the Healthcare Facility as ongoing businesses as well as the value of the Real Property and Improvements. Seller agrees

to cooperate with such appraiser or investment banker and provide information as is reasonably requested by them.

8.1.7. Title Policy. At Closing, the Title Company shall be prepared to issue to Buyer the Owner's Policy of Title Insurance referred to in Section 9.1.2 herein.

8.1.8. Opinions. The Seller shall have provided to the Buyer the opinions referred to in Section 9.3 herein, dated as of the Closing, which shall be satisfactory in form and substance to Buyer and Buyer's counsel.

8.1.9. Non-Foreign Affidavit. At Closing, Seller shall have delivered to Buyer the Affidavit described in Section 9.1.9 herein.

8.1.10. Site Assessment Report. On or before the Approval Date, approval by Buyer of a Phase I environmental report satisfactory in form and content to Buyer, and prepared at Buyer's expense by a qualified consulting firm or engineer approved by Buyer, stating that there is no evidence of any adverse environmental condition relating to the Healthcare Facility.

8.1.11. No Material Adverse Change. Subsequent to the applicable effective date of all matters represented to Buyer, or furnished or provided to Buyer, as set forth herein, neither the Seller nor the Healthcare Facility shall have incurred or suffered any change in its financial condition, business, operations, property or assets which materially and adversely affect the business conducted at the Healthcare Facility.

8.1.12. Termite Inspection Report. On or before the Approval Date, Buyer shall have obtained, at Buyer's expense, an inspection report from a licensed pest control company stating that the Healthcare Facility is free of infestation or damage by termites or other insects.

8.1.13. Buyer's Approvals. On or before the Closing, Buyer shall have obtained all necessary licenses and approvals from state, federal, and local authorities to the acquisition of the Healthcare Facility by Buyer, its agent or lessee, and the operation by such parties of the Healthcare Facility. Such approvals shall not place restrictions on the operation of the Healthcare Facility by Buyer, or Buyer's agent or lessee, which are deemed unacceptable by Buyer, in Buyer's sole discretion. Seller shall cooperate with Buyer in obtaining such approvals.

Section 8.2. Buyer's Waiver. Buyer may, at any time or times on or before the date of the Closing, at its election, waive any of the foregoing conditions in writing, and Buyer's consent to the Closing pursuant to this Agreement shall waive all such conditions, except as expressly reserved in writing on the date of the Closing, or otherwise agreed herein to survive the Closing.

Section 8.3. [Section Omitted]

Section 8.4. Buyer's Termination. In the event that the foregoing conditions or any other conditions of this Agreement which are for the benefit of the Buyer are not satisfied on or before the respective date specified, or waived pursuant to Section 8.2 above, Buyer shall have the option, in its sole discretion, to either (a) terminate this Agreement, by giving written notice to the Seller or (b) to extend the date of the Closing for a period not exceeding ten (10) days after Seller receives written notice from Buyer of the existence of such defects, in order to permit the Seller to cure them. If, on or before the expiration of said ten (10) day period, Seller has been unable to cure any such condition to the satisfaction of Buyer and Buyer's counsel, Buyer shall, in its own discretion either (a) waive such condition and proceed with the Closing, (b) grant an additional 10 day extension of the date of Closing if it is within its control to do so, or (c) terminate this Agreement, whereupon this Agreement shall be null and void and the parties hereto shall have no further obligations or recourse against each other except as may be expressly set forth in this Agreement.

Section 8.5. Seller's Conditions Precedent. It is understood and agreed that the obligations of the Seller hereunder are expressly contingent upon the satisfaction on or before the date of the Closing or such other date as herein provided, on the following conditions:

8.5.1. Performance of Covenants. Buyer shall have performed all of its covenants contained in this Agreement, including without limitation, its covenants contained in Article IX hereof.

8.5.2. Representations and Warranties. All representations and warranties made by the Buyer hereunder shall be true, complete and accurate as of the date hereof and as of the Closing, with the same force and effect as though such representations and warranties had been made on and as of the date of Closing.

Section 8.6. Seller's Waiver. Seller may, at any time or times on or before the date of the Closing, at its election, waive any of the foregoing conditions in writing, and Seller's consent to the Closing pursuant to this Agreement shall waive all such conditions, except as expressly reserved in writing on the date of the Closing, or otherwise agreed herein to survive the Closing.

ARTICLE IX

Title, Conveyance, Etc.

Section 9.1. Closing. At Closing, and upon performance and satisfaction of the conditions for Closing, each of the parties shall take such actions and execute and deliver to the other such documents, instruments, opinions and agreements as may be required pursuant to the terms hereof, including, but not limited to, the following:

9.1.1. Title to the Property. Fee simple title to the Real Property and Improvements shall be good and marketable of record and in fact and free and clear of any and all liens, conditional sales agreements, covenants, conditions, mortgages, security

interests, leases, restrictions, easements, options, claims, unrecorded agreements, or other encumbrances and title exceptions of any kind whatsoever other than the exceptions to title shown on the Title Commitment and approved by Buyer pursuant to Article V above, and shall be conveyed to Buyer by general warranty deed, the form and content of which shall be reasonably approved by Buyer and Buyer's counsel, and which shall be recorded at Closing.

9.1.2. Owner's Policy of Title Insurance. Upon Closing, Buyer shall be furnished an Owner's Policy of Title Insurance on a standard ALTA-1984 Form B (extended coverage) insurance policy form (or such other form as may be required in the State of Rhode Island) in the amount of the Purchase Price and issued by the Title Company, which shall insure good and clear, fee simple title to the Real Property and Improvements and all rights and appurtenances thereto in Buyer, without exception for matters of survey and subject only to such other matters as shall have been shown as exceptions on the Title Commitment and approved by Buyer pursuant to Article V above. Said Policy shall delete all general exceptions to the extent such exceptions may be deleted by the Title Company in the jurisdiction in which the Healthcare Facility is located, and shall contain such endorsements as Buyer may reasonably require, including, without limitation, a zoning endorsement if available, affirmative endorsements insuring that there are no violations of any restrictive covenants affecting the Real Property and Improvement and that any easements shown on Schedule B of the Policy do not interfere with the use and enjoyment of the Healthcare Facility as a nursing home.

9.1.3. Governmental Approvals. Seller shall deliver to Buyer the originals of all Governmental Approvals in the possession of Seller, including, without limitation, nursing home licenses, the building permits and the final certificates of occupancy for the Improvements issued by the appropriate governmental authority. In the event delivery of an original is impossible because such original is required to be posted at the Healthcare Facility, or held by the Cities or Towns in which the Healthcare Facility is located, delivery of an exact duplicate shall be permitted, or other evidence, reasonably satisfactory to Buyer, that such permits have been obtained and are in full force and effect.

9.1.4. Assignment of Warranties. Seller shall deliver to Buyer the originals of all currently effective warranties and guarantees of contractors, subcontractors, suppliers and materialmen received by Seller in connection with the Improvements and the acquisition of the Personal Property. Seller shall execute and deliver to Buyer at the Closing an Assignment of Warranties, in form and content satisfactory to Buyer, assigning to Buyer such warranties and guarantees. At Buyer's request, Seller shall obtain acknowledgments from those subcontractors and suppliers issuing such warranties that Buyer shall have the right to enforce the same with the same force and effect as if originally extended to Buyer.

9.1.5. Assignment of Service Agreements. Seller shall execute and deliver to Buyer an assignment, in form and content satisfactory to Buyer, assigning to Buyer those Service Agreements listed in Exhibit C which are assignable, and which Buyer agrees to

assume. Seller shall terminate as of the Closing, those Service Agreements designated in writing by Buyer to be so terminated.

9.1.6. Personal Property. Seller shall execute and deliver to Buyer a Bill of Sale containing general warranties of title, and otherwise in form and content satisfactory to Buyer regarding the furnishings and other Personal Property described on Exhibit B attached hereto. Said Personal Property shall be free of Encumbrances, except for any Assumed Obligations pertaining thereto.

9.1.7. Assignment of Trade Names. Seller shall execute and deliver to Buyer any documents that Buyer may reasonably request in order to transfer to Buyer any and all rights which Seller has to the use of the trade name *"Cherry Hill Manor"* it being understood, however, that Buyer shall be under no obligation to use such names in connection with the Healthcare Facility.

9.1.8. Notice of Rate Increase. On or after the Approval Date, Buyer may, by written notice and at its sole option, cause Seller to give proper notice on behalf of Buyer of an increase in private pay daily rates to the patients of the Healthcare Facility to be effective as of the date of the Closing, provided that all contingencies have been met or waived.

9.1.9. Non-Foreign Affidavit. Seller shall execute and deliver to Buyer and Buyer's counsel a non-foreign affidavit as required by the Foreign Investment and Real Property Tax Act, IRC Section 1445(b)(2), as amended, in form and substance satisfactory to Buyer and Buyer's counsel.

9.1.10. UCC Certificates. Seller shall deliver to Buyer certificates from the Secretary of State of Rhode Island, the City and/or County where the Healthcare Facility is located, and any other jurisdictions reasonably requested by Buyer, indicating that, as of Closing, there are no filings against Seller under the Uniform Commercial Code in effect in the State of Rhode Island, or in such other jurisdiction, which would be a lien on the Personal Property, other than any Assumed Obligations pertaining thereto.

9.1.11 Census Report. Seller shall deliver to Buyer a Census Report dated the date of Closing.

9.1.12. Other Agreements. The parties shall execute and deliver all other agreements specified herein or otherwise reasonably required to consummate the transaction contemplated by this Agreement, including but not limited to, assignments, affidavits, settlement statements and non-competition agreements, all as more fully set forth herein.

Section 9.2. Prorations. The following shall be prorated and adjusted between Seller and Buyer as of the day of Closing, except as otherwise specified:

9.2.1. Utilities. Water, electricity, sewer, gas, telephone and other utility charges, based, to the extent practicable, on final meter readings and invoices covering the period of time prior to the Closing.

9.2.2. Taxes. Accrued general real estate, personal property and valorem taxes for the current year shall be prorated on the basis of bills, if available prior to Closing. If such bills are not available, then such taxes shall be prorated on the basis of 100% of the most recent ascertainable taxes for the Healthcare Facility and promptly reprorated upon the issuance of final bills thereof, and any amounts due from one party to the other shall be paid in cash at that time. Prior to or at Closing, Seller shall pay or have paid all bills which are due and payable prior to Closing and shall furnish evidence of such payment to Buyer and the Title Company.

9.2.3. Special Assessments. All improvement lien assessments, if any, whether or not due and payable as of the date of Closing, shall be paid in full by Seller. Special assessments, whether pending or to become a lien prior to Closing, or not payable in installments, or for which a change of assessment may be levied on Buyer after Closing, shall be credited to Buyer.

9.2.4. Payroll. Payroll, F.I.C.A., accrued vacation and sick pay, any employee benefits and employee-related taxes for the period prior to Closing shall be paid in full or credited to Buyer by Seller, without contribution or proration from Buyer, at Buyer's election.

9.2.5. Security Deposits. Seller will at Closing transfer and assign to Buyer all patient security deposits and other patient funds then held by it and indemnify and hold Buyer harmless from all claims arising out of or resulting from Seller's failure to maintain or otherwise comply with applicable agreements and/or laws relating to patient security deposits and other funds prior to Closing. Buyer shall indemnify and hold Seller harmless for all claims arising out of or resulting from Buyer's failure to maintain or otherwise comply with applicable agreements and/or laws relating to patient security deposits and other funds following Closing.

9.2.6. Accounts Payable and Receivable. Seller shall pay all trade accounts payable accruing prior to or at the Closing which shall have arisen from the operation of the Healthcare Facility prior to Closing. Seller shall notify all vendors in writing that deliveries made before the Closing shall be paid by Seller and deliveries after the Closing shall be paid by Buyer. Buyer shall approve the form of notice. Seller will provide to Buyer at the Closing accurate lists of accounts payable which shall be paid by Seller at Closing. Seller shall retain all accounts receivable accruing prior to the Closing, including Medicaid reimbursements. Seller shall be responsible for collecting all Seller's accounts receivable. All payments received by the Healthcare Facility shall be first applied to the current charges of the residents, unless the payor source specifically indicates that such payment is to be applied to another period. All Social Security checks received by residents of the Healthcare Facility on or after

the Closing shall be applied to amounts due Buyer from such residents, unless such checks specifically apply to a period prior to Closing.

9.2.7. Closing Costs. Buyer shall pay the costs of the Survey, the termite inspection, the appraisal, the Site Assessment Report, the Title Policy, and Buyer's legal fees. Seller shall pay for the cost of recording the deed and all taxes due in connection therewith, any taxes due in connection with the transfer of the Personal Property, the UCC searches, and Seller's legal fees. The closing fee of the Title Company shall be paid equally by Buyer and Seller.

For purposes of calculating prorations, except as set forth herein, Buyer shall be deemed to be entitled to the Healthcare Facility, and, therefore, entitled to the income therefrom and responsible for the expenses thereof for the entire day upon which the Effective Date occurs. All such prorations shall be made on the basis of the actual number of days of the year and month which shall have elapsed as of the day of the Effective Date. The amount of such prorations shall be adjusted in cash after Closing, as and when complete and accurate information becomes available. Seller and Buyer agree to cooperate and use their best efforts to make such adjustments no later than sixty (60) days after Closing. Except as set forth herein, all items of income and expense for the period prior to the Effective Date will be for the account of Seller and all items of income and expense for the period on and after the Effective Date will be for the account of Buyer, all as determined by the accrual method of accounting.

Section 9.3. Opinions of Seller's Counsel. Seller shall deliver to Buyer at Closing the following opinions of Seller counsel, subject to reasonable and customary qualifications:

9.3.1. Due Authority; Enforceability. That (i) Seller has been authorized to enter into this Agreement and to perform Seller's obligations hereunder; (ii) the signatories hereunder and the signatories to all documents required to be executed by Seller have the authority to bind Seller; (iii) this Agreement is valid, binding and enforceable against the Seller in accordance with its terms; (iv) Seller is a limited partnership organized and in good standing under the laws of the State of Rhode Island, and has all requisite right, power and authority to enter into this Agreement and perform its obligations hereunder, (v) after reasonable investigation, Seller's counsel have no actual knowledge of any authorization, consent, approval, license, exemption of or filing or registration with any court or government deportment, commission, board, bureau, agency or other instrumentality of the United States, the State of Rhode Island or any city or town therein which is or will be necessary to the valid execution, delivery or performance by the Seller of this Agreement; and (vi) Seller's counsel have no actual knowledge, after reasonable investigation, of any pending or threatened litigation, claims or proceedings against Seller or the Healthcare Facility, that, if determined adversely, would have a material adverse effect on the Seller, the Healthcare Facility or the assets associated with any of them.

9.3.2. Zoning, Environmental. To Seller's counsel's knowledge, after due inquiry, that the construction, use and operation of the Healthcare Facility as a 172 bed nursing home

has been authorized by and is in substantial compliance with (i) all zoning and land use regulations including without limitation, provisions as to use, dimensional and parking requirements; (ii) all applicable building, fire, health codes, and similar statutes, rules, regulations, and ordinances, and (iii) all federal, state, county and municipal environmental protection statutes, ordinances, rules and regulations.

9.3.3. Compliance with Nursing Home Regulations. That the Seller and/or the Healthcare Facility (1) holds a valid nursing home license to operate a nursing home under the laws of the State of Rhode Island; (2) holds a valid Medicare provider agreement; (3) holds a valid Medicaid provider agreement; (4) is currently in substantial compliance with all applicable state and federal laws and regulations regarding the operation of nursing homes; (5) is not subject to any threatened or ongoing audit, compliance review, consent decree, judgment, investigation or proceeding related to any alleged violation of any laws or regulations regarding the operation or reimbursement of nursing homes or any labor safety regulations, or any environmental codes or regulations; and (6) is not a "poor performing facility", as defined under applicable regulations of the Health Care Finance Administration.

9.3.4. Other Matters. That relate to such other matters as Buyer and its counsel reasonably may require.

## ARTICLE X

### Obligations of the Seller

Section 10.1. Operation of the Healthcare Facilities. From the date hereof until the Closing, Seller shall not take any of the following actions without the express written consent of Buyer: (i) make or permit to be made any material alterations to or upon the Healthcare Facility (except as otherwise required herein); (ii) remove or permit the removal from the Healthcare Facility of any fixtures, mechanical equipment, or any other item included in the Healthcare Facility; (iii) reduce the quality of Improvements, services and maintenance, or materially reduce the number of employees currently employed to service, maintain and secure the building; (iv) other than in the ordinary course of business, modify or agree to any material modification of any of the terms or conditions of the Service Agreements, or any other agreements with respect to the Healthcare Facility, copies of which have been delivered to Buyer; or (v) transfer any residents to any other nursing home owned, operated or managed by Seller or any affiliate thereof.

Section 10.2. Service Agreements. Seller agrees not to enter into any service Agreements or similar agreements prior to the Closing which shall survive the Closing or which are not terminable upon sixty (60) days' prior written notice without penalty or termination charge.

Section 10.3. Insurance Policies. Seller shall, at its own expense, keep and maintain in full force and effect through the Closing, a policy or policies of professional liability insurance with respect to the Healthcare Facility, all risk insurance covering the Healthcare Facility, fixtures and

personal property from time to time on the Healthcare Facility, against loss or damage by fire, vandalism, malicious mischief, lightning, windstorm, water, contingent liability and other insurable perils in amounts not less than those in force as of the date hereof. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed. In addition, if Seller maintains its professional liability insurance as a claims made basis, Seller shall purchase a reporting endorsement with limits of $1,000,000 per claim and $3,000,000 annual aggregate covering Seller for professional, medical and nursing liability, and naming Buyer as an additional named insured.

Section 10.4. Performance of Seller's Obligations. Seller, shall operate and manage the Healthcare Facility in a first class manner at all times prior to Closing, retain all residents in the normal course of events, retain its present employees and agents (without changes in compensation or benefits from the date of this Agreement except with the prior written approval of Buyer or in accordance with existing personnel policies), and preserve the goodwill of the persons and firms having business relations with it. Seller shall maintain present service, maintain the Healthcare Facility in as good condition as on the date of Buyer's inspection, shall keep on hand sufficient materials, supplies, equipment and other personal property for the efficient operation and management of the Healthcare Facility in a first class manner, and shall perform when due all of Seller's obligations under the Service Agreements, Governmental Approvals and other agreements relating to the Healthcare Facility, and otherwise in accordance with applicable laws, ordinances, rules and regulations affecting the Healthcare Facility.

Section 10.5. Inventories. As of the date of Closing, inventories of food, medicine, and supplies shall not be less, in quantity or value, than the normal operating levels of the Healthcare Facility, and in any event adequate for fifteen (15) days of operation. The administrator of the Healthcare Facility shall perform an inventory as of the week of the Closing, and make a report thereon to Buyer.

Section 10.6. Encumbrances. After the date hereof and prior to Closing, no part of the Healthcare Facility, or any interest therein, will be alienated, liened, encumbered or otherwise transferred, without Buyer's prior written consent.

Section 10.7. Condition of Healthcare Facilities. Upon the Closing, possession to the Healthcare Facility shall be delivered in a structurally sound and in fully operational condition. If at Closing any portion of the Healthcare Facility shall not be in the aforesaid condition, Seller shall pay to, or credit to, Buyer as a cash adjustment the cost of restoring the Healthcare Facility to such condition, at Buyer's election.

Section 10.8. Change in Condition. At or prior to Closing, Seller shall promptly notify Buyer of any change in any condition with respect to the Healthcare Facility or of any event or circumstance which makes any representation or warranty of Seller to Buyer under this Agreement untrue or misleading, or any covenant of Seller under this Agreement incapable or materially less likely of being performed, it being understood that the Seller's obligation to provide notice to Buyer under this Section shall in no way relieve Seller of any liability for a breach by Seller of any of its representations, warranties or covenants under this Agreement.

Section 10.9. Access to the Healthcare Facility. At all reasonable times prior to Closing, Buyer, its employees, agents and representatives, shall be entitled to (i) enter onto the Real Property on reasonable notice to Seller to perform inspections and tests of the Healthcare Facility, and all systems within the Improvements; and (ii) examine and copy any and all books and records maintained by Seller or its agents relating to the Healthcare Facility. All inspections and reviews shall be coordinated with Seller and be subject to Seller's prior approval, which shall not unreasonably be withheld or delayed.

Section 10.10. Covenant Not to Compete. As an inducement to the Buyer entering this Agreement, Seller hereby agrees to execute at Closing a noncompetition agreement in the form attached hereto as Exhibit L, and to cause Richard Pisaturo and Elena Pisaturo, who are principals of Seller, to also execute such noncompetition agreements in the form attached hereto as Exhibit M.

Section 10.11. Post-Closing Filings. Seller shall file all Cost Reports and any other filings required for Medicare, Medicaid or other payors due after Closing in a timely and complete fashion, and shall provide Buyer prompt notice of such filing. Should any payment due Buyer or the Healthcare Facility be offset, withheld or delayed by such payment source due in whole or in part to Seller's failure to file accurate and complete Cost Reports, or to any other adjustments relating to the period prior to Closing, then Buyer may withhold or offset any payment due Seller, or any affiliate thereof or related party thereto, under any obligation owned any such person or entity, until receipt of such funds from the payment source, or Buyer may pursue any other remedy available to it at law or in equity, all in its sole discretion.

## ARTICLE XI

## Damage, Destruction or Condemnation

Section 11.1. Fire or Casualty. Risk of loss to the Healthcare Facility from fire or other casualty shall be borne by Seller until Closing. If the Healthcare Facility, or any portion thereof, is damaged or destroyed by fire or other casualty prior to the Closing and, after Seller's reasonable best efforts to restore, the Healthcare Facility is not substantially restored by the Closing date established by Article IV above, Buyer may (a) elect to proceed with the transaction contemplated herein, in which event the Purchase Price shall be reduced by the cost of such repairs (as estimated by Buyer's experts), and Seller shall be entitled to such insurance as is paid on the claim of loss; or (b) elect to terminate this Agreement, in which event this Agreement shall be deemed null and void and the parties hereto shall have no further obligations to or recourse against each other. If Buyer elects to terminate this Agreement, it shall notify Seller in writing within thirty (30) days after Buyer has received written notice of such damage or destruction from Seller.

Section 11.2. Condemnation. In the event that all or any portion of the Healthcare Facility becomes the subject of a condemnation proceeding or threat thereof by a public or quasi-public authority having the power of eminent domain prior to the Closing, Seller shall immediately notify Buyer thereof in writing and Buyer may (a) elect to proceed with the transaction contemplated herein,

in which event Buyer shall be entitled to receive all proceeds of any award or payment in lieu thereof resulting from such proceedings or threat thereof, or (b) elect to terminate this Agreement, in which event this Agreement shall be null and void and the parties hereto shall have no further obligations to or recourse against each other. If Buyer elects to terminate this Agreement, it shall so notify Seller within thirty (30) days after Buyer has received written notice of such proceedings from Seller.

## ARTICLE XII

## Brokers

Section 12.1 Brokers. Seller and Buyer hereby represent to the other that neither has discussed this Agreement or the subject matter thereof with any broker or salesman so as to create any legal right in any such broker or salesman to claim a commission or similar fee with respect to the purchase or sale of the Healthcare Facility contemplated by this Agreement. Buyer and Seller hereby indemnify each other against and agree to defend and hold the other harmless from any and all claims for any commission or similar fees arising out of or in any way connected with any claimed agency relationship with the indemnitor and relating to the purchase and sale of the Healthcare Facility contemplated by this Agreement.

## ARTICLE XIII

## Notices

Section 13.1. Notices. All notices, consents, approvals and other communications provided for herein or given in connection herewith shall be validly given, made, delivered or served if in writing and delivered personally or sent by registered, certified mail, or receipted overnight service, postage prepaid to:

| | |
|---|---|
| BUYER AT: | Cherry Hill Medical Investors Limited Partnership<br>3570 Keith Street, N.W.<br>Cleveland, Tennessee 37312<br>ATTENTION: General Partner |
| WITH COPY TO: | Life Care Centers of America, Inc.<br>3570 Keith Street, N.W.<br>Cleveland, Tennessee 37312<br>ATTENTION: General Counsel |

| | |
|---|---|
| SELLER AT: | Cherry Hill Nursing Home, Ltd.<br>2 Cherry Hill Road<br>Johnson, Rhode Island 02919<br>Attention: Richard Pisaturo |
| WITH COPY TO: | Edward P. Manning, Esquire<br>1500 Hospital Trust Tower<br>Providence, Rhode Island 02903 |

or to such other addresses as either party hereto may from time to time designate in writing and deliver in a like manner.

Notices, consents, approvals and communications given by mail shall be deemed delivered upon the earlier of receipt or three (3) days after deposit in the United States mail in the manner provided above.

ARTICLE XIV

Remedies

Section 14.1. Remedies Upon Default. The Buyer shall fully perform and comply with all agreements, conditions and covenants required by this Agreement to be performed or complied with hereunder, provided the Seller may waive in writing in whole or in part at or prior to the Closing the Buyer's performance of and compliance with any such agreement, condition or covenant. If the purchase and sale of the Healthcare Facility pursuant hereto is not closed and consummated through the default of the Buyer hereunder, the Seller shall receive Fifty Thousand Dollars ($50,000.00) as liquidated damages, which sum shall be held in escrow with the Title Company as earnest money, and shall be Seller's sole remedy at law and equity, Seller hereby waiving and relinquishing any and all other remedies available to it. Interest on said escrow shall accrue to Buyer.

The Seller shall fully perform and comply with all agreements, conditions, and covenants required by this Agreement to be performed or complied with by the Seller hereunder, provided, the Buyer may expressly waive in writing in whole or in part at or prior to the Closing date the Seller's performance or any compliance with such agreements, conditions, and covenants. If the purchase and sale of the Healthcare Facility pursuant hereto is not closed and consummated through the default of the Seller hereunder, the Buyer shall have the right to pursue such remedies at law or in equity against the Seller as maybe afforded to it under the law of the State of Rhode Island, including, without limitation, specific performance.

Section 14.2. Attorney's Fees. In the event either party hereto finds it necessary to bring an action at law or other proceeding against the other party to enforce any of the terms, covenants or conditions hereof or any instrument executed in pursuance of this Agreement, or by reason of any

breach or default hereunder or thereunder, the party prevailing in any such action or proceeding and any appeal thereupon shall be paid all costs and reasonable attorney's fees by the other party, and in the event any judgment is secured by such prevailing party, all such costs and attorney's fees shall be included in any such judgment, attorney's fees to be set by the court and not by the jury.

Section 14.3. Waiver. No delay in exercising any right or remedy shall constitute a waiver thereof, and no waiver by Seller or Buyer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

ARTICLE XV

General

Section 15.1. Time. Time is of the essence in the performance of the respective obligations of the parties contained in this Agreement.

Section 15.2. Successors and Assigns. Except as herein otherwise provided, this Agreement and all of the terms and provisions hereof shall inure to the benefit of and be binding upon the heirs, executors, personal representations and successors of the parties hereto. Seller may not assign this Agreement without Buyer's written consent.

Section 15.3. Entire Agreement. This Agreement, together with the Exhibits hereto, represents the entire agreement between the parties covering everything agreed upon or understood in this transaction. There are no oral promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof or in effect between the parties, except as may otherwise be provided herein. No change or addition is to be made to this Agreement except by a written agreement executed by the parties.

Section 15.4. Choice of Law. This Agreement and the rights of the parties hereto shall be governed and construed in accordance with the laws of the State of Rhode Island, without regard to conflict of laws.

Section 15.5. Indemnity. The Seller hereby agrees to indemnify the Buyer and its successors, assigns, affiliates, directors, officers, employees and partners of any of them, and hold each of them harmless from any and all claims, liabilities, damages, and penalties and any and all loss, cost, or expense incurred by the Buyer incident to, resulting from, or in any way arising out of, the ownership or operation of the Healthcare Facility prior to the Closing, or from any breach of any of the representations, warranties, covenants or agreements made or to be performed by Seller pursuant to this Agreement. The Buyer hereby agrees to indemnify the Seller and its successors, assigns, affiliates, directors, officers, employees and partners of any of them and hold each of them harmless from any and all claims, liabilities, damages, and penalties and any and all loss, costs, or expense incurred by the Seller incident to, resulting from, or in any way arising out of, the ownership or

operation of the Healthcare Facility after Closing, or from any breach of any of the representations, warranties, covenants or agreements made or to be performed by Buyer pursuant to this Agreement. Each of the parties hereto further agrees, upon notice from the other, to contest any demand, claim, suit, or action against which each party has hereinabove agreed to indemnify and hold the other party harmless, and to defend any action that may be brought in connection with any such demand, claim, suit, or action, or with respect to which each party has hereinabove agreed to hold the other party harmless, and to bear all costs and expenses of such contest and defense.

Section 15.6. Scope of Agreement. It is not intended by this Agreement to, and nothing contained in this Agreement shall, create any partnership, joint venture or other arrangement between Buyer and Seller.

Section 15.7. Survival of Obligations, Representations, and Warranties. All provisions herein and all obligations of Seller and Buyer pursuant to this Agreement, which are to be performed or which apply to circumstances subsequent to the Closing, shall survive the Closing and shall not be merged into any instrument of conveyance delivered at Closing. All representations and warranties contained in this Agreement (and in any certificate or other instrument delivered by or on behalf of any party pursuant hereto or in connection with the transactions contemplated hereby) are true in all material respects on and as of the date so made, will be true in all material respects on and as of the date on which the transaction(s) contemplated hereby are closed and will survive the Closing.

Section 15.8. Assignment By Buyer. Buyer may assign this Agreement and/or designate a nominee to take title to the Healthcare Facility at Closing, provided such assignee is an affiliate of Buyer. In the event of an assignment by Buyer, the assignor shall be released from any and all of its obligations hereunder, provided that the assignee of such rights agrees to be fully bound by the terms and conditions of this Agreement as if said assignee were the original signatory hereto.

Section 15.9. [Section Omitted]

Section 15.10. [Section Omitted]

Section 15.11. Due Authority. The parties signing below represent that they have the requisite authority to bind the entities on whose behalf they are signing.

Section 15.12. Headings. The descriptive headings of the Articles of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 15.13. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 15.14. Further Assurances. Whenever and so often as requested by a party hereto, the other party will promptly execute and deliver or cause to be executed and delivered all such other

and further instruments, documents or assurances, and promptly do or cause to be done all such other and further things as may be necessary and reasonably required in order to further and more fully vest in such party all rights, interest, powers, benefits, privileges and advantages conferred or intended to be conferred upon it by this Agreement

Section 15.15. Construction. The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretations of this Agreement or any amendments or exhibits hereto.

Section 15.16. Exhibits. All the exhibits attached hereto are made a part of this Agreement and the terms thereof are incorporated into this Agreement by reference.

# LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Real Property |
| Exhibit B | Personal Property |
| Exhibit B-1 | Excluded Personal Property |
| Exhibit C | Service Agreements |
| Exhibit D | Schedule of Employees and Compensation |
| Exhibit E | Operating Statements |
| Exhibit F | Census Report |
| Exhibit G | Litigation Schedule |
| Exhibit H | [OMITTED] |
| Exhibit I | Union Contracts, Grievances |
| Exhibit J | Encumbrances on Purchased Assets |
| Exhibit K | Compliance - Governmental Authorizations |
| Exhibit L | Noncompetition Agreement - Seller |
| Exhibit M | Noncompetition Agreement - Individuals |

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or representatives as of the day and year first written above.

BUYER:

**Cherry Hill Medical Investors Limited Partnership**

By: Developers Investment Company, Inc., its corporate general partner

By: ______________________
John P. O'Brien, Jr.
Vice President

SELLER:

**Cherry Hill Nursing Home, Ltd.**

By: ______________________

Its: ______________________

EXHIBIT L

## NONCOMPETITION AND CONFIDENTIALITY AGREEMENT

THIS NONCOMPETITION AND CONFIDENTIALITY AGREEMENT (the *"Agreement"*), dated to be effective as of ______________, 1996 , is by and between **Cherry Hill Medical Investors Limited Partnership**, a Tennessee limited partnership (*"Purchaser"*), and **Cherry Hill Nursing Home, Ltd.**, a __________________ limited partnership (*"Seller"*).

WHEREAS, simultaneously herewith, Purchaser is purchasing certain assets from Seller pursuant to that certain Agreement of Purchase and Sale, dated as of __________, 1996 (the *"Purchase Agreement"*), which assets are used as part of the Cherry Hill Manor nursing home, located in Johnson, Rhode Island (the *"Healthcare Facility"*); and

WHEREAS, in order to protect the Purchaser's acquisition of the assets of Seller and the goodwill associated therewith, the parties agree that Seller should refrain from engaging in certain businesses that compete with the business to be conducted by the Purchaser, all on the terms and conditions contained herein;

NOW THEREFORE, in consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representations and warranties contained herein, the parties do hereby agree as follows:

**Section 1. Noncompetition and Confidentiality.**

(a) In consideration for the payments set forth in Section 2 hereof, and for other good and valuable consideration, the receipt and adequacy of which is here acknowledged, Seller agrees that for a period of three (3) years from the date hereof (the *"Covenant Period"*);

(i) Seller will not, without the prior written consent of Purchaser in each instance, participate or engage, directly or indirectly, in any location within a twenty-five (25) mile radius of the Healthcare Facility, in the ownership, management, operation, or control of, or be connected as a partner, investor, lender or otherwise, with, or have any financial interest in, or aid or assist anyone else in the conduct of any of the business described on Schedule I hereto in competition with Purchaser.

(ii) Seller will not, directly or indirectly, employ, offer to employ, recruit, solicit, entice away, or in any other manner persuade or attempt to persuade

any employee of Purchaser or any person who, at any time during the twelve (12) months preceding the date in question, was an employee or customer of Purchaser, to discontinue the relationship with Purchaser.

(iii) Seller will hold and keep confidential all Confidential Information (as defined below) to which Seller, at any time shall have become informed, and that it will not, directly or indirectly, disclose any Confidential Information to any person, firm, corporation or entity, or use the same, or permit the same to be disclosed or used. "Confidential Information" as used herein means proprietary information directly relating to Seller or developed exclusively by Seller or developed for the exclusive use of Seller and may include, without limitation, the following types of information regarding Seller existing as of the date hereof: corporate information, including Healthcare Facility information, plans, strategies, tactics, or policies; marketing information, including strategies, tactics, methods, resident or patient lists, prospects, or market research data; operational information, including trade secrets; and technical information, including designs, drawings and specifications. Confidential Information is limited to that information which is not generally known to the public (other than as a result of unauthorized disclosure by Seller) or within the industry of which the businesses described in Schedule I are a part or that information which was not developed by or on behalf of Seller or any affiliate thereof.

(b) Seller understands and acknowledges that compliance with this Agreement is necessary to protect the business, goodwill, and proprietary interests of Purchaser and recognizes that irreparable injury will result to Purchaser, its business and property, in the event of a breach of this Agreement. Accordingly, Seller agrees that Purchaser will be entitled, in addition to any other remedies and damages available, to an injunction to restrain the violation of the terms of this Agreement.

**Section 2. Direct Cash Payments.**

In consideration for the agreement set forth in Section 1, Seller will be entitled to receive ______________ Dollars ($________) from Purchaser, payable in cash, or by certified or cashier's check or wire transfer, at Closing.

In the event Seller breaches this Agreement during the Covenant Period, Purchaser may institute an action to recover any amounts previously paid under this Agreement.

**Section 3. Reasonableness: Severability.**

Seller acknowledges and agrees that the restrictions placed on it and the rights and remedies conferred on Purchaser are reasonable in time, scope, and territory and are fully required to protect the legitimate business interests of Purchaser without a disproportionate detriment to Seller. If any

provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair, or invalidate the remainder of this Agreement, but shall be confined in its operation to the provision of this Agreement directly involved in the controversy in which such judgment shall have been rendered.

**Section 4. Miscellaneous.**

This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Rhode Island (without regard to the conflicts of laws principles thereof). This Agreement embodies the entire agreement and understanding between Purchaser and Seller with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and relating to the subject matter hereof. This Agreement may not be modified or amended or any term or provision hereof waived or discharged except in writing signed by the party against whom such amendment, modification, waiver, or discharge is sought to be enforced. All of the terms of this Agreement, whether so expressed or not, shall be binding upon the successors and assigns of the parties hereto and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement to be effective as of the date first above written.

PURCHASER

**Cherry Hill Medical Investors Limited Partnership**

By: Developers Investment Company, Inc., a general partner

By: John P. O'Brien, Jr.

Title: Vice President

SELLER

**Cherry Hill Nursing Home, Ltd.**

By: Edward J. Watson

Title: General Partner

EXHIBIT M

## NONCOMPETITION AND CONFIDENTIALITY AGREEMENT

THIS NONCOMPETITION AND CONFIDENTIALITY AGREEMENT (the *"Agreement"*), dated to be effective as of __________, 1996 , is by and between **Cherry Hill Medical Investors Limited Partnership**, a Tennessee limited partnership (*"Purchaser"*), and __________________, an individual residing in the State of ________________ (*"Principal"*).

WHEREAS, simultaneously herewith, Purchaser is purchasing certain assets from Cherry Hill Nursing Home, Ltd. (*"Seller"*), pursuant to that certain Agreement of Purchase and Sale, dated as of _____________, 1996 (the *"Purchase Agreement"*), which assets are used as part of the Cherry Hill Manor nursing home located in Johnson, Rhode Island (the *"Healthcare Facility"*); and

WHEREAS, Principal, as one of the controlling officers or partners of Seller, will benefit from the sale by Seller to Purchaser, and has acquired certain confidential information with respect to the business conducted by the Seller; and

WHEREAS, in order to protect the Purchaser's acquisition of the assets of Seller and the goodwill associated therewith, the parties agree that Principal should refrain from engaging in certain businesses that compete with the business to be conducted by the Purchaser, all on the terms and conditions contained herein;

NOW THEREFORE, in consideration of the covenants, warranties, and mutual agreements herein set forth, and in reliance upon the representations and warranties contained herein, the parties do hereby agree as follows:

**Section 1. Noncompetition and Confidentiality.**

(a) In consideration for the payments set forth in Section 2 hereof, and for other good and valuable consideration, the receipt and adequacy of which is here acknowledged, Principal agrees that for a period of three (3) years from the date hereof (the *"Covenant Period"*);

(i) Principal will not, without the prior written consent of Purchaser in each instance, participate or engage, directly or indirectly, in any location within a twenty-five (25) mile radius of the Healthcare Facility, in the ownership, management, operation, or control of, or be connected as a partner, investor, lender or otherwise, with, or have any financial interest in, or aid or assist anyone else in the conduct of any of the business described on Schedule I hereto in competition with Purchaser.

(ii) Principal will not, directly or indirectly, employ, offer to employ, recruit, solicit, entice away, or in any other manner persuade or attempt to persuade any employee of Purchaser or any person who, at any time during the twelve (12) months preceding the date in question, was an employee or customer of Purchaser, to discontinue the relationship with Purchaser.

(iii) Principal will hold and keep confidential all Confidential Information (as defined below) to which Principal, at any time shall have become informed, and that he will not, directly or indirectly, disclose any Confidential Information to any person, firm, corporation or entity, or use the same, or permit the same to be disclosed or used. "Confidential Information" as used herein means proprietary information directly relating to Seller or developed exclusively by Seller or developed for the exclusive use of Seller and may include, without limitation, the following types of information regarding Seller existing as of the date hereof: corporate information, including Healthcare Facility information, plans, strategies, tactics, or policies; marketing information, including strategies, tactics, methods, resident or patient lists, prospects, or market research data; operational information, including trade secrets; and technical information, including designs, drawings and specifications. Confidential Information is limited to that information which is not generally known to the public (other than as a result of unauthorized disclosure by Principal) or within the industry of which the businesses described in Schedule I are a part or that information which was not developed by or on behalf of Seller or any affiliate thereof.

(b) Principal understands and acknowledges that compliance with this Agreement is necessary to protect the business, goodwill, and proprietary interests of Purchaser and recognizes that irreparable injury will result to Purchaser, its business and property, in the event of a breach of this Agreement. Accordingly, Principal agrees that Purchaser will be entitled, in addition to any other remedies and damages available, to an injunction to restrain the violation of the terms of this Agreement.

**Section 2. Direct Cash Payments.**

In consideration for the agreement set forth in Section 1, Principal will be entitled to receive ______________________ Dollars ($_________) from Purchaser, payable in cash, or by certified or cashier's check or wire transfer, at Closing.

All payments shall survive the death of Principal. In the event Principal breaches this Agreement during the Covenant Period, Purchaser may institute an action to recover any amounts previously paid under this Agreement.

**Section 3. Reasonableness: Severability.**

Principal acknowledges and agrees that the restrictions placed on him and the rights and remedies conferred on Purchaser are reasonable in time, scope, and territory and are fully required to protect the legitimate business interests of Purchaser without a disproportionate detriment to Principal. If any provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair, or invalidate the remainder of this Agreement, but shall be confined in its operation to the provision of this Agreement directly involved in the controversy in which such judgment shall have been rendered.

**Section 4. Miscellaneous.**

This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Rhode Island (without regard to the conflicts of laws principles thereof) This Agreement embodies the entire agreement and understanding between Purchaser and Principal with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and relating to the subject matter hereof. This Agreement may not be modified or amended or any term or provision hereof waived or discharged except in writing signed by the party against whom such amendment, modification, waiver, or discharge is sought to be enforced. All of the terms of this Agreement, whether so expressed or not, shall be binding upon the successors and assigns of the parties hereto and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement to be effective as of the date first above written.

PURCHASER

**Cherry Hill Medical Investors Limited Partnership**

By: Developers Investment Company, Inc.,
a general partner

By: ____________________________

Title: ____________________________

PRINCIPAL

____________________________

# SCHEDULE I

Skilled nursing care, intermediate nursing care, subacute care, assisted living care or Alzheimer's care or treatment.

SCHEDULE I

Skilled nursing care, intermediate nursing care, subacute care, assisted living care or Alzheimer's care or treatment.