UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BARBARA ANTONUCCI,<br>Plaintiff,<br><br>v.<br><br>LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity,<br>Defendants. | : | C.A. No. 06-108-ML |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO PRECLUDE TESTIMONY BY PLAINTIFF'S EXPERT WITNESSES**

Defendants, Life Care Centers of America, Inc. ("Life Care"), Pamela Charron, and Steve Haase (collectively "Defendants"), submit this memorandum in support of their motion to preclude the testimony by Plaintiff's expert witnesses – Dr. Zelko Leon and Dr. Holly Tytell – because the anticipated testimony of these individuals regarding Plaintiff's alleged emotional injury (i.e. that it was related to her employment with Life Care) is directly contradicted by Plaintiff's earlier representations that the condition was not work-related. Therefore, the anticipated expert testimony should be barred under the doctrine of judicial estoppel. Plaintiff's expert testimony should also be barred for the independent reason that the single "expert report" thus far submitted by Plaintiff – consisting of a conclusory one-page letter – does not comply Fed. R. Civ. P. 26(a)(2).

In the alternative, Defendants request that Plaintiff be required to provide a report (or reports) which comply with Fed. R. Civ. P. 26(a)(2), and that Defendants be provided a 30-day period from receipt of that report(s) to depose Plaintiff's expert(s) and, if Defendants

believe it to be necessary, to designate their own expert. The grounds for Defendants' motion are set forth more fully below.

## FACTUAL BACKGROUND

Plaintiff was discharged from her employment on October 4, 2004, for unsatisfactory performance. On November 3, 2004, Dr. Zelko Leon diagnosed Plaintiff with an "adjustment disorder" unconnected to work and determined that Plaintiff was unable to work. See copy of Dr. Leon's Statement Of Attending Physician", dated November 23, 2004;[1] see also Plaintiff's Deposition transcript ("Pl. Tr."), p. 60-65.[2] On or about November 12, 2004, Plaintiff filed for Temporary Disability Insurance ("TDI") on the basis of Dr. Leon's diagnosis. On her application, Plaintiff clearly represented that her disability of "anxiety and depression" was not "work related." Plaintiff certified that this representation – along with the rest of the information on her application – was true and accurate. Indeed, directly above Plaintiff's signature on her application for TDI, it provides:

> "I certify that I am/was physically unable to work during the period for which I am claiming benefits and that the information that I have provided on this application is true and complete."[3]

In addition to the representation on her TDI application – i.e. that TDI is for non-work related injuries – at her deposition, Plaintiff testified that she understood that TDI benefits were for conditions that were not related to work. (Pl. Tr. 242).

Following Dr. Leon's diagnosis, Plaintiff's application for TDI was approved by the Temporary Disability Insurance Division. Plaintiff received a monthly TDI benefit in the

---

1 A copy of Dr. Leon's "Statement Of Attending Physician" is attached hereto as Exhibit A.

2 Copies of relevant portions of Plaintiff's deposition are attached hereto as Exhibit B.

3 A copy of Plaintiff's TDI application is attached hereto as Exhibit C.

amount of $312.00 from November 2004 through April 2005 for her alleged disability of anxiety and depression. (Pl. Tr. 66).

Following the first appointment, Plaintiff continued to meet with Dr. Leon on an approximately monthly basis for treatment related to her anxiety and depression, until approximately March 2005. At that point, Plaintiff began to see Dr. Leon's colleague, Dr. Holly Tytell, for the same treatment, due to a change in Dr. Leon's practice. See Pl. Tr. 118-19.

Plaintiff's deadline for designating an expert was originally set for January 5, 2007. On January 3, 2007, Plaintiff moved to extend the deadline until February 5, 2007 (Docket No. 16) and the motion was granted. On February 28, 2007, Plaintiff sought an additional extension (Docket No. 23) – this time until March 20, 2007 – and the motion was granted. On March 20, 2007, Plaintiff sought an additional extension (Docket No. 27) and the motion was granted.

On March 27, 2007, Plaintiff faxed Defendants a single page letter signed by Dr. Leon. A copy of the letter is attached as Exhibit D. No further reports or documents pertaining to this "expert" have been received from Plaintiff.

Also, on March 27, 2007, Plaintiff filed for her fourth extension of the expert disclosure deadline (Docket No. 29) and the motion was granted. On April 6, 2007, Plaintiff sought a fifth extension of the deadline (Docket No. 30) and the motion was granted. On April 13, 2007, Plaintiff sought a sixth extension (Docket No. 31) and the motion was granted.

## LEGAL ARGUMENT

### A. Testimony From Drs. Leon And/Or Tytell Would Be Futile, Because Plaintiff's Claim for Emotional Distress Damages Is Barred By The Judicial Estoppel Doctrine

Plaintiff proposes that Drs. Leon and/or Tytell testify regarding Plaintiff's alleged emotional injury and the alleged connection to Plaintiff's employment with Defendants. (See Docket No. 23). This testimony directly contradicts Plaintiff's earlier assertion that the alleged emotional condition was not work related. Accordingly, the testimony would be futile, because Plaintiff's claim for emotional distress damages is barred by the judicial estoppel doctrine.

Judicial estoppel has been defined as a doctrine that "precludes a party from asserting a position contrary to a position it has already asserted." The Cadle Co. v. Schlictmann, Conway, Crowley & Hugo, 338 F.3d 19, 22 (1st Cir. 2003). The First Circuit has outlined two criteria for the application of the doctrine of judicial estoppel. First, the positions must be directly inconsistent with one another. See Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 25 (1st Cir. 2004). Second, the responsible party must have been successful in its use of the prior position. Id. Courts generally invoke the doctrine of judicial estoppel to safeguard against a party that improperly manipulates the machinery of the judicial system or is "playing fast and loose with the courts." See Alternative System Concepts, Inc., 374 F.3d at 24, quoting Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987).

Here, Plaintiff's claim for emotional distress damages meets both criteria for the application of the judicial estoppel doctrine. As to the first element, Plaintiff's present claim before this Court for emotional distress damages is plainly inconsistent with her prior

assertion on her application for TDI. Plaintiff affirmatively represented on her application for TDI that her alleged emotional injury was not work related. During Plaintiff's deposition she unequivocally affirmed that the information she provided on her November 9, 2004 application for TDI was accurate. (Pl. Tr. 60-63). Moreover, Plaintiff affirmed in her deposition testimony that she understood that TDI is for conditions that are not related to work. (Pl. Tr. 242). This position is wholly inconsistent with her present claim – which Plaintiff seeks to establish through the expert testimony of Drs. Leon and/or Tytell – that her alleged injuries are work-related.

As to the second element, Plaintiff was successful in convincing the Temporary Disability Insurance Division to provide her with benefits due to her alleged disability of anxiety and depression. Indeed, Plaintiff was approved for TDI benefits because Plaintiff's disability of anxiety and depression was not work related. See Exhibits A, C; Pl. Tr. 66-67; 242.

Because both elements of the doctrine of judicial estoppel have been established, Plaintiff should be precluded from asserting that her alleged emotional condition was related to work. Consequently, any expert testimony to that effect – as is anticipated to be offered by Drs. Leon and/or Tytell – is futile, and this Court should preclude Plaintiff from offering it. See Cleveland v. Policy Mgmt. Systems Corp., 526 U.S. 795, 802 (1999) (addressing inconsistencies between plaintiff's claims for Social Security Disability Insurance ("SSDI") and claims under the Americans with Disabilities Act ("ADA")).

Review of the Cleveland decision demonstrates that application of the doctrine of judicial estoppel is appropriate in the instant case. In Cleveland, the Court found that the plaintiff's prior claim of total inability to work for purposes of SSDI could conceivably have

been consistent with her claim under the ADA, because of the ADA's reasonable accommodation provision. In other words, the plaintiff in Cleveland could have possibly worked if the employer provided the plaintiff with reasonable accommodation, but without the accommodation, the plaintiff was completely unable to work.

In this case, Plaintiff's prior sworn statement to the Temporary Disability Insurance Division – that her emotional condition was not work-related – is unable to be reconciled with Plaintiff's present claim that her emotional injury was work-related. Rather, it is a "purely factual contradiction" which warrants the application of the doctrine of judicial estoppel. See Cleveland, 526 U.S. at 802 (distinguishing conflicting "purely factual matters" from the potentially reconcilable positions asserted by the plaintiff in Cleveland). See also Alternative Sys. Concepts, 374 F. 3d at 34 (applying doctrine of judicial estoppel to prevent plaintiff from claiming, on the one hand, that its claim was not a breach of contract claim, and on the other hand, that it was); Patriot Cinemas, 834 F. 2d at 212 (plaintiff precluded from asserting a state anti-trust claim, based on prior representations – used to secure a favorable ruling in state court – that it would not do so).

In sum, Plaintiff is "playing fast and loose with" both the courts and the Temporary Disability Insurance Division. Plaintiff is seeking to establish through expert testimony that her alleged anxiety and depression was ***work related.*** Yet, she has previously certified that the same injury was ***not work related*** in connection with her successful application for TDI benefits. Because Plaintiff's contradictory assertions meet the two primary criteria for the application of the doctrine of judicial estoppel, her claim for emotional distress damages must be barred.

**B. Plaintiff Should Be Precluded From Offering Testimony by Drs. Leon and/or Tytell For The Independent Reason That The "Expert Report" Submitted Does Not Comply with Rule 26(a)(2)**

In addition to the fact that Plaintiff's expert testimony would be futile, the letter from Dr. Leon dated March 27, 2007 does not comply with Fed. R. Civ. P. 26(a)(2). Accordingly, the expert testimony offered in connection with this "expert report" should be precluded for this independent reason.

Rule 26(a)(2) explicitly requires that a report, which accompanies an expert disclosure, be prepared by the proposed expert witness and contain:

> [1] a complete statement of the opinions to be expressed and the basis and reasons therefore; [2] the data or other information considered by the witness in forming the opinion; [3] any exhibits to be used as a summary of or support for the opinions; [4] the qualifications of the witness, including a list of publications authored by the witness within the preceding ten years; [5] the compensation to be paid for the study and testimony; and [6] a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Dr. Leon's "report" fails to comply with at least five of the explicit requirements set forth in Rule 26(a)(2).

As an initial matter, Dr. Leon's "report" consists of a terse two paragraph summary of his treatment and opinion regarding Plaintiff rather than the required complete statement of his opinion and the basis for his opinion. Further, Dr. Leon's "report" does not contain his qualifications or a list of publications that he has written in the preceding ten years. Moreover, the "report" does not reflect what compensation Dr. Leon is being paid for his testimony. Finally, the report neglects to include a list of cases in which the witness has testified as an expert at trial or deposition within the last four years. As noted in the Advisory Notes to the 1993 Amendments to the Federal Rules of Civil Procedure, expert witnesses "must prepare a detailed and complete written report" containing specific

information. In addition, "a party will not ordinarily be permitted to use on direct examination any expert testimony" which is not disclosed in accordance with Fed. R. Civ. P. 26(a)(2).

In sum, while purporting to provide a disclosure of expert testimony pursuant to Rule 26(a)(2), Plaintiff has completely disregarded the very requirements set forth in that Rule for such a disclosure. Accordingly, this Court should not allow Dr. Leon to testify in this matter, because Plaintiff has failed to submit the mandated report accompanying her disclosure of expert testimony in violation of Rule 26(a)(2).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that Plaintiff be precluded from offering expert testimony in support of her claim for alleged emotional injury. In the alternative, Defendants request that Plaintiff be required to provide a report (or reports) which comply with Fed. R. Civ. P. 26(a)(2), and that Defendants be provided a 30-day period from receipt of that report(s) to depose Plaintiff's expert(s) and, if Defendants believe it to be necessary, to designate their own expert(s).

Respectfully submitted,
LIFE CARE CENTERS, INC.,
By its attorneys,

/s/ Christopher J. Campbell
Christopher J. Campbell, R.I. Bar No. 6611
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, MA 02116
617-367-0025

Dated: April 17, 2007

# CERTIFICATE OF SERVICE

This is to certify that on April 17, 2007, a copy of the above document was electronically filed with the United States District Court for the District of Rhode Island through its Electronic Case Filing System.

/s/ Christopher J. Campbell
Jackson Lewis LLP

# EXHIBIT A

001/002

10/23/2014 04:47 FAX

TDI-3 (Rev.10/01)

RHODE ISLAND DEPARTMENT OF LABOR AND TRAINING
TEMPORARY DISABILITY INSURANCE DIVISION
P.O. Box 20100 Cranston, RI 02920-0941
TELEPHONE (401)462-8447 FAX (401)462-8466

# STATEMENT OF ATTENDING PHYSICIAN

PLEASE COMPLETE THE SECTIONS INDICATED AND FAX, OR MAIL THIS FORM IN THE ENCLOSED ENVELOPE WITHIN FIVE WORKING DAYS OF 11/12/04

ANY INCOMPLETED ITEMS, INCLUDING THE PHYSICIAN IDENTIFICATION INFORMATION AND SIGNATURE, WILL DELAY YOUR PATIENT'S ELIGIBILITY DETERMINATION.

J058

DR ZELKO LEON
CENTER FOR MOOD &
ANXIETY DISORDERS
345 BLACKSTONE BLVD
PROVIDENCE, RI 02906

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-05-1 — CLAIM NUMBER
12/29/40 — DATE OF BIRTH
BARBARA J ANTONUCCI — NAME OF PATIENT
135 SCENERY LANE — ADDRESS
ADDRESS
JOHNSTON, RI 02919 — CITY, STATE, ZIP CODE

TDI00021

PLEASE COMPLETE SECTIONS A AND C

**A:** PLEASE COMPLETE THIS SECTION.

1. Your diagnosis. Adjustment Disorder I. C. D. Code (if known) 309. 28
2. Date of disability? ______ Is disability work connected? ☐ YES ☑ NO
   If YES who are you billing? ______
3. Date of examination for this disability closest to the date shown in section C below: 11/3/04
4. Date of most recent examination? 11/3/04
5. Name of hospital? N/A Date admitted? ______ Date discharged? ______
6. Type of operation? ______
7. Date of operation? ______ Able to work pending operation/delivery? ☐ YES ☐ NO
8. Pregnancy: Date delivered? ______ Expected delivery date? ______
   Complications to pregnancy (explain) ______
9. Is patient capable of signing checks and documents? ☑ YES ☐ NO

**B:**

1. Payments to patient have been authorized for a total of ______ weeks ending on ______
2. The most recent examination of this patient was on ______
3. Can patient return to customary work on a full-time basis? ☐ YES ☐ NO If Yes, when? ______
4. Have complications developed, has surgery been performed, and/or has there been a change in diagnosis, since your last report? If yes, please explain: ______

**C:** PLEASE COMPLETE THIS SECTION.

FROM THIS DATE 10/31/04 patient will be unable to work for 4 WEEKS

(PLEASE ESTIMATE NUMBER OF WEEKS, AVOID USE OF TERMS SUCH AS UNKNOWN, UNDETERMINED OR INDEFINITE. IF THERE IS CONSIDERABLE DOUBT, PLEASE INDICATE THE MINIMUM NUMBER OF WEEKS THAT THE PATIENT WILL BE UNABLE TO WORK).

SIGNATURE DR. [signature] PRINTED NAME DR. ZELKO LEON

LICENSE NO. MD09102 TELEPHONE NO. 274-8489 DATE 11/23/04

11/26/2004 FRI 08:58 [TX/RX NO 5376] 001

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI

VS. C.A. NO. 06-108-ML

LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity

* * * * * * * * * * * * * * * * * *

DEPOSITION of BARBARA ANTONUCCI, taken on behalf of the Defendants on Tuesday, January 9, 2007, at the offices of Jackson Lewis, LLP, 127 Dorrance Street, Providence, Rhode Island, commencing at 9:30 A.M. before Rebecca J. Forte, Notary Public.

APPEARANCES
CARLEY BEAUVAIS IAFRATE, ESQUIRE....FOR THE PLAINTIFF

JACKSON LEWIS, LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ..FOR THE DEFENDANTS
ALSO PRESENT
Pamela Charron

IRONS & ASSOCIATES
CERTIFIED PROFESSIONAL STENOGRAPHERS
11 South Angell Street #359
Providence, Rhode Island 02906
(401) 861-0909

Page 2

Page 3

INDEX

WITNESS FOR THE DEFENDANTS PAGE NUMBER
BARBARA ANTONUCCI
EXAMINATION BY MR. CAMPBELL............ 4

EXHIBITS

(MARKED DEFENDANTS FOR IDENTIFICATION)

NO. DESCRIPTION PAGE NUMBER

A Plaintiff's Rule 26 Initial Disclosures........................ 19
B Calendar........................... 24
C December 22, 2006 letter and enclosures........................ 58
D First Amended Complaint............ 67
E Charge of Discrimination........... 69
F Plaintiff's Answers to Interrogatories.................... 81
G Affidavit.......................... 89
H 2004 tax return....................100
I 2005 tax return....................101
J 2002 tax return....................106
K 2001 tax return....................108
L 2000 tax return....................109
M 2003 tax return....................118
N Form 1040X.........................118
O Notice of Disciplinary Action.......122

Page 4

P Competency Based Position Description and Performance Review..............130
Q Nursing Department/Bonus Forms.......136
R Action Plan..........................180
S Notice of Disciplinary Action........201
T Daily Schedule.......................204
U Employee Termination Notice..........219

Page 57

A It's almost like saying how many times did I go out to dinner. I don't know.
Q Do you gamble as frequently as you go out to dinner?
A No, but it's not something you keep track of.
Q How many times have you been to Mohegan Sun in the last two years?
A I have no idea.
Q More than five?
A I don't know. I really don't know.
Q As you sit here today under oath you can't say whether it's within more or less than five times in the last two years that you've been to Mohegan Sun?
A No, I'm not going to pinpoint it because I don't remember, honestly. That's my honest answer. I don't remember, so there's no way I can pinpoint it.
Q I'm not asking you to pinpoint it. I'm asking you to tell me whether it's more than five or less than five?
A I don't remember.
Q Can you say it's more than one or less than one?
MS. BEAUVAIS IAFRATE: Objection as to form. You lost me. More than one or less than one in what period?
MR. CAMPBELL: I note your

Page 58

objection.
Q Is it more than one?
THE WITNESS: Like she said, more than one what?
MR. CAMPBELL: In the last two years to Mohegan?
A More than one, yes.
Q But you can't say it was more than five?
A No.
Q Who did you go with?
THE WITNESS: Who did I go with?
MS. BEAUVAIS IAFRATE: To Mohegan.
THE WITNESS: To Mohegan?
MR. CAMPBELL: That's my question, yes, who did you go with to Mohegan.
A My husband, yes. Sometimes my sister. I don't know.
Q Who's your sister?
A Joan Jutras. Joan, J-U-T-R-A-S.
Q Where does she live?
A 133 Scenery Lane.
Q Anybody else you went with to Mohegan?
A Not that I remember.
Q Who did you go with to Foxwoods?

Page 59

A My husband.
Q Anyone else?
A No, not that I remember.
Q And who do you go with to the track?
A Myself, my sister, my husband. Whoever.
Q Anyone else that you recall?
A No, not that I can think of offhand.
Q And you believe that during this first three-week period of unemployment you may have gambled during that period of time?
A I don't remember.
Q It's possible?
A Anything is possible. Do I remember doing it, no.
Q Do you remember not doing it, making a conscious decision to stop doing it?
A No, I never made a conscious decision to stop doing it. I'm not a gambler, like, per se. I don't gamble thousands. I mean, I don't know. I never think about it, really. I mean, you're saying did I make a conscious effort?
Q No. I'm asking, do you recall making a conscious decision to stop gambling during the three-week period of time that you were --
A I don't recall. I can't say I never went. I don't

Page 60

remember.
Q After unemployment, do I understand that you sought TDI benefits?
A Correct.
MR. CAMPBELL: And I'll just mark these.
(Whereupon Defendants' Exhibit C is marked for identification.)
Q I'm showing you what's been marked as Exhibit C, and I would turn to, if you see at the bottom how these pages are mark TDI, it starts with 00001?
A Oh, okay.
Q Could you turn to 00018. And if you would turn one more page to 19. Do you recognize 18 and 19 as your application for benefits?
A Uh-hum.
Q You have to answer yes or no.
A Oh, yes. Sorry.
Q That's okay. This is all your writing?
A Yes.
Q You made all the marks on this page?
A Yes.
Q I'm sorry, on both pages, 18 and 19.
A Yes, my writing, yes.

Page 61

Q And you submitted this application for benefits because you're unable to work, correct?
A Yes.
Q And you understood that being unable to work was a condition of receiving these TDI benefits, correct?
A Correct.
Q And you filled out this application, correct?
A Yes.
Q And you were truthful and accurate in the application?
A I believe so. I tried to be.
Q Do you see on the second page, 19, where it indicates that it is, looking at the line right above your signature, "The information I have provided on this application is true and complete," do you see that?
MS. BEAUVAIS IAFRATE: Where are we?
A Oh, no.
Q "That the information...."
A Oh, yeah, yes.
Q It says, "I certify that the information that I provided on this application is true and complete," do you see where it says that?
A Yes.

Page 62

Q And you had signed that?
A Yes.
Q And you meant it to be truthful?
A I believe so, yes, as far as I know.
Q You believe that you meant it to be truthful?
A Well, yes. I mean, I filled it out the best I could. I believe I did.
Q Did you mean anything to be untruthful?
A No, no, no, of course not.
Q And you understand that being completely unable to work is a condition of receiving benefits for TDI, correct?
A Yes, that's what the doctor put me out of work, right.
Q And did you apply for this because you believed yourself to be completely and totally unable to work?
A Correct, yes.
Q And do you stand by the recommendations that you made in this application for benefits?
A I believe so. As far as I know, everything is truthful.
Q Is there anything on here, and please take a moment to review, that's not truthful?

Page 63

MS. BEAUVAIS IAFRATE: That's not truthful.
A Not that I see. It looks like it's all accurate to me, as far as what I believe to be truthful at the time.
Q You didn't intentionally misrepresent anything on here, did you?
A No.
Q You would agree with me that if you did provide untruthful information, that that would be wrong?
A Of course.
Q In fact, it would be fraud?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I mean, I would have no reason to not be truthful. I don't know.
Q Do you understand that if you had provided inaccurate information on this, that it would be false?
A Well, I probably would think that, but, I mean, I don't know the legal things. I mean, I just answered it truthfully, so.
Q And if you provided untrue information, you would agree with me that that would be fraudulent?

Page 64

A Right, I would think so.
Q And if you would turn these to the page that's been marked 21, TDI00021. I think you're on the right page. I just can't find the 21.
A I can't either.
Q It's the one right after 20. Somewhere on here. Oh, there it is, it's right in the middle. Do you see it there, TDI00021?
A I do.
Q Do you see that this is a physician's statement from Zell Leon?
A Okay. Yes.
Q And you see that he has diagnosed you with an adjustment disorder?
A I never heard that term, but I see it on there now.
Q If you would flip back to 18, you wrote at the top "Anxiety and depression?"
A Right.
Q Did you understand --
MR. CAMPBELL: Strike that.
Q Do you know of any difference between what he has set forth as your diagnosis and what you set forth as your disability?
A No, I never ever heard this, adjustment -- what does

Page 65

it say, adjustment disorder. I have never heard that term.
Q Do you understand that this was submitted on your behalf to TDI?
A Yes.
Q As you look at it, is there anything on there that you find that is not accurate?
MS. BEAUVAIS IAFRATE: On the doctor's one?
Q Yes. I'm looking at 00021.
A No. I guess it's pretty accurate. I don't know about the diagnosis. That was never discussed.
Q And do you stand, looking again at 18 and 19, do you stand by the representations you had made on your application?
A Yes. I mean, as far as my knowledge, I was going for anxiety and depression, so that's what I put down. I don't know what that other term means that he wrote. If it means basically the same thing, I don't know.
Q I'm just asking about the representations on 18 and 19 that you put down. Do you stand by them?
A As far as what I can see, I believe so, yeah.
Q And you have reviewed this document?

Page 66

A Yes, I don't see anything wrong.
Q During the period of time that you collected TDI, do you agree with me it was from November of 2004 until April of 2005?
A That seems right.
Q And that you got $312 a week?
A I don't remember. That seems like it could be wrong.
Q And that your total TDI benefits was $8,344 during that period of time?
A That I don't remember.
Q Could you turn to page five, TDI00005.
A Oh, way back?
Q And do you see there a payment for CWE date, that's the week ending 11/6/04. Does that sound like about the time that you first started getting TDI?
A Yes, that would be about right, yes.
Q And you see the check amount, 312?
A Yes.
Q And the benefit amount 312?
A Yes.
Q If you would turn to the next page. Do you see another series of amounts?
A Yes.

Page 67

Q And this corresponds to the period of time February through April of 2005?
A Uh-hum.
Q And then, finally, it seems to conclude on the week ending 4/29/06?
A Okay.
Q I'm sorry, strike that. It seems to conclude at the period of time ending 4/23/05, on page six?
A Yes, okay.
Q Does this appear to be that on pages five and six the total amount of TDI that you received during this period of time of November through April of '05?
A Yes, I guess if that's what they put, as far as the amounts and everything, that sounds like -- it looks right.
Q Okay. Did you take any trips out of state during this period of time?
A From '04 until now?
Q From November of '04 until April of '05.
A To April of '05. Not -- I don't remember. We may have gone to New Hampshire with friends, but I'm not positive, because we did go with friends, but I'm not sure if it was that period. We went a weekend

Page 68

to New Hampshire.
Q Did you also go to Altantic City in March of '05?
A I may, but that's the one -- isn't that the one that I said I did go? Yes, yes, that's when I went on the bus trip.
Q Did you go to Atlantic City in March of '06 as well?
A March of '06. That's last year. Oh, then it's not '05. I just went '06. I don't remember. I did go to Atlantic City between February and March. I don't recall if it was both '05 and '06 that we went on each.
Q Generally, once a year?
A Yes. Like, now I'm going in the end of February. So, it's like a bus trip with girls, yes. Well, yes, but we go with a bunch of girls.
MR. CAMPBELL: You indicated that you want to take a break. We can take one now.
(RECESSED AT 10:50 A.M.)
(RESUMING AT 11:03 A.M.)
MR. CAMPBELL: Shall we go back on the record.
Q Showing you a document that we're going to mark Exhibit D.
(Whereupon Defendants' Exhibit D is

Page 117

was 11/26/04?
A Yes.
Q Does that sound like the period of time between examinations, 11/3 to 11/26?
A That seems about right.
Q And then if you would turn one more page, you see in that same area the most recent exam appears to be January 4?
A Yes.
Q So, is it fair to say it sounds like you were seeing him about once -- well, in the first instance it was three weeks and in the second instance about five weeks?
MS. BEAUVAIS IAFRATE: Objection as to form.
Q Does that sound about right?
A That's about right probably.
Q Turn one more page. Does it indicate it was February 7, 2005 that you saw him?
A Correct.
Q And that was the next appointment?
A Yes.
Q If you would turn to, what is it, TDI00026?
A Yes.

Page 118

Q That indicates March 7?
A Right.
Q So, you're seeing him about once a month, would you say?
A Every four weeks, right.
Q And then you change to Dr. Holly Tytell?
A Tytell, she's all, you know, in the same office.
Q What was the reason you changed from Dr. Leon to Dr. Tytell?
A He was limiting taking certain patients, and if you went to Dr. Leon, you had to pay him and then put it in with your carrier, because he was going to be a professor at Brown or something, teach classes, so he had to limit his practice, so I decided to go with the associate.
Q That was the only reason you switched?
A Oh, yes, yes, yup.
Q And did you see the associate with about the same amount of frequency?
A Yes.
MS. BEAUVAIS IAFRATE: Can I go off the record for a minute.
(OFF-THE-RECORD COLLOQUY)
Q And you continued to see Dr. Tytell about the same

Page 119

amount of frequency?
A Correct.
Q And it was for the same reasons?
A Correct.
Q And there wasn't anything significantly different between the treatment of Dr. Leon and Dr. Tytell, that you could recall, was there?
A No, no.
MR. CAMPBELL: Why don't we take a break now, if that's all right. Go off the record.
(LUNCH RECESS AT 12:05 P.M.)
(RESUMING AT 1:05 P.M.)
Q Welcome back from the lunch break. Do you realize you're still under oath?
A Yes.
Q And did anything occur during lunch that would interfere with your ability to truthfully and completely testify here today?
A No.
MR. CAMPBELL: I just want to introduce two more exhibits.
(Whereupon Defendants' Exhibit M and N are marked for identification.)
Q I'm showing you your 2003 tax return. Is that

Page 120

accurate so far as you know?
A Yes.
Q And then you filed an amended tax return in 2003, is that Exhibit N, is that right?
A Yes.
Q Do you know why it was amended?
A I don't recall, but I kind of remember it being done.
Q Do you know what's different?
A What is different? No, I really don't remember. I kind of remember some of, because it was only the one time we had an amendment, I think, but I don't recall what it was about.
Q And so between the two documents, M and N, N would be the one that would be accurate, the amended one?
A I would think, because why would you amend it. I would think, yes.
Q When you were the staffing coordinator at Cherry Hill Manor, you worked for a variety of directors of nursing?
A Yes.
Q Did you call them DON's or DOS's?
A Either one of them. Not anything in particular.
Q You worked with Celeste Harris?

COPY



Page 235

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI *

VS. * C.A. NO. 06-108-ML

LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity *

* * * * * * * * * * * * * * * * * * *

CONTINUED DEPOSITION of BARBARA ANTONUCCI, taken on behalf of the Defendants on Monday, February 5, 2007, at the offices of Carley Beauvais Iafrate, 129 Dyer Street, Providence, Rhode Island, commencing at 1:00 P.M. before Rebecca J. Forte, Notary Public.

APPEARANCES
CARLEY BEAUVAIS IAFRATE, ESQUIRE....FOR THE PLAINTIFF

JACKSON LEWIS, LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ..FOR THE DEFENDANTS

IRONS & ASSOCIATES
CERTIFIED PROFESSIONAL STENOGRAPHERS
11 South Angell Street #359
Providence, Rhode Island 02906
(401) 861-0909

Page 236

INDEX

WITNESS FOR THE DEFENDANTS PAGE NUMBER
BARBARA ANTONUCCI
EXAMINATION BY MR. CAMPBELL............237
EXAMINATION BY MS. IAFRATE..............302
FURTHER EXAMINATION BY MR. CAMPBELL.....325

EXHIBITS
(MARKED DEFENDANTS FOR IDENTIFICATION)

NO. DESCRIPTION PAGE NUMBER
V 12/1/04 schedule.....................246
W 8/26/04 schedule.....................246
X 9/27/04 schedule.....................246
Y 9/30/04 schedule.....................246
Z 9/29/04 schedule.....................246

Page 237

Monday, February 5, 2007
(Commencing at 1:00 P.M.)
BARBARA ANTONUCCI
Being duly sworn, deposes and testifies as follows:
CONTINUED EXAMINATION BY MR. CAMPBELL
Q Good afternoon, Ms. Antonucci. It's nice to see you. Do you recall we met at your first day of your deposition?
A Correct.
Q You understand you're still under oath?
A Yes.
Q And is there any reason that you are not be able to testify truthfully and accurately here today?
A No.
Q And are you on any medications that are different than the first day?
A No.
MS. IAFRATE: Don't forget to let him finish the question.
A Okay.
Q When did you first begin taking any type of medication for anxiety?
A I think it was when I went to Dr. Leone, the first time I can remember anyway.

Page 238

Q Had you ever been prescribed any type of antianxiety medication prior to that?
A I really don't remember, to be honest with you. Not that I can remember.
Q Had you ever sought treatment for any type of mood disorder?
A No.
Q Or have you ever sought treatment for any type of anxiety prior to treating with Dr. Leone?
A No.
Q Had you ever sought treatment for any kind of stress prior to treating with Dr. Leone?
A Well, not really treatment. I know I was under stress from my position.
Q And your position is staffing coordinator with Life Care?
A Correct.
Q And for how long had you been under stress?
A Well, I think that position always is stressful. You know what I mean? It's that type of job. So, it wasn't like this time I wasn't stressed and that time I was stressed. It's just the way the job is.
Q Had you ever sought treatment for any of those symptoms?

COPY



Page 239

A Not that I recall.
MS. IAFRATE: I'm going to object to form just because I don't think she gets the treatment, her treatment.
Q Had you ever consulted any medical care provider for any of the stress that you were indicating?
A I may have spoken to my primary doctor or he may have said it to me because of my blood pressure being high.
Q So, your blood pressure was high?
A Yes.
Q Prior to your discharge?
A At times, yes.
Q Would the stress that you're talking about make you anxious?
A Maybe at times, but I don't know.
Q Would the --
A It's hard to describe, to be honest with you. Maybe at times I would feel a little anxious.
Q Would that cause you difficulty in falling asleep?
A I always have problems with sleeping.
Q Is that something that you've historically felt?
A I have had problems with sleeping due to medication I was on before.

Page 240

Q And also due to other factors, or is it solely because of medication?
A I think it was more the medication.
Q Which medication?
A I was on Prednisone.
Q And how long had you been on that?
A I really don't recall. I'm on it off and on, but I was on it for a period, and I wouldn't even begin to guess when that was.
Q Why don't we put it in the context of the other dates that we know, were you on Prednisone prior to your discharge in October of 2004?
A Periodically or every day? I don't know.
Q Periodically?
A Periodically, more for my asthma and sinus infections.
Q Is it fair to say you had been on Prednisone off and on for several years?
A It could be. The time goes by fast. It doesn't seem that long, but probably.
Q And during that time you would agree with me that you have some problems falling asleep?
MS. IAFRATE: Objection as to form.
A Sometimes.

Page 241

MS. IAFRATE: Answer unless I tell you not to.
A Sometimes.
Q You indicated that you had sinus infections, is that right?
A Yes.
Q I'm showing you what's been previously marked in this deposition as Exhibit C. Could you please turn to the page that's marked 32. You have that there in front of you?
A Yes.
Q And could you just look at the page following that, what's been marked as TDI00033. That's your signature there?
A Yes.
Q And this is your application for TDI benefits from May of 2006, is that right?
MS. IAFRATE: Objection. Just give her some time to make sure she's read the entire thing. I don't want her to answer any question until she looks at it.
Q By all means, take whatever time you need.
A Yes.
Q This is your application for benefits from TDI as a

Page 242

result of a sinus infection; is that right?
A Correct.
Q And you filled out applications like this before, correct?
A Yes.
Q In fact, you filled out an application like this for TDI benefits following your employment at Life Care; is that correct?
A Correct.
Q This sinus infection, that was something that was not related to your work at Haven Health; is that right?
A That's correct.
Q And if you would look at question number 13 there, on what's been marked as TDI00032, it indicates it was your disability connected to your job. Do you see that question?
A Yes.
Q And you had marked no, correct?
A Right.
Q And you understand that TDI is for disabilities that are not related to work, correct?
MS. IAFRATE: Objection as to form.
A Yes.

# EXHIBIT C

TDI-1 (5/02)

# APPLICATION FOR BENEFITS

TEMPORARY DISABILITY INSURANCE DIVISION
Department of Labor and Training
PO Box 20070, Cranston RI 02920-0941

NOV 12 2004

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-05-1

COMPLETE BOTH SIDES OF FORM

1. Date of Birth (Month/Day/Year) 12-29-40
2. Phone Number (401) 232-9296
3. Male (Female)
4. Check each day of the week you normally work: Sun ☐ Mon ☑ Tue ☑ Wed ☑ Thu ☑ Fri ☑ Sat ☐
5. Date you last worked before this disability began? 10/4/04
6. What is your disability? anxiety & depression
7. Date first unable to work because of this disability? (You are claiming TDI from this date) ~~11/3/04~~ 11/4/04
8. Date of your examination for this disability closest to date entered in item 7. 11/8/04

BARBARA ANTONUCCI
135 SCENERY LN
JOHNSTON, RI 02919

05 1

Correct your Name and Address if necessary.

9. If you have recovered and/or returned to work since this disability began enter date(s) below.

Date recovered: | Date returned to work:

10. Have you applied for or received TDI benefits in the last 12 months? NO ☑ YES ☐
11. What is your usual job? Staffing Coordinator
12. Have you applied for or received Unemployment Benefits in the last 12 months? NO ☐ YES ☑ ▶ Date last week unemployment paid for: 10/30/04
13. Was your disability listed in item 6 work related? NO ☑ YES ☐

WORK RELATED DISABILITIES (If you checked NO to item 13, go to item 16A.)

14. Have you filed a Workers' Compensation claim for this disability? YES ☐ NO ☐ → If NO, explain why not?

If YES, please give the name and address of the Workers' Compensation insurance co.:

If you have a lawyer representing you in this matter, provide his/her name and address:

15. Have you received ANY Workers' Compensation payments for this OR ANY OTHER disability? NO ☐ YES ☐ → If YES, DATES FROM: TO:

MEDICAL RECORD

| 16A. Your DR. Zelko Leon, MD. | 16B. Your DR. |
|---|---|
| Address 345 Blackstone Blvd. | Address |
| City Prov. State RI Zip 02906 | City State Zip |
| Telephone Number 274-8489 | Telephone Number |
| 17A. Were you hospitalized for this disability? NO ☑ YES ☐ → | 17B. If YES, name and address of hospital: |
| | Date admitted to hospital. FROM: TO: |

EMPLOYMENT RECORD (To add more employers, see back)
Please include all employers over the past two years.

| 18A. Last employer Cherry Hill Manor | 18B. Name of employer |
|---|---|
| Address 2 Cherry Hill Rd | Address |
| City Johnston State RI Zip 02919 | City State Zip |
| Telephone Number (401) 231-3102 | Telephone Number |
| Was your work performed in RI? No ☐ Yes ☑ | Was your work performed in RI? No ☐ Yes ☐ |
| Employed FROM: 2/86 TO: 10/4/04 | Employed FROM: TO: |

| OFFICE USE ONLY | DEP | PHYS | PHYS | DD | SE | WC | UI | BYB | BYE |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | Jaey | | Y | — | | 10/30/04 | 11/3/04 | 11/1/05 |

TDI00018

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 0501

TDI-1A (5/02)

| | |
|---|---|
| 18C. Name of employer | 18D. Name of employer |
| Address | Address |
| City State Zip | City State Zip |
| Telephone Number | Telephone Number |
| Was your work performed in RI? Yes ☐ No ☐ | Was your work performed in RI? Yes ☐ No ☐ |
| Employed FROM: TO: | Employed FROM: TO: |
| 19. In your present employment, are you a corporate officer? YES ☐ NO ☐ | 20. List beginning and ending dates of any period of self-employment during the past two years: FROM: TO: |

If you need to add more employers, attach a separate sheet with your ss no. & name at the top of each page.

## DEPENDENTS ALLOWANCE

21. How many children under age 18 are dependent upon you? (Include children 18 and older who are handicapped) ____? List below ONLY the names of dependents who are your OWN, NATURAL, ADOPTED, STEP children or court appointed wards.

| 22. CHILD'S NAME First Last | Relationship (natural, adopted, step child, or ward) | Date of Birth (mm/dd/yy) | Child's Social Security No. (Required if child is over 12 months old) |
|---|---|---|---|
| 1) | | | |
| 2) | | | |
| 3) | | | |
| 4) | | | |
| 5) | | | |

23. Do all children counted in item 21 live with you? YES ☐ NO ☐

24. Is any other person claiming your child/children as a dependent under the Rhode Island Temporary Disability Act? YES ☐ NO ☑

25. If YES, list name, address and Social Security number of the person claiming such children:

26. If any named above is 18 or older, indicate type of incapacity - mental or physical.

## REQUEST FOR DIRECT DEPOSIT (Do NOT complete unless you want direct deposit.)

27. Name of your bank: Bank Rhode Island

28. Bank Account Type (Check One): Checking ☑ Savings ☐

29. Bank Account Number: 111022943

30. Bank Routing Number: 0115-0168-2

I hereby authorize the Rhode Island Department of Labor and Training to directly deposit my Rhode Island Temporary Disability Insurance payment to the bank account designated on this application.

YOUR SIGNATURE Barbara Antonucci DATE 11/9/04

## SIGNATURE REQUIRED!

## CERTIFICATION & MEDICAL INFORMATION RELEASE FOR RHODE ISLAND TEMPORARY DISABILITY INSURANCE

I certify that I am/was physically unable to work during the period for which I am claiming benefits and that the information that I have provided on this application is true and complete.

AND I hereby authorize my physician, hospital or other health care provider to make available to the Rhode Island Temporary Disability Insurance Division any medical information, including hospital records, which may be requested. I agree that a photocopy of this release shall be as valid as the original.

YOUR SIGNATURE Barbara Antonucci SS NO 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 Date 11/9/04

TDI00019

# EXHIBIT D

Center for Mood & Anxiety Disorders
345 Blackstone Boulevard
Providence, RI 02906
401-274-8489

March 27, 2007

Patricia E. Andrews. Esquire
129 Dyer Street
Providence, RI 02903

Dear Attorney Andrews:

This letter is written on request of Patricia E. Andrews with written consent from Ms. Antonucci for the purpose of legal proceedings.

Ms. Barbara Antonucci (DOB: 12/29/1940) was under my medical care from 11/03/2004 through 03/07/2005. She presented with severe symptoms of anxiety and depression causing impairment in normal life functioning and her ability to work. Ms. Antonucci developed these symptoms and dysfunctions after being fired from her job on October 4, 2004. I treated her with Paxil and Ativan, medication that are commonly used for these types of symptoms. She had only partial benefit and at the time of her last appointment with me on 03/07/2005 she continued to experience clinically significant symptoms and impairments. Subsequently she continued her psychiatric treatment with Dr. Holly Tytell on 08/11/2005.

Because Ms. Antonucci never had episode of psychiatric disturbances prior to her firing from her job on October 4, 2005, it is my opinion with reasonable medical certainty that her symptoms and impairments were caused by firing from her job.

Respectfully submitted,

Zelko Leon

Zelko Leon, MD