**UNITED STATE DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**BARBARA ANTONUCCI,**
***Plaintiff,***

**vs.**

**LIFE CARE CENTERS OF AMERICA, INC., et al.,**

***Defendants.***

**C.A. No. 06-108 ML**

## PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO PRECLUDE TESTIMONY BY EXPERT WITNESSES

Now comes the Plaintiff, Barbara Antonucci, ("Plaintiff"), and hereby objects to Defendants' Motion to Preclude Testimony of Plaintiff's Expert Witnesses.

In support of this objection, Plaintiff relies on the memorandum submitted herewith.

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 1 of 45

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 3rd day of May 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 2 of 45

UNITED STATE DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **BARBARA ANTONUCCI,** *Plaintiff,* vs. **LIFE CARE CENTERS OF AMERICA, INC., et al.,** *Defendants.* | **C.A. No. 06-108 ML** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION TO PRECLUDE TESTIMONY BY PLAINTIFF'S EXPERT WITNESSES**

## *I. Brief Facts and Travel.*

This is an age-discrimination action filed by Plaintiff, Barbara Antonucci ("Plaintiff"), who was employed by Defendant, Life Care Centers of America, Inc. ("Life Care"), and its predecessors for nearly eighteen years. In October 2004, she was fired from her job as staffing coordinator by Defendant Pamela Charron ("Charron") who had recently become the Director of Nurses at Cherry Hill Manor. Following her termination, Plaintiff began treating with Dr. Zelko Leon from the Anxiety and Mood Disorder clinic at Butler Hospital. Dr. Leon diagnosed Plaintiff with "severe symptoms of anxiety and depression causing impairment in normal life functioning and her ability to work." See Exhibit A, *Expert Disclosures*. Thereafter, Plaintiff filed for temporary disability insurance ("TDI"). See Exhibit B, *Plaintiff's TDI Application & Physician's Statement*. While both Plaintiff and Dr. Leon indicated that the condition was not work-connected *in the context of checking boxes on the TDI application*, this does not prohibit Plaintiff or either of her physicians from further explaining the reality which is Plaintiff became ill because of the



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 3 of 45

discriminatory loss of her job.1 Accordingly, the doctrine of judicial estoppel is not applicable to the instant situation.

***II. Argument.***

A. Admissibility of Testimony

Defendants argue that the Plaintiffs' physicians should be precluded from testifying at her trial because Plaintiff allegedly has asserted that her treatment was not work-related. For the following reasons, Defendants' claim must fail.

1. Defendants' Motion is Premature and an Attempt to Misconstrue Testimony.

Admissibility of testimony is governed by the Rules of Evidence, 401 and 403. Admissibility is typically a determination made at or near the time of trial. Relevant testimony is generally allowed. Here, Defendants motion is entirely premature because it fails to account for the fact that the alleged inconsistencies can be adequately explained at trial. Any inconsistencies developed by the Defendants' questioning would allow the jury to weigh the testimony and credibility of the witnesses.

Notably, Defendants never asked Plaintiff in her entire deposition why she indicated her illness was not work-connected and similarly did not ask her whether the fact that she was depressed and anxious was, in her opinion, caused by the loss of her job. Instead, what Defendants are trying to do is misconstrue certain portions of Plaintiff's testimony. 2 Significantly, Defendants left out the following portions of Plaintiff's testimony which explain that she believed her illness, was, in fact, caused by the loss of her job.

---

1 Following Dr. Leon's change in practice, Plaintiff continued treating with Dr. Holly Tytell. She did not complete any TDI paperwork and her expert disclosure is contained in Exhibit A. Accordingly, this motion is wholly baseless as it relates to Dr. Tytell.

2 Notably, Defendants did not include all of Plaintiff's testimony on the TDI application in its motion. Plaintiff has attached all the relevant testimony as Exhibit C.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 4 of 45

"MS. IAFRATE: What was the reason for going on TDI?

MS. ANTONUCCI: Because the doctor said I was ill and unable to work.

MS. IAFRATE: And what was ill? What was wrong with you?

MS. ANTONUCCI: Anxiety, depression.

MS. IAFRATE: And why were you depressed.

MS. ANTONUCCI: Because of being fired.

MS. IAFRATE: Okay. And is that the same reason for why you had anxiety?

MS. ANTONUCCI: Yes." See Exhibit C, *Deposition Excerpts.*

Since Defendants did not re-inquire into the subject at this point, there can be no dispute that, according to Plaintiff, she sought TDI benefits because of the fact that she suffered from anxiety and depression caused by job loss. A jury is well qualified to hear expert testimony on this point, and to evaluate any cross-examination which seeks to discredit that testimony. Of further significance is that Defendants have never sought to depose either Dr. Leon or Dr. Tytell, and thus, Defendants have no information as to why Dr. Leon would have indicated the illness was not work-connected.

2. The Doctrine of Judicial Estoppel Does Not Bar Plaintiff from Explaining Her TDI Application.

*Rhode Island TDI*

At the outset it is important to understand the Rhode Island TDI system. First, TDI benefits are available to any employee who is unemployed because of illness. G.L. 1956 § 28-39-2(3), (20), § 28-41-11. In particular, sickness is defined in the following manner:

> "An individual shall be deemed to be sick in any week in which, because of his or her physical or mental condition, including pregnancy, he or she is unemployed and unable to perform his or her regular or customary work or services." § 28-41-11.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 5 of 45

There is no provision which limits recovery to non-work-related conditions. Significantly, whether an applicant is entitled to obtain TDI benefits is not contingent upon whether the illness claimed is connected to work or not. See id. In general, if the injury occurred on-the-job, an employee has the option of seeking Workers' Compensation benefits. However, there is no requirement that an employee do so. In the event an employee indicates the illness is work-related, TDI will inquire as to whether Workers' Compensation benefits are being sought. As long as the applicant certifies that he or she is not seeking Workers' Compensation, the benefits will be awarded even if the application indicates the illness is work-related. Because of the confusion, it is not uncommon for applicants to indicate that an illness is not work-related because, among other things, it did not occur at work in the traditional sense (such as a slip-and-fall on the job), because the applicant does not know which box to check, or because the applicant does not want to file for workers' compensation benefits.3 Either way, for purposes of being entitled to benefits, it makes no difference whether the injury is work-related or not.

*The Doctrine of Judicial Estoppel*

The Defendants seek to invoke a doctrine that is wholly inapplicable to the instant situation. The doctrine of judicial estoppel is designed to prohibit "a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32-33 (1st Cir. 2004). "The doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the

---

3 These are all sample explanations which would serve to explain any inconsistencies. Defendants have not asked either the Plaintiff or Dr. Leon any questions which would allow for such explanations.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 6 of 45

judicial system." Id. at 33. "In line with this prophylactic purpose, courts usually invoke judicial estoppel when a litigant is 'playing fast and loose with the courts.'" Id. (quoting Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987)). "[A]t a minimum, two conditions must be satisfied before judicial estoppel can attach." Id. "First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive." Id. (citing Faigin v. Kelly, 184 F.3d 67, 82 (1st Cir. 1999)). "Second, the responsible party must have succeeded in persuading a court to accept its prior position." Id. (citing Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 13 (1st Cir. 1999)). The purpose of the elements is to determine if the first court was misled or the second court may be misled, thus "endangering the integrity of the judicial machinery." Id. Courts also consider a third factor: "absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage?" Id.

Defendants' argument fails because the doctrine is not properly invoked when the inconsistency is not a true inconsistency, but rather, can be reasonably explained away. See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 799 (1999). In Cleveland, the plaintiff sought and received social security disability benefits based on her sworn statement that she was unable to work. Id. Cleveland then filed a disability-discrimination suit against her former employer, arguing that the employer refused to reasonably accommodate her so that she could continue working. Id. The trial court granted the Defendant's motion for summary judgment because "Cleveland, by applying for and receiving SSDI benefits, had conceded that she was totally disabled. And that fact, the court concluded, now estopped Cleveland from proving an essential element of her ADA claim, namely that she could 'perform the essential functions' of her job, at least with 'reasonable accommodation.'" Id. Upon review, the Supreme Court rejected the district court's conclusion. The Court noted that although Plaintiff's representation to social



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 7 of 45

security was seemingly purely factual and inconsistent with her position in the ADA claim, the Court was required to examine the context in which the statements were made. Id. at 802.

In Cleveland's case, she stated she was totally disabled for purposes of the social security act. The Court held that even if this position was, on its face, inconsistent with the ADA claim, it was insufficient to judicially estop her later representation that she could have performed the essential functions of her job with reasonable accommodation. Id. Accordingly, the Court ruled that Cleveland was allowed to explain the alleged inconsistencies to the jury.

In this case, Defendants would have to prove that the two statements at issue are "mutually exclusive," that there is no possible explanation which would have allowed Plaintiff to check the "no" box on the TDI application, yet, allow her physicians to testify that her condition was work-related.4 Here, there is no true inconsistency. First, the Court should take note that even though Plaintiff marked the "no" box on the TDI box, her testimony on the point is clear that she believed her illness was work-related. See supra, p. 3. She was never asked by Defendants why she checked the "no" box. Dr. Leon has never been asked any questions. Despite that, we know from his report that his medical opinion is that the condition is work-related. Significantly, there are numerous ways that the alleged inconsistency in this case can be explained away. For example, Plaintiff could testify that she made a mistake, that she indicated the illness was non-work-related because it did not occur at work in the traditional sense, because she did not know which box to check, or because she did not want to file for workers' compensation benefits.5

---

4 On its face, this makes no sense. For example, what if the applicant did not know if the condition was work-related at the time she filled out the application? Only upon the physician's determination would she know one way or the other since she is not a physician.

5 Arguably, in this situation, what box Plaintiff checked is totally irrelevant. Plaintiff is not a physician or a lawyer. Whether her condition is work-related is a medical determination to be made by the physicians in the case. Plaintiff is neither a physician nor a lawyer.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 8 of 45

Dr. Leon could explain that he is aware of the distinction for purpose of Workers' Compensation. All of these things would explain the "inconsistency," which would allow the expert testimony to stand. Additionally, if Defendants ever depose Dr. Leon they could easily ask Dr. Leon what his intentions were.

Based on the forgoing, there is simply no evidence that Plaintiff is "playing fast and loose" or that 'intentional self-contradiction is being used as means of obtaining unfair advantage.'" Franco v. Selective Ins. Co., 184 F.3d 4, 11-12 (1st Cir. 1999) (quoting Patriot Cinemas, Inc., v. General Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987)). As the following excerpts make clear, Plaintiff's intentions with respect to the TDI form were made clear in her deposition, and based on the testimony, there can be no suggestion or inference that she intentionally misrepresented any information to TDI.6

"MR. CAMPBELL: After unemployment, do I understand that you sought TDI benefits?

MS. ANTONUCCI: Correct. * * *

MR. CAMPBELL: And you submitted this application for benefits because you're unable to work, correct?

MS. ANTONUCCI: Yes.

MR. CAMPBELL: And you understood that being unable to work was a condition of receiving these TDI benefits?

MS. ANTONUCCI: Correct.

MR. CAMPBELL: And you filled out this application, correct?

MS. ANTONUCCI: Yes.

MR. CAMPBELL: And you were truthful and accurate in the application?

6 In addition, similar to the Cleveland case, TDI did not make any determination whether Plaintiff's emotional distress was not caused by the loss of her job.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 9 of 45

MS. ANTONUCCI: I believe so. I tried to be. * * *

MR. CAMPBELL: And you meant it to be truthful?

MS. ANTONUCCI: I believe so, yes, as far as I know.

MR. CAMPBELL: You believe that you meant it to be truthful?

MS. ANTONUCCI: Well, yes, I filled it out the best I could. I believe I did.

MR. CAMPBELL: Did you mean anything to be untruthful?

MS. ANTONUCCI: No, no, no, of course not. * * *

MR. CAMPBELL: You didn't intentionally misrepresent anything on here, did you?

MS. ANTONUCCI: No." See Exhibit A.

At the second deposition, Defendants again inquired about the TDI application. Specifically, Defendants inquired about Plaintiff's TDI application when she suffered from sinusitis in May 2006. In the context of that inquiry, Defendants asked Plaintiff: "And you understand that TDI is for disabilities that are not related to work, correct?" Plaintiff's attorney objected to the form of the question, since it called for a legal conclusion. Plaintiff incorrectly responded in the affirmative. See Exhibit C. Defendants highlight this particular question to support its position. The problem is that both Defendants and Plaintiff are wrong. Pursuant to the statute, TDI is not only for disabilities that are non-work related. Thus, it is entirely irrelevant what Plaintiff's legal opinion is on that point (since she is not an attorney).

The final point was made when Plaintiff's counsel inquired on the ultimate question - - was the illness work-related or not. As noted above, Plaintiff affirmed that the illness was because of the loss of her job. Thus, this is not the case where Plaintiff takes one position earlier in the litigation and then changes strategies.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 10 of 45

Defendants further have to prove that Plaintiff obtained an unfair advantage. "'Unfair advantage' generally requires that a party have 'succeeded previously with a position directly inconsistent with one it currently espouses.'" Franco, 184 F.3d at 13. As the Court stated in Franco, it must be clear that the success obtained by the Plaintiff must be dependent "conceptually" on the position that is supposedly now inconsistent. Id. Here, Plaintiff's success in obtaining TDI benefits was not dependent on any person indicating that her illness was not connected to work. Furthermore, no determination was made by TDI that the illness was non-work-related.

Finally, the purpose of the doctrine would not be served in the instant case. There is not a scintilla of evidence that there is any improper manipulation that would be prevented by invoking the doctrine. Accordingly, Defendants' motion must be rejected insofar as it seeks to limit Plaintiff or Dr. Leon's testimony based on the doctrine of judicial estoppel.

B. Sufficiency of Reports/Extension of Time

Defendants' next argument is that the report provided by Dr. Leon is insufficient under Rule 26(a)(2). This argument must also be rejected. Plaintiff supplied the appropriate reports within the timelines approved by the Court. See Exhibit A. This is not a complicated case of experts. These are simply two treating physicians of whom defendants have been aware of the identities since the inception of the discovery period, in October 2006. Defendants have had ample opportunity to depose both physicians and have made no attempt to do so. Defendants have had the physicians' medical records for nearly six months. Defendants have had sufficient time to conduct depositions of these experts and to hire their own expert.

III. *Conclusion.*

Accordingly, Plaintiff respectfully requests that Defendants' motion be denied.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 11 of 45

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 3rd day of May 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 12 of 45

EXHIBIT A

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 13 of 45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BARBARA ANTONUCCI, Plaintiff, | : | |
| v. | : | C.A. No. 06-108 ML |
| CHERRY HILL MANOR, ET AL., Defendants. | : | |

**FURTHER SUPPLEMENTAL EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(2)**

Plaintiff, Barbara Antonucci ("Plaintiff") makes the following supplemental disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2). Plaintiff reserves the right to supplement or amend its responses herein based on additional information obtained through formal discovery or other means.

**II. Rule 26(a)(2)(B).**

Attached is Dr. Leon's "report."

Plaintiff,
By her Attorneys,

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0065
(401) 421-0964 (fax)

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 14 of 45

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent to Christopher J. Campbell, Jackson Lewis, LLP, 75 Park Plaza, Boston, MA 02116 on the 27th day of March 2007.

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 15 of 45

Center for Mood & Anxiety Disorders
345 Blackstone Boulevard
Providence, RI 02906
401-274-8489

March 27, 2007

Patricia E. Andrews, Esquire
129 Dyer Street
Providence, RI 02903

Dear Attorney Andrews:

This letter is written on request of Patricia E. Andrews with written consent from Ms. Antonucci for the purpose of legal proceedings.

Ms. Barbara Antonucci (DOB: 12/29/1940) was under my medical care from 11/03/2004 through 03/07/2005. She presented with severe symptoms of anxiety and depression causing impairment in normal life functioning and her ability to work. Ms. Antonucci developed these symptoms and dysfunctions after being fired from her job on October 4, 2004. I treated her with Paxil and Ativan, medication that are commonly used for these types of symptoms. She had only partial benefit and at the time of her last appointment with me on 03/07/2005 she continued to experience clinically significant symptoms and impairments. Subsequently she continued her psychiatric treatment with Dr. Holly Tytell on 08/11/2005.

Because Ms. Antonucci never had episode of psychiatric disturbances prior to her firing from her job on October 4, 2005, it is my opinion with reasonable medical certainty that her symptoms and impairments were caused by firing from her job.

Respectfully submitted,

Zelko Leon

Zelko Leon, MD

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **BARBARA ANTONUCCI,** **Plaintiff,** | : | |
| v. | : | **C.A. No. 06-108 ML** |
| **CHERRY HILL MANOR, ET AL.,** **Defendants.** | : | |

**FURTHER SUPPLEMENTAL EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(2)**

Plaintiff, Barbara Antonucci ("Plaintiff") makes the following supplemental disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2). Plaintiff reserves the right to supplement or amend its responses herein based on additional information obtained through formal discovery or other means.

**II. Rule 26(a)(2)(B).**

Attached are several additional documents. With respect to Dr. Leon, we have attached his curriculum vitae and his bill for services. He has not testified as an expert within the last four years. In addition, Plaintiff incorporates Dr. Leon's medical records already in the possession of Defendants.

With respect to Dr. Tytell, attached are her report, curriculum vitae, and bill for services, which includes information about the fact that she has not given expert testimony in the past four years. In addition, Plaintiff incorporates Dr. Tytell's medical records already in the possession of Defendants.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 17 of 45

Plaintiff,
By her Attorneys,

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0065
(401) 421-0964 (fax)

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent to Christopher J. Campbell, Jackson Lewis, LLP, 75 Park Plaza, Boston, MA 02116 on the 18th day of April 2007.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 18 of 45

Holly Tytell, MD, Ltd.
120 Wayland Avenue, Suite 3
Providence, RI 02906
Tel: 401-437-8715 fax: 401-437-8716

April 17, 2007

Dear Patricia Andrews:

Enclosed you will find a bill for my hourly rate of $400/hr. This includes the cost of preparation of the enclosed report as well as my time for phone conversations. I have also attached a copy of my Curriculum Vitae.

Please note I have not served as an expert witness in the last four years. I am faxing over a copy of my report and will mail the original to you.

Yours Truly,

H Tytell MD

Holly Tytell, MD

# INVOICE

Holly Tytell, M.D., Ltd.
120 Wayland Avenue, Suite 3
Providence, RI 02906

**DATE:** 04/17/07

**FOR:** *Barbara Antonucci*

**Bill To:**
Patricia Andrews
129 Dyer Street
Providence, RI 02903

| DESCRIPTION | AMOUNT |
|---|---|
| Fee for my enclosed report and phone conversations. (my hourly rate) | $ 400.00 |
| **TOTAL** | $ 400.00 |

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 20 of 45

**Holly Tytell, M.D., Ltd.**
**120 Wayland Avenue, #3**
**Providence, RI 02906**
**Office (401) 437-8715 Fax (401) 437-8716**

April 16, 2007

Patricia Andrews, Esquire
129 Dyer Street
Providence, RI 02903

Dear Attorney Andrews:

Barbara Antonucci has been receiving psychiatric care from me since August 11, 2005. She had been treated by Dr. Leon since November 2004 for anxiety and depression after being fired from her job in October 2004. I have continued to prescribe medication for anxiety related to this incident since August of 2005.

During the time that I have treated Barbara, she has required medication for anxiety. While working at a new job from August of 2005 until the fall of 2006, she had constant worries about being fired. The anxiety concerning being fired from this job was far in excess of what would be expected and without any question related to the firing from the previous job. In my opinion with reasonable medical certainty, her continued symptoms of anxiety and need for psychiatric medication are related to the original incident of her being fired in October 2004.

Yours truly,

Holly Tytell, MD

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 21 of 45

March 17, 2007

# CURRICULUM VITAE

Holly Tytell, M.D.

Holly Tytell, M.D., Ltd.
120 Wayland Avenue, #3
Providence, RI 0290
Telephone number: (401) 437-8715
Fax number: (401) 437-8716
E-mail address: hculver1@cox.net

## EDUCATION

| | |
|---|---|
| Undergraduate | Brown University<br>Providence, Rhode Island |
| Dates attended: | 1971-1975 |
| Graduation: | 1975 |
| Degree: | Sc.B. Biomedical Science |
| Medical School | Brown University Program in Medicine<br>Providence, Rhode Island |
| Dates Attended: | 1974-1978 |
| Graduation: | 1978 |
| Degree: | M.D. |

## POSTGRADUATE TRAINING

Residencies:

Brown University
Residency Training Program in Psychiatry
Providence, Rhode Island
June 2001- June 2004

Northwestern University
Combined Residency in Emergency Medicine and Internal Medicine
Northwestern Memorial Hospital
Chicago, Illinois
June 1980- June 1982

Harvard University
Internship and 1st year Residency in Internal Medicine
Mount Auburn Hospital
Cambridge, Massachusetts
June 1978- June 1980



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 22 of 45

PROFESSIONAL LICENSES AND BOARD CERTIFICATION

| | |
|---|---|
| Board Certification: | American Board of Internal Medicine 1982 |
| | American Board of Emergency Medicine 1983-1993<br>Recertification 1993- 2003 |
| | American Board of Psychiatry and Neurology 2005 |

ACADEMIC APPOINTMENTS

| | |
|---|---|
| 12/05-present | Clinical Assistant Professor Brown Medical School |

HOSPITAL APPOINTMENTS

| | |
|---|---|
| 8/ 81 – 7/82 | Emergency Medicine Physician (part-time)<br>EMSCO Ltd.<br>Ravenswood Hospital<br>Chicago, Illinois |
| 7/82 – 6/90 | Emergency Medicine Physician<br>Mid-Maine Medical Center<br>(renamed Maine General Hospital)<br>Waterville, Maine |
| 6/90 – 6/01 | Emergency Medical Physician<br>Eastern Maine Medical Center<br>Bangor, Maine |
| 9/05 – present | Psychiatrist<br>Butler Hospital<br>Providence, Rhode Island |

HOSPITAL COMMITTEES AND ADMINISTRATIVE RESPONSIBLITIES

| | |
|---|---|
| 1/06 – present | Member of RCC Committee (resident outpatient clinic) |
| 6/03 – 6/05 | Member of Butler Hospital Pharmacy and Therapeutics Committee |
| 6/00 - 6/01 | Member of Eastern Maine Medical Center Clinical Informatics Committee and member of three related subcommittees |
| 4/00 - 6/01 | Emergency physician representative to emergency department work group for installation of |

| | |
|---|---|
| | computerized triage and tracking of the ED at Eastern Maine Medical Center |
| 1992 - 2001 | QI coordinator for radiology in the emergency department at Eastern Maine Medial Center |
| 1992 - 1996 | Coordinator for education for emergency department clinicians at Eastern Maine Medical Center |
| 1082 - 1990 | QI coordinator for the emergency department at Mid-Maine Medical Center |

MEMBERSHIP IN SOCIETIES

| | |
|---|---|
| 2001 – present | American Psychiatric Association |
| 2001 – present | Rhode Island Psychiatric Society |
| 2004 – present | Rhode Island Medical Society |

HOSPITAL TEACHING ROLES

| | |
|---|---|
| 12/06 – present | Supervision and teaching of residents in the Residents' Continuity Clinic (outpatient clinic) |
| 1990 – 2001 | Supervision and teaching of family practice residents, medical students, and physician assistant students during rotations in the emergency department at Eastern Maine Medical Center, Bangor, Maine |
| 1982 – 1990 | Supervision and teaching of family practice residents, medical students, and physician assistant students during rotations in the emergency department at Mid- Maine Medical Center, Waterville, Maine |

Center for Mood & Anxiety Disorders, Ltd.
345 Blackstone Boulevard
Providence, RI 02906
Phone 401-274-8489 Fax 401-274-0248

**DATE:** March 27, 2007

**FOR:** *Barbara Antonucci*

**Patricia Andrews, Esquire**
129 Dyer Street
Providence, RI 02903

| DESCRIPTION | AMOUNT |
|---|---|
| Documents prepared for Barbara Antonucci | $ 200.00 |
| TOTAL | $ 200.00 |

**Make all checks payable to Center for Mood &Anxiety Disorders**
Tax ID#05-0519798

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 25 of 45

Center for Mood & Anxiety Disorders
345 Blackstone Boulevard
Providence, RI 02906
401-274-8489

March 27, 2007

Patricia E. Andrews, Esquire
129 Dyer Street
Providence, RI 02903

Dear Attorney Andrews:

This letter is written on request of Patricia E. Andrews with written consent from Ms. Antonucci for the purpose of legal proceedings.

Ms. Barbara Antonucci (DOB: 12/29/1940) was under my medical care from 11/03/2004 through 03/07/2005. She presented with severe symptoms of anxiety and depression causing impairment in normal life functioning and her ability to work. Ms. Antonucci developed these symptoms and dysfunctions after being fired from her job on October 4, 2004. I treated her with Paxil and Ativan, medication that are commonly used for these types of symptoms. She had only partial benefit and at the time of her last appointment with me on 03/07/2005 she continued to experience clinically significant symptoms and impairments. Subsequently she continued her psychiatric treatment with Dr. Holly Tytell on 08/11/2005.

Because Ms. Antonucci never had episode of psychiatric disturbances prior to her firing from her job on October 4, 2005, it is my opinion with reasonable medical certainty that her symptoms and impairments were caused by firing from her job.

Respectfully submitted,

Zelko Leon

Zelko Leon, MD

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 26 of 45

06/12/06

# CURRICULUM VITAE

## ZELKO LEON, M.D.

Address: One 2nd Street South, Apt. 1-405
Fargo, ND 58103
401-243-4083 401-274-0248 (Fax)
zelko54@yahoo.com (e-mail)

**EDUCATION:**

Medical School: School of Medicine
Belgrade, Yugoslavia
September 1973-December 1978
M.D. 1978

**POSTGRADUATE TRAINING:**

Residency Neuropsychiatric Residency Program
University of Belgrade School of Medicine
Yugoslavia 1983-1985

Psychiatry Residency Program
University of North Dakota School of Medicine
U.S.A. 1988-1992

**HONORS AND AWARDS:**

| | |
|---|---|
| 2004 | America's Top Psychiatrists, Consumer's Research Council of America |
| 2004 | National Alliance of Mentally Ill Exemplary Psychiatrist Award |
| 2003 | America's Top Psychiatrists, Consumer's Research Council of America |
| 1994 | Psychiatry Clerkship Outstanding Teacher Award |
| 1993 | Mental Health Association, Red River Valley Award for Special Project (National Depression Screening Day) |
| 1990 | National Institute of Mental Health Outstanding Resident Award |
| 1990 | Second Place, Bingham Competition for Scholarship in Schizophrenia, University of Louisville, Kentucky |

**PROFESSIONAL LICENSES AND BOARD CERTIFICATION:**

| | |
|---|---|
| 1996 | Licensed Medical Doctor, Board of Medical Licensure and Discipline State of Rhode Island and Providence Plantations |
| 1994 | Diplomate, National Board of Psychiatry and Neurology |
| 1990 | Licensed Medical Doctor, State of North Dakota |



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 27 of 45

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| 2005-present | Clinical Professor, University of North Dakota School of Medicine |
| 2005-present | Clinical Associate Professor, Brown University School of Medicine |
| 1996-2005 | Clinical Assistant Professor, Brown University School of Medicine |
| 1992-1996 | Assistant Professor, University of North Dakota School of Medicine |
| 1991-1991 | Chief Resident, University of North Dakota School of Medicine |

**HOSPITAL APPOINTMENTS:**

| | |
|---|---|
| 2005-present | Staff Psychiatrist, Meritcare Hospital, Fargo, ND |
| 1996-2004 | Staff Psychiatrist, Butler Hospital, Providence, RI |
| 1995-1996 | Chief of Psychiatry Service, VA Hospital, Fargo, ND |
| 1993-1996 | Staff Psychiatrist, Heartland Hospital, Fargo, ND |
| 1992-1995 | Director of Inpatient Psychiatric Unit, VA Hospital, Fargo ND |

**HOSPITAL COMMITTEES:**

| | |
|---|---|
| 2000 | CME Committee, Butler Hospital, Providence, RI |
| 1996 | Chairman, Performance Improvement Council VA Hospital, Fargo, ND |
| 1995 | Resource Planning and Management, VA Hospital, Fargo, ND |
| 1995-1996 | Clinical Executive Board, VA Hospital, Fargo, ND |
| 1994 | Utilization and Management, VA Hospital, Fargo, ND |
| 1992-1996 | Mental Health Council, VA Hospital, Fargo, ND |

**MEMBERSHIPS IN SOCIETIES:**

| | |
|---|---|
| 1989-present | American Psychiatric Association |
| 2005-present | American Association of LifeStyle Counselors |

**COMMUNITY ACTIVITY:**

| | |
|---|---|
| 2003 | Health tip featured on findRI.com the week of January 13, 2003 |
| 1999-2004 | Lecture Series in Mood Disorders for patients, families and interested others, Providence, RI |

**PUBLICATIONS**

Carpenter LL, Schecter JM, **Leon Z** (2004). A Case Series Describing Orlistat Use In Patients On Psychotropic Medications. **Medicine and Health/Rhode Island** , 87 (12): 375-7

Yasmin S, Carpenter LL, **Leon Z**, Siniscalchi, JM Price LH (2001). Adjunctive Gabapentin inTreatment-Resistant Depression: A Retrospective Chart Review. **J Affective Disorders**, 63(1-3):243-7.

Carpenter LL, **Leon Z**, Yasmin S, Price LH (2002). Do obese depressed patients respond to topiramate? A retrospective chart review. **J Affective Disorders**, 69(1-3):251-5.

Carpenter LL, **Jocic Z**, Hall JM, Rasmussen SA, Price LH (1999). Mirtazapine Augmentation in the Treatment of Refractory Depression. **J Clin Psychiatry**, 60:45-49.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 28 of 45

Carpenter LL, **Leon Z**, Yasmin S, Price LH (1999). Clinical Experience with Mirtazapine in the Treatment of Panic Disorder. **Ann Clin Psychiatry**, 11:81-86.

Rokke PD, Tomhave JA, **Jocic Z** (1999). The Role of Client Choice and Target Selection in Self-Management Therapy for Depression in Older Adults. **Psychology and Aging**, 14(1):155-69.

Rokke PD, Tomhave JA, **Jocic Z** (2000). Self-Management Therapy and Educational Group Therapy for Depressed Elders. **Cognitive Therapy and Research**, 24(1): 99-119.

Wonderlich SA, Brewerton TD, **Jocic Z**, Danski BS, Abbott DW (1997). Relationship of Childhood Sexual Abuse and Eating Disorders. **J Am Child Adolesc Psychiatry**, 36(8):1107-15.

Ferraro R, Wonderlich S, **Jocic Z** (1997). Performance Variability as a New Theoretical Mechanism Regarding Eating Disorders and Cognitive Processing. **J Clin Psych**, 53(2):117-21.

Beatty WW, **Jocic Z**, Monson N, Katzung VM (1994). Problem Solving by Schizophrenic and Schizoaffective patients on the Wisconsin and California Card Sorting Tests. **Neuropsychology**, 8(1):49-54.

Beatty WW, **Jocic Z**, Monson N, Staton RD (1993). Memory and Frontal Lobe Dysfunction in Schizophrenia and Schizoaffective Disorder. **J Nerv Ment Dis**, 181:448-453.

Beatty WW, **Jocic Z**, Monson N (1993). Picture Sequencing by Schizophrenic Patients. **Bull Psychonomic Society**, 31(4):265-67.

**Jocic Z**, Staton RD (1993). Reduplication after Right Middle Cerebral Artery Infarction. **Brain and Cognition**, 23:222-30.

**Jocic Z** (1992). Delusional Misidentification Syndromes. **The Jefferson Journal of Psychiatry**, 10:3-11.

**INVITED PRESENTATIONS:**

| | |
|---|---|
| 2006 | "About Love", Meritcare Psychiatric Services Holiday Workshop, Fargo, ND |
| 2006 | "Pharmacotherapy of Binge Eating Disorder, Obesity and Comorbid Depression", Eating Disorders Unit Teaching Conference, Meritcare Hospital, Fargo, ND |
| 2006 | "Depression & Obesity: Coincidence or Influence?", University of North Dakota, Fargo, ND (Grand Rounds) |
| 2005 | "Improving Outcomes in Patients with Bipolar Disorder", The Center for Medical Knowledge, Fargo, ND |
| 2005 | "Update on Mood Disorders in Adults", Meritcare Psychiatric Services Holiday Workshop, Fargo, ND |
| 2005 | "Creative Brain", University of North Dakota, Fargo, ND (Grand Rounds) |
| 2005 | "Brain and Creativity", Symposium Understanding Creativity, UMASS Dartmouth, New Bedford, MA |
| 2004 | "Ask the Doctor", 20th Annual Meeting of NAMI-RI, Newport, RI |



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 29 of 45

| | |
|---|---|
| 2004 | "Challenges in diagnosing bipolar disorder", University of North Dakota, Fargo, ND (Grand Rounds) |
| 2003 | "Omega 3 fatty acids and their role in psychiatry", NRI Mental Health Center, Woonsocket, RI |
| 2003 | "Update on Bipolar disorder", RI State Nurses Association, Providence, RI |
| 2002 | "Weight gain and psychiatric illness", 18th Annual Meeting of NAMI-RI, Newport, RI |
| 2000 | "Potential Benefits of SAMe in Psychiatry and Medicine," University of North Dakota, Fargo, ND (Grand Rounds) |
| 1998 | "Mirtazapine in Treatment of Depression and Anxiety," Butler Hospital, Providence, RI |
| 1995 | "Edvard Munch, His Life and Work," University of North Dakota, Fargo, ND (Grand Rounds) |
| 1995 | "Artistic Creativity in Mental Illness and Health," Concordia College, Moorhead, MN (Course) |

## UNIVERSITY TEACHING ROLES:

**Brown University**

| | |
|---|---|
| 2004- 2005 | Supervisor of third year medical students during psychiatric clerkship |
| 2001-2004 | Supervisor of psychiatry residents and medical students at Butler Hospital Patient Assessment Service two days per week |
| 1999-2005 | Supervisor of psychiatry residents in outpatient rotation at Butler Hospital |
| 1997-1999 | Clinical Seminar for PGY 1 psychiatry residents |
| 1996-1999 | Psychodynamic psychotherapy supervisor |
| 1996-2002 | Supervisor of new intakes in the outpatient department of Butler Hospital |

**University of North Dakota**

| | |
|---|---|
| 2005-present | Clinical Instructor in outpatient psychiatry |
| 2005-present | Courses and seminars |
| 1992-1996 | Clinical Instructor in hospital and C-L psychiatry |
| 1992-1996 | Psychodynamic psychotherapy supervisor, Courses and Seminars (Introduction to Clinical Psychiatry, Neuroscience, Psychiatric Interviewing, Socio-cultural Psychiatry, Psychotherapy Case Conference) |



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 30 of 45

**PERSONAL INFORMATION:**

| | |
|---|---|
| Date of Birth: | November 29, 1954 |
| Place of Birth: | Slavonski Brod, Croatia |
| Citizenship: | U.S.A. |
| Name Change: | March 1, 1999 (Formerly Zeljko Jocic) |

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 31 of 45

EXHIBIT B

Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 32 of 45

TDI-1 (5/02)

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-05-1

# APPLICATION FOR BENEFITS

TEMPORARY DISABILITY INSURANCE DIVISION
Department of Labor and Training
PO Box 20070, Cranston RI 02920-0941

NOV 12 2004

COMPLETE BOTH SIDES OF FORM

1. Date of Birth (Month/Day/Year) 12-29-40
2. Phone Number (401) 232-9296
3. Male (Female)
4. Check each day of the week you normally work: Sun ☐ Mon ☑ Tue ☑ Wed ☑ Thu ☑ Fri ☑ Sat ☐
5. Date you last worked before this disability began? 10/4/04
6. What is your disability? anxiety & depression
7. Date first unable to work because of this disability? (You are claiming TDI from this date) 11/3/04 11/4/04
8. Date of your examination for this disability closest to date entered in item 7. 11/3/04
9. If you have recovered and/or returned to work since this disability began enter date(s) below.

Date recovered:
Date returned to work:

BARBARA ANTONUCCI
135 SCENERY LN
JOHNSTON, RI 02919

05 1

Correct your Name and Address if necessary.

10. Have you applied for or received TDI benefits in the last 12 months? NO ☑ YES ☐
11. What is your usual job? Staffing Coordinator
12. Have you applied for or received Unemployment Benefits in the last 12 months? NO ☐ YES ☑ ▶ Date last week unemployment paid for: 10/30/04
13. Was your disability listed in item 6 work related? NO ☑ YES ☐

14. Have you filed a Workers' Compensation claim for this disability? YES ☐ NO ☐ ▶ If NO, explain why not?

If YES, please give the name and address of the Workers' Compensation insurance co.:

If you have a lawyer representing you in this matter, provide his/her name and address:

15. Have you received ANY Workers' Compensation payments for this OR ANY OTHER disability? NO ☐ YES ☐ ▶ If YES, DATES FROM: TO:

| 16A. Your DR. Zalko Leon, MD. | 16B. Your DR. |
|---|---|
| Address 345 Blackstone Blvd. | Address |
| City Prov. State RI Zip 02906 | City State Zip |
| Telephone Number 274-8484 | Telephone Number |

17A. Were you hospitalized for this disability? NO ☑ YES ☐ ▶ 17B. If YES, name and address of hospital:

Date admitted to hospital. FROM: TO:

| 18A. Last employer Cherry Hill Manor | 18B. Name of employer |
|---|---|
| Address 2 Cherry Hill Rd | Address |
| City Johnston State RI Zip 02919 | City State Zip |
| Telephone Number (401) 231-3102 | Telephone Number |
| Was your work performed in RI? No ☐ Yes ☑ | Was your work performed in RI? No ☐ Yes ☐ |
| Employed FROM: 2/86 TO: 10/4/04 | Employed FROM: TO: |

| OFFICE USE ONLY | DEP | PHYS | PHYS | DD | SE | WC | UI | BYB | BYE |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | Zalky | | Y | | | 10/30/04 | 11/13/04 | 11/12/05 |

TDI00018

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 051

TDI-1A (5/03)

18C. Name of employer

Address

City State Zip

Telephone Number

Was your work performed in RI? Yes ☐ No ☐

Employed FROM: TO:

19. In your present employment, are you a corporate officer?
YES ☐ NO ☐

18D. Name of employer

Address

City State Zip

Telephone Number

Was your work performed in RI? Yes ☐ No ☐

Employed FROM: TO:

20. List beginning and ending dates of any period of self-employment during the past two years: FROM TO:

[illegible]

**DEPENDENTS' ALLOWANCE**

21. How many children under age 18 are dependent upon you? (include children 18 and older who are handicapped) _____? List below ONLY the names of dependents who are your OWN, NATURAL, ADOPTED, STEP children or court appointed wards.

| 22. CHILD'S NAME First / Last | Relationship (natural, adopted, step child, or ward) | Date of Birth (mm/dd/yy) | Child's Social Security No. (Required if child is over 12 months old) |
|---|---|---|---|
| 1) | | | |
| 2) | | | |
| 3) | | | |
| 4) | | | |
| 5) | | | |

23. Do all children counted in item 21 live with you? YES ☐ NO ☐

24. Is any other person claiming your child/children as a dependent under the Rhode Island Temporary Disability Act? YES ☐ NO ☑

25. If YES, list name, address and Social Security number of the person claiming such children:

26. If any named above is 18 or older, indicate type of incapacity - mental or physical.

**REQUEST FOR DIRECT DEPOSIT Do NOT complete unless you want direct deposit.**

27. Name of your bank: Bank Rhode Island

28. Bank Account Type (Check One): Checking ☑ Savings ☐

29. Bank Account Number: 11022943

30. Bank Routing Number: 0115-0168-2

CH

I hereby authorize the Rhode Island Department of Labor and Training to directly deposit my Rhode Island Temporary Disability Insurance payment to the bank account designated on this application.

YOUR SIGNATURE Barbara Antonucci DATE 11/9/04

**SIGNATURE REQUIRED**

**CERTIFICATION & MEDICAL INFORMATION RELEASE FOR RHODE ISLAND TEMPORARY DISABILITY INSURANCE**

I certify that I am/was physically unable to work during the period for which I am claiming benefits and that the information that I have provided on this application is true and complete.

AND I hereby authorize my physician, hospital or other health care provider to make available to the Rhode Island Temporary Disability Insurance Division any medical information, including hospital records, which may be requested. I agree that a photocopy of this release shall be as valid as the original.

YOUR SIGNATURE Barbara Antonucci SS NO 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 Date 11/9/04

TDI00019

10/23/2014 04:47 FAX 001/002

TDI-8 (Rev.10/01)

RHODE ISLAND DEPARTMENT OF LABOR AND TRAINING
TEMPORARY DISABILITY INSURANCE DIVISION
P.O. Box 20100 Cranston, RI 02920-0941
TELEPHONE (401)462-8447 FAX (401)462-8486

# STATEMENT OF ATTENDING PHYSICIAN

PLEASE COMPLETE THE SECTIONS INDICATED AND FAX OR MAIL THIS FORM IN THE ENCLOSED ENVELOPE WITHIN FIVE WORKING DAYS OF 11/12/04

ANY INCOMPLETED ITEMS, INCLUDING THE PHYSICIAN IDENTIFICATION INFORMATION AND SIGNATURE, WILL DELAY YOUR PATIENT'S ELIGIBILITY DETERMINATION.

J068

DR ZELKO LEON
CENTER FOR MOOD &
ANXIETY DISORDERS
345 BLACKSTONE BLVD
PROVIDENCE, RI 02906

TDI00021

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-05-1 — CLAIM NUMBER
12/29/40 — DATE OF BIRTH
BARBARA J ANTONUCCI — NAME OF PATIENT
135 SCENERY LANE — ADDRESS
ADDRESS
JOHNSTON, RI 02919 — CITY, STATE, ZIP CODE

PLEASE COMPLETE SECTIONS A AND C

**A:** PLEASE COMPLETE THIS SECTION.

1. Your diagnosis. Adjustment Disorder  I. C. D. Code (if known) 309. 28
2. Date of disability? ____ Is disability work connected? ☐ YES ☑ NO
   If YES who are you billing? ____
3. Date of examination for this disability closest to the date shown in section C below: 11/3/04
4. Date of most recent examination? 11/3/04
5. Name of hospital? N/A Date admitted? ____ Date discharged? ____
6. Type of operation? ____
7. Date of operation? ____ Able to work pending operation/delivery? ☐ YES ☐ NO
8. Pregnancy: Date delivered? ____ Expected delivery date? ____
   Complications to pregnancy (explain) ____
9. Is patient capable of signing checks and documents? ☑ YES ☐ NO

**B:**

1. Payments to patient have been authorized for a total of ____ weeks ending on ____
2. The most recent examination of this patient was on ____
3. Can patient return to customary work on a full-time basis? ☐ YES ☐ NO If Yes, when? ____
4. Have complications developed, has surgery been performed, and/or has there been a change in diagnosis, since your last report? If yes, please explain: ____

**C:** PLEASE COMPLETE THIS SECTION.

FROM THIS DATE 10/31/04 patient will be unable to work for 4 WEEKS

(PLEASE ESTIMATE NUMBER OF WEEKS. AVOID USE OF TERMS SUCH AS UNKNOWN, UNDETERMINED OR INDEFINITE. IF THERE IS CONSIDERABLE DOUBT, PLEASE INDICATE THE MINIMUM NUMBER OF WEEKS THAT THE PATIENT WILL BE UNABLE TO WORK).

SIGNATURE DR. [signature] PRINTED NAME DR. ZELKO LEON

LICENSE NO. MD 09102 TELEPHONE NO. 274-8484 DATE 11/23/04

11/26/2004 FRI 08:59 [TX/RX NO 5376] 001

EXHIBIT C

Page 57

A It's almost like saying how many times did I go out to dinner. I don't know.
Q Do you gamble as frequently as you go out to dinner?
A No, but it's not something you keep track of.
Q How many times have you been to Mohegan Sun in the last two years?
A I have no idea.
Q More than five?
A I don't know. I really don't know.
Q As you sit here today under oath you can't say whether it's within more or less than five times in the last two years that you've been to Mohegan Sun?
A No, I'm not going to pinpoint it because I don't remember, honestly. That's my honest answer. I don't remember, so there's no way I can pinpoint it.
Q I'm not asking you to pinpoint it. I'm asking you to tell me whether it's more than five or less than five?
A I don't remember.
Q Can you say it's more than one or less than one?
MS. BEAUVAIS IAFRATE: Objection as to form. You lost me. More than one or less than one in what period?
MR. CAMPBELL: I note your

Page 58

objection.
Q Is it more than one?
THE WITNESS: Like she said, more than one what?
MR. CAMPBELL: In the last two years to Mohegan?
A More than one, yes.
Q But you can't say it was more than five?
A No.
Q Who did you go with?
THE WITNESS: Who did I go with?
MS. BEAUVAIS IAFRATE: To Mohegan.
THE WITNESS: To Mohegan?
MR. CAMPBELL: That's my question, yes, who did you go with to Mohegan.
A My husband, yes. Sometimes my sister. I don't know.
Q Who's your sister?
A Joan Jutras. Joan, J-U-T-R-A-S.
Q Where does she live?
A 133 Scenery Lane.
Q Anybody else you went with to Mohegan?
A Not that I remember.
Q Who did you go with to Foxwoods?

Page 59

A My husband.
Q Anyone else?
A No, not that I remember.
Q And who do you go with to the track?
A Myself, my sister, my husband. Whoever.
Q Anyone else that you recall?
A No, not that I can think of offhand.
Q And you believe that during this first three-week period of unemployment you may have gambled during that period of time?
A I don't remember.
Q It's possible?
A Anything is possible. Do I remember doing it, no.
Q Do you remember not doing it, making a conscious decision to stop doing it?
A No, I never made a conscious decision to stop doing it. I'm not a gambler, like, per se. I don't gamble thousands. I mean, I don't know. I never think about it, really. I mean, you're saying did I make a conscious effort?
Q No. I'm asking, do you recall making a conscious decision to stop gambling during the three-week period of time that you were --
A I don't recall. I can't say I never went. I don't

Page 60

remember.
Q After unemployment, do I understand that you sought TDI benefits?
A Correct.
MR. CAMPBELL: And I'll just mark these.
(Whereupon Defendants' Exhibit C is marked for identification.)
Q I'm showing you what's been marked as Exhibit C, and I would turn to, if you see at the bottom how these pages are mark TDI, it starts with 00001?
A Oh, okay.
Q Could you turn to 00018. And if you would turn one more page to 19. Do you recognize 18 and 19 as your application for benefits?
A Uh-hum.
Q You have to answer yes or no.
A Oh, yes. Sorry.
Q That's okay. This is all your writing?
A Yes.
Q You made all the marks on this page?
A Yes.
Q I'm sorry, on both pages, 18 and 19.
A Yes, my writing, yes.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 37 of 45

Page 61

Q And you submitted this application for benefits because you're unable to work, correct?
A Yes.
Q And you understood that being unable to work was a condition of receiving these TDI benefits, correct?
A Correct.
Q And you filled out this application, correct?
A Yes.
Q And you were truthful and accurate in the application?
A I believe so. I tried to be.
Q Do you see on the second page, 19, where it indicates that it is, looking at the line right above your signature, "The information I have provided on this application is true and complete," do you see that?
MS. BEAUVAIS IAFRATE: Where are we?
A Oh, no.
Q "That the information...."
A Oh, yeah, yes.
Q It says, "I certify that the information that I provided on this application is true and complete," do you see where it says that?
A Yes.

Page 62

Q And you had signed that?
A Yes.
Q And you meant it to be truthful?
A I believe so, yes, as far as I know.
Q You believe that you meant it to be truthful?
A Well, yes. I mean, I filled it out the best I could. I believe I did.
Q Did you mean anything to be untruthful?
A No, no, no, of course not.
Q And you understand that being completely unable to work is a condition of receiving benefits for TDI, correct?
A Yes, that's what the doctor put me out of work, right.
Q And did you apply for this because you believed yourself to be completely and totally unable to work?
A Correct, yes.
Q And do you stand by the recommendations that you made in this application for benefits?
A I believe so. As far as I know, everything is truthful.
Q Is there anything on here, and please take a moment to review, that's not truthful?

Page 63

MS. BEAUVAIS IAFRATE: That's not truthful.
A Not that I see. It looks like it's all accurate to me, as far as what I believe to be truthful at the time.
Q You didn't intentionally misrepresent anything on here, did you?
A No.
Q You would agree with me that if you did provide untruthful information, that that would be wrong?
A Of course.
Q In fact, it would be fraud?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I mean, I would have no reason to not be truthful. I don't know.
Q Do you understand that if you had provided inaccurate information on this, that it would be false?
A Well, I probably would think that, but, I mean, I don't know the legal things. I mean, I just answered it truthfully, so.
Q And if you provided untrue information, you would agree with me that that would be fraudulent?

Page 64

A Right, I would think so.
Q And if you would turn these to the page that's been marked 21, TDI00021. I think you're on the right page. I just can't find the 21.
A I can't either.
Q It's the one right after 20. Somewhere on here. Oh, there it is, it's right in the middle. Do you see it there, TDI00021?
A I do.
Q Do you see that this is a physician's statement from Zell Leon?
A Okay. Yes.
Q And you see that he has diagnosed you with an adjustment disorder?
A I never heard that term, but I see it on there now.
Q If you would flip back to 18, you wrote at the top "Anxiety and depression?"
A Right.
Q Did you understand --
MR. CAMPBELL: Strike that.
Q Do you know of any difference between what he has set forth as your diagnosis and what you set forth as your disability?
A No, I never ever heard this, adjustment -- what does



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 38 of 45

Page 65

it say, adjustment disorder. I have never heard that term.
Q Do you understand that this was submitted on your behalf to TDI?
A Yes.
Q As you look at it, is there anything on there that you find that is not accurate?
MS. BEAUVAIS IAFRATE: On the doctor's one?
Q Yes. I'm looking at 00021.
A No. I guess it's pretty accurate. I don't know about the diagnosis. That was never discussed.
Q And do you stand, looking again at 18 and 19, do you stand by the representations you had made on your application?
A Yes. I mean, as far as my knowledge, I was going for anxiety and depression, so that's what I put down. I don't know what that other term means that he wrote. If it means basically the same thing, I don't know.
Q I'm just asking about the representations on 18 and 19 that you put down. Do you stand by them?
A As far as what I can see, I believe so, yeah.
Q And you have reviewed this document?

Page 66

A Yes, I don't see anything wrong.
Q During the period of time that you collected TDI, do you agree with me it was from November of 2004 until April of 2005?
A That seems right.
Q And that you got $312 a week?
A I don't remember. That seems like it could be wrong.
Q And that your total TDI benefits was $8,344 during that period of time?
A That I don't remember.
Q Could you turn to page five, TDI00005.
A Oh, way back?
Q And do you see there a payment for CWE date, that's the week ending 11/6/04. Does that sound like about the time that you first started getting TDI?
A Yes, that would be about right, yes.
Q And you see the check amount, 312?
A Yes.
Q And the benefit amount 312?
A Yes.
Q If you would turn to the next page. Do you see another series of amounts?
A Yes.

Page 67

Q And this corresponds to the period of time February through April of 2005?
A Uh-hum.
Q And then, finally, it seems to conclude on the week ending 4/29/06?
A Okay.
Q I'm sorry, strike that. It seems to conclude at the period of time ending 4/23/05, on page six?
A Yes, okay.
Q Does this appear to be that on pages five and six the total amount of TDI that you received during this period of time of November through April of '05?
A Yes, I guess if that's what they put, as far as the amounts and everything, that sounds like -- it looks right.
Q Okay. Did you take any trips out of state during this period of time?
A From '04 until now?
Q From November of '04 until April of '05.
A To April of '05. Not -- I don't remember. We may have gone to New Hampshire with friends, but I'm not positive, because we did go with friends, but I'm not sure if it was that period. We went a weekend

Page 68

to New Hampshire.
Q Did you also go to Altantic City in March of '05?
A I may, but that's the one -- isn't that the one that I said I did go? Yes, yes, that's when I went on the bus trip.
Q Did you go to Atlantic City in March of '06 as well?
A March of '06. That's last year. Oh, then it's not '05. I just went '06. I don't remember. I did go to Atlantic City between February and March. I don't recall if it was both '05 and '06 that we went on each.
Q Generally, once a year?
A Yes. Like, now I'm going in the end of February. So, it's like a bus trip with girls, yes. Well, yes, but we go with a bunch of girls.
MR. CAMPBELL: You indicated that you want to take a break. We can take one now.
(RECESSED AT 10:50 A.M.)
(RESUMING AT 11:03 A.M.)
MR. CAMPBELL: Shall we go back on the record.
Q Showing you a document that we're going to mark Exhibit D.
(Whereupon Defendants' Exhibit D is



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 39 of 45

Page 89

there?
A One of the girls that was, I think she was acting director of nursing, she was the assistant director, I believe, and then acting director, and originally the director of nursing was doing all of that, staffing, and then she spoke to me and asked me if I would like -- would I be interested in doing staffing, and that's how it all came about, because previous to that they never had a staffing coordinator.
Q And you believe this is somewhere around 1999?
A Yes, around that time.
Q And who is it that approached you?
A Dawn Gonnelli, G-O-N-N-E-L-L-I.
Q And did Dawn offer you the position?
A Yes, she spoke to me and along with the administrator.
Q Who was who?
A I think at the time it was Jeff Martin.
Q And you accepted the position?
A Yes. Well, we discussed it, but I said I would try it. I didn't really -- she said she thought I would be good at that position, so that's how it came about.

Page 90

Q And after beginning it, did you continue in that position until you were discharged?
A Correct.
Q And who did you report to in that position?
A The director of nursing. I always worked more with the director of nursing.
Q So, at all times during your employment as staffing coordinator, the supervisor was the director of nursing?
A Correct.
Q And your supervisor would assign you duties?
A Basically. You kind of know exactly what you have to do, so it's kind of, you know, you know what you're doing, so you just do it. It's not like I'll assign you anything. It's kind of just there to do.
Q You understood that the director of nursing had the authority to assign you to perform duties?
A Right, right.
Q And that there was no limit on the duties that the director of nursing could assign you to do, is that right?
A Well, I could say it was all -- it was right there. There wasn't, like, they didn't come to me and say, here, do this kind of thing.

Page 91

Q My question is, were you aware of any limit on the authority of your supervisor, the director of nursing?
A Oh, no.
Q To assign you duties as he or she saw fit?
A Correct, I understand that.
MR. CAMPBELL: Mark this next.
(Whereupon Defendants' Exhibit G is marked for identification.)
Q Showing you what's been marked as Exhibit G. I'd ask you if you recognize this?
MS. BEAUVAIS IAFRATE: Can I just check, is the interrogatories F, is that what we said? Okay. Thank you.
Q Do you recognize this document?
A Yes.
Q Is it an affidavit that you signed?
A Yes.
Q And you signed it under the pains and penalties of perjury?
A I believe so. I don't know if -- it doesn't say
Q And you were truthful in this document?
A I believe so.
Q And it indicates that you were unemployed until

Page 92

August 1, 2005, paragraph two there?
A Yes.
Q And then you were hired at a full-time job performing similar work?
A Correct.
Q And you were making more than you did at Cherry Hill?
A Correct.
Q Now, prior to that, I think we had talked about those first three weeks you were receiving unemployment?
A Yes.
Q And then from November until April, November 2004 until April 2005 you were receiving TDI?
A Yes.
Q And during that period of time you were completely and totally unable to work in any capacity, is that right?
A Correct, according to the doctor. He said he was to be out of work, yes.
Q Did you believe that to be true?
A Of course.
Q So, there's no way you could have worked during that period of time, correct?



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 40 of 45

Page 93

A Not if the doctor wouldn't allow me to, of course not.
Q I'm asking independent of your physician, did you have a belief that you were unable to work?
A Right, I could not work, right.
Q And there was no way that you could have become gainfully employed during that period of time?
A I do not believe. Not in the condition I was in.
Q And from April 2005 until August of 2005, you then became -- I'm sorry, from May of 2005 until August of 2005 you then became able to work?
A Yes.
Q But during that period of time you were unable to find work?
A Right. I did look for work, yes.
Q But you were unable to find work?
A Until I found this one, that particular job I got hired for.
Q And you collected unemployment throughout the entire period of time, correct?
A Correct.
MS. BEAUVAIS IAFRATE: Objection as to form. Sorry.
Q The period of time from May 2005 until August of

Page 94

2005?
A Right, until I told them I had returned to work.
Q So, during the entire period of October of 2004, your discharge, until you got re-employed on August 1, 2005, you were either collecting TDI or unemployment?
A Correct, yes.
Q And it was approximately $311 or $312 a week?
A Yes.
Q And, so, it indicates in paragraph one here that you didn't pay for healthcare benefits?
A Cherry Hill gave you healthcare benefits, the employee only, yes.
Q Okay. Is that what you had?
A Yes.
Q Employee only?
A Yes.
Q Was your husband uninsured?
A He was on Medicare, disability, Medicare.
Q Throughout the entire time that you were at Cherry Hill?
A No, no, no. At first he was employed, so he had his own pension, and then they gave me mine paid in full. They gave me coverage without payment.

Page 95

Q Individual coverage?
A Right.
Q And then once he ceased employment --
A Right.
Q -- he was on disability?
A Yes.
Q And he had insurance at that point?
A Right.
Q You were individually covered at the time of your discharge?
A Yes.
Q And then you elected COBRA?
A Correct.
Q And you believe that was $400 a month?
A It started off at 400. I think it went up a little bit after that. I don't know the exact figure, but I thought it increased a little bit just before I got off of it.
Q And do you know if Cherry Hill continues to provide completely subsidized individual coverage healthcare?
A Oh, I have no idea.
Q That could have changed?
A Of course. I have no idea what they're doing now.

Page 96

Q You estimate that it cost you approximately $6,000 from November 2004 until February of 2006?
A Figuring from 400 a month, approximately that, right.
Q In February of 2006 --
MR. CAMPBELL: Strike that.
Q When did you become eligible for health insurance at Haven Health?
A I didn't take health insurance at Haven Health, because I do not like their plan, so I applied for my own Blue Chip and Medicare.
Q When did you do that?
A I'm trying to think. Let's see. What was the date here? In December of '05 I believe I called for Medicare, because I would have been turning 65 the end of that month, if I remember, if that's correct.
Q So, in December of '05 you were covered for health insurance with Medicare?
A I think December 1st of '05 was Medicare, correct.
Q And do you have some supplemental policy?
A Blue Chip.
Q And what's that cover?
A What does it cover? You mean as far as the benefits?



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 41 of 45

Page 239

A Not that I recall.
MS. IAFRATE: I'm going to object to form just because I don't think she gets the treatment, her treatment.
Q Had you ever consulted any medical care provider for any of the stress that you were indicating?
A I may have spoken to my primary doctor or he may have said it to me because of my blood pressure being high.
Q So, your blood pressure was high?
A Yes.
Q Prior to your discharge?
A At times, yes.
Q Would the stress that you're talking about make you anxious?
A Maybe at times, but I don't know.
Q Would the --
A It's hard to describe, to be honest with you. Maybe at times I would feel a little anxious.
Q Would that cause you difficulty in falling asleep?
A I always have problems with sleeping.
Q Is that something that you've historically felt?
A I have had problems with sleeping due to medication I was on before.

Page 240

Q And also due to other factors, or is it solely because of medication?
A I think it was more the medication.
Q Which medication?
A I was on Prednisone.
Q And how long had you been on that?
A I really don't recall. I'm on it off and on, but I was on it for a period, and I wouldn't even begin to guess when that was.
Q Why don't we put it in the context of the other dates that we know, were you on Prednisone prior to your discharge in October of 2004?
A Periodically or every day? I don't know.
Q Periodically?
A Periodically, more for my asthma and sinus infections.
Q Is it fair to say you had been on Prednisone off and on for several years?
A It could be. The time goes by fast. It doesn't seem that long, but probably.
Q And during that time you would agree with me that you have some problems falling asleep?
MS. IAFRATE: Objection as to form.
A Sometimes.

Page 241

MS. IAFRATE: Answer unless I tell you not to.
A Sometimes.
Q You indicated that you had sinus infections, is that right?
A Yes.
Q I'm showing you what's been previously marked in this deposition as Exhibit C. Could you please turn to the page that's marked 32. You have that there in front of you?
A Yes.
Q And could you just look at the page following that, what's been marked as TDI00033. That's your signature there?
A Yes.
Q And this is your application for TDI benefits from May of 2006, is that right?
MS. IAFRATE: Objection. Just give her some time to make sure she's read the entire thing. I don't want her to answer any question until she looks at it.
Q By all means, take whatever time you need.
A Yes.
Q This is your application for benefits from TDI as a

Page 242

result of a sinus infection; is that right?
A Correct.
Q And you filled out applications like this before, correct?
A Yes.
Q In fact, you filled out an application like this for TDI benefits following your employment at Life Care; is that correct?
A Correct.
Q This sinus infection, that was something that was not related to your work at Haven Health; is that right?
A That's correct.
Q And if you would look at question number 13 there, on what's been marked as TDI00032, it indicates it was your disability connected to your job. Do you see that question?
A Yes.
Q And you had marked no, correct?
A Right.
Q And you understand that TDI is for disabilities that are not related to work, correct?
MS. IAFRATE: Objection as to form.
A Yes.

Page 243

MS. IAFRATE: I'm going to lodge an additional objection only because that calls for an --

MR. CAMPBELL: I believe that the rules that we set up for this deposition is that you object as to the form of the question and save subsequent argument for the Court, to the extent it's necessary. I would ask that you respect those rules.

MS. IAFRATE: I'll try, but if I feel it's necessary, then I might throw something else in.

Q Ms. Antonucci --
A Yes.
Q -- you would agree with me that from time to time you would offer bonuses to licensed nurses in order to have them pick up a shift, correct?

MS. IAFRATE: Objection as to form.

A Correct.
Q And you would do that on behalf of Life Care?
A Yes.
Q I'm showing you what's been previously marked as Exhibit Q in this matter. You recognized that, I believe at the first day of your deposition as a

Page 244

tally sheet of bonuses that was turned into payroll in order for individuals to be paid; is that correct?
A Yes.
Q I'm going to ask you to turn to 1592, DEF001592. Previously I recall you testifying that when you wrote a dollar amount, you don't put the dollar sign before it; is that right?
A Usually I don't.
Q And at the top of this sheet do you see the number 200 without a dollar sign?
A Yes.
Q And that's your handwriting, correct?
A I believe so.
Q And so that indicates that on the week of September 12th a $200 bonus was provided to at least some of the staff in order to get them to work, is that correct?

MS. IAFRATE: Objection as to form.

A Yes.
Q If you would turn to page 1594, two pages further, do you see similarly at the top of the page it says $200 bonus?
A Yes.

Page 245

Q And that's your handwriting?
A Yes.
Q And this indicates that, again, a $200 bonus was offered to at least some of the staff in order to get them to work; is that right?

MS. IAFRATE: Objection as to form.

A Yes.
Q In fact, at the top of the page it indicates DaCosta was paid a $200 bonus for two different shifts; is that right?

MS. IAFRATE: Objection as to form.

A Correct.
Q And then under that you see the name A-D-D-E-S-I, Addesi, and that indicates a $200 bonus was paid to that individual to pick up a shift?

MS. IAFRATE: Objection as to form.

A Yes.
Q And would you indicate that the same thing is indicated for the third name down, Johnson, $200 bonus?

MS. IAFRATE: Objection to form.

A Yes.
Q You would agree with me from time to time a $200 bonus was offered to staff and paid to staff in

Page 246

order for them to pick up shifts, correct?

MS. IAFRATE: Objection to form.

A At times.

MS. IAFRATE: Give me a chance to do my objection before you answer so she's not struggling.

THE WITNESS: Okay.

(Whereupon Defendant's Exhibit V is marked for identification.)

Q I'm showing you what's been marked in this deposition as Exhibit V. This appears to be a scheduling sheet, does it not?
A Yes.
Q And it's for Friday, October 1st, 2004, correct?
A That's what -- it's not very clear, but that's what it looks like.

MR. CAMPBELL: I'll mark the other one.

(Whereupon Defendant's Exhibit W, X, Y and Z are marked for identification.)

Q If you would please turn to W, which is DEF1031. Do you have it there in front of you?
A Uh-hum, yes.
Q And do you see at the top there there's two lists of



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 43 of 45

Page 299

MS. IAFRATE: Objection as to form.
A Yes.
Q And he --
A But, like, not just have you called nurses, you know, not just a simple question. He just went on and on, and then he went back to Pam's office.
Q And you believe that he was asking you about the schedule because of concerns that Pam had?
MS. IAFRATE: Objection as to form.
A I guess. He never approached me about it other times, and I had seen him in the building, you know, other times, earlier before she was hired.
Q Did he ever say or do anything that made you think that he didn't like you because of your age?
MS. IAFRATE: Objection as to form.
A I don't believe so.
Q Did Steve Haase ever do anything or say anything that made you think that he didn't like you because of your age?
MS. IAFRATE: Objection as to form.
A No.
MR. CAMPBELL: Aside from the questions on which I reserve my right to move to compel and reconvene this deposition, I have nothing

Page 300

further at this point.
MS. IAFRATE: Okay. I'm going to take a few minutes to myself because I think I'm going to have some questions, but I want to take a few minutes to myself, so if we can just take a break.
(BRIEF PAUSE)
MR. CAMPBELL: If it makes sense, I know I rested, just to note, I have received a Subpoena Duces Tecum and a request for documents today for the deposition on Wednesday, and I'll certainly attempt to cooperate with Carley and get you what you need, but we're going to have to either reschedule this, or, you know, work out a compromise as to what you can get before the deposition, but we're only going to make Rebecca Santin available the one day, so we'll either -- and we can talk after the conclusion of the deposition, if that's your preference. I believe that the rules state that there's 30 days to respond to a request for documents, and the two days from now that the deposition is scheduled to take place simply isn't enough time to respond completely to this.
MS. IAFRATE: Okay. Just to note my

Page 301

response to that, is that these are documents that were part of, or at least the documents that relate to Rebecca Santin, who is a witness for a deposition on Wednesday and not a defendant or a named defendant, those documents were part of a first request for production of documents which have not ever been received, and I believe counsel has already indicated he will not provide those particular documents, and so in order to try to have the deposition with some meaning on Wednesday, seeing that there is no time for a motion to compel, I did subpoena them under Rule 45, and there's no 30-day time limit. I know we probably disagree on which rule applies, but, either way, I'm willing to talk to you about it afterwards to see what we can do in terms of getting any documents, but the reason why there's this necessity is because you've already indicated you're going to stick me with the seven-hour rule, but if I do not get what I need, probably what I will end up doing is having to move to compel to bring Rebecca back if it turns out that I then get some documents that I may have wanted to ask her about and we can address that at that time, depending on the course of events.

Page 302

MR. CAMPBELL: What's my hope, we will be able to figure it out, Carley, but, in any event, I haven't given you any final position on any of the documents. I believe that we were corresponding back and forth about the request for production, but we are going to produce her once and once only, so that you'll have to decide whether that's Wednesday or not, but we won't be bringing her back, absent a court order to the contrary.
MS. IAFRATE: I understand.

EXAMINATION BY MS. IAFRATE

Q Barbara, I'm going to ask you just a few questions to clarify or to elaborate on some of the things that you've already testified about. One of the things that came up at the last deposition, and perhaps even today again, was the word TDI, which is Temporary Disability Insurance. You understand what that is, correct?
A Yes, yes.
Q Okay. And so after you were fired from Cherry Hill Manor, you went on TDI, correct?
A I went on unemployment first and then TDI.
Q So, at some point after you were fired you did apply for TDI, correct?

Page 303

A Yes.
MR. CAMPBELL: Objection as to the form. I just request that you wouldn't ask leading questions to your own client, but that's my objection to the form.
MS. IAFRATE: Okay. I'm going to ask them the way I want to, and if you want to object, that's fine.
Q What was the reason for going on TDI?
A Because the doctor said I was ill and unable to work.
Q And what was ill? What was wrong with you?
A Anxiety, depression.
Q And why were you depressed?
A Because of being fired.
Q Okay. And is that the same reason for why you had anxiety?
A Yes.
Q I'm going to ask you about these two documents that you just indicated during this deposition that you were confused about, and that is Defendant's U and Defendant's S. I'm going to show you both of these documents at the same time. I'm going to ask you to take your time. I'm going to refer you to the

Page 304

second page of Defendant's U and the only page of Defendant's S. Take a look at both of those documents.
(WITNESS PERUSES DOCUMENTS)
A Okay.
Q Did you have a chance to read both of them or look at both of them?
A Yes.
Q Defendant's U, when did you first receive this document?
A Yes.
Q Can I note for the record it's DEF00172.
A That's when it was terminated, the day I was terminated.
Q So this is the notice that you were given the day you were fired?
A Correct.
Q Okay. And that's the first time you ever saw it?
A Correct.
Q Okay. And on the bottom there you signed it indicating that you had been given a copy of it, correct?
A Yes.
MR. CAMPBELL: Objection as to form.

Page 305

Q Now, that document, this document 172, Defendant's 172, is a different document from Defendant's 174, correct?
A Yes.
Q Okay. Now, looking at Exhibit S, which is also 174, when was the first time that you ever saw that document?
A When I saw it, you had it, you showed me this.
Q When I showed it to you?
A Yes.
Q And when did I show it to you?
A I think it may have been before the deposition.
Q The last deposition that we had?
A Yes, yes.
Q Not just before this deposition?
A No, no.
Q Okay. And did you ever see that document when you were working at Cherry Hill Manor?
A No.
Q And if you would look at the bottom there, that's a spot where it says this notice was given to, or this notice was given on?
A Yes.
Q Okay. And you never signed there?

Page 306

A Right.
Q Now, the last deposition you said that you recognized that document, correct?
A Yes.
MR. CAMPBELL: Objection as to form.
Q And I think you may have said that you received it?
A Yes.
MR. CAMPBELL: Objection as to form.
Q And is that accurate?
A No.
Q Okay. Why did you say that you received it?
A I think I was getting confused with the two.
Q Okay.
A This one kind of, they looked alike and I think I got confused with thinking this was this.
Q So, you're saying you confused S with U?
A Correct.
Q And, so, in fact, you had not received S when you were working at Cherry Hill?
A Correct.
MR. CAMPBELL: Objection as to form.
Q Now, Mr. Campbell asked you a couple of times about the change in your work hours, correct?
A Yes, yes.



Case 1:06-cv-00108-ML-DLM Document 41 Filed 05/03/2007 Page 45 of 45