UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| BARBARA ANTONUCCI,<br>Plaintiff,<br><br>v.<br><br>LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity,<br>Defendants. | C.A. No. 06-108-ML |

## DEFENDANTS' RULE 56 STATEMENT OF UNDISPUTED FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule Cv 56, Defendants, Life Care Centers Of America ("Life Care"), Pamela Charron, and Steve Haase (collectively "Defendants") submit Defendants' Rule 56 Statement of Undisputed Facts in support of their Motion for Summary Judgment.

### Relevant Background Information On Cherry Hill Manor

1. Defendant Life Care is a corporation incorporated in Tennessee and has its principal place of business at 3570 Keith Street, Cleveland, Tennessee. Life Care owns and operates nursing homes throughout the United States, including Cherry Hill Manor ("Cherry Hill"), a nursing home located in Johnston, Rhode Island. (Affidavit of Cindy Cross para 1-2). The Affidavit of Cindy Cross was submitted to this Court on March 8, 2006 with Defendants' Notice of Removal, (Document No. 1).

2. In 2004, the Executive Director of Cherry Hill was Defendant Steve Haase. (Haase Tr. 25)[1]. Mr. Haase held this position from approximately September 2003 until April 2006. (Haase Tr. 25, 53).

3. From the end of July 2004 until approximately October 2005, the Director of Nursing Services ("DNS") at Cherry Hill was Defendant Pamela Charron. (Charron Tr. 65; Sweeting Tr. 41-42).

4. Prior to Ms. Charron, the DNS was Celeste Harris, who held the position for less than a year and then voluntarily transferred to an alternate position at Cherry Hill. (Haase Tr. 251-252; Pereira Tr. 26; Sweeting Tr. 23-24).

5. Cherry Hill has capacity to serve approximately 172 residents on three floors. (Sweeting Tr. 87). Residents are cared for by nurses – including Licensed Practical Nurses ("LPNs") and Registered Nurses ("RNs") – and by Certified Nursing Assistants ("CNAs"). (Haase Tr. 37, 224-227; Sweeting Tr. 9, 85-86).

6. Nurses and CNAs generally work three shifts: 7 a.m. to 3 p.m.; 3 p.m. to 11 p.m. and 11 p.m. to 7 a.m. (Haase Tr. 224-227). There is no Rhode Island state minimum number of nurses or CNAs that are required to be assigned to work on a unit or shift. (Haase Tr. 226; Sweeting Tr. 100; Pl. Tr. 250-252). Rather, appropriate staffing levels in at Cherry Hill are determined by Life Care management. (Haase Tr. 227; Sweeting Tr. 100-103).

---

[1] References to the transcripts of the depositions of Steven Haase, Pamela Charron, Donna Sweeting, Joseph Pereira, Plaintiff, and Rebecca Santin are set forth as "Haase Tr. ___," etc., and the relevant excerpts from these depositions are attached to the Affidavit of Christopher J. Campbell ("Campbell Affidavit") as Exhibits A-F.

7. The number of staff assigned at Cherry Hill varies, according to the particular shift, the level of patient acuity and the number of residents on each floor. (Haase Tr. 224-227; Sweeting Tr. 85-86, 97-99, 103-106).

8. Throughout 2004, the nursing home industry has had a chronic shortage of nurses, and it was difficult to fully staff the patient floors at Cherry Hill. (Haase Tr. 35-38; Pl. Tr. 160, 223-224, 238; Pereira Tr. 53; Sweeting Tr. 54; Charron Tr. 82).

9. Prior to April 2004, Cherry Hill relied upon outside agencies to supply it with adequate nursing staff. (Haase Tr. 179-180). In early 2004, in order to save money and increase the quality of patient care, Life Care set a goal of becoming agency-free by April 1, 2004. (Pl. Tr. 136; Haase Tr. 179-181).

10. Following April 1, 2004, in order to motivate staff to work additional shifts, Cherry Hill periodically authorized the payment of bonuses to nursing staff who would agree to work additional shifts. (Haase Tr. 179-181; Pl. Tr. 136).

**Life Care's Use Of A Scheduler To Fill Open Shifts**

11. In 2004, Life Care employed a full-time Scheduler at Cherry Hill whose job it was to schedule nursing staff to provide appropriate patient care. (Pl. Tr. 88). The Scheduler reports to the DNS, who has the authority to assign work-related duties to the Scheduler. (Pl. Tr. 90-91).

12. Nursing staff generally have a set schedule of hours which are part of a Master Schedule (a/k/a the Monthly Schedule). (Sweeting Tr. 128). Using the hours set forth on the Master Schedule, a Scheduler creates daily staffing sheets listing the nurses and CNAs assigned to each of Cherry Hill's three resident floors. (Pl. Tr. 197).

13. Because there was not sufficient nursing staff, daily staffing sheets regularly had openings that were required to be filled by the Scheduler. (Pl. Tr. 160). Openings may also result from absences or staff vacations. (Sweeting Tr. 55).

14. In order to fill the openings, a Scheduler would call eligible staff members and attempt to have them agree to work. (Santin Tr. 220-223, 226). The majority of a Scheduler's duties are devoted to attempting to fill openings in the daily staffing schedule. (Santin Tr. 220-223, 226).

15. In order to be successful, a Scheduler needs to be aggressive and persistent - calling nursing staff to fill open shifts several times a day, if necessary. (Santin Tr. 220-223; Sweeting Tr. 158-160). Even if a nurse initially says "no" to filling a shift, a Scheduler is expected to call the person back later to see if anything has changed that would enable the nurse to work. (Sweeting Tr. 158-160).

16. In addition, a Scheduler must be creative and accommodating when attempting to fill shifts – for instance, offering a nurse a day off later or a holiday off, if the nurse agrees to work on a day with an open shift. (Sweeting Tr. 163-164). A Scheduler can also seek to secure employees to work for part of an open shift. (Charron Tr. 185-186).

17. If there are still openings in a daily staffing schedule that the facility was unable to fill, a nurse or CNA could be offered bonus dollars to pick up a shift. (Pl. Tr. 136; Charron Tr. 86-87). Bonuses were expected to be offered to staff, only if all other options – such as persistent calling – had first been exhausted. (Charron Tr. 88-89; Haase Tr. 178-179).

**Basic Facts Relating To Plaintiff's Employment As A Scheduler At Cherry Hill**

18. Plaintiff worked as a Scheduler at Cherry Hill prior to her discharge in October 2004. (Pl. Tr. 88).

19. As a Scheduler at Cherry Hill, Plaintiff was as an employee "at-will." (Pl. Tr. 87). Life Care was not required to employ Plaintiff for a specific period or to undergo any particular process prior to discharging Plaintiff from employment. (Pl. Tr. 87-88; Haase Tr. 40-41). Discipline of Life Care employees was dependent on the particular facts and circumstances, and its severity was left to the discretion of the department head. (Haase Tr. 42-45).

20. As of July 2004, Plaintiff worked a four-day work week, with Wednesdays off. (Pl. Tr. 187). Donna Sweeting filled in on Wednesdays as a per diem Scheduler. (Sweeting Tr. 121-123).

**Discipline Of Plaintiff's Under The Supervision Of Celeste Harris, The DNS Prior To Ms. Charron**

21. For part of 2003 and from January to July of 2004, Plaintiff was supervised by Celeste Harris, who held the position of DNS at the time. (Pl. Tr. 121-122).

22. In December 2003, Ms. Harris issued Plaintiff a written warning for insubordinate and disrespectful behavior. (Pl. Tr. 124). At her deposition, Plaintiff acknowledged that she received the written warning, a copy of which is attached to the Campbell Affidavit as Exhibit G. (Pl. Tr. 124-125).

23. The warning indicates that, in connection with the rejection of Plaintiff's request for a particular holiday off, Plaintiff told Ms. Harris "I don't get paid enough to put up with this aggravation," and "If I got paid as much as you do, I would do your job." (Pl. Tr. 126-127; Exhibit G). The warning also indicates that Plaintiff raised her voice to

Ms. Harris. (Exhibit G). Plaintiff's actions toward Ms. Harris were witnessed by Ms. Sweeting, who saw Plaintiff yelling at Ms. Harris as Plaintiff followed Ms. Harris down the hall. (Sweeting Tr. 213).

24. Plaintiff claims that she does not "recall" making the statements contained in the warning, but she concedes that she "may" have been loud toward Ms. Harris, because she "was very upset" as a result of not getting the day off. (Pl. Tr. 130-131).

25. Plaintiff claims to not know what motivated Ms. Harris to provide the warning for insubordination, but does not allege that it was because of age. (Pl. Tr. 127-129).

26. Plaintiff concedes that Ms. Harris was generally fair and reasonable in her dealings with Plaintiff, except for the instance described above, when Ms. Harris would not allow Plaintiff to take a particular holiday off day. (Pl. Tr. 121-122). Plaintiff does not know of any action that Ms. Harris ever took against Plaintiff that was motivated by unlawful age-animus. (Pl. Tr. 123).

27. Ms. Harris informed Ms. Charron that Plaintiff had been insubordinate during the period Ms. Harris supervised Plaintiff. (Charron Tr. 125-126).

**Ms. Charron Begins As DNS In Late July 2004 And Counsels Plaintiff Regarding Unsatisfactory Performance As A Scheduler**

28. In July 2004, Ms. Charron was promoted from her position as Assistant DNS at Life Care's facility in Raynham, MA (the "Raynham Facility"), to DNS of Cherry Hill. (Charron Tr. 114; Pereira Tr. 105). As DNS, Ms. Charron reported to the Executive Director, Mr. Haase, and to the Regional Clinical Coordinator, Joseph Pereira. (Charron Tr. 144)

29. Plaintiff claims that Ms. Charron was not friendly to Plaintiff from the very first meeting. (Pl. Tr. 144). Plaintiff's immediate conclusion regarding Ms. Charron's

lack of friendliness was based on a feeling, rather than any specific action – testifying "It's hard to describe it. It's just something you feel when you meet somebody." (Pl. Tr. 144).

30. Within a week of Ms. Charron commencing as DNS, Plaintiff and Ms. Charron had a discussion over maintaining the Master Schedule. (Pl. Tr. 148; Charron Tr. 74). In particular, Plaintiff approached Ms. Charron about making changes to the Master Schedule, and Ms. Charron indicated that it was Plaintiff's job to maintain the Master Schedule. (Pl. Tr. 147-148; Charron Tr. 74). Plaintiff indicated that, under the supervision of previous DNSs, Plaintiff had not maintained a Master Schedule. (Charron Tr. 74-77). Nonetheless, Ms. Charron made it clear that Plaintiff was responsible for this task. (Charron Tr. 74-77). Plaintiff described this interaction as the "first real bad encounter" with Ms. Charron. (Pl. Tr. 148).

31. Following the interaction regarding the Master Schedule, Plaintiff told Ms. Sweeting, the per diem Scheduler, that "She wants me to add names to the schedule. It's not my job. Why should I have to do it?" (Sweeting Tr. 139).

32. Plaintiff testified that Ms. Sweeting always treated Plaintiff in a fair, honest and reasonable manner, and that Ms. Sweeting did not dislike Plaintiff or harbor age-related animus. (Pl. Tr. 256-257).

33. Following the interaction regarding the Master Schedule, Ms. Charron counseled Plaintiff, because Ms. Charron believed that Plaintiff was making insufficient telephone calls to fill the schedule. (Charron Tr. 81-82, 91-94). When there were open shifts on the schedule, Ms. Charron would ask Plaintiff who she had called and how many time she had called, and Plaintiff would respond that she had left a message

(Charron Tr. 83) or that she was "doing the best [she could]" or that "[she knows] what [she is] doing." (Charron Tr. 90). Plaintiff would also indicate that she was not willing to "badger" staff by making repeated calls to have them agree to work open shifts. (Charron Tr. 91-94, 111-113).

34. Plaintiff claims to "not remember" the particular conversations with Ms. Charron regarding Plaintiff's calling activities, but does not deny they could have occurred. (Pl. Tr. 165). Plaintiff generally agrees that Ms. Charron had discussions with Plaintiff regarding whether Plaintiff had made repeated calls to staff to pick up shifts (Pl. Tr. 157-158) and that such conversations would occur when there were openings in the daily schedule. (Pl. Tr. 160-161). Plaintiff also contends that she had done the scheduler job long enough such that she knew what to do and did not need Ms. Charron to tell her what to do. (Pl. Tr. 161-164).

35. Plaintiff told Ms. Sweeting, the per diem scheduler, that Ms. Charron talked to Plaintiff on more than one occasion about Plaintiff's failure to continually call individuals. (Sweeting Tr. 281-282).

36. Plaintiff also testified that Ms. Charron's clinical supervisor, Mr. Pereira, questioned Plaintiff about who she had called to fill empty shifts, because of concerns that Ms. Charron had about the schedule. (Pl. Tr. 298-299).

37. Ms. Charron counseled Plaintiff about over-reliance on bonuses to get staff to pick up shifts. (Charron Tr. 81-82, 86). Rather than calling individuals repeatedly, Plaintiff would overly rely on payment of bonus dollars to fill the schedule. (Charron Tr. 82-83, 89-90). Plaintiff also concedes that Ms. Charron "may have" told her that she needed to rely less on bonuses to fill shifts. (Pl. Tr. 170).

**Plaintiff Is Issued A Written Action Plan Regarding Her Performance**

38. On August 23, 2004, Ms. Charron and Mr. Haase, Cherry Hill's then Executive Director, presented Plaintiff with a written Action Plan regarding her performance deficiencies as Scheduler. (Pl. Tr. 181). Plaintiff acknowledges receiving the document, a copy of which is attached to the Campbell Affidavit as Exhibit H. (Pl. Tr. 181-182). Ms. Charron testified that the Action Plan was disciplinary in nature, and that it was provided to Plaintiff to detail what Ms. Charron expected of Plaintiff and what Plaintiff needed to work on. (Charron Tr. 39).

39. In the Action Plan, Ms. Charron listed particular performance deficiencies that she needed Plaintiff to remedy. (Pl. Tr. 185). One of the directives was that Plaintiff was not to "ignore workplace requests of the DNS." (Pl. Tr. 185; Exhibit H). The Action Plan also counseled Plaintiff to "F/U [follow up] + complete duties as assigned," and "review + sign updated job description." Exhibit H. The Action Plan also indicated that "In the event these expectations are not met, appropriate action will be taken **up to and including termination** as management feels appropriate." Id. (emphasis added).

40. Plaintiff denies that she refused to follow any directives or otherwise had performance problems. (Pl. Tr. 182-185). Nonetheless, Plaintiff claims to "not know" why Ms. Charron issued the Action Plan, and admitted that the Action Plan reflected Ms. Charron concerns regarding Plaintiff's performance. (Pl. Tr. 186-188).

**Ms. Charron Sends Plaintiff For Training With The Scheduler At The Life Care Nursing Home In Raynham, Massachusetts**

41. Following the August 23, 2004 Action Plan, Ms. Charron sent Plaintiff for training with Rebecca Santin, the Scheduler at Life Care's Raynham, Massachusetts facility. (Pl. Tr. 174-175, 192). Ms. Santin performed the position of Scheduler well,

and required very little oversight, and Ms. Charron wanted Plaintiff to see how Ms. Santin enlisted staff to pick up open shifts. (Pereira Tr. 15-17; Santin Tr. 216). Ms. Santin has no incidents of disciplinary action during her employment with Life Care. (Santin Tr. 182).

42. Plaintiff concedes that Ms. Charron felt that training with Ms. Santin was necessary, but did not believe that Ms. Santin could show her anything about how to do her job. (Pl. Tr. 180). Plaintiff told Ms. Sweeting that she did not need to go for the training, because she already knew how to perform her position. (Sweeting Tr. 149-150).

43. While at the training, Ms. Santin showed Plaintiff the manner in which Ms. Santin performed her position as Scheduler, including calling individuals multiple times in the same day. (Santin Tr. 209-212). Following the training, Ms. Santin reported to Ms. Charron that Plaintiff had been "surprised" at the number of times that Ms. Santin contacted employees, and that Plaintiff told Ms. Santin that she (Plaintiff) would not telephone individuals on multiple occasions. (Santin Tr. 219-220, 226-228; Pl. Tr. 181).

44. Plaintiff does not have any reason to believe that Ms. Santin was dishonest or sought to take action against Plaintiff because of Plaintiff's age. (Pl. Tr. 257-259).

**<u>Plaintiff Is Discharged For Turning In A Weekend Schedule With A Significant Number Of Unfilled Openings</u>**

45. On Friday, October 1, 2004, Ms. Charron sought to leave work early to attend a funeral with Mr. Haase, and had previously informed Plaintiff of her need to leave. (Charron Tr. 136). Plaintiff testified that "Maybe she did [previously inform Plaintiff of Ms. Charron's need to leave early]. I don't recall it." (Pl. Tr. 207).

46. At approximately 2 p.m., Plaintiff brought Ms. Charron the schedule for the weekend (October 2-3, 2004) with a significant number of vacancies. (Charron Tr. 136-

137; Pl. Tr. 209). Plaintiff had not previously informed Ms. Charron that there was such significant problem with the schedule. (Charron Tr. 141). Charron was unable to attend the funeral with Mr. Haase, because the schedule was not sufficiently complete. (Charron Tr. 136; Pl. Tr. 209).

47. Ms. Charron and two other employees were able to substantially complete the schedule. (Charron Tr. 136-137).

48. Based on the manner in which Plaintiff presented the incomplete schedule (i.e. late in the afternoon, with significant vacancies, without sufficient prior notice on a day when Ms. Charron was scheduled to attend a funeral), Ms. Charron concluded that Plaintiff had not put sufficient effort into completing the schedule. (Charron Tr. 138-139, 143-144).

49. Plaintiff concedes that there were openings on the schedule when she presented it to Ms. Charron, and that Ms. Charron was upset when she saw the condition of the schedule provided by Plaintiff. (Pl. Tr. 207-208; 293).

50. Plaintiff also concedes that the schedule she turned in on October 1, 2004 was the event that precipitated her discharge. (Pl. Tr. 293).

51. Based on the events of October 1, 2004 – and in light of the prior attempts by Ms. Charron to have Plaintiff remedy her performance deficiencies – Ms. Charron believed Plaintiff's performance was not acceptable and warranted discharge. (Charron Tr. 133-134, 138-139). Ms. Charron consulted with her clinical supervisor, Joseph Pereira, and the Executive Director, Steve Haase, and thereafter Defendants concluded that Plaintiff should be discharged. (Charron Tr. 144-145; Haase Tr. 52-55, 135-137, 237-239; Pereira Tr. 138-143; Pl. Tr. 285).

52. On Monday, October 4, 2004, Plaintiff was called in to a meeting with Ms. Charron and Mr. Haase, and her employment was terminated. (Pl. Tr. 290-291). The reason provided by Ms. Charron and Mr. Haase was Plaintiff's poor job performance. (Pl. Tr. 284-285). At the meeting, Plaintiff was provided a Notice of Termination, which she signed. (Pl. Tr. 222-223). A copy of the Notice of Termination, signed by Plaintiff, Ms. Charron and Mr. Haase, is attached to the Campbell Affidavit as Exhibit I.

53. On the Notice of Termination, Plaintiff indicated that the inability to fill the schedule was a result of insufficient nurses employed at the facility. (Pl. Tr. 223-224; Exhibit I).

54. Following Plaintiff's termination, Ms. Sweeting performed the position of Scheduler. (Haase Tr. 124-125; Charron Tr. 166). When Ms. Sweeting was Scheduler, Ms. Charron was able to devote less time to scheduling, and spend more time on the clinical responsibilities of her position. (Haase Tr. 64).

**Plaintiff's Allegations Of Age Discrimination Are Not Supported By Evidence**

55. Plaintiff's complaint alleges that Ms. Charron was motivated by unlawful age-discrimination when she discharged Plaintiff. Plaintiff's First Amended Complaint, ¶¶ 17-18.

56. As of March 4, 2005, Cherry Hill employed approximately 233 employees. Of those, 120 employees were over the age of 40, and 113 employees were under the age of 40. Thirteen employees were aged 60 or older. Affidavit of Madeline Horner ("Horner Affidavit"), ¶¶ 2-3.

57. From late July 2004 until February 23, 2005, approximately 20 employees were involuntarily terminated from employment at Cherry Hill. Nine of those employees

were under 40 years old and eleven of those employees were over 40 years old. None of the other employees aged 63 (Plaintiff's age at discharge) or *older* were discharged during this period. Horner Affidavit ¶¶ 4-5.

58. Ms. Charron did not make any comments regarding Plaintiff's age, or which otherwise suggested that Ms. Charron harbored age-animus. (Haase Tr. 329; Santin Tr. 255-256; Pl. Tr. 275-278, 287-288). Plaintiff admits that she does not have any personal knowledge that Ms. Charron took action against any other employee because of age. (Pl. Tr. 75).

59. Plaintiff never made any complaints regarding age discrimination while employed at Cherry Hill. (Pl. Tr. 265).

60. Plaintiff's complaint also alleges that Mr. Haase engaged in age discrimination. Plaintiff's First Amended Complaint, ¶¶ 17-18.

61. Plaintiff testified that, on the few occasions that she interacted with Mr. Haase, he was generally pleasant to Plaintiff, and that he never did anything that caused Plaintiff to conclude that Mr. Haase did not like her. (Pl. Tr. 261-264). Plaintiff has not alleged that Mr. Haase made any age-related comments.

62. Mr. Haase maintained an open-door policy regarding employee concerns, and was available to meet with Plaintiff regarding employment-related concerns. (Pl. Tr. 266; Haase Tr. 70-71) Plaintiff did not ever complain to Mr. Haase, regarding age or otherwise. (Pl. Tr. 265).

63. Mr. Haase concurred with Ms. Charron that Plaintiff's performance warranted discharge. (Haase Tr. 135-137, 237-239; Exhibit I to Campbell Affidavit). See also Pl.

Tr. 285 (testimony that Plaintiff has "no idea" why Mr. Haase went along with the decision to discharge Plaintiff).

64. Plaintiff's belief regarding age-discrimination is a result of her belief that Ms. Charron was friendlier to younger individuals, and because Plaintiff viewed herself as doing an "excellent job." (Pl. Tr. 287-288).

65. As to Plaintiff's conclusion that the alleged difference in friendliness was age-related, Plaintiff testified "That's just what I feel, that it was because of my age that she wasn't friendly with me and she was with other people that were younger." (Pl. Tr. 277-278). Plaintiff was unable to provide any additional facts to support her conclusion. (Pl. Tr. 278).

66. Plaintiff claimed by Ms. Charron was friendlier to Ms. Sweeting, because Ms. Charron and Ms. Sweeting would have discussions about things they had in common. (Pl. Tr. 275-277).

67. Ms. Sweeting never engaged in conduct that warranted being issued a written warning. (Sweeting Tr. 82-84; Haase Tr. 326-327; Pl. Tr. 275).

68. Plaintiff denies that her performance warranted discipline or that she refused Ms. Charron's directives, and claims that any difficulties in scheduling nurses were not her fault. (Pl. Tr. 157-158, 222-223). Nonetheless, Plaintiff concedes that Ms. Charron discussed Plaintiff's performance with her. (See e.g. Pl. Tr. 147-148, 157-158, 160-164, 170). Plaintiff also concedes that Ms. Charron and Mr. Haase provided Plaintiff with a written action plan on August 23, 2004 regarding her performance, and that Ms. Charron and Mr. Haase discharged Plaintiff in October 2004 because of her work on a weekend schedule. (Pl. Tr. 182-185, 290-293).

69. Plaintiff claims that the reason provided for her discharge is pretextual, because Plaintiff believes her performance did not warrant it, and because Ms. Charron only supervised Plaintiff for a two-month period. (Pl. Tr. 286-287).

Respectfully submitted,

LIFE CARE CENTERS, INC.,
By its attorneys,

/s/ Christopher J. Campbell
Christopher J. Campbell, R.I. Bar No. 6611
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, MA 02116
617-367-0025

Dated: June 28, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document has been filed electronically on June 28, 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Patricia E. Andrews, Esquire
peandrews@verizon.net

and

Carly B. Iafrate, Esquire
ciafrate@verizon.net

/s/ Christopher J. Campbell