# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI,
Plaintiff,
VS. C.A. NO. 06-108ML
CHERRY HILL MANOR, et al.,
Defendants.

DEPOSITION OF STEVEN HAASE, in the above-entitled cause, taken on behalf of the Plaintiff, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the Law Office of Patricia Andrews, 129 Dyer Street, Providence, Rhode Island, on April 30, 2007, at 10:00 a.m.

APPEARANCES:

For the Plaintiff:
LAW OFFICE OF PATRICIA ANDREWS
BY: PATRICIA ANDREWS, ESQUIRE
129 Dyer Street
Providence, RI 02903

LAW OFFICE OF CARLY IAFRATE
BY: CARLY IAFRATE, ESQUIRE
129 Dyer Street
Providence, RI 02903

For the Defendants:
JACKSON LEWIS, LLP
BY: CHRISTOPHER J. CAMPBELL, ESQUIRE
75 Park Plaza
Boston, MA 02116

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

A. Correct.
Q. Are you still a Life Care employee?
A. No.
Q. And how long had you been at Cherry Hill?
A. Three and a half years.
Q. And before that, were you a Life Care employee?
A. No.
Q. Okay. Have you ever been involuntarily terminated?
A. Yes.
Q. How many times?
A. Once.
Q. Tell me the circumstances.
A. There were questions of my leadership.
Q. And where were you working?
A. Brockton, Massachusetts.
Q. What was the name of the place?
A. Regent Park.
Q. Regent?
A. Yes.
Q. R-E-G-E-N-T?
A. Yes.
Q. And what was your position at the time?
A. Administrator.
Q. And what do you mean there were questions about

facility effectively causing a shortfall in census.

Q. Was there ever any discussion about the status of the facility causing a shortfall of staffing personnel?

MR. CAMPBELL: Objection as to form.

THE WITNESS: Can you repeat the question?

Q. Was there ever a discussion that the condition of the financial condition of Cherry Hill also caused a shortfall in staffing personnel?

A. No.

Q. So that -- strike that. During the time that you you've been at Cherry Hill, did you ever have any problems recruiting nurses?

MR. CAMPBELL: Objection as to form.

A. As an industry, it's always a challenge. It's always an ongoing concern to recruit staff.

Q. I'm asking about Cherry Hill specifically and during your tenure, sir.

A. Yes, we had discussions about that.

Q. You had discussions with whom, Kate O'Connor?

A. Yes.

Q. And who else?

A. I'm sure there was lots of people. I don't

recall.
Q. Tell me what those discussions were about?
MR. CAMPBELL: Objection as to form.
A. We were discussing various opportunities or ways to recruit staff.
Q. And did these discussions take place before Barbara Antonucci was terminated?
A. They had been taking place for over three years.
Q. I'm just asking right now, did they take place before Barbara Antonucci was terminated in October of 2004?
MR. CAMPBELL: Objection as to form.
A. Before, during and after.
Q. Okay. And what were the specific discussions about?
MR. CAMPBELL: Objection as to form.
A. Try to find creative ways to recruit the various staffing vacancies that we had.
Q. And what staffing vacancies are you talking about?
A. Various kinds. Licensed nurses, therapy staff -- those are the major areas, licensed nurses and therapy staff.
Q. What about CNAs?
A. To my memory, Cherry Hill usually did not have

difficulty in hiring certified nursing assistants.
Q. And was that before Barbara Antonucci was fired?
MR. CAMPBELL: Objection as to form.
A. Before, during and after.
Q. Okay. And can you define for me licensed nurses?
A. A licensed nurse is someone who's licensed as either a licensed practical nurse or a registered nurse, and has received school training and has passed various exams to become licensed as a nurse.
Q. Okay. What about med techs?
A. A certified medication technician is a nursing assistant who has taken and completed a six-week pharmacology course offered by various colleges/institutions in Rhode Island.
Q. Tell me, again, what a med tech is, a CNA with --
A. Yes, with a six-week --
MR. CAMPBELL: CNA plus.
Q. Okay. Sot it's a CNA who undergoes a six-week training?
A. Yes.
Q. And is able at the conclusion of that training and once they get licensed to administer certain medications?
MR. CAMPBELL: Objection as to form.

A. They are eligible to administer medications at that point, not -- they are not necessarily immediately employed in that position.
Q. Okay. Did you have any issues relating to recruiting med techs?
MR. CAMPBELL: Objection.
A. Not that I remember.
Q. Okay. So I take it then that there were discussions about trying to recruit licensed nurses both before Barbara left and after she left?
A. Correct.
Q. Can you tell me, sir, was there a time when there was more of a shortage of licensed nurses during your tenure?
MR. CAMPBELL: Same objection.
A. The worse I remember it -- the worse I can recall was about a year stretch from late 2003 until late 2004.
Q. And tell me about that period of time.
A. To my memory, we had a lot of vacancies of licensed nurses, and I don't recall how many vacancies we had, but I remember the struggles in trying to fill those positions.
Q. Do you believe that you were treated unfairly

regarding your termination?
A. No.
Q. And why do you say that?
A. Because the administrator is responsible for the financial performance of the facility.
Q. And tell me, again, how long the facility had been having bad financial performance.
MR. CAMPBELL: Objection as to form.
A. Matter of months.
Q. And during your tenure, had there been other periods when the financial picture was the same as it was the last three months that you worked at Cherry Hill?
A. No.
Q. Okay. And did you ever receive any disciplinary -- strike that. Did you ever receive any discipline regarding your job performance while you were at Cherry Hill?
MR. CAMPBELL: Objection to form.
THE WITNESS: Can you be specific as to the kinds of discipline?
Q. Well, why don't you define for me -- strike that. At Cherry Hill, can you tell me the disciplinary process?
MR. CAMPBELL: Objection to form.

THE WITNESS: For Cherry Hill staff members?
Q. Was it different than yours?
MR. CAMPBELL: Objection as to form.
A. If anything, administrators are treated more harshly than a staff member at the facility. That's just the way it is.
Q. Okay. What was the disciplinary policy for staff members?
MR. CAMPBELL: Objection as to form.
A. It depends on the situation and the circumstance. Certain offenses depending on their severity can result in immediate termination without any warning or counseling. And other lesser offenses, the facility has a disciplinary system process.
Q. Okay. So can you tell me which offenses are subject to an employee being terminated without any warning?
MR. CAMPBELL: Objection as to form.
A. I can give you a couple examples.
MS. ANDREWS: Okay.
A. Obviously, confirmed patient abuse; confirmed vandalism, stealing; violence in the workplace, to name a few; someone caught, you know -- what's the

term I'm trying to use -- punching in someone else's timecard. That would be --
Q. Fraud?
A. Yes. That would be an example of some of the gross offenses that would result in immediate termination.
Q. And is there a document which sets forth the types of offenses which are subject to termination without warning?
MR. CAMPBELL: Objection as to form.
A. No, a lot of the severity of the discipline is left to the discretion of a manager. When I say "manager," I mean department head.
Q. Is the director of nurses a department head?
A. Yes.
Q. So is there any policy which deals with the disciplinary procedure to be followed for staff members?
MR. CAMPBELL: Objection as to form.
A. Well, with regards to discipline, there is a process, I mentioned earlier, that we follow. It's a progressive discipline system. Again, depending on the type of the offense could start with a verbal counseling statement, which even though it's called verbal is documented in

writing, and it goes through a series of written warnings leading up to and in many cases including termination.

Q. So under this policy, you begin with a documented verbal warning?

MR. CAMPBELL: Objection.

A. Yes.

Q. And what is the next level of discipline that you get?

MR. CAMPBELL: Objection as to form.

A. It would still be based on the situation and the circumstance. There's no one set direction. It would depend on the offense that would trigger what the next progressive step would be.

Q. Okay. So are you saying that, under the policy, an employee could receive a documented verbal warning and then receive another documented verbal warning?

MR. CAMPBELL: Objection as to form.

Q. Depend -- go ahead.

THE WITNESS: For the same offense?

MS. ANDREWS: Okay. Let's take for the same offense.

A. Generally, no.

Q. Okay. That's what I'm trying to find out. So we

have a situation where you've issued a documented verbal warning. Are there any circumstances that you can think of in which the next level would be another verbal -- documented verbal warning?

MR. CAMPBELL: Objection as to form.

A. Generally not.

Q. Okay. But are there times when -- strike that. Are there exceptions?

MR. CAMPBELL: Objection as to form.

A. I'm sure there always are exceptions.

Q. Well, can you think of any sitting here today?

MR. CAMPBELL: Objection.

THE WITNESS: Again, for the same offense?

Q. I asked you whether you can think of any circumstance in which an employee receives a documented verbal warning and -- strike that. I'm asking you a situation in which an employee receives a documented verbal warning, and then receives another documented verbal warning. Can you tell me if there are any circumstances that would justify receiving another documented verbal warning after you've received one?

MR. CAMPBELL: Objection, asked and answered.

Q. Do you understand my question?
A. Yes.
MR. CAMPBELL: Objection, asked and answered.
A. No, I really can't.
Q. So is it fair to say once you have received a documented verbal warning, the next warning that you receive would -- strike that. Is it fair to say then that once you receive a documented verbal warning, you would receive a harsher form of discipline for the next offense?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. And what would that harsher form of discipline be?
A. Again, based on the situation and circumstance, it would some form of discipline in writing called a written type of disciplinary depending on the offense. It could be as severe as a termination. It could be a suspension. It could be some more severe form of discipline depending on the offense.
Q. Okay. So that's what I'm trying to find out. You're telling me after a documented verbal warning, the person could be terminated depending on the offense; correct?

A. Correct.
Q. Could be suspended depending on the offense?
A. Correct.
Q. Could receive a written warning depending on the offense?
A. Correct.
Q. Okay. But would not receive a documented verbal warning; correct?
MR. CAMPBELL: Objection as to form.
A. Generally, not.
Q. Okay. And you keep saying "generally" like you're qualifying. Can you think of any circumstances, again, under which an employee would receive two successive documented verbal warnings?
MR. CAMPBELL: Objection as to form, asked and answered.
A. Sitting here at this table, no.
Q. Okay. And can you give me an example of the kind of offense that after a documented verbal warning an employee would receive a firing next?
MR. CAMPBELL: Objection as to form.
A. I'm thinking.
MS. ANDREWS: Uh-huh.
A. I'll throw this out. If the facility had reason to believe that there was a perception that

Q. Did you consider Barbara's intentional refusing to do what was expected of her an act of misconduct?
A. Yes.
MR. CAMPBELL: I'm sorry. I meant to say objection as to form.
Q. So tell me, sir, did you believe that Barbara Antonucci was insubordinate?
MR. CAMPBELL: Objection as to form. Go ahead.
A. Yes.
Q. Insubordinate to whom?
A. Pamela Charron, and if my memory serves me right, Celeste Harris.
Q. Anyone else?
MR. CAMPBELL: Objection as to form.
A. Well, I hear that she was somewhat insubordinate to Kate O'Connor prior to my arrival at Cherry Hill, but I was not firsthand for that.
Q. And tell me what you heard.
MR. CAMPBELL: Objection as to form.
A. I heard secondhand that she had in some way refused to make the schedule right by making phone calls to fill open positions. Again, it's secondhand information.
Q. This was before you got to Cherry Hill?

A. Yes.
Q. So when did you get to Cherry Hill?
A. September 2003.
Q. And who did you hear this from?
A. I heard it from Celeste Harris.
Q. Did you like Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. Nice person.
Q. Do you know how -- strike that. Did Pam Charron ever express to you how she felt about Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. On how many occasions?
A. Several.
Q. And who was present?
A. On many occasions, it was Pamela and myself.
Q. On any occasions, were other people there as well?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. Who?
A. All I can recall are Life Care's Regional Nurse, Joe Pereira.
Q. Anyone else?
A. Probably Kate O'Connor as well.

Q. Anyone else?
A. Those are the names that stick out.
Q. And what did Pam Charron tell you?
MR. CAMPBELL: Objection as to form.
Q. About how she felt about Barbara Antonucci on those occasions?
A. That Barbara was argumentative.
Q. Anything else?
A. That there appeared to be an unwillingness to take the steps necessary to make the phone calls to get nurses to fill open slots, open positions.
Q. Anything else?
A. That Barbara wasn't flexible. Things were always done a certain way. Why do they have to be done a certain way now?
Q. Anything else?
A. Pretty much got it.
Q. Did she ever express how she felt about Barbara?
MR. CAMPBELL: Objection as to form.
A. She said that she was frustrated. She said she was spending a lot of time essentially trying to do Barbara's job, which was taking away from her time managing the nursing department and monitoring patient care.
Q. Anything else?

A. That's it.
Q. Did she ever tell you if she liked Barbara?
MR. CAMPBELL: Objection as to form.
A. I don't think she ever brought up how she felt about Barbara as a person.
Q. Okay. How about Kate O'Connor, did she ever express anything about Barbara Antonucci?
A. She expressed a dissatisfaction with her performance. I can't recall when.
Q. Did she express that before Pam Charron came on board at Cherry Hill?
A. Yes.
Q. And what did she say?
A. I can't recall the conversation.
Q. What was the gist of what she was dissatisfied with?
A. That she's not doing a good job filling the slots, filling positions.
Q. And did she tell you how long she felt that way?
A. No.
MR. CAMPBELL: Objection to form.
THE WITNESS: Could I have two minutes for a bathroom break?
MS. ANDREWS: Sure.
(BRIEF RECESS FROM 11:29 TO 11:35 A.M.)

slots filled.

Q. I'm talking now about the period after which Barbara Antonucci left; okay?

A. Okay.

Q. Did Pam Charron tell you that she had to help Donna Diallo fill slots?

MR. CAMPBELL: Objection as to form. Go ahead.

(NO ANSWER)

Q. I thought you just said she did.

A. I'm sorry. I'm mistaken. I thought it was -- I thought it was during the time when Barbara was still there. After Donna Diallo was appointed the scheduler, it's my impression Pam spent a lot more time being director of nurses, less time worrying about the schedule.

Q. And that's just your impression; correct?

A. It's me that counts.

Q. And did you ever speak to Pam Charron about how much time she was spending helping Donna Diallo fill slots?

MR. CAMPBELL: Objection to the form.

A. No.

Q. And I take it that Pam Charron never came to you to talk to you about Donna Diallo's inability to

MS. ANDREWS: Yes.

A. No.

Q. Life Care?

A. No.

Q. Did you have an open-door policy, sir, as administrator?

MR. CAMPBELL: Objection to form.

(NO ANSWER)

Q. Do you know what I mean by open-door policy?

A. Yes.

Q. Did you have an open-door policy?

A. Yes.

Q. And did you encourage your staff to come in and speak to you if there were problems that they were having?

MR. CAMPBELL: Objection.

A. My policy was if they had a problem, that they feel that they can handle at their department head level, that they should seek their department head because the department head also has an open-door policy where they can come in and talk freely, but if they got stuck or if it was an issue that was beyond their department head, yes, they can come in. My door was open. They could talk.

Q. And did Barbara Antonucci ever go in to you and

speak to you?

MR. CAMPBELL: Objection as to form.

A. I don't remember. I mean, I've, obviously, spoken to Barbara, but I can't recall the scenario you just described where she came in to talk to me. I mean, I could have talked to her in her office. I could have talked to her in the hallway. I don't recall the situation you just mentioned.

Q. Did she ever talk to you about Pam Charron?

MR. CAMPBELL: Objection as to form.

A. I don't remember.

Q. You don't remember one way or the other?

A. Correct.

Q. Would you have been receptive to her coming in if she had wanted to?

A. Sure.

Q. It wouldn't have made you nervous; right?

MR. CAMPBELL: Objection as to form.

A. I don't get nervous talking to my staff.

Q. Now, what involvement did Kate O'Connor have regarding discipline of employees?

MR. CAMPBELL: Objection as to form. Go ahead.

THE WITNESS: In what --

MS. ANDREWS: Just you and Barbara alone.

MR. CAMPBELL: Objection as to form.

A. I don't think I ever spoke to her alone.

Q. And why not?

MR. CAMPBELL: Objection as to form.

A. Because Barbara reported to the director of nurses and not me. I let the director of nurses deal with that.

Q. So it never crossed your mind to speak to her directly, and see if you could get the problem resolved?

MR. CAMPBELL: Objection as to form.

A. No.

Q. And it never crossed your mind to maybe speak to her to see if you could help her do the job?

MR. CAMPBELL: Objection as to form.

A. Well, she was getting a lot of help between the direction from Pam Charron and her off-site training. I didn't see what else would have been helpful.

Q. Did you ever -- you know who Donna Diallo is; correct?

A. Sure.

Q. And when did she become the scheduling

coordinator?
A. Shortly after Barbara was terminated.
Q. Was that within a month?
A. Yes.
Q. Could it have been within two weeks?
MR. CAMPBELL: Objection as to form.
A. It could have been. I don't remember the exact date that she was appointed.
Q. And did you believe she was qualified to be the staffing coordinator at that time?
A. Yes.
Q. Was there any posting of that position?
MR. CAMPBELL: Objection as to form.
A. I don't remember.
Q. So you never considered anyone other than Donna Diallo?
MR. CAMPBELL: Objection as to form.
A. Donna had done the job at least one day a week while Barbara was still working in that position, so Donna had a working knowledge of the position.
Q. My question to you is you never considered anyone else?
MR. CAMPBELL: Objection as to form.
A. No, I don't think so.
Q. Did Donna want the job?

MR. CAMPBELL: Objection as to form. Go ahead.

Q. As defined here?

MR. CAMPBELL: A new objection as to form. Go ahead.

A. She was fired because she didn't do what Pam asked her to do.

Q. My question to you is was she fired for misconduct, as defined here?

MR. CAMPBELL: Objection, asked and answered. You may answer the question again.

A. Yes, she was fired for misconduct.

Q. Was she fired for poor job performance?

MR. CAMPBELL: Objection as to form.

A. That, as well.

MS. ANDREWS: Okay. Let me mark as Plaintiff's Exhibit 8 a document Employee Termination Notice.

(PLAINTIFF'S EXHIBIT 8 MARKED FOR IDENTIFICATION)

Q. Have you ever seen that document before?

A. Yes.

Q. Prior to the time that Barbara left the -- strike that. Prior to October 5, 2004, when did you first see this document?

MR. CAMPBELL: Objection as to form.
A. In the normal course of processing the termination process with employees.
Q. Okay. What about in the case of Barbara Antonucci, when did you see this document?
MR. CAMPBELL: Objection as to form.
THE WITNESS: Is your question when did I see it for the first time?
MS. ANDREWS: Yes.
A. I don't remember.
Q. Did you sit in on any -- strike that. Is this a document that is presented to an employee when they're fired?
MR. CAMPBELL: Objection as to form.
A. This document here, no.
Q. Is it one that's generated when they are terminated?
A. Yes.
Q. Okay. And this is the document that was -- the document that was generated on or about October 4, 2004, when Barbara Antonucci was terminated; correct?
A. Correct.
Q. Okay. And did you have any input into this document?

MR. CAMPBELL: Objection as to form.
A. No input, no.
Q. But you talked to Pam Charron about Barbara Antonucci's termination; correct?
A. Yes.
Q. Okay. And who made the decision that she would be fired?
A. Pam.
Q. Okay. And you see at the third line down, it says Reason for termination, where it says unsatisfactory job performance?
A. Yes.
Q. Do you see anything about misconduct there?
MR. CAMPBELL: Objection to the form. Go ahead.
A. No, I don't.
Q. Do you see down under D02 where it says misconduct?
A. Yes.
Q. I don't see that circled; correct?
MR. CAMPBELL: Wait for a question.
A. Correct.
Q. That's not circled?
A. Correct.
Q. Can you tell me why it wasn't circled if she

A. Yes.
Q. Let's talk about --
A. I -- never mind.
Q. No, if you want to add something, go ahead.
A. You're talking about a situational circumstance. You're not talking about a long-term issue here. I mean, a bonus is what you do in the short term. It doesn't handle the concern of ratios over the long term. That's a budgetary operational issue.
Q. I understand that, but haven't -- hasn't Cherry Hill been paying bonuses since 2004?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. Okay. And they're still paying bonuses; right?
A. I don't know what they're doing today. I'm not there.
Q. Okay. As of the time that you left?
A. I guess so, yes.
Q. Is that a guess or do you know whether they were paying bonuses?
A. At the time that I left, they were paying them at the time that I left.
Q. Did bonus payments go up or down after Barbara

Antonucci left?

MR. CAMPBELL: Objection as to form.

A. Both.

Q. And what do you mean by that?

A. Some weeks, they were down. Other weeks, they were up.

Q. And when they were up, do you know why?

A. Depends on the situation. It could have been one of those scenarios I described to you before. It could have been someone who was fired and a resignation without notice in the same week; could have been, you know, couple people with the flu that were out sick. It could be lots of things.

Q. At some point -- we're going to come back to that. At some point, you did not use bonuses at Cherry Hill; correct?

MR. CAMPBELL: Objection as to form. Go ahead.

A. I think so.

Q. Okay. And that was prior to approximately March of 2004; correct.

A. I think so.

Q. Okay. And you used outside agencies prior to March of 2004; correct?

A. Prior to April 1.

Q. Okay. And tell me why Cherry Hill ceased using outside agencies.
MR. CAMPBELL: Objection as to form.
A. Corporate mandate.
Q. And was that in writing?
A. I don't know.
Q. And why did the corporation mandate that; do you know?
MR. CAMPBELL: Objection. It's do you know.
A. Couple reasons. First of all, typically, agency nurses don't show the same form of dedication and compassion to resident care nurses who are your own nurses who work there, and secondly, they cost a ton of money. They cost a lot more than your own nurses for working the same number of hours.
Q. Okay. And even if you pay bonuses?
A. Agency nurses are still more money.
Q. Okay. How long were agency people used?
MR. CAMPBELL: Objection as to form.
A. To my knowledge, years.
Q. And when was the first time that there was any discussion that you're aware of about stopping the use of outside agencies?

A. Celeste Harris and I had a formal discussion with Kate O'Connor either in January or February of 2004, and at that meeting, the date of being agency free by April 1 was established.

Q. And who said that?

A. Kate O'Connor.

Q. Okay. And what took the place of -- strike that. What did you do to become agency free?

A. We did a lot of things. We increased our advertising in the newspaper. We purchased a list of the names and addresses of the RNs and LPNs licensed in the State of Rhode Island. We had job fairs. We offered a sign-on bonus. We offered hiring bonuses, and we also set up our own in-house pool. When I say "pool," I mean pool of staff who would cover open slots. We had an alternating schedule where once every 10 or 11 weeks, one of the people in that pool would have to work at the facility over a weekend if there was insufficient licensed staffing. So all those things is what we did.

Q. Okay. And so much of your effort was geared to hiring nurses; correct?

A. Correct.

Q. And did you accomplish that goal?

if she had received a prior written warning, the next step would not be a verbal written warning; correct, at least according to your explanation this morning?

MR. CAMPBELL: Objection as to form. Answer if you can.

A. In a number of prior disciplinary notices on file, that line is left blank. I would have to guess as to why it's left blank.

Q. You don't know?

A. I don't know. Again, I didn't discover this until Pam had transferred to Evergreen.

Q. Is it your testimony that Barbara Antonucci never came to you during any week to say she was having difficulty filling vacancies, and that she needed authority for some bonuses?

MR. CAMPBELL: Objection as to form.

A. Yes, I think so. I think that's accurate.

Q. That she never came to you?

A. I think so.

Q. Can you tell me what the staffing levels are supposed to be?

MR. CAMPBELL: Objection as to form.

Q. During your tenure?

THE WITNESS: For which level

position, which shift?
Q. Well, for all shifts. Let's talk the first shift, that's 7:00 to 3:00; correct?
A. It's --
Q. And let's take the first floor. Then there's a second floor and then there's a third floor; right?
A. It's actually 2, 3 and 4. There is no first floor.
Q. Okay. So let's do 7:00 to 3:00 on the second floor, who's supposed to be there?
MR. CAMPBELL: Objection as to form.
A. Supposed to -- I can do this for you quickly.
MS. ANDREWS: Okay.
A. For CNAs on second, third and fourth floor, 6, 6 and 6.
Q. Okay. So the same?
A. Correct.
Q. That's 7:00 to 3:00?
A. Right. 3:00 to 11:00, 5, 5 and 5.
Q. CNAs?
A. Right. Everything I'm giving you now is CNAs. 11:00 to 7:00, 3, 3, and 3.
Q. So now let's do nurses -- licensed nurses on the 7:00 to 3:00.

A. On the second floor is 5 nurses; on the third floor and the fourth floor, there's 3.

MS. ANDREWS: Yes.

A. On the 3:00 to 11:00 shift --

Q. Are they RNs or LPNs?

A. Combined.

Q. It could be either one?

A. Combined. They can be either R.N. or LPN

Q. So you don't have to have an R.N. at all?

MR. CAMPBELL: Objection as to form.

A. We have to have an R.N. in the building every shift 24 hours a day. So as long one of those nurses -- doesn't matter what floor it is, as long as there's an R.N. on duty 24 hours a day, that's the State of Rhode Island requirement for skilled nursing facilities.

Q. Okay. So 7:00 to 3:00 now? For nurses, did you tell me 7:00 to 3:00?

A. Yes, I gave you have 5 nurses for the second floor; 3 nurses for the third floor and 3 nurses -- 3 nurses for third floor, and 3 nurses for the fourth floor.

Q. And that's for what shift?

A. 3:00 to 11:00.

Q. And then there's 11:00 to 7:00?

A. 11:00 to 7:00, it's 3, 2, and 2.
Q. Okay. What about med techs?
MR. CAMPBELL: Objection to the form.
A. Med techs are included as part of that CNA staffing I gave you because that's what med techs are.
Q. And is this a requirement, what you just gave me?
A. That's my Life Care budget from the company.
Q. What does that mean?
A. I have a staffing budget.
Q. For?
A. For labor, for nurses and for CNAs.
Q. Okay. And could you ever substitute med techs for nurses?
A. When the need arose.
Q. Are you supposed to do that?
MR. CAMPBELL: Objection as to form.
A. We have to do that.
Q. You're allowed to do that?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. By regulation?
A. It's not by regulation. It's by facility need. There are no minimum staffing levels for nurses or nursing assistants in the State of Rhode Island.

Q. And that was Life Care?
A. Correct.
Q. And when did she tell you that?
A. I don't remember. She tried to play it that, you know, don't tell me about it because then she would be privy to it, but Madeline E-mailed her every week the bonuses, so Kate knows.
Q. Do you know whether her supervisor knew?
A. Well, I guess I can't get into any more trouble. They already fired me. I think she probably tried to keep it a secret from her boss as long as she could.
Q. How do you know that?
A. Because she would be smart to. It's not an approved company program. If her boss became privy to it, then she'd also be responsible.
Q. So Barbara Antonucci got fired for paying bonuses that were not even supposed to be paid?
MR. CAMPBELL: Objection as to form.
Q. According to corporate policy?
MR. CAMPBELL: Objection as to form.
Q. Correct?
A. No, she got fired because she wasn't aggressive in filling the schedule. She got fired because she didn't do what Pam asked her to do.

Q. Didn't she get fired for overreliance on bonuses?
MR. CAMPBELL: Objection to form.
A. Which is a result of not trying to get the schedule filled.
Q. Yes, okay. And my point is you were allowing her to pay bonuses that weren't even sanctioned by Life Care; correct?
MR. CAMPBELL: If she wants to make a point, I suggest you make it in your papers. Wait for a question.
MS. ANDREWS: That is my question.
MR. CAMPBELL: That wasn't a question.
MS. ANDREWS: Could you read it back?
(PENDING QUESTION READ)
MR. CAMPBELL: Objection as to form.
Q. Is that correct?
A. It's not precise.
Q. And what is wrong with the way that I've characterized it?
A. Because it makes it sound like the root cause of the problem was her overreliance on the bonuses when that's not the root cause of the issue. The root cause of the issue is she was asked time and time again make phone calls, make phone calls,

make phone calls, get people to come in and work.
Q. And --
A. I'm answering your question. And she did not do that, and you want to turn it around, and say it's because of bonuses. That's why it's not precise.
Q. But the reason that she was, I thought -- according to the Defendant in this case, I thought that the reason that you believe she wasn't making repeat phone calls was because she was -- she knew she could pay them bonuses?
MR. CAMPBELL: Objection as to form.
Q. Is that not the case?
MR. CAMPBELL: If you understood that, you can answer it.
A. I don't understand anything anymore.
MR. CAMPBELL: Let's take five minutes. This is getting to be a process where it's like ships passing in the night here.
MS. ANDREWS: I don't think so.
MR. CAMPBELL: Well, you cannot think so if you want, but I'd like to take five minutes. It's now quarter of 5:00. We're off the record.
MS. ANDREWS: Okay.
(BRIEF RECESS FROM 4:42 TO 4:49 P.M.)

A. I'm sure there were.
Q. And were they about agency and staffing?
MR. CAMPBELL: Objection as to form.
A. I assume it had to be part of the discussion.
Q. Did you ever search your computer to find out whether you had any E-mails relating to staffing or agency --
A. No.
Q. No. And why not?
MR. CAMPBELL: Objection as to form.
A. What was the point?
Q. Okay. Why was Pam Charron transferred to your facility?
MR. CAMPBELL: Objection as to form.
A. She was an assistant director at Life Care of Raynham, and she wanted to become a director, and there was no director position at Raynham. So Kate O'Connor and Joe Pereira said if you don't transfer her to another facility and keep her, then you'll lose her from the company. So they didn't want to lose her from the company. So they asked me if I would interview her for the DNS position at Cherry Hill because Celeste wasn't wanting to be DNS anymore.
Q. And why didn't Celeste want to be DNS anymore?

MR. CAMPBELL: Objection to the form.
A. It's a tough job, high stress job.
Q. And did you hire Pam Charron?
A. Yes.
Q. Did you interview anyone else?
A. No.
Q. Did you have any reservations with Pam Charron?
A. Yes.
Q. What were those reservations?
A. Her interpersonal skills.
Q. And what do you mean by that?
A. She was rough around the edges. She lacked a certain amount of sophistication and just good basic people skills. She came across with a -- for lack of a better term, like a South Boston demeanor about her, you know, like she was from Dorchester, like a tough -- don't take this the wrong way, like a tough broad type of a demeanor.
Q. Did you think that maybe she was too young for the job?
MR. CAMPBELL: Objection as to form.
A. Not so much age, but not experienced enough.
Q. Did you think that the older nurses would have a problem taking direction from a young nurse like that -- a young director of nursing?

MS. ANDREWS: Objection as to form.
A. Yes.
Q. If you look at the first two or three pages of Exhibit 18, the block of names in the upper left-hand corner, does this look like some type of a photocopy that was filled in after the fact?
MS. ANDREWS: Objection as to form.
A. Yes, it does.
Q. So for the one, two, three, four, five -- six pages, can you show me any difference at all in the upper left-hand block?
MS. ANDREWS: Objection as to form.
A. It looks all the same.
Q. So before when Ms. Andrews showed you a schedule from April of 2005 showing Irene Ferruccio, I believe you were unable to say why it is Irene Ferruccio's name was there; do you remember that testimony?
A. Yes, I do.
Q. Do you have any indication now as to why her name may be there after the date of her discharge?
MS. ANDREWS: Objection as to form.
A. It looks like the form was photocopied without it being changed.
Q. Do you know if Donna Diallo ever exhibited

performance that would warrant someone having to specifically tell her that she has to comply with her boss's requests?

MS. ANDREWS: Objection as to form.

A. No.

Q. Bonus amounts were paid through ADP; is that correct?

A. Yes.

Q. Is ADP a system that's used by the Defendant, Life Care?

A. Yes.

Q. Is that information reviewed by others outside of the facility?

MS. ANDREWS: Objection as to form.

A. Yes.

Q. Is it fair to say that any bonus dollars which were paid were paid through ADP, to your knowledge?

MS. ANDREWS: Objection as to form.

A. Yes, they're paid through ADP.

Q. Previously Ms. Andrews had shown you a document with the definition from the state regarding misconduct in the context of an unemployment filing; do you recall that?

A. Yes.

MS. ANDREWS: Same objection.
A. None of it is my writing, no.
Q. Do you know what was in Pam Charron's head when she put down any of these marks?
MS. ANDREWS: Objection as to form.
A. I don't know what's in anybody's head.
(OFF THE RECORD)
Q. Did Pam Charron ever make any age-related remarks?
MS. ANDREWS: Objection as to form.
A. No.
Q. Did she ever do or say anything that caused you any concern that she didn't like people because they were older?
MS. ANDREWS: Same objection.
A. No.
Q. Did she get along well with older employees?
MS. ANDREWS: Objection as to form.
A. Yes.
Q. Did she ever have any problems with any --
(OFF THE RECORD)
MR. CAMPBELL: I'll withdraw that question.
Q. So my question is do you know if she ever had any problems with any employees that were under the age of 40?