# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI *

VS. * C.A. NO. 06-108-ML

LIFE CARE CENTERS OF AMERICA, INC, PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity *

* * * * * * * * * * * * * * * * *

DEPOSITION OF PAMELA CHARRON, Defendant in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Mary Ann Sheridan-Woods, a Notary Public in and for the State of Rhode Island, at the offices of PATRICIA ANDREWS, ESQUIRE, 121 DYER STREET, PROVIDENCE, RHODE ISLAND, on April 11, 2007, commencing at 10:15 A.M.

APPEARANCES:

For the Plaintiff.........PATRICIA ANDREWS, ESQ.

For the Defendant.........JACKSON LEWIS LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ.

Life Care?

A. I'm sure I had.

Q. Okay, so in the case of Barbara Antonucci, you took discipline after you issued a verbal warning to her...

MR. CAMPBELL: Objection as to form.

Q. ...correct?

A. Yes.

Q. What did you give her next?

MR. CAMPBELL: Objection as to form.

A. Actually I -- an Action Plan, I believe, was the next thing that we did.

Q. What is an Action Plan?

A. This particular Action Plan had -- it just had what I was expecting and what the areas I needed her to work on, so this is what we need to be happening, sort of.

Q. Was it a form of discipline?

A. Yes.

Q. And did you issue an Action Plan to any other employee while at Life Care?

MR. CAMPBELL: Objection to form.

A. I'm sure -- I believe I did.

Q. Who?

A. I believe it was after the fact.

Q. It was after she left?

week?

MR. CAMPBELL: Objection as to form. Go ahead.

A. I have to say within -- I don't want to say she didn't meet the expectation, but I knew there were issues within the first week. I guess that's it.

Q. What do you mean by "I knew there were issues"?

A. That she was not used to completing the task as I was used to seeing it being done by somebody in her position.

Q. What was the task?

MR. CAMPBELL: Objection as to form.

A. Maintaining the monthly schedules.

Q. So you started July 26; correct?

A. I believe so.

Q. Yes?

A. I believe so.

Q. And did you take any vacation after you started at Cherry Hill Nursing but before Barbara Antonucci was terminated?

A. Yes.

Q. When?

A. I don't remember the date. It was shortly after I started.

Q. How long did you take?

A. A week.

first week that you started and she did not have the monthly schedule prepared?

MR. CAMPBELL: Objection as to form. Go ahead.

A. That's not what -- how it came about.

Q. Well, tell me how it came about?

A. It was in regards to -- she actually asked me a question, about how I was going to update it. I don't remember specifically. Something about me. I think it had to do about hiring. I'm not positive, but something to do with me updating the monthly schedule and I just said to her "why would I be doing a monthly schedule. That's your job," and that's how the conversation started. That's when I got into it.

Q. I'm trying to find out what was said during that conversation?

A. Specifically I can't remember, but generally it was just "I wouldn't be doing that. That's not my job. I'm the Director of Nurses. You're the scheduler. You need to do the monthly scheduling, keep it updated."

Q. Anything else that you recall in that conversation?

MR. CAMPBELL: Objection as to form. Go ahead.

A. I believe Barbara had said to me something in regards to the fact that she never had to do that before. That's the DON's job, not hers.

Q. Anything else you can recall about that conversation?
A. Just that I reiterated with her that I wouldn't be doing that. That wasn't my job.
Q. Anything else that you can recall about that conversation?
MR. CAMPBELL: Objection as to form.
A. Not off the top of my head.
Q. So as I understand it, Barbara went to you, and asked you whether you were going to be updating the monthly schedule; correct?
A. She had asked me some questions. I don't specifically remember. It was something to do with that, yes.
Q. That related to you doing something to the monthly schedule?
A. Correct. I know it was something to do with me doing it.
Q. Then she said -- strike that. Then you said, "that's not my job...
MR. CAMPBELL: Objection as to form.
Q. ...as the Director of Nursing;" correct?
MR. CAMPBELL: Objection as to form. Go ahead.
A. I don't know if I used those specific words but the general -- that was the general idea, "why would I be doing that. I'm the Director of Nursing. I don't do scheduling."

Q. And then Barbara said that in the past the Director of Nurses that she worked with had done, what she was asking you to do; correct?

MR. CAMPBELL: Objection as to form.

A. To a certain degree, yes. I don't know if those were her specific words, but that was the general idea.

Q. She was confused, because in the past, the Director of Nursing she had worked with had done this thing that she was asking you to do it; correct?

MR. CAMPBELL: Objection as to form. Go ahead.

A. I don't know if confused is the word I would like to say, but she was -- I don't know. I hate to put emotions into her head, but it just seemed that she was stunned that I would -- I don't know if stunned is the right word, but surprised maybe.

Q. And then you said to her again, in so many words, "as the Director of Nursing, I'm not not going to do it here"?

MR. CAMPBELL: Objection as to form.

Q. Correct?

MR. CAMPBELL: Go ahead.

A. To a certain extent, yes. That's the general idea that "I had so much more to deal with, how can I do the monthly schedule? "

Q. What did she say after that?

A. Again that was -- just that she never had to do it and she didn't.
Q. Anything else?
A. She didn't -- I don't know. I'm trying to remember specifics, and trust me I've been trying to remember specifics for long time now and it's hard to go back. Just in general that she didn't understand it. She didn't know how she was going to do it, something to that effect.
Q. Anything else that you can recall in that first conversation?
A. Just that -- just that I told her we would have to work on it and see how--
Q. And see how what?
A. How we could get there.
Q. Anything else...
MR. CAMPBELL: Objection as to form. Go ahead.
Q. ...that you can recall about that first one?
A. Not that I can remember.
Q. You had originally said that she refused to do it in that conversation; correct?
MR. CAMPBELL: Objection as to form.
A. Yes, to a certain extent, yes.
Q. What you do you mean by a certain extent? I thought she refused to do it and did she refuse to do it. -- Strike

MR. CAMPBELL: Objection as to form. Go ahead.
A. When was the first time?
Q. The next time, when was the next time?
A. A conversation came up again in regards to staffing. I don't remember the exact time.
Q. So you're saying that you had conversations with Barbara Antonucci about staffing?
A. Correct.
Q. And who was present?
A. Who else was present?
Q. Yes.
A. I don't believe anybody. I'm not sure.
Q. And tell me what you two talked about?
MR. CAMPBELL: Objection as to form.
A. The schedule.
Q. Can you be more specific?
A. I'm trying to remember correctly. I believe it was in regard to incompleted schedules, and the manner in which she was filling the slots.
Q. What I'm looking for, as best you can recall, what words came out of your mouth during that encounter?
MR. CAMPBELL: Objection as to form. Go ahead.
A. I don't know what words came out of my mouth. This is a couple of years later. I'm doing the best I can with

generals.

Q. Can you recall anything that you said during that encounter?

A. Specifically, no.

Q. Generally?

A. Generally, it was just, you know, trying to understand how she went about this daily schedule, filling those daily schedules.

Q. Now, when you say "filling the daily schedules," you mean, not writing in the daily schedules but filling vacancies?

A. Correct.

Q. Filling vacancies, and what was your issue with her?

A. It was a matter of a concern that I had, and that scheduling is not an easy task. I acknowledge that to this day. I still knowledge it, but, you know, the way in which she was pursuing the filling of those vacancies was not very cost effective for the facility.

Q. What do you mean by that?

A. Instead of calling the people on several occasions, she could just try to give bonuses.

Q. Now, she didn't have the authority to give the bonuses; correct?

A. Correct.

Q. Why do you blame her if management is giving her the bonus money; why is she blamed for taking it?

MR. CAMPBELL: Objection as to form.

MS. ANDREWS: Go ahead.

A. She wasn't being blamed for taking it. It was, you know, "how many times did you call this person?" "I already called them." "How many times?" "I left them a message." "How many times," you know, that sort of -- I'm not saying that's what happened verbatim, but that's the general gist of the conversation, you know, but "if I called and offered them bonuses they would come." "Well, did you try just again without offering"? That's where it came from.

Q. But she could not offer bonuses without getting approval first; correct?

A. Correct, for the most part, yes.

Q. So who would she go to to ask if she would get bonuses?

A. Usually she went to me or Steve.

Q. And you would either tell her yes or no; correct?

MR. CAMPBELL: Objection as to form.

Q. Correct?

A. Yes.

Q. And then you told her no on most occasions?

MR. CAMPBELL: Objection as to form.

A. Depending on the situation, I did tell her no.

MR. CAMPBELL: Objection as to form.

A. She was spoken to about the reliance too much on bonus dollars.

Q. When you say "spoken to," was that counseling?

MR. CAMPBELL: Objection.

A. I spoke to her, and I guess you could say it was a form of counseling, as to what I expected.

Q. I'm asking you whether it was counseling.

MR. CAMPBELL: Objection as to form. Go ahead.

A. I guess you could say yes.

Q. And why?

MR. CAMPBELL: Objection as to form.

A. Because I thought she relied too heavily on the bonus dollars.

Q. Weren't you relying too heavily on them?

A. No.

Q. You authorized them though?

MR. CAMPBELL: Objection.

A. Only in the case of a last minute -- we had nothing left to do.

Q. Are you saying that you authorized bonuses at the last minute?

MR. CAMPBELL: Objection as to form.

A. Probably.

Q. I'm looking for your best recollection here.
MR. CAMPBELL: Wait for a question.
Q. Is that a guess on your part?
MR. CAMPBELL: Objection as to form. Go ahead.
A. For the most part, yes. I wouldn't offer bonus dollars to fill a slot three days from now, no.
Q. When do you believe that they should be authorized?
MR. CAMPBELL: Objection as to form.
A. As the end all.
Q. Pardon?
A. As the end all. I'm trying to think of a way to say it if you understand what I mean. Last minute, shift coming up in a couple of hours. There in nobody else to fill it. That's all we can do.
Q. What about Mr. Haase?
MR. CAMPBELL: Objection as to form.
A. You would have to ask him.
Q. You don't know the circumstances under which he did?
MR. CAMPBELL: Objection as to form.
A. I can only speak to what I authorized. He was under the same pressure that I was, so I'm assuming that he didn't jump the gun either.
Q. If you took the position that it should only be at the end, how is it that Barbara got money before the end?

MR. CAMPBELL: Objection as to form.
Q. How is it that she kept getting the money?
MR. CAMPBELL: Objection as to form. Go ahead.
A. She wasn't getting the money from me.
Q. Who was she getting it from?
A. When I arrived she was getting it from me, or from Steve, if I was unable to do it.
Q. But any time that she offered money at any time during the week, she either got authority from you or Steve; correct?
MR. CAMPBELL: Objection as to form. Asked and answered three times. Go ahead.
A. Correct.
Q. And to the extent that she offered a bonus on a Tuesday, for the following weekend, she had authority to do that; correct?
A. No, I never gave her authority to do that.
Q. What about Steve?
A. I don't know. I would think not, but I don't want to say absolutely no or I never gave it to her.
Q. What was your issue with her regarding the bonuses; you took the position that she was offering bonus money too early; correct?
MR. CAMPBELL: Objection as to form. Go ahead.

A. Too early, too often, yes.

Q. When was she offering those bonuses?

MR. CAMPBELL: Objection as to form.

A. She wasn't offering them. If it was Tuesday, let's go to your example of Tuesday, she didn't offer them for the week because she didn't get the authorization from me. What she would say do if you want to fill the schedule for Tuesday, I can get so and so, if we give them this bonus, so that was the scenario.

Q. You critiqued her, because she was giving out too much bonus money; correct?

MR. CAMPBELL: Objection as to form. Go ahead.

A. Because that's what she was using to schedule, fill the schedule.

Q. You thought that she was giving out bonus money too early; correct?

MR. CAMPBELL: Objection as to form.

A. Relying on it too much.

Q. So are you saying that she wasn't giving it out too early; she was just relying on it?

MR. CAMPBELL: Objection as to form.

A. Again she didn't have -- if it was Tuesday and we were trying to work on Friday's schedule, instead of continually calling somebody from Friday's schedule, she would wait

until Friday morning, tell me if you want this person, you got to pay them -- give them a bonus to come in. It's too late to do anything by that time. That was the issue. If it's Tuesday, she's not authorized to give a bonus on the weekend because I certainly wasn't going to give her the authority at that point. There is still a lot of work that could be done in those few days, but she would say to me on Tuesday, "if we give so and so a bonus, then we can get them for the weekend."

Q. And you said?

A. "No, keep trying."

Q. What did she say?

A. "I'm doing the best I can."

Q. Did she -- did you say, "what are you doing?"

A. Yes, I'm sure.

Q. What did she say?

MR. CAMPBELL: Objection as to form.

A. "I'm calling people. I know my job." I got that a lot. "I know what I'm doing. I know my job."

Q. What else?

A. Again specifics, and I apologize, it is difficult to remember specific conversations.

Q. Who did she say she was calling?

MR. CAMPBELL: Objection as to form.

A. Just nurses.

Q. Did she say how many times she was calling?

MR. CAMPBELL: Objection as to form.

A. In around about way. I'd say "Did you call so and so?" "I left a message." "Did you call back?" "No, I left a message. She'll call me if she wants it." That sort of thing.

Q. You have to understand that...

MR. CAMPBELL: Were you finished, Pam?

Q. I'm really trying to pin you down on what your criticism was of what she was doing?

MR. CAMPBELL: She was in the middle of a sentence, and you interrupted her, and I'm not going to allow you to do that. If you ask her a question that's open ended, and she gives you a narrative, you may not interrupt her again. At this point it's 12:40. We indicated that we would have lunch at 12:40 and right now it's a logical break, if you have no question pending.

MS. ANDREWS: There's an area that I'm into though.

MR. CAMPBELL: Your co-counsel ceased her client and your client's deposition with two minutes notice with no prior indication that she would not allow me to complete my deposition in a day. That fact that you're in

the middle of an area, while certainly I expect to extend the courtesy, we did say 12:40. Is it a short area? If it is, I certainly will be glad to extend professional courtesy to allow you to complete your line of questioning.

MS. ANDREWS: Thank you.

MR. CAMPBELL: Is it a short area?

MS. ANDREWS: I anticipate that it is. It depends on how long her answer is.

MR. CAMPBELL: If it's more than five minutes, we'll be taking lunch. Please proceed.

MS. ANDREWS: Could you mark that one. What was my question?

MR. CAMPBELL: Let's not get in the middle of something. Off the record.

(OFF THE RECORD)

Q. What I'm trying to find out here is, did my client say that she was not calling people back...

MR. CAMPBELL: Objection as to form.

Q. ...after she left a message?

MR. CAMPBELL: Objection as to form. Go ahead.

A. Yes.

Q. Every time you spoke to her?

MR. CAMPBELL: Objection as to form. Go ahead.

A. I'm not sure.

Q. Did she ever tell you that she refused to call people a second time?
A. Yes.
Q. When was the first time that she told you?
A. I don't know. I really don't know when it was. I know the conversation. It came out of her mouth that I'm not badgering people like that.
Q. Did you ask her why?
MR. CAMPBELL: Objection as to form. Go ahead.
A. I told her it's not badgering. It's her job.
Q. What did she say?
A. I know my job.
Q. Did she ever -- strike that. Did you tell her that she had who do it?
A. I told her that this is what I expected of her, yes.
Q. To call people back?
A. Correct.
Q. Did you ever seek to find out where she was doing that?
MR. CAMPBELL: Objection as to form. Go ahead.
A. I did ask her again.
Q. What did she say?
A. "I know my job."
Q. What did she say about whether she was calling them back?

A. "They know to call me."
Q. But did you ever ask whether she was following your directive to call people back?
MR. CAMPBELL: Objection as to form. Go ahead.
MS. ANDREWS: Go ahead.
A. Yes, I did ask her.
Q. What did she say?
A. She was always very -- there was never a specific yes or no. She was always very roundabout with her answer. "Well, I called them. I know what I'm doing. I'm calling them. They know me. They know when to call me."
Q. Did she ever tell you that she was not calling people back?
MR. CAMPBELL: Objection to form, asked and answered twice.
A. As I said previously to the fact that I'm not badgering people. She did tell me that she wasn't going to badger people.
Q. Did she tell you what she meant by that?
MR. CAMPBELL: Objection as to form.
A. To the best of my knowledge, I didn't go into a conversation with her, "What do you mean by that?" I just said to her "that's not badgering. That's what we have to do sometimes to get what we need."

A. In regard to that, no.
Q. Now, you said that you would call nurses, and say "If I gave you a Friday, will you do it," and you got results; correct?
THE WITNESS: I'm sorry. Can we go back to the previous question?
MS. ANDREWS: Do you want to add something?
THE WITNESS: Yes.
MS. ANDREWS: If you want to add something, go ahead.
A. You had asked me if she specifically said that she wasn't doing it. There were conversations where she did say that I'm not calling people more than once.
Q. When was that?
MR. CAMPBELL: Objection as to form.
A. I don't remember exactly when. It was around this time.
Q. And is there a reason why you had not recalled her saying that before just now?
MR. CAMPBELL: Objection as to form. Go ahead.
A. Is there is reason why?
Q. Yes. I'm just wondering why you didn't mention that before?
A. I just wanted to make sure that I give you the right

answer when I said, no, but, you know, in light of the way the conversation was going I knew there was an instance when she did say that she wasn't calling people more than once.

Q. You say an incident, what do you mean an incident?

A. Instance.

Q. So there was a day when you questioned her about the schedule and she said she had not called people more than once?

MR. CAMPBELL: Objection as to form.

A. I questioned her about calling people to work the schedule and, you know, how many times she called them, and don't remember her exact words and her response was "I'm not calling them again. I already called them. I know what I'm doing," blah, blah, blah.

Q. Did you understand that she was saying, "As a rule I'm not going to place repeat phone calls."

MR. CAMPBELL: Objection as to form.

A. My understanding of what she was saying to me was that I'm not -- exactly.

Q. What was it that she said that led you to believe that?

A. Just as said, I don't know verbatim, but just as I stated a little while ago that she just, you know, "I'm not calling them more than once. I know what I'm doing," was the general thing that she kept saying to me, and "I'm not going

to keep calling these people, if they want to work, they will work."

Q. Did you take as an act of insubordination?

MR. CAMPBELL: Objection as to form.

A. I took it as an act of resistance, continued resistance.

Q. Did you write that anywhere, that she refused to give you -- that she refused to call back?

MR. CAMPBELL: Objection as to form.

A. It was part -- it went into play with this Action Plan. That's how I acknowledged it.

Q. How do you that she did not mean in this particular week I am not doing that?

MR. CAMPBELL: Objection as to form.

MS. ANDREWS: Go ahead.

A. As I stated, it was an ongoing issue with the scheduling.

Q. Well, so far you only...

MR. CAMPBELL: Can she finish her answer? You just cut her off.

Q. So far you told me there was one instance where she said "I'm not calling people back"?

MR. CAMPBELL: Objection as to form.

A. At that point.

Q. Did she ever tell you that again?

MR. CAMPBELL: Objection as to form.

A. I don't know. I'm assuming that she did. I would hate to say -- I can't remember a specific instance, so....

Q. You can't remember her doing that more than once?

MR. CAMPBELL: Objection as to form.

MS. ANDREWS: Go ahead.

A. Specifically, no.

Q. Why did you leave Raynham?

A. I was promoted.

Q. To Director of Nursing?

A. Correct.

Q. How old were you when you were promoted?

A. Oh, God. I'm 39 so it was in 2004, so I was 36.

Q. And did you ever tell anyone that you were concerned about the fact that you were so young, and that you might have trouble in your position as Director of Nursing because of your age?

MR. CAMPBELL: Objection as to form.

A. No.

Q. Did you ever think that -- strike that. Do you know of any Directors of Nursing who were over 40 who worked at Cherry Hill?

A. Over 40?

sure she stood in those duties to cover.

Q. What did you ask her about the monthly schedules?

A. If she was doing them.

Q. If who was doing them?

A. Celeste was doing them. I asked Celeste "Were you doing these?"

Q. What did she say?

A. Yes.

Q. And did you two talk about anything else?

A. In regard to the monthly schedules?

Q. I said did you ever have a discussion with Celeste about Barbara Antonucci and then you said that you confirmed with her about the monthly schedules, and then that was what I'm trying to find out about, what did you talk about in terms of Barbara Antonucci?

A. I again asked her how the scheduling went. I don't remember specific conversations. I know at one point when I first had resistance, met resistance with Barbara, Celeste had told me that she had problems with her with the past. We just discussed that.

Q. What problems did she tell you she had?

A. That she was insubordinate to her and there were occasions where she had actually refused to do something. I don't remember specifics, but I remember she had told me

that she had problems with her as well in the past.

Q. Did she tell you that ultimately she and -- strike that. Did she tell you that ultimately she did not have problems with Barbara Antonucci?

MR. CAMPBELL: Objection as to form.

A. That she didn't?

MS. ANDREWS: Strike that. It's a poor question.

Q. Did she tell you that she always had problems with Barbara Antonucci?

MR. CAMPBELL: Objection as to form.

A. Not always, but that she did.

Q. Did she tell you that it was in the beginning that she had the problems with her?

A. She wasn't specific to me that it was this week or that week. It was just that she had them in the past.

Q. Did she give you any advice about how to deal with Barbara Antonucci?

A. No.

Q. Did you ask for any?

A. I don't think so.

Q. Did she tell you how she felt about the manner in which Barbara Antonucci performed her job?

MR. CAMPBELL: Objection as to form.

Q. And then you decided only a short time later that you were going to fire her; correct?

MR. CAMPBELL: Objection as to form.

A. Correct.

Q. Am I to assume that between the verbal warnings and the termination, she did something else that caused you to decide we've got to now fire her?

A. It just continued. It was just ongoing. It was evident to me that it didn't matter what I said, what I did, she wasn't going to do it my way.

Q. What did she do after that verbal warning that led you to believe that she should now be fired?

MR. CAMPBELL: Objection to form. Go ahead.

A. It was a specific incident -- well, the one specific incident that comes to mind was the -- a weekend schedule that she brought to me on a Friday afternoon with numerous open slots, when I repeatedly asked her during the week to fill them.

Q. Anything else?

A. That was....

MR. CAMPBELL: Objection as to form. Go ahead.

A. That was the -- that was the biggest one.

Q. I'm trying to find out what she did, okay, after the verbal warning, but before she was fired, beside that, that

led you to believe that she should be terminated?

MR. CAMPBELL: Objection as to form. Go ahead. It's not a question.

MS. ANDREWS: No, that is a question.

A. That schedule. That specific schedule -- the fact she came to me on Friday afternoon with all these open spots.

Q. That was the only reason that you decided that she now had to be fired?

MR. CAMPBELL: Objection as to form.

A. I guess that you can say that was the end all. That was it for me. That was enough.

Q. Well, you had given her a verbal warning and then after the verbal warning, you fired her, so I'm assuming that she did something between the verbal warning and the firing to make you decide that you had to take it to a termination; correct?

A. Uh-hum.

Q. And so far you have told me that it was her failure to fill in the schedules for a particular weekend; correct?

MR. CAMPBELL: Objection as to form.

A. Yes.

Q. Was there anything else?

A. That was enough,

Q. There was nothing else?

A. No.
Q. Tell me how you found out about the vacancies on Friday.
A. She brought me the schedule.
Q. Who was present?
A. I don't remember.
Q. Are you saying that someone was present, you just can't recall who?
MR. CAMPBELL: Objection as to form.
A. I believe when she initially gave me the schedule, I was on the nursing unit, so there could have been other people around.
Q. Can you identify any of them?
A. I know who I talked to following that. I don't think I know if they were present when Barbara walked up or not, but they were present with me shortly thereafter.
Q. Was that Melissa?
A. Melissa was one of them.
Q. Who else?
A. Celeste, I believe Donna was there. That's all I can remember.
Q. And when she brought the schedule to you, what time was it?
A. Specifically, I don't know. It was around two-ish.

Q. What did she say?
A. This is what it looks like.
Q. That was it?
A. Initially, yes. Then I just looked at it.
Q. And who said something next?
A. Just "What are these all these holes?" I'm generalizing. I don't know verbatim what I said. Generally I couldn't believe how many holes there were and she said "I did the best I could."
Q. Anything else that you recall talking about?
A. I knew I had to leave that day. I'm not sure, but I might have said something to her to the effect we discussed this. "You knew I had to leave." You know, just to that effect. "Why? You knew I had to leave today."
Q. What else, what happened next?
A. I called Steve. I don't know if I called or I walked in his office, but it wasn't too far from the unit. I informed Steve anyway, Mr. Haase, because we were going to a funeral together, and that he is probably going to have to go without me, because I couldn't leave. I couldn't leave the schedule like that. That's my responsibility to make sure it's properly staffed and I went back, talked to Celeste and Melissa and told them I had to fill these slots. We proceeded to call a couple of people and fill the slots.

Q. So you, Celeste and Melissa did it?

A. Yes.

Q. How many vacancies were there?

A. I'm not sure. Close to 20. I remember there was about 20-ish or so.

Q. What are the positions?

A. CNA's and nurses.

Q. And how many people did you call?

MR. CAMPBELL: Objection as to form.

A. I couldn't tell you. A lot.

Q. Ten?

A. At least

Q. Was it 20?

A. I don't know.

Q. How many did Celeste call?

A. I don't know. She called some people herself.

Q. And how many did Melissa call?

A. Melissa was talking to a couple of people working with her.

Q. How many did you get to come in, you personally?

MR. CAMPBELL: Objection as to form.

A. I'm not sure. I would have to count. I'm not sure. I couldn't tell you off the top of my head. I got a lot of them.

Q. What did you offer them?

MR. CAMPBELL: Objection as to form.

A. I don't know. Different things.

Q. Like what?

A. Days off. Four hours. Doing it for me.

Q. Money?

A. I believe somebody got money.

Q. One person got money?

A. No, more than one person got money.

Q. How much?

A. I don't know.

Q. Do you know what efforts Barbara Antonucci made prior to the time that she handed you that list on Wednesday?

MR. CAMPBELL: Objection as to form.

A. I didn't lean over and see how many -- how many times she called. I don't know. I mean it was obvious to me at that point not as much as I thought she should have done.

Q. How do you know?

A. Because it wasn't filled.

Q. Aren't there times when you can call and not get it filled?

A. Yes, but to the degree that was wasn't filled is the issue. You always have those issues on a Friday afternoon. It goes without saying, and I understand that. There is

always that degree that you're going to have this slot or that slot that you really just can't -- it's really getting difficult, and we're down to the nitty gritty, as we call it. To the degree that this schedule was left, no.

Q. Tell me, sitting here today, did you ever seek to determine what efforts she made to fill those vacancies?

MR. CAMPBELL: Objection as to form. Go ahead.

A. By speaking. No, it was pretty evident to me at that point.

Q. Did you seek to find out, did you make any effort to find out?

MR. CAMPBELL: Objection as to form.

MS. ANDREWS: Go ahead.

A. Not really. I don't remember it.

Q. Did you have any reason to believe that she did not place repeat calls in an effort to get those vacancies filled?

MR. CAMPBELL: Objection as to form.

A. I have every reason to believe that. They were empty.

Q. You already told me that repeat calls don't necessarily mean that people decide to come in; correct?

A. Yeah, but not enough to leave 20 holes.

Q. How many do you know, how many would it have been if she had called?

MR. CAMPBELL: Objection as to form.

Q. And made repeat calls?

MR. CAMPBELL: Same objection.

A. Like I said, if there were four or five holes, I would understand. You did the best you could and it's just down to the nitty gritty, but you wouldn't have all these holes.

Q. Did Barbara tell you what she did?

A. The best she could.

Q. Had you authorized to give her bonus money to get it filled?

A. I believe I did.

Q. And even with bonus money she couldn't do it?

MR. CAMPBELL: Objection as to form.

A. Nope.

Q. How much had you authorized her to give?

A. I don't remember.

Q. When did you first look -- strike that. What she handed to you was the weekly sheet?

A. The daily, the daily for the weekend. It was like four sets of papers.

Q. And then -- strike that. Had you talked to Barbara Antonucci about her difficulties in getting people for the weekend before that Friday afternoon?

MR. CAMPBELL: Objection as to form.

A. I spoke to her about the schedule prior to that, but she just said "I'm doing it. I'm know what I'm doing. I'm doing the best I can."

Q. Well, you must have spoken to her about giving bonuses; right?

A. We must have. I know it was there.

Q. So she had let you know that she was having problems prior to Friday afternoon; correct?

MR. CAMPBELL: Objection as to form.

A. I don't know. She never indicated to me that there was that big of an issue prior to that Friday afternoon, but I know I authorized some form of bonus and it probably was in the form of, "Mary said that she will fill that Friday afternoon for you, but can I just give her something?"

Q. Well you told me earlier that you only authorize bonuses, if you were really desperate; correct?

MR. CAMPBELL: Objection as to form. Go ahead.

Q. Right?

A. Yes.

Q. So do you know in that week you had authorized these bonuses?

A. No, probably towards the latter part of the week.

Q. Do you know for sure?

A. No.

Q. Had she come to you earlier to ask whether she could give bonuses and you rejected her on that?

MR. CAMPBELL: Objection as to form.

A. Earlier than what?

Q. Had she come to you earlier in the week and asked you whether she could start giving bonuses and you said...

A. No, I don't remember.

Q. So are you aware of anything that Barbara Antonucci did in an effort to fill that weekend?

MR. CAMPBELL: Objection, asked and answered.

Q. Other than what you have testified to?

MR. CAMPBELL: Same objection.

A. No.

MR. CAMPBELL: Have you completed your answer?

MS. ANDREWS: She said no. She shook her head and put her head down.

MR. CAMPBELL: Have you completed your answer?

A. Yes. No, I don't know. I'm not sure.

MR. CAMPBELL: And let's go off the record.

(OFF THE RECORD)

MS. ANDREWS: I'd ask that you not speak to her, okay. Why don't you put that on the record. You just said, "don't come with me to the restroom."

MR. CAMPBELL: If you want that on the record,

Pat, that's fine.

MS. ANDREWS: I want everything you're saying in this deposition to be on the record.

MR. CAMPBELL: I'm just going to use the restroom, if that's okay.

MS. ANDREWS: Because it's very inappropriate.

MR. CAMPBELL: And I have to grab a coffee at some point.

MS. ANDREWS: Well, she has to change paper, so you might as well.

MR. CAMPBELL: I will not stop you if you're in a line of questioning, but at some point...

MS. ANDREWS: Go now. That's the point. She has to change her paper. I would ask that you not talk about the testimony. I assume that you will honor that.

MR. CAMPBELL: Shall we.

(BRIEF RECESS)

Q. Why did you ask Barbara to help you fill these vacancies?

A. At that point? I just said "Well, forget it." She had all week to fill them. A that point I was just "I'll just do it myself."

Q. Had you made a decision at that point that you wanted her out of there?

MR. CAMPBELL: Objection as to form.
A. I was upset, but -- I don't know if I said "That's it." Not specifically, just that I knew that was enough and I had had it and I had to talk to my superiors -- I needed to let them know what had happened.
Q. So you had not made a decision definitively that she had to go?
A. No.
Q. Did you at some point come to the concussion that she had to be fired?
A. After I discussed that with my supervisors, yes.
Q. That's Haase and Pereira?
A. Correct.
Q. Was Human Resources involved at all?
MR. CAMPBELL: Objection to form. Go ahead.
Q. In the decision to terminate her?
A. I don't believe so.
Q. You never had to get approval?
MR. CAMPBELL: Objection as to form.
A. No.
Q. Was it your recommendation that she be fired?
MR. CAMPBELL: Objection as to form.
A. I just want to answer appropriately. Please forgive my hesitance. It's just that I approached it as what else am I

going to do. This is enough. So was that enough to say that it was my recommendation. I don't know.
Q. Who brought up the topic of termination?
A. We spoke.
Q. Go ahead.
A. We spoke. I don't remember exactly who brought it up. I just know that I spoke to Joe and I spoke to Steve. "This is enough. I've had enough. What else am I going to do?"
Q. Had you, prior to this, ever told Barbara Antonucci that her job was in jeopardy?
MR. CAMPBELL: Objection as to form.
A. In essence the Action Plan alone was -- when we sat and talked to her I said "these are the things I expect you to be doing. This is what you're going to be doing." If you don't do it...
Q. Did you ever tell her that her job was in jeopardy?
MR. CAMPBELL: Objection as to form.
A. I don't think I used those specifics, no.
Q. Did you ever tell her that she might be terminated?
MR. CAMPBELL: Objection as to form.
A. I don't remember saying that to her.
Q. Do you know if anyone else did?
A. No, I didn't, prior to.
Q. Was there a discussion about suspending as opposed to

would be silly to think that I could remember everybody's schedule, but I do remember specific like Donna and Lori Rickett. I remember some people that didn't even work that shift. It's in different handwriting so, yes.

Q. How do you know though that -- strike that. How many different handwritings are you seeing on Plaintiff's Exhibit Number 5, more specifically 1067?

MR. CAMPBELL: Objection as to form.

Q. That you're comparing?

A. There is at least three different handwritings on here.

MS. ANDREWS: We're going to come back to that.

Q. Tell me who replaced Barbara Antonucci?

MR. CAMPBELL: Objection as to form. Go ahead.

A. As Staffing Coordinator?

Q. Yes.

A. Donna Diallo.

Q. And did you believe that she was fully qualified to perform the duties of Staffing Coordinator as of the time that Barbara left?

MR. CAMPBELL: Objection as to form.

A. I knew she had some experience scheduling to give it a try.

Q. My question to you is, did you believe that she was qualified to step into the position as of the time that

Q. And Number 4 is the same; correct?
A. Uh-hum.
Q. And now here is Number 5, the old one says "processes request for shift changes," and on your redefined job description it states, "processes requests for shift changes after DNS approval"?
A. Yes.
Q. You added "after DNS approval"?
A. Yes.
Q. Why did you do that?
A. As I said in case anybody wants to change from full-time days to full-time second shift we need to make sure that I have enough staff on each shift.
Q. How do you know that was not interpreted by Barbara as being unable to change someone's shift as an incentive to get them to come in?
MR. CAMPBELL: Objection as to form.
A. Because we spoke about it. I told you that. We spoke about that.
Q. I didn't know that you spoke about that. When did you speak about that?
A. I spoke about it earlier, in conversation, when we were talking about being creative, and what not, that I would say to her "You know, ask them if they'll do half a shift," or

"If they'll do 3 to 11, I'll give them a shift off." She knew that was appropriate, because I had told her.

Q. You but didn't tell her that she could do that on her on without your approval?

A. Yes, I did.

Q. When did you tell her that she could do it on her own without your approval?

A. Whenever we were speaking in regards to filling a schedule. This here refers to permanent change of shift.

Q. Where does it say that?

MR. CAMPBELL: Objection as to form.

A. It doesn't.

Q. And you never had that discussion with her, did you?

MR. CAMPBELL: Objection as to form.

A. As for permanent, when we discussed this.

Q. When you discussed what?

A. When he went over the job description.

Q. So prior to your changing this she had -- she didn't have to get DNS approval?

MR. CAMPBELL: Objection as to form.

A. I don't know. I don't remember.

Q. You added it. It wasn't in the previous ones; correct?

A. No, it wasn't. But I just added it for clarification and make sure that she understood that had to be. If