# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI :
:
vs. : C.A. NO. 06-108 ML
:
CHERRY HILL MANOR, ET AL. :

**VOLUME I**

**PAGES 1-187**

***DEPOSITION OF DONNA L. SWEETING***

produced, sworn and examined on FEBRUARY 9, 2007, at 9:00 a.m. at LAW OFFICE OF PATRICIA E. ANDREWS, 129 Dyer Street, Providence, Rhode Island, before:

*CLAUDIA RATHBUN, RPR-RMR*
*CAPITOL COURT REPORTING, INC.*
A Notary Public in and for the State of Rhode Island taken on behalf of the Plaintiff

**— CAPITOL COURT REPORTING, INC. —**
**931 Jefferson Boulevard, Suite 2003**
**Warwick, RI 02886**
**401/739-3600**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI :
:
vs. : C.A. NO. 06-108 ML
:
CHERRY HILL MANOR, ET AL. :

VOLUME II
PAGES 187-349
EXHIBITS 1-15

***DEPOSITION OF DONNA L. SWEETING***

produced, sworn and examined on FEBRUARY 9, 2007, at 9:00 a.m. at LAW OFFICE OF PATRICIA E. ANDREWS, 129 Dyer Street, Providence, Rhode Island, before:

*CLAUDIA RATHBUN, RPR-RMR*
*CAPITOL COURT REPORTING, INC.*
A Notary Public in and for the State of Rhode Island taken on behalf of the Plaintiff

**— CAPITOL COURT REPORTING, INC. —**
**931 Jefferson Boulevard, Suite 2003**
**Warwick, RI 02886**
**401/739-3600**

A. CNA.
Q. Okay. What does a CNA do?
A. Certified nursing assistant.
Q. What do they do?
A. Caring for the patients who are in Cherry Hill Manor.
Q. Like what kind of tasks, if you could break it down for me.
A. Bathing, feeding, weighing, vital signs. All of the daily living. Everything to do with the daily living.
Q. And what's the difference between a CNA and an RN?
MR. CAMPBELL: Objection as to form. Go ahead.
A. A registered nurse runs the floor obviously. She can do things that I can't do, like IVs, needles, insulins. You have to go to school longer to be a registered nurse as opposed to being a certified nursing assistant.
Q. So, what about medication as a CNA?
A. I'm a certified med tech as well as a CNA.

A. Pretty much, yeah, business friendly.

Q. Okay. And so, when she was working there, in your opinion was she a good director of nursing?

MR. CAMPBELL: Objection to form. Go ahead.

A. Yeah, I never -- I never had problems. I mean, I don't know. I wasn't her boss, so, I didn't know what was going on, you know, in office meetings and stuff, but as a director, I thought she was okay.

Q. Okay. Did you ever hear about any problems that she was having on the job?

A. No.

(BRIEF INTERRUPTION)

MS. IAFRATE: I think I had a question pending, didn't I?

(PREVIOUS QUESTION AND ANSWER THERETO READ)

Q. Okay. So, Deb Medeiros is there for eight months?

A. Uh-huh.

Q. Okay. And then who replaces Deb Mederios?

MR. CAMPBELL: Objection as to

form. Go ahead.
A. Celeste Harris.
Q. And do you have any idea when that was, like what year that happened?
A. I am not good at remembering dates. I believe Celeste was director in 2003.
Q. And then how long did Celeste stay in the director-of-nursing position continuously?
A. Not very long. Not very long.
Q. More or less than Deb Medeiros?
A. Could have been about as long as Deb Medeiros. Could be.
Q. Okay. So, you think it was less than a year?
A. Yeah.
Q. And when Celeste Harris was the director of nursing, in your opinion was she good at the job?
A. Yeah. Yeah, she was good.
Q. Okay. Is there any reason why she only stayed in it for less than a year --
MR. CAMPBELL: Objection as to form. Go ahead.
Q. -- that you're aware of?

form. Go ahead.
A. Some CNAs left. I mean, I hired some CNAs. So, some CNAs left, whether they got fired or found another job, but I did hire and try to replace, because I do the hiring for CNAs.
Q. When did you start hiring for CNAs?
A. About a year and a half ago.
Q. And how did that come about that you were asked to hire CNAs?
A. Denise Schwartz was director of nursing and she started doing the interviews, and then she said from any facility that she ever worked at, the staffing person did the hiring for CNAs, so, she assigned that to me.
Q. Okay. And Denise Schwartz?
A. Schwartz.
Q. Replaced Pam Charon?
MR. CAMPBELL: Objection as to form.
Q. Is that correct?
A. Yes.
Q. Do you know approximately when Denise became the director of nursing?

A. I think she came in October of '05.
Q. And is she still the director of nursing?
A. Nope.
Q. When did she leave?
A. Denise was probably a director for six months. Actually, I think she left -- it might have been a little longer than that. I think she left in July of '06.
Q. And who became the director of nursing at that time?
A. Celeste Harris was acting and then she took the position again.
Q. Okay. So, Celeste is the same person who was the director of nursing for a short period of time in 2003?
A. Right.
Q. Okay. And now, in 2006 she takes the position again, and she is in 2007 still the director of nursing?
A. Yes.
Q. Okay. And for Denise --
A. Schwartz.
Q. I don't know why I can't say that name today -- what was the reason why she left?

take it over until she knows what Steve wanted her to do with the position.

MS. IAFRATE: Okay.

A. And that wasn't right away.

MS. IAFRATE: Okay.

A. And I can remember telling her, "I'll take it temporary. I don't think I want to handle staffing full time," because staffing's staffing. It's a tough position.

Q. When you say that it's a tough position and you didn't want to do it, can you elaborate on why it's difficult to do?

A. It's just dealing with different people and different attitudes. Dealing with people in general.

Q. Okay. And you didn't want to do that?

MR. CAMPBELL: Objection as to form.

A. No.

Q. Okay. So, when you say, "Dealing with different people" -- I'm sorry, do you want to say something?

A. Yeah, I can't say I didn't want to do it. I had to think whether or not I wanted

what I didn't put in, I didn't separate them, I just -- because I was always on the go helping what I had to do. And she went through the incident reports this particular day, and she knew if I didn't initial it that meant the 24-hour preliminary wasn't in. So, she separated them and she called me into her office, and that's when she told me that they weren't in, we're beyond the 24 hours and that can't happen. She said to me, "If you need -- if something is not going the way you planned, or if you need to talk to me about something that's going on in your job that you can't handle, you need to tell me because this can't happen."

Q. Okay. So, did you tell her that you thought you weren't going to be able to get all that work done?

A. No, I didn't tell her that.

Q. Were you nervous about getting all that work done?

A. No. No.

Q. So, you thought you could do it?

A. Yeah.

Q. So, even though you hadn't been able to get it all --
A. There were days that I did it. You know, there were weeks that it was all done, but then there were weeks that something was either not going according to as planned, or it could have been anything. I came into work late. It could have been anything.
Q. Okay. So, she sat down with you and talked to you about this?
A. Yes.
Q. Okay. And she didn't write you up for it?
A. She told me if it happened again -- she said, "I was going write you up, but I'm not. If it happens again, I'm going to write you up."
Q. Okay. And did that ever happen again?
A. No.
Q. Do you know if she continued to check your little stack of incident reports?
A. Yes. Yes, she did.
Q. Okay. How often would she check that pile?
MR. CAMPBELL: Objection as to form.

A. Weekly.
Q. Okay. Is it possible that you had some that were not entered within 24 hours but that she just didn't realize it?
MR. CAMPBELL: Objection as to form.
A. No.
Q. Because after that you made sure --
A. Made sure that they were done.
Q. Okay. Other than that incident, is there any other time that you were made aware that Pam was not happy with something that you were doing on the job?
A. Not that I recall.
Q. And this includes even after you became the staffing person?
A. Yes.
Q. So, when you were staffing person, she never ever sat you down and said, you know, I'm concerned about this problem or you need to work on something else?
A. No.
MR. CAMPBELL: Objection as to form.

Q. I want to talk to you a little bit about Cherry Hill Manor itself. It's a nursing home; correct?
A. Correct.
Q. How many floors are in the nursing home?
A. Three floors.
Q. Okay. With patients on each floor?
A. Yes.
Q. Okay. And how many units are there?
A. Three.
Q. Okay. So, there's one unit on each floor?
A. Right.
Q. Okay. So, what's on the third floor?
A. Third floor? What on it meaning the units?
Q. What kind of unit, yes.
A. It's a 60-patient unit, usually two nurses during the day, two nurses in the evening, and one at night.
Q. So, when you say "60 patients," is there any particular kind of patient?
A. Some different illnesses. Some could be Alzheimer's, some could be dementia.
Q. But is there anything different, I guess what

I'm trying to say is, between the kind of patients that you have on the second floor and the kind of patients you have on the first floor?

A. Third and fourth floor are pretty much the same, and the second floor is subacute units, and that's -- that's like the hospital setting, people come and go. There's some long-term people there, that's there to stay. They don't have the desire to move, or they didn't want to move; they're comfortable where they are.

Q. Okay. Let me just get this straight. Is there four actual floors to the total building? Is that what you're saying?

A. Three floors.

Q. Okay. I just thought I heard you say "fourth floor."

A. Yeah, because we only have three floors we use. There's the basement, second floor, third floor, fourth floor. We have three floors that we use.

Q. Okay. I'm following you now. So, there's patients on the second floor, the third floor

and the fourth floor.
A. Right.
Q. Okay. So, on the fourth floor, how many patients are there, or how many beds are there?
A. 60.
Q. Okay, and the same on the third floor?
A. Right.
Q. And then what about the second floor?
A. 52.
Q. So, the total number of beds is...
A. 172.
Q. Okay. And has that been the same from 2004 to the present time?
A. Yes.
Q. Okay. And then you started talking about staffing on each of the floors. So, for the 60 patients on the fourth floor and the 60 patients on the third floor, would it be the same?
A. Yes.
Q. Okay. So, you're saying during the day shift, which is 7:00 to 3:00; correct?
A. Uh-huh.

floor tomorrow. Is that okay?" And she'll say, "Okay, that's fine."

Q. So, getting back to the setup at Cherry Hill, so you said the last shift is 11:00 to 7:00; right?

A. Right.

Q. Okay. So, is it the same thing for nurses, you need two nurses or one?

A. One.

Q. Why is it different at night?

MR. CAMPBELL: Objection as to form.

A. That's been the pattern.

Q. Okay. So, no one has ever explained to you why you only need one at night?

A. No.

Q. Or overnight, I should say.

A. Overnight.

Q. Okay. And then how many CNAs do you need each for the fourth floor?

MR. CAMPBELL: Objection as to form.

A. 7:00 to 3:00, six CNAs; 3:00 to 11:00 is five, and 11:00 to 7:00 is three. The

staffing pattern for the second floor is different, though.

Q. So, this is the same thing for third and fourth?

A. Third and fourth, right.

Q. Because they have the same number of patients?

A. Right.

Q. Okay. And then as far as med techs, is there any requirement of how many med techs have to be on for the third and fourth floor?

A. The only time we use med techs is when we are down a nurse and we substitute two meds tech for a nurse.

Q. Who told you that you can substitute two med techs for one nurse?

A. Barbara, when she first started showing me that.

Q. She was the one that said if, say for the 7:00 to 3:00 on the fourth floor, you can't get two nurses --

A. Uh-huh.

Q. -- that you could have one nurse and two med techs?

A. Right.
Q. And you're saying that Barbara told you that?
A. Right.
Q. And you're still doing that today?
A. Right.
Q. And what's the pattern on the second floor?
A. The second floor is different because it's like the hospital setting. It's 52 beds. It's a subacute unit. So, they have a charge nurse and three nurses, for a total of four.
Q. How many CNAs?
A. Six.
Q. And now can you switch out med techs for those nurses on the second floor?
A. We still have to have at least three nurses because one's at the desk, two's running the floor. We have a charge nurse, two nurses and two med techs.
Q. So, the same formula if you're going to replace a nurse, you have to have two med techs?
A. Right. We just can't replace two nurses

for four med techs. It doesn't make sense.
Q. When you say, "It doesn't make sense," what do you mean?
A. Because you have a nurse for each side. They divide the floor.
Q. Is there any, like rule or policy, anything in writing that you've ever seen that sets forth these requirements that you're talking about?
MR. CAMPBELL: Objection as to form.
A. No.
Q. So, any information that you have is from Barbara, or it could be from someone else?
A. Barbara, or it could have been from Pam Quinn when I first started the staffing.
Q. Okay. Is there anything about how you do your staffing, in terms of the numbers and the type of staff person, that you learned from Pam Charon?
A. No, Pam Charon, I think, was just -- I think she's the one who started PPD.
Q. Okay. But I mean other than PPD, there's nothing else in terms of the numbers and the

type of staff person; she didn't teach you like you could take one LPN and turn it into three med techs or anything like that?
A. No. I think I got that -- I knew that much.
Q. Before?
A. From Barbara, right.
Q. So, those numbers, in terms of how many nurses you need, how many CNAs you need or how many med techs you can have, might change if you have less than 172 patients; is that correct?
A. The main thing that changes is the CNAs, not the nurses. Unless we're way, way down, like maybe -- for instance, second floor is 52 beds. It went down to 42 beds at one time. So, for temporarily -- for temporary -- and this has happened, I just think this time since Celeste Harris has been the director; it hasn't happened in the past -- she would say for temporary we could leave a charge nurse, two nurses and one med tech. We'd still have to have the two nurses. One med tech...

Q. Would be the difference?

A. Yes.

Q. Instead of the two.

A. Instead of the three nurses -- the three nurses and the med tech, because the charge nurse is always there. We either have three nurses or two nurses and two med techs, and she'll cut one of the CNAs. Instead of six CNAs, you can put five. I don't remember the census going down that low with any of the other directors either. It could have. It could have, but I don't recall.

Q. Okay. So, you think this might have been the only time that it happened?

A. Right. I think it's just been happening recently. I don't recall it going down that far with the other three directors or four directors.

Q. So, is there any other point, besides this situation we just described, that you would assign less staff than what we just reviewed in terms of those numbers?

MR. CAMPBELL: Objection as to form. Go ahead.

A. The only time we assigned less staff, it could be less staff on the weekend and that would be, again, CNAs more than anything because we have on-call rotation for the nurses. CNAs would be working short more than anything.
Q. What do you mean "working short"?
A. I mean if it's their weekend off, we get the six, five and five, or six, six and six during the day, they can work with as little as five. See, the staffing pattern for all three floors, morning, noon and night, is six, five and three for CNAs. During the day if -- during the weekend, I'm sorry, during the weekend if we can't get six CNAs for the day, we could let them work with five. Five is okay. It's doable. And it's acceptable.
Q. How do you know that?
A. We've had to leave five on the floor.
Q. Because you couldn't get the sixth person?
A. Because we couldn't get the sixth person.
Q. Okay, but who told you that that was okay?
A. Barbara, Pam Quinn, Deb Medeiros,

Celeste Harris, Denise Schwartz.
Q. Okay. So, nothing new about that that you learned from Pam Charon?
A. No.
Q. So, on a daily basis, you're planning for this same staffing pattern that you've described?
A. Uh-huh.
Q. And so, you're not changing that on a daily basis?
A. I change it on a daily basis according to our census, yes, I do.
Q. Okay. So, maybe that's what I'm not understanding. So, what you've just described to me is if there's 172 people, 172 beds, but if it goes lower than that, you might change that?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. At what point, like what's the number of beds where you can then staff less people?
A. When it goes under 166.
Q. And does that happen often?

A. Lately, yes.
Q. Okay. In 2004, did that happen often?
A. I can't remember our census being lower than that. We've always had a full house.
Q. Okay. So, you think you've always or pretty much always had a full house?
A. Right.
Q. Up until recently?
A. Yes.
Q. Okay. And so, if it goes below 166, how does that change the staffing pattern?
A. Again, more so with CNAs over nurses. We try to keep the building staffed with nurses.
Q. Okay. And so, what do you do? Like say you see it's 166, what do you?
THE WITNESS: If I found out it's less than 166?
MS. IAFRATE: Yes.
A. I look at what the floor has the most census, like what floor is the fullest to their capacity, and that's the floor I try to take from.
Q. Do you do a mathematical calculation, this

PPD thing, before you take away that person, or do you do it after?
A. No, I get a daily census sheet every day.
Q. Okay. From who?
A. From Carol Perfetto, our assistant administrator.
Q. Okay. So, you get that census. And so, if it's 166 or above, you don't do anything?
MR. CAMPBELL: Objection as to form.
A. I fill it the regular way: Six, five and three. Four, two and two.
Q. Because you're talking about for the following day?
A. Uh-huh.
Q. Okay. So, you get the census and you have to look at the daily sheet for the next day coming up?
A. Right.
Q. Okay. But don't you already have the daily sheet done for the next day?
A. I have it done. I go in every morning to a census sheets, and what I do is that

A. Right.
Q. Now, when you started working for Barbara on the Wednesday, do you have any idea about how long she had been at Cherry Hill?
MR. CAMPBELL: Objection as to form.
A. She told me, but I forgot. She told me how long she's been there, how she got it there and what have you.
Q. Okay. Was it a short time?
A. No, it was a long time.
Q. Okay. You just don't know exactly how long?
A. I don't remember how long.
Q. Okay. So, when you filled in for Barbara, did anyone ever review your performance in terms of staffing?
A. No, because that was my part-time position, a per-diem position.
Q. So that was never part of your evaluations?
MR. CAMPBELL: Objection as to form.
Q. As to how you did on the staffing?
A. Not that I remember. My evaluations

were not on staffing because I did it one day a week.

Q. Okay. And I think you may have already said this, but I want to make sure. No director of nursing ever came to you with any job-performance issues when you were filling in for Barbara Antonucci?

A. Right, no. Nope.

Q. So, how would the director of nursing know whether you were doing a good job when you were filling in for Barbara?

MR. CAMPBELL: Objection as to form.

A. I guess by my daily sheet being the way it was, no problems. There was no holes. I don't ever remember a time filling in for Barbara. I had run into not being able to fill the schedule or -- you know, and, again, it was one day a week. Maybe I had the best day out of the week. I don't know. Who knows.

Q. Was the daily sheet already completed for you before you would fill in for her?

A. Not all the time.

Q. Okay. So, when you came in to fill in for her on a Wednesday morning --
A. Uh-huh.
Q. -- you would have the beginning -- at least the beginning of a daily sheet for the Thursday?
A. I would have -- I would fill the Thursday. I would have to work on the Thursday, Friday, weekend just like I was working all week. I would still have to do more than Wednesday's work.
Q. Okay. That's what I'm trying to get at, is when you came in on Wednesday, what exactly you were doing.
MR. CAMPBELL: Objection as to form.
A. I would go in on Wednesday, check the staffing for the 7:00 to 3:00 shift, make sure the appropriate staffing is in the building, so, we can move forward for the day. And then, if there were call-outs, replace call-outs if needed to be. Then once I situated 7:00 to 3:00, I'd go in and make sure the day was set, afternoon -- making

call out too much," or "They say I'm late all the time," or somebody said this, somebody said that. Nobody was really private when it came to being called in the office.

Q. Okay. Do you remember any person -- a particular person by name who was called in to Pam Charon's office while you were there?

A. I know that Barbara Antonucci was called in, and Barbara said to me, "She wants me to add names to the schedule. It's not my job. Why should I have to do it?"

Q. Okay. So, besides Barbara, can you think of anybody else that was called in to Pam Charon's office while you were there?

MR. CAMPBELL: I'm sorry, you're looking for names?

MS. IAFRATE: Yes.

A. Names? Names, no. I can't recall, no.

Q. Is there any reason why you can remember Barbara's name, but you can't remember anybody else's name?

A. Because me and Barbara spoke a lot, and

you, make the changes and give it back?
A. Right.
Q. Okay. The second thing that you mentioned was you said that Barbara may have gone into Pam's office to discuss new things regarding the schedule?
A. Uh-huh.
Q. Okay. And what other things are you aware of that were new relating to the schedule at that time?
A. Barbara went in like for a little general meeting with Pam. She really didn't -- she really didn't tell me like what the changes were. It didn't affect, I guess, my helping her, because she never said -- she said, "She just wants to talk to me about the schedule." She would tell me, "I'm going in to meet with Pam. Pam wants to talk to me about the schedule." I said, "Oh, why? Is something changing?" "Oh, no, no, just staffing patterns," you know. And then I do recall her going in to Pam, and Pam told us she was sending her for training, because Barbara felt -- she said, "Pam thinks I don't

do a good job, and I do this" -- and she goes, "And I don't need to be taught. I know what I'm doing."

Q. Okay. So, the first incident about the adding names to the schedule, did Barbara give you any indication that she was in trouble with Pam?

A. No.

Q. Okay. And how about --

A. The only thing that I can recall Barbara always says is, "I know she doesn't like me. I know she doesn't like me." But I just didn't, you know, feed into that. I didn't act on that. Barbara thought Pam didn't like her. Why? I have no idea.

Q. Okay. So, you never saw Pam Charon giving Barbara a reason to believe that she didn't like her?

MR. CAMPBELL: Objection as to form.

A. No. No.

Q. So, you never saw Pam Charon treat Barbara in any way that would cause you to think that, you know, she didn't like Barbara?

form.
Q. Okay. And so, do you know how many times Pam spoke to Barbara about keep working on the schedule?
A. She had to talk to her several times about the schedule, like work on the schedule. She had to tell her, "Maybe call back, offer a bonus." She talked to her several times about working on the schedule. And I know the thing that both Pam and Celeste didn't like is because Barbara kept a log of who she called and she would call somebody maybe on a Monday or a Thursday shift, and if that person said, "I'm going bowling on Thursday," that was the answer for the whole week. And through my experience in staffing, and the way that I do staffing, you could tell me you're going bowling Thursday, Friday, Saturday. I'm asking you to work Thursday, Friday, Saturday, I've gone dinner Friday, Thursday I'm going bowling, Saturday I've got a wedding to go to." I'm still going to call you and ask you, "Can you work Thursday, Friday and Saturday?" because

that's my job. I have a job to do. And Barbara would keep a log of who she called and what they said for each day. And if that was their answer, that was the answer; she wasn't going to call back. "They're not going to do it because they're going dinner on Thursday. They're not going to do it because Friday night they have" -- I don't know -- "an engagement party to go to." Whatever the situation was, she kept a log. And whether it was offered with a bonus or without a bonus, she would not call back, and I know that she wouldn't because she said, "I'm not going to call" -- she said that plainly to me, "I'm not going to call back on several occasions because I know this person is not going to do it because she's doing this."

Q. So, you're saying that if Barbara called somebody already for, say a Thursday, and they said no, and now it's getting closer to the Thursday and she still needs somebody, you're saying she's supposed to call that person back?

A. You have to.
Q. Okay. I'm just trying to understand what you're saying.
A. Yup. Yup.
Q. And you're saying that she's called that person once for that particular day, and if she got an explanation for why the person wouldn't want to work, she wouldn't call back?
A. She wouldn't call back.
Q. Okay. Do you have any way to tell me how many times you've been able to fill an opening by calling the person back a second time when they've already given you an explanation for why they can't work that shift?
A. How many times I've been able to fill it?
Q. Yeah, like how many -- do you keep a record of who you call and when you call them?
A. No.
Q. Okay. So, based on your experience, you know, can you put a percentage on how many times you're able to fill that opening if you

Q. Okay. And besides calling them multiple times to get them to change their mind, what other things have you done?
A. Working -- work on my other staff.
Q. No, I know, but I'm saying --
A. What do you mean?
Q. You said you'd make a deal.
A. Uh-huh.
Q. What do you mean by that?
A. Oh, like if you work my Sunday -- work Monday, I'll give you Saturday off. Who is not going to go for a Saturday over a weekday?
Q. Okay. So, then you have to try to fill the Saturday?
A. Right.
Q. What else besides that would you do without offering a bonus to try to get someone to fill in?
A. If there's upcoming holidays that I know they requested off, I could promise them a holiday because I know a lot of people pick up on the holidays for the money.
Q. Meaning they'd still get paid, or you just

tell them they can have it off?
A. They can have it off. When somebody wants a holiday off, they really don't care if they get paid or not; they want the holiday off. So, if I know this is your favorite holiday and you want it off, and where maybe, I don't know, we're close to the holiday, I can always use the holiday when we're close to the holiday, but if we're not, a Saturday you might have requested off -- a day that you might have requested off that you got rejected, I can always make that deal for that day off because we have to live for today, what we need for this week, you know what I mean?
MS. IAFRATE: Yup.
A. And I'll work on that week covering when it comes up is what I usually say.
Q. Okay. Now, what else, besides what you just told me without using bonuses, have you done to try to get someone to fill a shift?
A. Basically making deals with changing days off and giving them a request that they get granted. That usually does it.

form.

THE WITNESS: Could I believe they fired her?

MS. IAFRATE: Yeah.

A. Well, there was one point where -- I never said it out loud to Barbara, but there was one thing that I witnessed that Barbara argued with Celeste Harris as director, and it got to -- it got really loud. It was in the hallway. Celeste was going into the ladies' room, which was like maybe from here to your bathroom but all on one level, and Barbara's following behind her. I'm standing in the back. The exact words I couldn't tell you, but it was loud where everybody stopped, turned around and looked, and Barbara's following Celeste all the way to the bathroom arguing, saying, "I don't care" -- it was about a vacation. "Well, I don't care. I've always been able to take those vacations. Pam always gave me -- Pam Quinn always gave me this time off," and Celeste said to her, "Well, I'm not Pam Quinn," and I know she got written up after that because it was loud in

Barbara being unable to staff the facility?

MR. CAMPBELL: Objection as to form.

A. The same thing, Barbara set in her ways, she had answers. She felt if she continued to call them, that she was harassing them. She didn't want to keep harassing a person who told her no more than one time.

Q. So, the calling issue, is what you're talking about?

A. The calling issue, it was a big issue for Barbara.

Q. With Celeste, too?

A. With Celeste, too.

Q. Do you know if Celeste ever disciplined her for that?

A. I know Celeste had to discipline her for insubordination. Did it include that? I don't know.

Q. Okay. And do you know whether Pam Charon ever disciplined Barbara for not calling enough?

MR. CAMPBELL: Objection as to form.

A. For specifically not calling enough, no, but Barbara said that Pam talked to her about -- Barbara mentioned Pam talking to her a couple of times about her work ethics.
Q. Her work ethics?
A. Yeah, like the way -- I don't know, "work ethics," scratch that, wrong word -- about still working on a schedule, still re-calling back.
Q. The same things we talked about earlier?
A. Right, the same things we talked about earlier.
Q. So, these are not different incidents that you're talking about now?
A. Right.
Q. Okay. Now, did you ever find that Barbara did not put sufficient staff on a schedule?
A. Not that I recall, no.
Q. Okay. So, you never saw a schedule prepared by her before Pam Charon came on where she just didn't schedule enough people?
MR. CAMPBELL: Objection as to form.
A. I can't recall that, no.

# EXHIBIT D

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, SC. SUPERIOR COURT

***************************
BARBARA ANTONUCCI *
*
VS. * C.A. NO.:06-108-ML
*
CHERRY HILL MANOR, *
et al *
***************************

DEPOSITION OF JOE PEREIRA, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Patricia E. Andrews, 129 Dyer Street, Providence, Rhode Island, on May 3, 2007, at 10:00 a.m.

APPEARANCES:
FOR THE PLAINTIFF: PATRICIA E. ANDREWS, ESQUIRE
FOR THE DEFENDANT: JACKSON LEWIS, LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

director of nurses.
Q. And we're going to get to that further but let me ask you, prior to the time that you held this position, what position did you hold at Life Care?
A. I was the director of nurses.
Q. And how long were you the director of nurses?
A. I started in November 2001 until, I believe, November 2003.
Q. And where were you the director of nurses?
A. Life Care Center of Raynham.
Q. Okay. And who was your supervisor when you were director of nurses?
A. Deborah Ready.
Q. Okay. And did you have a staffing coordinator who worked with you?
A. Yes.
Q. And who was that?
A. Well, I had a few. Let me see, who was -- Becky Santin was the very last one.
Q. Who was the one before?
A. His name was, Joe. I don't remember his last name.
Q. Okay. Do you remember anyone before him?
A. Yes. We had -- I had a CNA, and I don't remember her name, sorry.

Q. Okay. So, you had three staffing coordinators?
A. Yes.
Q. Now, did you have an assistant staffing coordinator at any time?
A. No.
Q. Are there facilities which had assistant staffing coordinators during the time that you worked at Life Care?
A. Can we go back to that other question?
Q. Yes.
A. I didn't have an assistant. I did always have some cross-training to fill that slot when the staffing coordinator wasn't there. There was no assistant. I cross-trained other people to do the job.
Q. And are you saying that they would only do the staffing coordinator job when the actual staffing coordinator was not present?
A. Correct.
Q. Tell me on a scale of one to five, one being the worst job performance, and five being the best, where would you rate Becky Santin?
MR. CAMPBELL: Objection as to form.
A. I would say about a four and a half.
Q. And why do you say that?

A. Because she needed very little oversight. If there was five opened positions, she was very good at getting those five opened positions completed.
Q. What? I didn't understand.
A. She was very good and needed very little oversight.
Q. Yeah, I got that.
A. If there was a shift, or a day that had five open positions, she took a lot of initiative and would fill those positions.
Q. And how did she fill the positions?
MR. CAMPBELL: Objection as to form. Go ahead.
A. Calling people.
Q. And did she offer bonuses?
A. There was times.
Q. Can you tell me what percentage of times she offered bonuses?
MR. CAMPBELL: Objection as to form. Go ahead.
A. I can't really remember. It would depend on the time of the year.
Q. And what do you mean by that?
A. Well, in the summertime, there would probably be people that would be on vacation, therefore,

discussions with -- strike that. Apart from information that Pam Charron gave you, and apart from your possibly looking at some daily sheets, do you have any other -- was there any other way that you found out about the job that Barbara Antonucci was doing?

MR. CAMPBELL: Objection as to form.

A. Celeste Harris was a previous director who -- she was there a very short time -- who I know was not happy with the scheduler, but I never got into the detail with her that Pam would tell me, or share with me, in terms of open positions.

Q. Are you saying then, that -- strike that. How did you find out that Celeste Harris was not happy with Barbara Antonucci?

MR. CAMPBELL: Objection as to form. Go ahead.

A. Because, I would say to Celeste, Celeste, you should have your staffing coordinator track, daily call-ups. You should have your staffing coordinator track hours per patient day. And I just remember one conversation where Celeste laughed and thought that Barbara wouldn't do it, or couldn't do it, or whatever.

Q. Well, which one is it, wouldn't or couldn't?

back to validate, they found -- I can't remember if they found, or they didn't clear, on one or two of the deficiencies.
Q. And do you recall what deficiencies they did not clear?
A. I think I said earlier, following the care plan.
Q. And was that, again, something that you thought was directly related to the amount of staffing in place?
MR. CAMPBELL: Objection as to form.
A. Yes.
Q. And did you think that between the time that you entered into the plan of correction and the time that the state came back and found that they should not be cleared for one or two deficiencies, that there were still staffing level issues?
MR. CAMPBELL: Objection as to form.
A. I think if you look -- I think there's a shortage of nursing in Rhode Island and Massachusetts that you can have a problem almost any day. I don't remember, specifically, you know, if any correlated to that time frame.
Q. Well, did you ever seek to find out what was wrong with -- strike that. Did you ever come to any

Q. Did you make any recommendations about whether or not she was hired?
A. If I was asked, I'm sure I did.
Q. Did you think that she'd be good for that job at Cherry Hill?
MR. CAMPBELL: Objection as to form. Go ahead.
A. She, you know, she had -- she was following the natural flow in her career, that would be the next step.
Q. But did you believe that she would be good at that job at Cherry Hill?
MR. CAMPBELL: Objection to form.
A. She could have been.
Q. You had no opinion?
MR. CAMPBELL: Objection as to form.
A. My opinion was based on her career path.
Q. And your opinion was what?
A. She deserved a shot. She deserved an opportunity. She had been working as the assistant director of nursing prior.
Q. Okay. Do you know who Beverly Hawkins is?
A. I know she worked there. I think she was a nurse. That's about all I can remember.
Q. Was she over 40, do you know?

Q. Okay?
A. All right.
Q. So, can you tell me what your hours were on Friday in October 2004?
A. I couldn't. It varies, depending on where I was, depending on the issue. It would vary.
Q. Well, do you recall when you got to the funeral parlor that day?
MR. CAMPBELL: Objection to form.
A. No, I don't remember.
Q. Was it after 5:00?
A. I think so.
Q. Okay. And you saw Steve Haase; correct?
A. I'm pretty sure, yeah.
Q. And how did the subject of the vacancies come up?
A. Well -- how did it come up?
Q. Yeah.
A. I -- it just came up. I think -- I think he was making some excuse for the director not being there. I think he was saying something like, Pam can't come, she's working on the schedule for the weekend, or something like that.
Q. And what did you say?
A. I wasn't involved.
Q. Did you say anything in response to that?

A. I did not.
Q. Now, would it surprise you if I told you that Pam Charron received the schedule from Barbara Antonucci at 2:00?
MR. CAMPBELL: Objection.
A. Would it surprise me?
Q. Yeah.
A. No.
Q. Okay. If she had received the schedule at 2:00, would you expect her to have made the funeral?
A. Depending on the number of open positions.
Q. And how long it took her to fill them?
A. Correct.
Q. If I told you that she received the vacancies at 2:00 and that in this litigation, Cherry Hill had said it only took one hour to fill them, would you have expected her to be at the funeral parlor?
MR. CAMPBELL: Objection as to form.
A. I -- I -- I don't know what she was thinking at the time.
Q. Well, did anyone ever tell you how many vacancies there were that day?
MR. CAMPBELL: Objection as to form. Asked and answered. Go ahead.
A. I can't remember.

Q. Well, double digits can be 11; correct?
A. I can't remember if it was before or after the fact.
Q. If what was before or after the fact?
A. I can't remember if I knew it was twelve positions -- twelve open positions on that Friday or if it was the following weekend.
Q. Well, would you expect her not to go to a funeral on October 1 because there were vacancies the following weekend?
MR. CAMPBELL: Objection as to form.
A. What I'm saying is, I can't remember if I was informed of how many open positions there were that day.
Q. The day of the funeral?
A. That day of the funeral or if those numbers came to me after the weekend.
Q. Oh, I see, okay. But I thought you said that you had a discussion with Haase at the funeral and he told you that she wasn't there because there were vacancies?
A. Working on the schedule. I didn't ask how many. I didn't ask anything like that.
Q. Okay. Did you ever find out how many vacancies there were --

MR. CAMPBELL: Objection as to form.
Q. -- for that weekend?
A. I remember there being, like I said, a weekend around a funeral, Deborah's funeral, that it was in the double digits. I just -- how I got the information, at this point in time, I couldn't tell you.
Q. Well, could it have been eleven vacancies?
MR. CAMPBELL: Objection as to form.
A. It could have been.
Q. Could it have been ten vacancies?
MR. CAMPBELL: Objection as to form.
A. Could have been.
Q. Did you ever have a discussion with Pam Charron about her need to fill vacancies for a weekend around the time of the funeral?
A. Can you say that again?
Q. Did you ever have any discussions with Pam Charron about the fact that there were vacancies in the double digits around the time of a funeral?
MR. CAMPBELL: Objection as to form.
A. There was only one funeral that I went to that I knew that she knew the same person.
Q. Okay. Did you ever have a discussion with her around the time of the funeral regarding the fact

that there were a lot of vacancies to fill on a Friday and that she had to stay after to do the filling?

A. Before the funeral?

Q. Yeah.

A. I doubt it, I don't know. I could have. I don't know.

Q. Okay. Let me put it this way, at some point you found out that Pam Charron had to stay at work instead of going to a funeral; correct?

A. Yes.

Q. And you learned that it was because Barbara Antonucci had failed to fill the vacancies?

A. Correct.

Q. Okay. Did you ever have a discussion with Pam Charron about that?

MR. CAMPBELL: Objection as to form.

A. We probably could have.

Q. Do you recall sitting here?

A. We could have.

Q. But you have no recollection?

A. I'm just saying we could have, we could have, you know.

Q. Well, then, what do you recall about it then?

A. As I said earlier, I'm not sure exactly where

I got the information from.

Q. Did that cause Barbara Antonucci to be fired in any way?

MR. CAMPBELL: Objection as to form.

A. Well, not that I know of. I was not --

Q. Go ahead. You were not, what?

A. You know, I wasn't -- I didn't make a recommendation to fire anyone.

Q. Well, did Pam Charron ever talk to you about that incident and say that she thought that she should be fired?

MR. CAMPBELL: Objection to form.

A. You know, she could have.

Q. But, sitting here today, you don't recall?

A. You know, it's -- she could have.

Q. Well, is that a guess on your part?

MR. CAMPBELL: Objection as to form.

A. It's going to be a guess, yes.

Q. Okay. Did you -- apart from the action plan that you say that Barbara Antonucci received; correct?

MR. CAMPBELL: Objection as to form.

Q. Strike that. Did Barbara Antonucci ever receive an action plan?

MR. CAMPBELL: Objection.

A. Well, I reviewed that yesterday. I saw it --