# EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI *

*

VS. * C.A. NO. 06-108-ML

*

LIFE CARE CENTERS OF AMERICA, *
INC., PAMELA CHARRON, in her *
personal and official capacity, *
and STEVE HAASE, in his personal *
and official capacity *

* * * * * * * * * * * * * * * * *

DEPOSITION of BARBARA ANTONUCCI, taken on behalf of the Defendants on Tuesday, January 9, 2007, at the offices of Jackson Lewis, LLP, 127 Dorrance Street, Providence, Rhode Island, commencing at 9:30 A.M. before Rebecca J. Forte, Notary Public.

APPEARANCES

CARLEY BEAUVAIS IAFRATE, ESQUIRE....FOR THE PLAINTIFF

JACKSON LEWIS, LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ..FOR THE DEFENDANTS

ALSO PRESENT
Pamela Charron

ORIGINAL

IRONS & ASSOCIATES
CERTIFIED PROFESSIONAL STENOGRAPHERS
11 South Angell Street #359
Providence, Rhode Island 02906
(401) 861-0909

# I N D E X

WITNESS FOR THE DEFENDANTS PAGE NUMBER

BARBARA ANTONUCCI

EXAMINATION BY MR. CAMPBELL............. 4

## E X H I B I T S

(MARKED DEFENDANTS FOR IDENTIFICATION)


| NO. | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| A | Plaintiff's Rule 26 Initial Disclosures | 19 |
| B | Calendar | 24 |
| C | December 22, 2006 letter and enclosures | 58 |
| D | First Amended Complaint | 67 |
| E | Charge of Discrimination | 69 |
| F | Plaintiff's Answers to Interrogatories | 81 |
| G | Affidavit | 89 |
| H | 2004 tax return | 100 |
| I | 2005 tax return | 101 |
| J | 2002 tax return | 106 |
| K | 2001 tax return | 108 |
| L | 2000 tax return | 109 |
| M | 2003 tax return | 118 |
| N | Form 1040X | 118 |
| O | Notice of Disciplinary Action | 122 |

P Competency Based Position Description
and Performance Review...............130

Q Nursing Department/Bonus Forms.......136

R Action Plan.........................180

S Notice of Disciplinary Action........201

T Daily Schedule......................204

U Employee Termination Notice..........219

Q Nothing stands out in your head?
A No, not specifically, because it was so every day type thing. Not a general -- not a specific thing that I can give you.
Q If you would turn the page to paragraph 21. It indicates that after you were terminated, Defendant Charron had fired another employee because of her age?
A Correct.
Q Are you referring to Diane Ferruccio?
A Correct.
Q Anyone else?
A I don't really know. I mean, I haven't heard.
Q Have you any knowledge of any other person?
A No, I don't believe so. No, no, no.
Q Okay. Have you had any personal knowledge of the circumstances that surrounded Ms. Ferruccio's discharge?
A No.
Q Anything you know it's because she told you?
A Correct.
Q Did anybody else tell you any information besides Ms. Ferruccio?
A Not that I can remember.

have no idea what she's doing. I haven't spoken to her.
Q You began employment at Cherry Hill in about 1986, is that right?
A Yes, that's correct.
Q You didn't have a written contract when you started, did you?
A No.
Q And is it true you didn't have a written contract throughout the time that you worked there?
A No.
Q And did you have any unwritten contract?
A No.
Q Similar to your current employment, you understood that it was employment at will?
A Right.
Q And that you could quit at any time?
A Correct.
Q And that you could be fired at any time?
A I believe so. I guess you can from any position.
Q You don't believe that there was any obligation on the part of Cherry Hill Manor or Life Care that prevented them from discharging you at any point in time; is that right?

MS. BEAUVAIS IAFRATE: Objection as to form.

A I guess not.

Q For how long did you hold the position of staffing coordinator?

A Approximately five to six years.

Q And was that the last five to six years?

A Yes.

Q What did you understand the position required you to do?

A Just what I was doing, filling the positions that were open, writing the daily sheets, taking care of the vacation requests.

Q Anything else?

A Oh, I think that's basically it, if I'm not forgetting anything. I'm writing up call-outs, I believe I was doing the absent reports, you know, like if somebody called out.

Q What position did you hold prior to this?

A I was working in the main office.

Q As what?

A It was everything, receptionist, secretarial work, you did a little bit of everything, admissions.

Q How did you come to become the staffing coordinator

Q And after beginning it, did you continue in that position until you were discharged?
A Correct.
Q And who did you report to in that position?
A The director of nursing. I always worked more with the director of nursing.
Q So, at all times during your employment as staffing coordinator, the supervisor was the director of nursing?
A Correct.
Q And your supervisor would assign you duties?
A Basically. You kind of know exactly what you have to do, so it's kind of, you know, you know what you're doing, so you just do it. It's not like I'll assign you anything. It's kind of just there to do.
Q You understood that the director of nursing had the authority to assign you to perform duties?
A Right, right.
Q And that there was no limit on the duties that the director of nursing could assign you to do, is that right?
A Well, I could say it was all -- it was right there. There wasn't, like, they didn't come to me and say, here, do this kind of thing.

Q My question is, were you aware of any limit on the authority of your supervisor, the director of nursing?
A Oh, no.
Q To assign you duties as he or she saw fit?
A Correct, I understand that.
MR. CAMPBELL: Mark this next.
(Whereupon Defendants' Exhibit G is marked for identification.)
Q Showing you what's been marked as Exhibit G. I'd ask you if you recognize this?
MS. BEAUVAIS IAFRATE: Can I just check, is the interrogatories F, is that what we said? Okay. Thank you.
Q Do you recognize this document?
A Yes.
Q Is it an affidavit that you signed?
A Yes.
Q And you signed it under the pains and penalties of perjury?
A I believe so. I don't know if -- it doesn't say
Q And you were truthful in this document?
A I believe so.
Q And it indicates that you were unemployed until

A Correct.
Q She was the DON?
A Yes.
Q And do you remember when?
THE WITNESS: The exact dates, you mean that I worked for her, like under her?
Q Was she the DON prior to Ms. Charron?
A I think so. I think, but I'm still not positive, because they come and go, but I think so.
Q About how long did you work under Ms. Harris?
A I don't even think it was a year, if I remember correctly, but I'm not positive. It wasn't long.
Q Was she professional?
A At times.
Q Was there sometimes --
A Sometimes she wasn't. Yes, at times she was not.
Q When was it she was not professional?
A She was sometimes very abrupt with Seth.
Q Was she abrupt with you?
A Not usually.
Q Was she ever abrupt with you?
A No, I don't believe so, not that I can recall.
Q Was she fair and reasonable to you?
A Most times, yes.

Q Was there ever a time that she was not fair?
A Yes.
Q When was that?
A When she wouldn't give me a day off, that I was so important to Cherry Hill that I couldn't get a day off that I had been taking for years.
Q Is that the only time?
A That's the only time I can recall.
Q And she didn't give you a day off?
A Right.
Q And you had requested one?
A Right.
Q And you had a disagreement about that?
A We did.
Q And you feel that she wasn't being fair to you?
A Definitely.
Q And, aside from that, you can't think of any other time she wasn't fair to you?
A No, no.
Q You just need to let me finish the questions. I know it's been a little while since you did this, but, please, let me finish the questions before you answer.
A Okay.

Q Was there ever a time that she was disrespectful to you?
A Disrespectful in the way that she may have spoken -- not like I would have expected a director to speak.
Q Well, when was that?
A Well, maybe there's just in general, over the schedule or something.
Q Do you remember a particular time?
A No. Because, you know, I know they have their moods, so I was used to it. I was just, you know.
Q Do you believe Ms. Celeste disliked you?
A Oh, no, on the contrary.
Q Do you think she liked you?
A I would say so. She told me I was a wonderful staffing coordinator. She said I did a great job.
Q Do you believe that she ever took any action against you because of your age?
A The only one time we had that disagreement was about the day off.
Q So, that wasn't about your age, was it?
A No. It was about my request.
Q So, my question is, do you know if she ever took any action against you because of your age?
A Not that I'm aware of.

(Whereupon Defendants' Exhibit O is marked for identification.)

Q I am showing you what's been marked as Exhibit O. It's a two-page document that indicates that you're receiving a written warning for insubordination. Do you see that?

A Yes.

Q On the second page, which you flipped to there --

A Yes.

Q -- it indicates in the third paragraph that you became loud, agitated and spoke in a disrespectful manner. Do you see that?

A I do.

Q And Celeste Harris signed this document?

A Correct.

Q It indicates you made statements such as, "I don't get paid enough to put up with this aggravation, if I made as much money as you do, I would do your job?"

A Right.

Q And, "I never had a problem until you became director, and I don't need this, I'm ready to retire," do you see those statements?

A Yes, I do.

Q And you understand that Celeste Harris is indicating in this document, this written warning, that you said those things, correct?

A Correct.

Q Do you understand that she felt your behavior was inappropriate?

A Yes.

Q Do you think your behavior was inappropriate?

A Not at all.

Q Do you think it's appropriate to say these sorts of things?

A I don't believe I did. That's why I never signed it.

Q My question is, do you believe that it is inappropriate to say these sorts of things?

A Yes.

Q If you had said these sorts of things, someone could fire you?

A Right.

Q And it would have nothing to do with your age, correct?

MS. BEAUVAIS IAFRATE: Objection as to form. Still answer.

A Right, yes.

Q Did you say anything like these things?
A I don't believe so.
Q Let's take them one at a time.
A Okay.
Q "I don't get paid enough to put up with this aggravation."
A I don't remember that at all.
Q Well, you say you don't remember it. Ms. Celeste has written it down that you did say it. Do you think she's lying?
A Could be. I really don't know if she's lying. I don't remember saying it, is what I'm saying.
Q You don't know one way or the other?
A No, I don't remember saying it at all.
Q You could have said it, though?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I don't believe I did.
Q You don't believe you did?
A Right.
Q Can you --
A I don't remember it.
Q Can you characterize, can you categorically deny that you said this statement or anything like this?

MS. BEAUVAIS IAFRATE: Objection as to form.
A To my memory, as far as my memory, I don't remember it.
Q It says, "If I made as much money as you do, I would do your job." Do you see that there?
A Yes. I don't even understand that.
Q Okay. I'm not asking you whether you understand it. I'm asking, do you categorically deny you said this?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I don't remember saying it, correct.
Q You don't remember saying it?
A Yes, I don't.
Q But you could have said it?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I don't believe I did. I'm going to say no, because I don't believe I did.
Q You understand that she believes you did?
A I guess.
Q And you don't have any facts to suggest that she was lying when she wrote it down, do you?
MS. BEAUVAIS IAFRATE: Objection as

to form.
A I don't know what was in her mind when she wrote this.
Q You have no idea what was in her mind?
A No, not at all.
Q It said, it says here, at the end, "I never had a problem until you became director." Do you see that?
A Yes.
Q Did you say that?
A I don't remember this at all. This conversation I don't remember. I know I told her that I wanted the day off, and she called me on the phone and said I couldn't have it off, which she, I think, took it off herself. I guess that's why I was needed.
Q The beginning of the memo says, "We had a discussion regarding a request for a vacation and I had to deny it?"
A Right.
Q Do you believe that she had tasks she needed you to perform?
A No, because she blamed it on the holiday. Holiday schedule was done much before this conversation.
Q Why is it you believe she gave you this memo?

A Maybe she was upset with me because I could not understand why I couldn't have the day off.
Q That's the only reason?
A I believe. She took it off, I believe. If my recollection is correct, I think she was not there that day that I wanted off. I'm not positive, but I kind of remember something about that.
Q Does that have anything to do with whether or not she gave you this warning?
A I don't know if it has anything to do with that, but it has to do with why she didn't give me the day off.
Q She didn't give you the day because she was taking it?
A I think so.
Q You would agree with me that has absolutely nothing to do with your age, is that correct?
MS. BEAUVAIS IAFRATE: Objection as to form.
A No, I guess not. I don't know what her intention was. I know after this here, my evaluation from her was very good and she had said to me that, "We got off on the wrong foot, Barbara, but you do a wonderful job of staffing." That I remember.

Q You would agree with me that it would be inappropriate to be insubordinate to your director of nursing?
A Oh, correct, definitely.
MS. BEAUVAIS IAFRATE: Wait until he finishes the whole question.
Q And would you agree with me that this is a legitimate thing to give someone a warning about?
MS. BEAUVAIS IAFRATE: Objection as to form.
A Yes.
Q But you claim that -- well, let me ask you this. Did you become loud and agitated?
A I do talk loud at times, and if I was upset, I may have raised my voice. That could possibly be.
Q Would you agree with that, that that would be inappropriate?
A It would be inappropriate, I do agree.
Q And so for at least part the reason that she's written down in this memo, you would agree with the conduct that she's indicated?
MS. BEAUVAIS IAFRATE: Objection as to form.
A As far as loud, being loud, I may have been. That I

wouldn't deny because I was very upset because I had planned on it, I had planned on those two days off.

Q You would agree with me that she has the authority to schedule you as she needs you to be scheduled, correct?

A Yes.

Q And that if she needs you to work, that's a legitimate thing to do, correct?

MS. BEAUVAIS IAFRATE: Objection as to form.

A May be legitimate, but not very fair for one day off.

Q And you say she gave you an evaluation after that?

A Yes.

(Whereupon Plaintiff's Exhibit P is marked for identification.)

Q And this exhibit we've been looking at as Exhibit O, this is a written warning to you from Celeste Harris dated December 8th, 2003, correct?

A Yes.

Q I'm showing you what's been marked as Exhibit P. This is an evaluation that she gave you from March 2004, correct?

A I don't -- oh, date of review, March, yes, yes.

staffing without agency?
A They always tried to staff without agency. A definite change, I don't remember.
Q It could have happened, though?
A It could have, yeah.
Q At that point in time do you remember the use of bonus dollars?
A Correct.
Q And so from, let's say up until March of 2004, you were using agency to staff vacancies on the schedule, but after March of 2004 you used bonus dollars to fill in vacancies on the schedule?
A I know we used bonus dollars. As far as when we started or the details, I don't remember.
Q It's possible that the timing I just gave you is accurate?
A It could be. I have the slightest idea of what dates and when the bonus things started.
Q And you used bonus dollars to motivate staff to pick up shifts, did you not?
MS. BEAUVAIS IAFRATE: Objection as to form.
A Correct.
Q That use of bonus dollars was a significant

A Nothing. Just being introduced to her, but not too much conversation.
Q Was she friendly?
A No. She was never friendly with me.
Q She wasn't friendly at all the first time you met her?
A I didn't think so.
Q Did she shake your hand?
A Oh, I don't remember that.
Q Do you remember distinctly that she didn't?
A No.
Q Why is it that you recall your first meeting with her as being unfriendly?
A She didn't seem to have the same ways that other directors had when I worked for them.
Q And what does that mean?
A It's hard to put into words. It's more of an attitude, I guess that's what you call it, an attitude.
Q And how would that attitude, as you term it, manifest itself? How would you think that she had an attitude?
A It's hard to describe it. It's just something you feel when you meet somebody.

Q What I'm asking you is, was she different with you than other individuals?
A I feel she was. I saw her laughing and talking to other individuals.
Q Who was she laughing and talking with?
A Maybe a nurse on the unit or aids. I can't say a specific person.
Q You can't name a single individual?
A No, no.
Q Did she ever say anything that you thought was rude?
MS. BEAUVAIS IAFRATE: Objection as to form.
A Well, one of the instances was all directors had their own master schedule, and they usually liked -- all the other directors liked to keep their own, what they call their original master schedule. So, when she first started working there, I went in one day and I had said, I had a change for the schedule, and I didn't know if she would like me to erase things on hers, what I call her master schedule, I didn't know other nurses, if they did something on it, they usually did it and put a little sticky and I would change what I had to change on my copy, my photocopy of the original, and I had said to her in

a nice way, "I have a change for your master schedule," I said, "did you want me to mark it," or, she was new to me, I didn't know what her procedure would be, I said, "or do you prefer to mark it?" She said, "I don't have a master schedule," very rude, just like. And I'll never forget that day because I was trying to be extra nice, would she like me to help her, or would she like to do it on her own. That was the first real bad encounter, instead of saying, "I don't keep a master schedule," like the other directors did, and I wasn't aware that she didn't want to have a master. How was I to know.

Q So, was this within a week?

A This was at the very beginning.

Q So, within a week of starting employment you understood that she didn't keep a master schedule and that she expected you to?

A Correct.

Q Did you agree to keep the master schedule?

A Yes, because then I started working, she said some changes and we started making a new way of doing it, which I started doing I think around the time I was terminated.

shifts?
A She questioned me on that, and I always kept a record of every, like, I had a book just like this, in fact, of everyone I called, the date I called, what they said, so that she would know I was contacting everyone.
MR. CAMPBELL: Could you please read back my question.
(Whereupon the stenographer read back the previous question.)
A No.
Q Never once during the entire time she supervised you did she say, you need to call people to fill shifts?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I would think that maybe she said to me, have you called people, but I always called people. I called everyone that wasn't working. So, she couldn't tell me to do more than call everyone that I had called. And, I had showed, always showed them the form. That's why I purposely kept a form.
Q Would you agree with me that she felt, and expressed to you, that you weren't being aggressive enough in asking people to fill shifts?

A I don't know if she felt that way. I don't think she ever said that to me.
Q Did you ever tell her that you were not going to badger people to pick up shifts?
MS. BEAUVAIS IAFRATE: Objection as to form.
A No. I think I did a little badgering in my day, but, no, I don't recall that. I think I called more than once, because that's why I kept dates, times, everything I did, that, you know what I'm saying, so that I would have proof.
Q Did you ever say to her that you had tried already and were unable to fill shifts?
A Of course, that always happens, yes.
Q Did she tell you to try again?
A She may have, and I would have.
Q Each and every time you tried again?
A Each and every -- what do you mean? Did she tell me every day to do it again?
Q Each and every time she told you?
THE WITNESS: Did I do it again?
MR. CAMPBELL: Yes.
A Oh, of course. I diD it on my own. I didn't need anybody to tell me. In other words, I always called

A If I did keep them, they would have been left somewhere there, but most times it was only a matter of a few weeks I would keep them in case I had to refer to anything.

Q So, is it your testimony that you -- well, let me ask you. Ms. Charron counseled you about needing to pursue staff to get them to fill shifts, did she not?

MS. BEAUVAIS IAFRATE: Objection as to form.

A I don't recall her counseling me about that, when it's something I was doing regularly.

Q Did she have discussions with you about doing that?

MS. BEAUVAIS IAFRATE: Objection.

A Not that I remember. Like I say, she may have questioned me on, like directors say, did you try everyone, did I call the nurses, she questioned me on did you try everyone.

Q And she did that because you would give her a schedule that wasn't complete?

A Of course, schedules were never complete. There was such a shortage.

Q So you gave her a schedule with vacancies?

A Yes.

Q And she would tell you you need to go back and call people again?
A Like I say, she didn't have to tell me. I would do that on my own. That was part of my job.
Q If there were still vacancies, you still need to go back and call people, wouldn't you?
A Of course, and I would, without being told.
Q But would she tell you?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I don't recall her saying that to me. I mean, she may have looked over what I wrote and who I called and said, try them again. That would be just not like -- I don't know how to explain it. If there were openings and I had tried everybody twice, she may have said, try again, maybe somebody will work.
Q You believe that's what she told you?
MS. BEAUVAIS IAFRATE: Objection to form.
A I don't even recall her doing that, but I am saying, you keep insisting, so maybe she did. I don't recall. I did it on my own because I had done it long enough before she came to know what I had to do.

Q Did you feel that there was no further learning that you needed to do?

MS. BEAUVAIS IAFRATE: Objection as to form.

A It wasn't a matter of learning. It was a matter of trying to fill the slots. You know you have to call the people, but you can't force them to work. If they say no and they want their weekend off, you can't say you have to work.

Q Did you turn in schedules --

A Yes.

MS. BEAUVAIS IAFRATE: Hold on.

A I didn't mean to answer him. Yes, go ahead.

Q Did you turn in schedules that were not complete?

MS. BEAUVAIS IAFRATE: She already answered that question.

THE WITNESS: Daily sheets, schedules for staffing?

MR. CAMPBELL: Yes.

THE WITNESS: Turn in the sheets?

MR. CAMPBELL: Give them to Ms. Charron.

A No. I discussed with her, in other words, if I had called all the nurses and per diem people -- let me

start at the beginning. In the beginning of the week, if I thought it was really bad that it might be a problem for staffing, I gave Pam and Steve a copy of the daily sheets, sheets that you write out with the staffing every day, and I would highlight all the openings for nurses and all the openings for aids and then at the top I would put need, 30 nurses, I'm just saying a figure, I don't know, 30 nurses, X number of CNA's for that particular week, and I would start making calls and filling them. Then when it gets towards the end of the week and there's still openings, I may go to her and say, here is the sheets of everyone I called, and we still have X number of openings.

Q So, you would go to her and you would say, I have done all that I can, but there's still openings?

A Right, and a lot of times, if the director calls people, even though they don't want to work, they're more embarrassed to say no and they will work. That has happened. Sometimes they still say no.

Q When you brought those sheets to Ms. Charron --

A Yes.

Q -- that were incomplete --

MS. BEAUVAIS IAFRATE: Objection to

form.
Q -- but you indicate that you've done all the work that you can do on it, would she tell you to go back and do more work?
MS. BEAUVAIS IAFRATE: Objection to form.
A Not necessarily.
Q That could have happened?
A I think at that point we kind of -- maybe she would ask people, too. I don't know. That's what most directors did.
Q My question is very specific. Did she tell you to go back and do more work?
A No, not that I recall, and I think you've asked me that before and I said I don't recall her saying those things.
Q You don't recall her saying them?
A No. Why? You know, if -- I don't know. Not that I remember.
Q But, here is my question, you say not that you remember?
A Right.
Q If she remembers that she did have those conversations --

A Okay.
Q -- is it possible that she did?
A If she said go back and call, then I would go back and call.
Q That's not my question. I'll try it again.
A You're asking me if I remember.
MS. BEAUVAIS IAFRATE: Hold on.
Q No. What I'm asking you, if she indicates that she did tell you to go back and work on it some more, do you deny that could have occurred?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I deny that she could have. No, I don't deny it, but I don't remember it.
Q If Ms. Charron recalls directing you to work on the monthly schedule and to do more than you had done on it, do you deny that could have occurred?
MS. BEAUVAIS IAFRATE: Objection as to form, deny it.
A I don't recall it, so I deny it, yes. I don't see what -- I mean I'm working on it.
Q You understand there is a difference between not remembering something and being positive it didn't occur, do you not?

sending me to Raynham. That's all I can come up with.

MR. CAMPBELL: Could you please read back my question.

(Whereupon the stenographer read back the previous question.)

Q Is that accurate?

A Yeah, I think so. I don't recall her saying she didn't think I did a good job. I mean, I was killing myself, everybody else in the building thought I did an excellent job, so I don't know how anyone else could think I wasn't, with the work I produced.

Q My question is only, did she or did she not ever express dissatisfaction with what you had done?

MS. BEAUVAIS IAFRATE: Objection. Asked and answered three or four times.

A Not that I remember. I don't really remember. I can't tell you things I don't remember.

Q Did she ever give you an indication you needed to rely less on bonus dollars?

A It may have been discussed, and, of course, any director knows you don't want to pay bonus dollars unless you're in a bind. There's no way -- in other

she did something different than what I did. But, Becky had only been doing it a year-and-a-half, so when I got there, Becky said, "I don't know what you are doing here, because if you've been doing it five years, six years, whatever, I've been doing it only a year-and-a-half, so I don't know what I'm supposed to show you that you wouldn't know." I said, "I don't know, Pam wanted me to come, so whatever you can show me, you can show me." Really, there wasn't much difference that she could. She was making phone calls, receiving phone calls, basically what you're doing, you're doing staffing.

Q My question was, did Ms. Charron arrange for you to go and meet with Ms. Santin to train regarding staffing coordinator duties?

MS. BEAUVAIS IAFRATE: Objection as to form.

A When you use the word training, I don't know about training to meet with her.

Q Did she want you to learn something from Ms. Santin?

MS. BEAUVAIS IAFRATE: Objection to form.

A She said to go to Raynham and meet with Becky, and more or less see how she handled things.

Q Did you understand that to mean that she wanted you to learn more about the way Becky had done it so that you would do it differently?
A But we discussed that, and we were both kind of doing it the same way, and that's what Becky said, she said, you're doing what I'm doing. I don't know.
Q Did you understand Ms. Charron to be sending you to meet with Ms. Santin in order that you start doing your job more like Ms. Santin was doing it?
MS. BEAUVAIS IAFRATE: Objection as to form, and asked and answered.
A To just see what she was doing, maybe, yes, but that's what I said, but when we discussed it, we were both doing the same thing.
Q I'm not asking you about the discussions with Ms. Santin yet. I will get there, and so you need pay attention to my question. Did you understand Ms. Charron was sending you there because she wanted you to do it more like Ms. Santin was doing?
MS. BEAUVAIS IAFRATE: Same objection.
A No, I didn't understand.
Q What did you understand the reason for her sending

which I would have loved. You always like to find easier ways.

Q Did you find the training valuable?

MS. BEAUVAIS IAFRATE: Objection as to form.

A I didn't find that she could show me anything that I wasn't doing.

Q Did you view the training as necessary?

MS. BEAUVAIS IAFRATE: Objection as to form.

A No, not necessary.

Q Do you understand that Ms. Charron viewed it as necessary?

MS. BEAUVAIS IAFRATE: Objection as to form.

A Yes, she did, I guess to send me there, but I don't know what the purpose was, since the girl did the same thing I did.

Q But you do understand that Ms. Charron thought that you needed to meet with Ms. Santin, correct?

A Yes.

Q But you didn't think you needed to?

A Of course not, not when I had done it so many years more than her. What could she show me? I mean, she

didn't show me anything. I was all ears. I would have loved for her to be giving me some kind of pointers that would make staffing easier, believe me.

Q But you didn't think she was able to?

A No, and she didn't think so either. She mentioned that to me herself. Now, if she told Pam something different, I don't know.

Q So, she may have told Pam something different?

A It may very well be. I wouldn't talk about Pam to her when I knew they were very friendly. I would have been very foolish to.

Q You have no idea what Ms. Santin spoke about to Ms. Charron about that day she spent with you?

A Right, I don't have any idea.

MR. CAMPBELL: Can you mark that as R.

(Whereupon Defendants' Exhibit R is marked for identification.)

Q You've seen this document, haven't you?

A Yes.

Q And this is signed by Ms. Charron, correct?

A Yes.

Q And this was given to you on August 23rd, 2004?

A Yes.
Q This is a criticism of your performance, is it not?
A Yeah. These were -- I didn't sign this, because these were all things I was working on already.
Q This is a criticism of your performance, correct?
A It's an action plan. It doesn't say anything about it being a criticism. It says action plan, like what to do in the future.
Q Did you view this as critical of your performance?
A Not so much as informative, like things she requested.
Q It indicates at the front, the top paragraph, "Barbara was instructed on the first week of August that she was to update and maintain nursing monthly schedule." Do you see that?
A Yes.
Q And you agree that that occurred?
A I was doing that. I was doing the schedule. I don't know.
Q It indicates that you were instructed that you were to update and maintain the nursing monthly schedule. Do you see that?
A Yes.
Q You agree that you were instructed to do that?

MS. BEAUVAIS IAFRATE: Objection as to form.

A That must have been when we referred to the fact that she wouldn't have a schedule, I guess. I mean, I always updated my master -- my schedule, so maybe she meant her schedule that she wasn't requesting to bother keeping.

Q Then it says, "On Thursday, August 13, during a phone conversation, Barbara stated she cannot and will not perform such duties as directed."

A It's not true.

Q Do you agree it says that?

A It says that.

Q Do you agree that Ms. Charron wrote that?

A She did.

Q Do you agree that that's critical of your performance?

A I would agree that's not true of my performance. I did not say that.

Q Do you agree that's critical of you, she's criticizing your performance here, would you agree with me?

A Well, number one, somebody that worked with me about two weeks, three weeks has a lot of criticism. She

didn't get to know me when she wrote this. But, I don't know if it's critical.
Q Do you view it as critical?
A I view it as untruth, because I never said that.
Q Setting aside the way you view it, do you believe that it is criticizing you?
MS. BEAUVAIS IAFRATE: Objection as to form. Objection, asked and answered.
A Criticizing my work or criticizing. I don't -- are you talking about that last statement that she will not?
Q "Cannot and will not perform such duties as directed." Do you agree with me that that's critical of you?
MS. BEAUVAIS IAFRATE: Objection as to form, objection as to -- answer.
A I don't know if I view it as critical.
Q It indicates --
A She is not saying that I would -- that I did a bad job on anything. She's not criticizing what I did. She's saying I didn't -- I will not do it, which is an untruth. Definitely. I never said that.
Q Do you agree with me that she wrote down that that is what you said, right?

MS. BEAUVAIS IAFRATE: Objection, asked and answered. Objection as to form.
A I agree that she wrote that, yes.
Q And that she put five different things that she needed you to do, correct?
A Yes.
Q It says, "Will not ignore requests by DNS." Do you see that number two?
A Yes, right, I never have. I've worked with several of them. I've never ignored a request.
Q Would you agree with me that from this writing it appears that Ms. Charron believed that you had ignored her request?
A I don't know if she meant I would in the future or I had in the past. Will not ignore requests in the future. I don't know how she meant it.
Q She had some concerns that you had ignored requests by her?
MS. BEAUVAIS IAFRATE: Objection as to form.
Q Based on this number two, would you agree with me?
A I don't know what she was thinking when she wrote that, to be honest with you.
Q So, she could have had concerns about you?

MS. BEAUVAIS IAFRATE: Objection as
to form.
A She had concerns for the two weeks she worked with
me, didn't she?
Q So, she did have concerns?
A I guess, according to this.
Q And, according to this in number three, "Will
follow-up and complete duties as assigned," would
you agree with me that she wrote this down?
A Yes.
Q And she gave it to you?
A Uh-hum.
Q You have to say yes or no.
A Oh, yes. She wrote it down, yes.
Q And that she needed you to do this, correct?
MS. BEAUVAIS IAFRATE: Objection as
to form.
A She needed me to complete and -- complete my duties?
Q As assigned.
A Well, that's -- nothing is assigned to me. It's
just my duties. I know what I do. I did it
automatically, so I don't know what she meant by
that.
Q Well, you agree with me that she could have meant

that she had concerns that you weren't doing it?
MS. BEAUVAIS IAFRATE: Objection as form.
A I really don't know what she had in her mind.
Q She had you review and sign the updated job description, correct?
A Yes, that was the new thing, right, because I never had one.
Q And that you were to go five days instead of four, correct?
A Correct.
Q Did you mind doing that?
A No, not at all.
Q You were fine with that?
A Yes.
Q She gave you two weeks to ease into it, correct?
A Yes, because I think, too, there was a vacation coming up, my vacation, and that's what changed things. Originally it was going to be a different date, but then we discussed I wouldn't even be there.
Q Would you agree with me that getting an action plan from the supervisor reflects that the supervisor believes action is needed on your part?

MS. BEAUVAIS IAFRATE: Objection as to form.
A I don't know what it means because I've never, ever had anything like this.
Q Does it make sense to you that Ms. Charron felt you needed to do something different than what you were doing?
MS. BEAUVAIS IAFRATE: Objection as to form.
A I don't know what that means, to be honest with you, because I was doing my duties like I had been for six years, so I don't know what changed when she came, is what I'm puzzled about.
Q Would you agree with me that getting a two-week action plan from your supervisor reflects concerns about your performance?
A I don't know exactly what it meant, to be honest with you, when the job is being done. What I don't know is what this purpose was. I really never did, why she did this.
Q Now, this is a meeting with your supervisor and the executive director of the facility, correct?
A Yes.
Q What is it that Steve Haase did in this meeting?

don't know.

Q Do you see on number 15, it indicates that you're required to tabulate nurses' hours and PPD daily and provide those reports to the DNS?

A Right.

Q That's not something you were doing, was it?

A I don't think it was something I ever was told to do. It's on here, but, like I said, we didn't read this word for word, and I don't recall ever being shown how to process it. You know what it I mean? Like, you're saying tabulate it and all that, nobody ever showed me how to do it.

Q Ms. Charron sent you for training after this, didn't she?

MS. BEAUVAIS IAFRATE: Objection as to form?

A She sent me to Becky but we didn't discuss -- I don't think PPD was something that came up. I don't believe so anyway. And, if Becky did show me, then I would know how to do it, which I don't recall ever doing that. I know I looked at the census in the morning to see how many beds were empty, because that's in the main office.

Q But you didn't recall doing this number 15?

Q You would agree with me that Ms. Charron meant something by it, don't you?
A I guess, but I don't know how you could be creative. It's either cut and dry, you're taking your master and you're putting your employees on the daily sheet.
Q And that's how you saw it?
A Of course, that's how it is.
MR. CAMPBELL: You had indicated that you had wanted to take a break.
MS. BEAUVAIS IAFRATE: Yes.
MR. CAMPBELL: Please, go ahead.
(RECESSED AT 2:27 P.M.)
(RESUMING AT 2:31 P.M.)
Q We've been discussing a two-week option plan that your supervisor gave to you on August 23rd, is that correct?
A Yes.
Q You would agree with me that Ms. Charron believed there were concerns with your performance that she needed to address, correct?
MS. BEAUVAIS IAFRATE: Objection as to form.
THE WITNESS: I believed it, that

Q During that week Ms. Charron had told you that she needed to leave early on Friday, didn't she?
A I don't recall that. I don't remember her.
Q You don't recall that she had to go to a funeral?
A Not that she -- she didn't usually talk to me that much to say that. I don't recall her ever telling me that.
Q You don't recall that she told you she needed to leave early?
A Maybe she did. I don't recall it. But, she never had a conversation with me that much, so I don't think she did.
Q Okay. Did she speak to you several times during the week as to whether the weekend schedule was complete?
A No. In fact, I was very surprised, because when I gave them the papers at the beginning of the week saying how bad the weekend would be, nothing was said to me by anyone, until I went back to her and said, we're still having a hard time with these weekend slots.
Q During the week?
A I don't know if I talked to her that Thursday or just before she went home or the Friday morning. I

just don't remember, but I know we discussed that nothing -- I mean, I had filled a lot of them, but there were still openings.

Q Numerous openings, correct?

A I don't know about numerous openings.

Q There were still numerous openings by the time you gave it to her on Friday?

A I don't know, because this is all my writing, which means I filled all that out ahead of time.

Q Do you know whether or not there were openings in the schedule when you gave it to her?

A There were still openings, that's why I let her know that we hadn't filled it completely.

Q And you had discussions with her during the week that it wasn't full?

A That I don't remember during the week at all. I don't remember if she discussed it with me during the week.

Q What was Ms. Charron's reaction when you gave her the schedule with all the openings?

A We went over to the second floor nursing station -- first she went in to see Steve and then she went over to the second floor nursing station, and I was there, but she didn't -- well, first I had made

calls that day, I think again offering the $100 again, but then we still didn't have any luck with the $100, so she went over to the nurses' station and Melissa DeCosta, one of the nurses, made calls, but I guess they couldn't get anyone at the $100, and she then upped it to 200, if I remember correctly, but she wasn't dealing with me at all, like I wasn't there, and it was other people making these calls.

Q This is on Friday?

A This is on Friday.

Q Friday afternoon?

A Yes.

Q And she was unable to leave because the schedule was not complete, correct?

A I don't remember anything about her leaving.

Q Did you tell her you had done the best you could?

A I told her I had called everyone, which I had, at the $100, and I think they made more calls at the $100 and couldn't get anyone, so then she upped it to 200 in order to get people.

Q Now, the schedule that she provided to her, you would agree with me -- well, let's go through it. As you look at that first page, the second name

Barbara, make calls again and increase the bonus to 200, that could make a difference, just like it made a difference when she increased it for herself to fill it. Plus, she used med techs. I can't use med techs like she did unless the director tells me to. It's her license, not mine.

Q That's the only two reasons she was able to fill the schedule?

A Basically, yes.

Q Would you agree with me she may have a different view?

A She may, but it's quite obvious when you look at it that the people she picked up she gave $200 to.

Q Every single one of them?

A Yes. It's right here. There is DeCosta.

Q So, if they're not on that sheet 1598 as receiving $200 bonuses, then they didn't get it, right?

MS. BEAUVAIS IAFRATE: Objection to form.

A As far as I know, if they forgot to add them. I wasn't doing it. It's not my figures there.

Q I'm going to show you what has been marked as Exhibit U. If you would turn to the second page of that.

A Yes.
Q You signed this, right?
A No. Did I? Oh, yes, I did, but I wrote a note that I didn't agree with it.
Q This is the Notice of Termination that you received on October 4, 2004, correct?
A Right.
Q And it was provided to you by Ms. Charron?
A Yes.
Q And it says, "Despite previous discussions and education, staff member is not performing up to expectation," do you see that?
A I do.
Q You say, "Do not agree with above. Work through breaks, sometimes lunch, put every effort into getting staff, not enough nursing staff in facility?"
A Correct.
Q Do you say that's the reason you were not able to complete your duties?
MS. BEAUVAIS IAFRATE: Objection as to form.
A Yes.
Q But you do agree there was difficulty in performing

your duties?

MS. BEAUVAIS IAFRATE: Objection.

A It wasn't difficulty in performing. It was difficulty in getting people to work those doubles.

Q It was difficulty in completing?

MS. BEAUVAIS IAFRATE: Objection.

A No, I am not saying it was difficult to do my work. It was difficult to get nurses to pick up several shifts extra every week.

Q Was it difficult to complete up a schedule without vacancies?

MS. BEAUVAIS IAFRATE: Objection.

A Not if there were enough nurses in the facility, not at all.

Q You're claiming there weren't enough nurses?

A Yes.

Q Because there were not enough, you're saying it was difficult for you to complete the schedule?

MS. BEAUVAIS IAFRATE: Objection as to form.

A It was difficult to have all the openings filled when there aren't enough nurses to fill the hours.

Q You would agree with me that the number of nurses in the facility has nothing to do with age, correct?

MS. BEAUVAIS IAFRATE: Objection as to form.

A The number of nurses in the facility has nothing to do -- for their ages or my age?

Q Yes.

A No, I don't really get that too much. I don't know what you mean by that. My age and the nurses working there?

Q Yes. Those circumstances have nothing to do with the fact of your age, correct?

A How many people they hired does not have anything to do with my age. I don't think so.

Q You would agree with me that you weren't the oldest employer there, were you?

A I don't know their ages. I really don't know.

Q Do you remember Zeita McCabe?

A A nurse, yes.

Q She was significantly older than you, wasn't she?

A She was.

Q Do you know if she had any problems with Ms. Charron?

A I have no idea. A lot of nurses did. I don't know if she particularly did. She was only there very seldom.