UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI *

VS. * C.A. NO. 06-108-ML

LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity *

* * * * * * * * * * * * * * * * *

CONTINUED DEPOSITION of BARBARA ANTONUCCI, taken on behalf of the Defendants on Monday, February 5, 2007, at the offices of Carley Beauvais Iafrate, 129 Dyer Street, Providence, Rhode Island, commencing at 1:00 P.M. before Rebecca J. Forte, Notary Public.

APPEARANCES

CARLEY BEAUVAIS IAFRATE, ESQUIRE....FOR THE PLAINTIFF

JACKSON LEWIS, LLP

BY: CHRISTOPHER J. CAMPBELL, ESQ..FOR THE DEFENDANTS

ORIGINAL

IRONS & ASSOCIATES

CERTIFIED PROFESSIONAL STENOGRAPHERS

11 South Angell Street #359

Providence, Rhode Island 02906

(401) 861-0909

Q Had you ever been prescribed any type of antianxiety
medication prior to that?
A I really don't remember, to be honest with you. Not
that I can remember.
Q Had you ever sought treatment for any type of mood
disorder?
A No.
Q Or have you ever sought treatment for any type of
anxiety prior to treating with Dr. Leone?
A No.
Q Had you ever sought treatment for any kind of stress
prior to treating with Dr. Leone?
A Well, not really treatment. I know I was under
stress from my position.
Q And your position is staffing coordinator with Life
Care?
A Correct.
Q And for how long had you been under stress?
A Well, I think that position always is stressful.
You know what I mean? It's that type of job. So,
it wasn't like this time I wasn't stressed and that
time I was stressed. It's just the way the job is.
Q Had you ever sought treatment for any of those
symptoms?

any law that requires a certain number, are you?
MS. IAFRATE: Objection as to form. Same answer, three times.
A Do I answer again? I guess there is a law, but I don't know the law.
Q Well, that's my question. You say you guess there is a law. Are you aware as to whether there is or not?
MS. IAFRATE: Objection as to form. Please wait for me to object before you answer.
A Okay.
MR. CAMPBELL: And, I'll just note, you're objecting after each and every one of my questions.
MS. IAFRATE: Almost.
MR. CAMPBELL: And I find that it tends to disrupt your client's ability to answer, and I would appreciate it if you would simply object and allow her to answer without prolonging each one.
MS. IAFRATE: I'm not prolonging. I have to get it there so the court reporter can get it before her answer.
Q So, you would agree with me, you're not aware of any law?

MS. IAFRATE: Objection as to form.
A I know there must be, but I don't know the law, because the director would take care of that.
Q You think there's a law?
A I really don't know.
Q One way or the other you're not sure?
A Right.
Q Would you agree with me the same is true, that you are not aware of any regulation, as you sit here today, that would say a certain number of nurses needs to be scheduled?
MS. IAFRATE: Objection as to form.
A Yes. There is something that regulates staffing, because a nurse would not just pick, a director would not just pick and say, well, one nurse on this unit. Something guides her decision as to making up the form with the nurses that are required.
Q And what's the basis of that knowledge?
MS. IAFRATE: Objection as to form.
A Just the fact that I -- it's common sense, that you just could not randomly do a schedule without something to guide.
Q Is there any other information that you have as a basis of your knowledge, besides, as you term it,

common sense?

MS. IAFRATE: Objection as to form.

A No.

Q Looking at what's been marked as Exhibit X, which is three pages down in the stack of paper before you, again, you saw at the top there that there's a CMT, a certified med tech, scheduled for 7:00 to 3:00 on days; is that correct?

MS. IAFRATE: Objection as to form.

A Correct.

Q And you don't think there's anything illegal about that, do you?

MS. IAFRATE: Objection as to form.

A Not that I am aware of.

Q And on the second box over to the right it indicates that there's a certified med tech scheduled for evenings, 3:00 to 11:00 in the subacute unit and that's in your writing, correct?

MS. IAFRATE: Objection as to form.

A Yes.

Q And you're not of the belief that it's illegal to have a med tech there, are you?

MS. IAFRATE: Objection as to form.

A Not that I'm aware of. The director looks this

Q How friendly?
A Yes.
Q Was there anything that you found her to be unreasonable about?
MS. IAFRATE: Objection as to form.
A Not that I can think of.
Q Would you say that she was generally honest?
MS. IAFRATE: Objection as to form.
A I guess.
Q Was there ever anything that she did that made you think she was a dishonest person?
MS. IAFRATE: Objection as to form.
A No, not that I can think of.
Q Was there anything that she ever did that made you think that she disliked you?
A No.
Q You don't believe that she harbors any age-related animus against you, do you?
MS. IAFRATE: Objection as to form.
A Not that I would know of.
Q You wouldn't have any reason to believe she would be out to get you, would you?
MS. IAFRATE: Objection as to form.
THE WITNESS: Out to get me?

MR. CAMPBELL: Yes.

THE WITNESS: What do you mean?

Q Have you any reason to think that she would be looking to do you harm?

A I would hope not. Not that I know of.

Q You met Ms. Santin briefly, did you not, Rebecca Santin?

A Yes.

Q And I think you testified previously that she was generally nice?

A Yes.

Q Did she ever do anything that would make you believe that she would be dishonest?

MS. IAFRATE: Objection as to form.

A Not that I can think of.

Q Did you find her generally to be a reasonable person?

MS. IAFRATE: Objection as to form.

A I really wasn't with her that long.

Q During the period that you were with her, did you find her to be generally a reasonable person?

MS. IAFRATE: Objection as to form.

A I guess.

Q As far as you could tell she was honest?

A Well, she did make a couple of comments that surprised me.

Q What comments were those?

A Comments against Pam Charron, which surprised me because she didn't know me that well, and I thought that she was making a mistake in making comments, because she didn't know how frequently I was with Pam.

Q And what comments did she make?

A Something to the effect that, Pam was good at giving orders, and that she will tell you to do a lot of things, but just listen to her and do what you want, and I thought that was kind of very poor advice. I mean, poor advice, number one, I couldn't believe that she would say anything against Pam, not knowing how friendly -- you know, I could have been her best friend. So, I was surprised at that comment.

Q So, did you somehow form a conclusion that she was dishonest as a result of that?

MS. IAFRATE: Objection as to form.

Q If anything, she was too honest, wasn't she?

MS. IAFRATE: Objection as to form.

A I never said she was dishonest. I just was surprised at -- I know I would never make a comment

like that about someone.

Q Well, that was my question. Did she ever do anything that made you conclude that she might be dishonest?

MS. IAFRATE: Objection as to form.

A No.

Q In fact, by stating something that would be, as you indicated, perhaps not the wisest thing to do, she was almost too honest, wasn't she?

MS. IAFRATE: Objection as to form.

A Well, I don't know if the word is too honest or too stupid, because I wouldn't never talk about someone in that way. I was speaking to a complete stranger.

Q Is there anything else that you recall her making comments about that you found odd?

A No, that one really surprised me, so I guess that's the one I remember the most. I don't recall too much.

Q And you would agree with me that Ms. Santin never did anything that would lead you to conclude that she didn't like you because of your age, is that right?

MS. IAFRATE: Objection as to form.

A No.

Q Do you know who Steven Haase is?
A Of course.
Q He was the executive director at Life Care while you were, is that right, at the end of your employment?
A Correct.
Q Do you know when he began?
A I don't, to be honest with you.
Q If I told you somewhere around 2001, would that sound about right?
A I didn't think that it was that far back, but if that's the accurate information. I didn't realize he was there that long.
Q You thought it was somewhat shorter than that?
A I did, but years go by fast.
Q It may well be. I'm not sure if I have the accurate date. Let me try a different line of questioning. He was there before Pam Charron started, correct?
A Correct.
Q At least several years?
A I really have no idea, to be honest with you. I didn't think he was there that long, but, as I said, the years go by fast. You may be right.
Q Was it at least a year?
A I'm sure it was a year.

Q And how were your interactions with Mr. Haase?
MS. IAFRATE: Objection as to form.
A We really didn't interact that much. I mean, say good morning, hi, you know.
Q So, you would exchange pleasantries?
A Right, right.
Q Was he generally pleasant to you?
A Yes, I mean.
Q Was he generally agreeable?
MS. IAFRATE: Objection as to form.
A I really don't have anything to base that on.
Q Fair enough. Did he ever do anything or say anything to you that would lead you to believe that he was a disagreeable sort of fellow?
MS. IAFRATE: Objection as to form.
A No. Because, like I said, we didn't really interact that much. Sometimes he would stay later in the evening and I would still be there working and I would see him then, if I went down to the office to make kind of something, but, like, we never really had a lot of conversation.
Q Was he generally pleasant when you did converse with him?
A Yes, never had a problem with him.

Q Okay. Would you agree with me that he was generally a reasonable executive director?

MS. IAFRATE: Objection as to form.

THE WITNESS: As far as with me or in general?

MR. CAMPBELL: Well, let's start with you.

A I never had a problem with him.

Q How about in general?

A I don't really know --

Q No real basis --

A -- as far as how he treated other people.

Q No real basis for knowing?

A Right.

Q But so far as he treated you, it was generally reasonably?

MS. IAFRATE: Objection as to form.

A Yes.

Q He was reasonably fair?

MS. IAFRATE: Objection as to form.

A Like I said, we didn't really interact that much.

Q Sure. But, when you did interact, was he generally fair?

MS. IAFRATE: Objection as to form.

The entire time she was working there? You have no time period on this.

MR. CAMPBELL: This is the second time I'm going to ask you to restrict your objections to objections to the form the way that the rules strictly require and the way that the case law has made it clear counsel is obligated to follow.

Would you please read back the question.

(Whereupon the stenographer read back the previous question.)

A I really had --

MS. IAFRATE: Objection to form.

A I have nothing to base it on, because you're saying fair, like there was something going on that he would be fair or unfair, and I really don't have an answer to that type of question.

Q Did he ever say or do anything that made you think that he disliked you?

MS. IAFRATE: Objection as to form.

A Not that I can recall.

Q Did he seem to interact reasonably and fairly with the other staff there, so far as you could tell?

MS. IAFRATE: Objection as to form.

A I've heard complaints, but, I mean, nothing that effected my work, so I really didn't buy into it or pay attention to it, to be honest with you. But, I know one thing, he didn't seem to have a problem with my work, if he was there as long as you're saying.

Q I want to make it clear, I'm not representing he was there any particular time. I don't have the date in front of me.

A Well, even if he was there five years ago, I never had any complaint to him about my staffing or any correction on anything I did. Nothing like that. He seemed to be more than satisfied with the job I was doing.

Q So far as you could tell?

MS. IAFRATE: Objection as to form.

A Yes, yes.

Q Now, he sat in on that meeting on August 23rd that you had with Pam Charron regarding the two-week action plan, did he not?

A Yes.

Q And he didn't suggest to you by word or by action that he disagreed with anything Ms. Charron was saying, did he?

MS. IAFRATE: Objection as to form.

A He really didn't say anything. She kind of handled the whole meeting, to be honest with you.

Q And during that meeting did he interact at any point in time to give you the understanding that he disagreed with Ms. Charron's assessment of your work?

MS. IAFRATE: Objection as to form.

A Not that I recall.

Q You never complained to Mr. Haase about age discrimination while you were at Life Care, did you?

MS. IAFRATE: Objection as to form.

A No.

Q In fact, you didn't complain to anybody about age discrimination while you were there, did you?

MS. IAFRATE: Objection as to form.

A I didn't complain to anyone about anything really.

Q Including age discrimination?

MS. IAFRATE: Objection as to form.

A Right.

Q In fact, the first time you raised a complaint of age discrimination was after your discharge; is that right?

A That I don't remember if it came up before the

discharge.
Q You don't recall reporting it to anybody?
THE WITNESS: An authority, you mean, someone in authority that I would go to complain to?
MR. CAMPBELL: Yes.
A No.
Q If you asked to meet with Steve Haase about something, was it your understanding that he would agree to do that?
MS. IAFRATE: Objection as to form.
A I believe so. I don't think he could refuse.
Q Do you know if he was supervised by anybody?
A I imagine there's someone over him.
Q Do you know if Ms. Charron were supervised by anybody?
A I really don't know who, you know, who directs them. I don't know that.
Q Have you ever heard the name Kate O'Connor?
A Oh, yes.
Q What position do you understand that she fills in Life Care?
A I really don't remember. I can't remember her title, to be honest with you.

head that you're unable to identify, did any of them work directly for Pam Charron?

MS. IAFRATE: Objection as to form.

A One of them was an LPN, Melissa DaCosta. She's younger and she was always fine with her.

Q Do you know if Melissa DaCosta ever told Pam that she wasn't going to follow one of Pam's directives?

MS. IAFRATE: Objection as to form.

A I have no way of knowing that.

Q Can you think of any other individuals that you claim Pam was friendly with?

A Well, Donna, and I did give you her name before, I believe.

Q Donna Sweeting?

A Yes.

Q Do you know if Donna Sweeting ever refused to do what Pam Charron had instructed her to do?

MS. IAFRATE: Objection as to form.

A I have no way of knowing whether that happened or not.

Q Do you believe that Pam Charron treated Donna Sweeting better than you?

A I do believe that.

Q Do you believe that she did because of your age?

MS. IAFRATE: Objection as to form.

A I would believe that, yes.

Q Please tell me every fact that you have that supports your belief that Pam Charron treated Donna Sweeting better because of your age?

MS. IAFRATE: Objection as to form. Your questions are so broad, Chris, it's, like, you've got to ask her a specific question. You can't --

MR. CAMPBELL: This is the third time I'm noting my objection for the record and for the Court that you are attempting to coach the witness through extended objections. The rules require that you say objection as to form and no more, and if this continues, I plan to stop the deposition and seek the Court's intervention. Please, allow me to conduct my deposition.

MS. IAFRATE: My intent is that, you have a limited amount of time here and I'm trying to help you out. I am not trying to coach the witness or anything else. If you feel you need to seek the Court's intervention, you do that, but that's my intent.

MR. CAMPBELL: What I need to do is

conduct my deposition without your interruptions. Please, do not offer me any of what you call your assistance. Please, read back my question.

(Whereupon the stenographer read back the previous question.)

MS. IAFRATE: Objection as to form. Thank you.

A Just the overall conversations. I mean, she was a lot friendlier with Donna, discussing different things. She never really spoke to me. But, if I were to go in the office and Donna was in there with her, sometimes they would be discussing things, like they're both divorced, more of a social type thing, where with me she didn't even speak with me, so.

Q So, they had some things in common?

A Both being young, yes.

Q Okay. And divorced?

A I believe both were, yes.

Q So, you've indicated that she was more friendly towards Donna, and what I want to know is why do you believe that's because of your age?

MS. IAFRATE: Objection as to form.

A Just what I just explained to you.

Q Well, you explained that she was more friendly.

What I want to know is why you formed the conclusion that it was because of your age?

MS. IAFRATE: Objection as to form.

A Well, that's just what I feel, that it was because of my age that she wasn't friendly with me and she was with other people that were younger.

Q Have you any other information?

A No.

MS. IAFRATE: Objection as to form.

Q What is it that your husband did prior to you becoming disabled?

A He worked for car dealerships.

Q Which ones?

A Menard Ford. This is going back. I'm trying to remember. I guess that was the latest one.

Q What other ones prior to that?

A Puritan Chrysler.

Q Any others you recall?

A Not that I can remember offhand. I hadn't given this any thought for a long time.

Q I understand you met your current attorneys through a referral of your husband's friend?

A Not my husband. My husband's -- a lawyer that my husband knows.

it, couldn't you have?
A I suppose. I know at a morning meeting she told everyone that she was very disappointed that I had given her my resignation, that she never thought I would do that.
Q I'll show you what has been previously marked as Exhibit U. You saw this at your prior day of deposition. This is your termination notice, is that right?
A Yes.
Q Give me just a moment while I get it in front of me on the second page of this exhibit, which is marked DEF00172. Do you see at the bottom Steve Haase's signature?
A Yes.
Q And you see above that Pam Charron's signature?
A Yes.
Q And in the second box down from the top it indicates that the reason for your discharge is ongoing poor job performance?
A Yes.
Q Do you think that's the real reason for your discharge?
A Not at all. My job performance was excellent, as

six or seven other directors can testify to.

Q Would you agree with me that Pam Charron and Steve Haase have indicated that your discharge is because of ongoing poor job performance on this form, would you agree with me that they have indicated that?

MS. IAFRATE: Objection as to form.

A They did indicate that.

Q Do you think they made that up?

A Well, I know it's not true. My job performance was excellent, according to all the other people I had worked for, and according to Steve, apparently. He never said a word to me prior to her being there.

Q Well, didn't he sit in on the August 23rd counseling?

A Right. And, I don't know why he was going along with her, if he never found a problem with my work prior to that.

Q You didn't know why he was doing that?

A I have no idea.

MS. IAFRATE: Objection as to form.

Q But you think this reason isn't true?

MS. IAFRATE: Objection as to form.

A I definitely know it's not true.

Q And do I understand correctly that the reason you

think this is a false reason for your discharge is because you believe you did a good job?

MS. IAFRATE: Objection as to form.

A Correct.

Q Is there any other facts which support your belief that this isn't the real reason for your discharge?

MS. IAFRATE: Objection as to form.

A Well, I worked for her approximately, not even two months, and she found all this, an inexperienced director, found all these problems with my work in this short period of time. That alone says a lot.

Q So, is the fact that you believe you did a good job and the fact that she only seemed to supervise you for a two-month period --

MS. IAFRATE: Objection to form.

A Not even a full two months, I don't believe.

Q For a period slightly less than two months?

A Right.

Q Are there any other facts which you believe --

MR. CAMPBELL: Strike that.

Q Are there any other facts that support your belief that this isn't the real reason?

MS. IAFRATE: Objection as to form.

A I don't know how to answer that, except I know it

wasn't my work, my performance.
Q Well, you told me it was because you did a good job and because she supervised you for a period slightly less than two months, those are the two facts that suggest that this isn't the real reason?
A Correct.
Q Any other reasons?
MS. IAFRATE: Objection as to form.
A Not that I can think of right now.
Q Do you believe that this decision to discharge you was because of your age?
MS. IAFRATE: Objection as to form.
A Definitely.
Q Please give me all of the facts that you have to support your belief that your discharge, this discharge decision was because of your age?
MS. IAFRATE: Objection as to form.
A I think we already went over that, didn't we? I think we did that a little while ago.
Q You don't have any additional things?
MS. IAFRATE: Objection as to form.
A No.
Q And, if I recall correctly, you had said because Pam was friendlier with younger people?

MS. IAFRATE: Objection as to form.

A Yes. It just seems to me that an experienced director of nursing, which I worked for several, thought I was doing an excellent job, each one of them, not one person. How can she come along in less than two months and find that I was doing such a poor job that she had to terminate me.

Q During that two-month period, you would agree with me that she gave you at least one oral counseling?

MS. IAFRATE: Objection as to form.

A I don't know.

Q Do you recall looking at a form last time at your deposition?

MS. IAFRATE: Objection as to form.

THE WITNESS: Can I see that form again, please?

Q I'm just asking you if you recall seeing the form from last time. Do you or don't you?

MS. IAFRATE: Objection as to form. If she wants to look at the document, Chris, it's only fair.

A I know there is a document you showed me that I got confused with this one, that I didn't recall seeing. I was thinking it was this form.

Q Would you agree with me that on August 23rd she sat down and gave you a two-week action plan?

MS. IAFRATE: Objection as to form.

A Right.

Q And that you had had conversations outside of that August 23rd meeting regarding Pam Charron's thoughts about your work performance?

MS. IAFRATE: Objection as to form.

Q Like you had told me that you had discussed keeping the master schedule?

A Oh, things I already was doing, you mean. Oh, yes.

Q And she talked to you about those?

MS. IAFRATE: Objection as to form.

A Yes, she was doing that, yes.

Q And I believe you also indicated that she had talked to you about the manner in which bonuses were paid and you needed to reduce that?

MS. IAFRATE: Objection as to form.

A We always tried to reduce the bonuses, and, yes, she did want to reduce them, but, apparently, it couldn't be done and it still hadn't been done. They're stilling giving bonuses, from what I understand. So, I mean, you can think as a director that you would like to do it, but is it possible,

probably not.
Q Now, immediately prior to receiving this discharge notice you're meeting with Pam and staff?
MS. IAFRATE: Objection as to form.
Q That day that you met with them?
THE WITNESS: When they terminated me?
MR. CAMPBELL: Yes.
A You met them on October 4, right.
Q And that was a machine?
A Yes.
Q And you retained counsel in November of 2004?
MS. IAFRATE: Objection as to form.
A I don't recall the date.
Q Thereabouts?
MS. IAFRATE: Objection as to form.
A Sounds about right.
Q It was certainly shortly after your discharge?
A Yes. It wasn't too much later.
Q Please tell me everything that you recall about that meeting on October 4, 2004 when you were discharged?
A I was downstairs putting new employees on the schedule, and she beeped me because I had a beeper, and I don't recall if I called her and she said to

come up to her office. No, I was going up to her office anyway to get something and it just happened that's when she beeped me, so when I got up there, Steve and Pam were sitting in the other office, and she said, called me in to tell me that I was terminated, and not much more than that took place. I did tell Steve that she'll be out of Cherry Hill and you're going to wish I was back, because I knew what a good job I did and I know how hard staffing people are to get, and that was all I said.

Q Have you told me absolutely everything you recall of that meeting?

MS. IAFRATE: Objection as to form.

A Definitely.

Q Now, the prior Friday, October 1 --

A Yes.

Q -- that would have been the day that you turned in the weekend schedule to Pam Charron, correct?

MS. IAFRATE: Objection as to form.

A No. That was -- I turned in the weekend schedule -- I turned in that week's schedule at the beginning of the week. I remember I had said, I gave a copy to Steve and a copy to Pam, and I noted all the openings and what they were for, CNA's or LPN's or

RN's or whatever, and then usually, if the director sees that the staffing is that poor, she will come and kind of work on it together. Sometimes the director even offers to make calls. She never got back to me on it. Nothing was said about the scheduling. And, I think it was on Thursday that I mentioned something to her, but, of course, she kind of just always brushed me off, so she didn't get into it. It was, like, like, I'm not going to talk about it right now. So, on Friday morning again, I said, Pam, we still have openings and I haven't been able to fill them, and that's when she, like, I guess got all upset, like, she didn't know that they were there, but that was her reaction, like this was something new I was telling her.

Q And then what happened?

A Then she went into Steve's office, and I don't know what that was about. Then she went to the second floor nursing station, and that's when she asked other people to try to make calls and try to get help. But, I think a lot of the nurses were upset about a lot of things that were going on and that's why they weren't picking up. So, anyway, then she had to increase the bonus and use med techs and

whatever she did to fix it. Sometimes the director herself would come to work if it was that bad. But, of course, she didn't offer to do that. And, she settled for the med techs and for increasing the bonus.

Q Do you remember anything else from that Friday?

MS. IAFRATE: Objection as to form.

A Not that I can think of.

Q And you would agree with me that was the event that led Pam Charron to discharge you?

MS. IAFRATE: Objection as to form.

A It's hard to believe, but I believe that's the incident, because she wanted to work on the staffing, I guess. I don't know. It just seems very unfair that staffing is bad for a week and she gets all bent out of shape about it, when she had all week to address it.

Q And she did get bent out of shape?

MS. IAFRATE: Objection to form.

A I think so. She just snubbed me, ignored me like I wasn't supposed to be making the calls, and I just stood there in case she needed me. I never said a word.

Q Do you recall anything else from that Friday --

Pam was working there.

Q And you say he came into your office?

A Questioning me all about the schedule.

Q What was he questioning you about?

A Call this one, call that one. I'm sure Pam sent him in because he would never have come in there prior to that, so. In fact, one day he upset me so much, I had one of the nurses take my blood pressure, and it was extremely high.

Q He upset you because he was asking you questions about the schedule?

MS. IAFRATE: Objection as to form.

A He was just going on and on.

Q About the schedule?

A Yes.

Q And when you say he was just going on and on, what was he saying?

A Making, like, remarks, did you call this one, did you call that one, so I took out the list and I showed him who I had called and what they had said, and he was just more or less harassing me, is what I would say.

Q And this harassment was in the form of asking you who you had called?

MS. IAFRATE: Objection as to form.

A Yes.

Q And he --

A But, like, not just have you called nurses, you know, not just a simple question. He just went on and on, and then he went back to Pam's office.

Q And you believe that he was asking you about the schedule because of concerns that Pam had?

MS. IAFRATE: Objection as to form.

A I guess. He never approached me about it other times, and I had seen him in the building, you know, other times, earlier before she was hired.

Q Did he ever say or do anything that made you think that he didn't like you because of your age?

MS. IAFRATE: Objection as to form.

A I don't believe so.

Q Did Steve Haase ever do anything or say anything that made you think that he didn't like you because of your age?

MS. IAFRATE: Objection as to form.

A No.

MR. CAMPBELL: Aside from the questions on which I reserve my right to move to compel and reconvene this deposition, I have nothing