# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI :
:
vs. : C.A. NO. 06-108 ML
:
CHERRY HILL MANOR, ET AL. :

**VOLUME I**

**PAGES 1-142**

**EXHIBITS 1-3**

***DEPOSITION OF REBECCA SANTIN***

produced, sworn and examined on FEBRUARY 7, 2007, at 9:30 a.m. at LAW OFFICE OF PATRICIA E. ANDREWS, 129 Dyer Street, Providence, Rhode Island, before:

*CLAUDIA RATHBUN, RPR-RMR*
*CAPITOL COURT REPORTING, INC.*
A Notary Public in and for the State of Rhode Island taken on behalf of the Plaintiff

**— CAPITOL COURT REPORTING, INC. —**
**931 Jefferson Boulevard, Suite 2003**
**Warwick, RI 02886**
**401/739-3600**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI :
:
vs. : C.A. NO. 06-108 ML
:
CHERRY HILL MANOR, ET AL. :

**VOLUME II**

**PAGES 142-271**

**EXHIBITS 4-9**

***DEPOSITION OF REBECCA SANTIN***

produced, sworn and examined on FEBRUARY 7, 2007, at 9:30 a.m. at LAW OFFICE OF PATRICIA E. ANDREWS, 129 Dyer Street, Providence, Rhode Island, before:

*CLAUDIA RATHBUN, RPR-RMR*
*CAPITOL COURT REPORTING, INC.*
A Notary Public in and for the State of Rhode Island taken on behalf of the Plaintiff

**— CAPITOL COURT REPORTING, INC. —**
**931 Jefferson Boulevard, Suite 2003**
**Warwick, RI 02886**
**401/739-3600**

Q. I'm not going to look through this real quick, but I just think there was no disciplinary action in your personnel file; correct?

A. No.

Q. So, you've never been written up for anything?

A. No.

Q. And you've never been counseled on anything other than what we've talked about?

MR. CAMPBELL: Objection as to form.

A. No.

Q. Okay. When you were working on the schedule, did Pam ever check in to see what your progress was in terms of staffing?

THE WITNESS: As far as like the monthly schedules?

MS. IAFRATE: Yes.

A. No.

Q. How about the daily sheets, did anyone ever check, Pam or Wendy, on how much progress you had made on the daily sheets?

A. They might just ask, you know, "Any

told you?
A. Right.
Q. And you don't remember one way or the other?
A. Right.
Q. Okay. So, you physically helped her do the monthly schedule for November?
A. Yes.
Q. And then do you remember her asking you any questions about the monthly schedule or how to do it or how you do it?
A. No, nothing that rings -- nothing that stands out, no.
Q. Okay. And then you taught her how to do daily sheets?
MR. CAMPBELL: Objection to form.
A. Yes, we just went over it, but I mean theirs -- like obviously theirs is set up a little different, but just the main putting people in, you know, changing them, whatever needed to be changed.
Q. Do you remember anything that you talked to her about in terms of daily sheets, like any

points you would have given her or...
A. No.
Q. Okay. So, other than what you've already talked to me about, taking the information off of the monthly schedule and plugging it in to the daily sheet, there's nothing else that you would have taught or shown Donna Diallo?
MR. CAMPBELL: Objection as to form.
A. No, not that I can think of, no.
Q. Okay. And then you said you talked to her about the PPD. What do you mean by that?
A. Just how to do it.
Q. Okay. So, you explained to her how to do that math?
A. Yes.
Q. And you explained to her that 3.29 number?
A. Yes.
Q. And how to get to that number or get below it?
A. Right.
Q. And prior to that, did she have any understanding of what PPD was?

A. I'm not sure.
Q. Okay. She didn't tell you one way or the other?
A. No, not that I remember, no. We just went over how to do it.
Q. And so, she didn't seem confused by that?
A. No.
Q. Okay. Or surprised by the PPD?
A. No.
Q. Okay. So, you can tell one way or the other whether it's something she already did when she filled in?
A. I couldn't tell if she did it, you know, whenever she filled in or not, no, she didn't.
Q. Okay, and then you said you talked to her about getting staff, like making phone calls and that kind of thing?
A. Uh-huh.
Q. Like what would you have said to her?
A. Probably just how to get the staff, be persistent in calling, that type of thing, you know, making the deals. Like I was saying before, you know, maybe give this day

off to work this day and...

Q. Is there any method to, you know, what you say to the people when you call them that you think that, you know, might make them work?

MR. CAMPBELL: Objection as to form. Go ahead.

A. No, I don't think there's a method. I just call up and say, you know, "It's Becky from Life Care. I have this open shift. I want to know if you want to work it."

Q. So, there's nothing special that you're saying in that conversation?

A. No.

MR. CAMPBELL: Objection as to form.

Q. Okay. Other than the three things that you just mentioned: The daily sheets, the PPD and getting the staff calls or explaining how to do the calls, is there anything else that you do remember talking to Donna Diallo in terms her job?

A. No.

Q. While Donna was there, did you engage in, you know, regular conversation with her?

Barbara how to do?
A. No.
Q. Okay. Did you view that as a training?
A. I don't think so. I don't really know what. I just knew somebody was coming to work with me.
Q. So, did Pam tell you that Barbara was having any performance problems?
A. No, she just wanted me to help her with being more -- as far as to get staff in the building, on how I do it.
Q. So, nobody gave you a list of "Talk to Barbara about these five things"?
A. No.
Q. How long were you supposed to meet with Barbara?
MR. CAMPBELL: Objection as to form.
A. I don't know how long, what Pam's intentions were, but it was only a day.
Q. Did Pam ever tell you it was going to be more than one day?
A. No.
Q. So, you never said anything to Barbara about,

MR. CAMPBELL: Objection as to form.

A. Yeah, she was a nice lady. She seemed, you know, nice enough.

Q. You didn't think she had an attitude?

A. No, she didn't have one towards me, no.

Q. Did you find out, in the course of this meeting with Barbara, that you were doing anything differently than what she was doing?

A. Yes.

Q. Okay. And what was that?

A. The biggest difference was -- as far as the phone calls were, she was pretty surprised that I would call somebody more than one time, you know, for a schedule -- for an open shift.

Q. Okay. Anything else?

A. Just that -- basically that was it, that she was just surprised that I would call somebody more than once, that she wouldn't do that, that she wasn't going to, you know, bother somebody more than one time. She

figured if she called them one time and told them what she had and they didn't call her back, that they didn't want the shift.

Q. Okay. And so, did you explain to her why you might call people more than once?

A. Well, yeah, I told her that's pretty much the job. Your job is calling people and, you know, being persistent, and, you know, you do have to call them more than one time in a day, and, you know, if you don't get them that day, you call them the next day. She didn't want to do that.

Q. Okay. So, it's your testimony that Barbara Antonucci indicated to you that she would only call an individual one time for an open shift, and if they refused, she would not call them back?

A. But they didn't call her back. It's not if.

Q. Oh, okay. So, you're saying if she didn't actually speak with the person, she would not call them back?

A. Right.

Q. Okay. So, say she left a message.

A. Right.
Q. Okay. You're saying if Barbara Antonucci called somebody and left a message and did not speak to them, she would not call them back a second time?
MR. CAMPBELL: Objection as to form. I just want to make sure, you're asking her about what Barbara said to her, not about what Barbara's practices are.
MS. IAFRATE: Right.
A. Right, that's what she had said.
Q. Okay. And so, you -- or your practice is that you call someone once; and if you get a message -- if you get an answer machine and you leave a message, you will not wait to see if they call you back?
A. I'll wait a little bit of time. I mean, I don't hang up and call them back. But no, I usually call somebody, you know, in the morning, and then I'll call again right before I go to lunch, and I'll call them again later on in the afternoon, you know.
Q. You'll call until you get a human?
A. Pretty much three times a day is pretty

much my limit and then...

Q. So, is it your impression that you were better than her at making phone calls persistently?

MR. CAMPBELL: Objection as to form. Go ahead.

A. I don't know about better, just different. I mean, as far as being persistent, yes, I did. She just, you know, I wouldn't call them more than once -- I mean I would call them more than once, where she said she wasn't going to do that.

Q. When you said, "She said she wasn't going to do that," you're saying that not only was she saying that she didn't do that, that was her practice not to call more than once if she got a message, but that she wasn't going to change what she was doing?

A. Right.

Q. And what was your reaction to her saying that she wasn't going to change what she was doing?

A. I just told her -- I mean, obviously I can't make her do it, but that's how you've

got to get staff. I mean, you know, you have to be persistent. That's the job. That's...

Q. So, do you think that she was not a good staffing person if that's what her approach was, "I will not call somebody more than once if I left a message"?

MR. CAMPBELL: Objection as to form. Go ahead.

A. It was going to make her job a lot harder. I mean, I don't know, I wouldn't say she was bad, but I mean, it was going to make her job a lot more difficult by not doing that, by not being persistent and not doing that.

Q. Okay. Other than that instance where she was surprised that you were calling repeatedly if you didn't get a response, was there anything else that you remember that you did differently than what she did?

A. No, not really. No.

Q. Okay. Anything else that you showed her that it seemed like she didn't know what you were doing?

MR. CAMPBELL: Objection as to

she was?

A. I'm not offended. I am not going to force her and say, "You have to do it." I mean, I don't think -- I wouldn't say that I was offended, no.

Q. Did you think she wasn't receptive to what you were trying to teach her?

A. No, she wasn't receptive at all.

Q. No? Okay. On that point or the whole thing?

MR. CAMPBELL: Objection.

A. Mostly the whole thing. I mean, you know, as far as the monthly goes and that, it was kind of different paper, but same idea, you know. But she just wasn't receptive in anything that I had to say. It was, you know, "I already know that," or "I'm not going to do that," you know, especially like with the phone-call thing. I mean, that's a big part of the staffing job. I mean I spend 90 percent of my day on the phone. You know, she just was not going to do that.

Q. Did you ever tell Barbara that you thought she wasn't receptive to what you were trying

to teach her?
A. No.
Q. Do you think she thinks that she wasn't receptive?
MR. CAMPBELL: Objection as to form. Do you know what she thinks?
A. No, I don't know what she thinks.
Q. Did you, after this -- well, let me get this. Was there anything aside from the PPD and the phone calls that you thought she wasn't receptive to?
A. No. No, those are the two major things that she...
Q. And after you met with her that day, was there anything else that you showed her that we haven't talked about?
A. Not that I remember, no.
Q. Did you talk to Pam about how the day went?
A. At some point after that I know I had talked to Pam. I don't know how long in between, you know, Barbara going, you know, after me meeting Barbara and talking to Pam, I don't know what the span of time was, but...

Q. Did you call Pam, or did she call you?
A. I think she called me.
Q. Okay. To find out how it went?
A. Yes.
Q. Okay. And what did you tell her?
A. Just, you know, the basics. I just told her how the day went, really. I mean it was that she wasn't very receptive to what I had to say and the phone call, I just -- you know, the main thing that stood out for me is not wanting to make the phone calls. That's about it.
Q. So, you reported back to Pam what you just explained to me about the phone calls, about her not wanting to call somebody more than once?
A. Yes.
Q. Okay. And then you also reported back to Pam that Barbara didn't want to do a practice PPD?
A. I'm not sure if I said that to Pam or not. I just remember the biggest thing was the phone calls. That was the biggest thing for me, you know, that kind of struck me as

3 percent raise?
A. Right.
Q. So, does it looks like Barbara would have gotten the same raise as you got --
A. Yes.
Q. -- in 2004?
A. Yes.
Q. Okay. And this evaluation, if you look at the last page for Barbara, it is dated March 4, 2004?
A. Yes.
Q. Which is just prior to -- oh, I'm sorry, hold on a minute. Let's look at your second evaluation, the 2004 one. Page back on this one. So, looking at this one from your 2004, which was in May; correct?
A. Yes, May, yup.
Q. And Barbara's was in March?
A. March.
Q. Okay. And so, again, it looks like your score on this one is lower than the score that Barbara Antonucci got.
A. Yes.
Q. Okay. Do you think it's possible that Pam

Charon would have had problems with Barbara Antonucci because of Barbara's age?

MR. CAMPBELL: Objection as to form.

A. No.

Q. Do you think it's possible that Barbara's age factored into the reason why she was ultimately fired?

MR. CAMPBELL: Objection as to form.

A. No.

Q. Okay. And what do you base that on when you say no? Why?

MR. CAMPBELL: Objection as to form.

A. Just knowing Pam, you know, and the work that I know. You know, how much as I know of her, I just don't see that she would have a problem with somebody because of their age or anything like that. I just don't.

Q. You don't think it was possible that she could have been intimidated by Barbara's age?

A. No.

# EXHIBIT G

# Cherry Hill Manor

2 Cherry Hill Road
Johnston, Rhode Island 02919

(401) 231-3102 / Fax (401) 232-5520

PENGAD 800-631-6989 DEFENDANT'S EXHIBIT NO. 0 FOR IDENTIFICATION DATE: 1/9/07 RPTR RF

## Notice of Disciplinary Action

Name Barbara Antonucci Job Title staffing coord. Facility CHM

Nature of Violation: ___ Absenteeism ___ Tardiness ___ Dress Code ___ Policy Violation ___ (Name Policy) ___ Attitude

___ House Rule Violation ___ (House Rule # )

✓ Other insubordination

Dates (s) of Violation: 12/5/03

Number of prior Disciplinary Action Notices on file: Ø

Detail What, Where and How: see attached

Employee Comments:

Action Taken: ___ Documented Verbal Notice ✓ Written Notice ___ Termination

Suspension for ___ days, to start on ___ (date) and return to work on ___ (date)

Action to be taken if same violation occurs: ___ Written Notice ✓ Suspension up to & including termination ___ Termination

Important Note: If another type of violation occurs, the disciplinary action may be different than shown above. All the relevant facts would be taken into consideration, including this prior disciplinary action.

This notice was given on ___ (date)

Supervisor's Signature & Job Title [signature] Date 12/8/03

Dept. Head/Administrator [signature] Date 12/9/03

Employee's Signature ___ Date ___

☐ Employee Refused to Sign - requires witness signature

Witness ___ Date ___

DEF 00031

**Cherry Hill Manor**

# Memo

**To:** Barbara Antonucci, Staffing Coordinator

**From:** Celeste Harris, R.N. D.N.S.

**CC:** Steve Haase, Executive Director

**Date:** 12/08/03

**Re:** Notice of Disciplinary Action- **Written Warning**

---

On 12/5/03, we had a discussion regarding your vacation request for December 2003. I was forced to deny your request due to the number of existing nursing vacancies that would require your help to get filled. If we approved your vacation request we would have a very difficult time finding someone to do your job.

In addition, you were granted a vacation during the Thanksgiving holiday and gave me no indication at that time that you would also want to take a vacation during the Christmas holiday.

During our discussion you became loud and very agitated and spoke to me in a very disrespectful manner. You made statements to me such as " I don't get paid enough to put up with this aggravation." " If I made as much money as you do I would do your job." "I am technically not under nursing, I'm listed under receptionist." "I never had a problem until you became director." "I don't need this, I am ready to retire."

Because of your behavior during this discussion, I am issuing you a written warning for misconduct/insubordination. If you ever speak to me in loud or disrespectful manner again, you will receive progressive disciplinary action up to and including termination.

---

Employee signature and date

[signature] 12/8/03

---

Supervisors signature and date

employee refused to sign / [signature] / [signature]



DEF 00030

# EXHIBIT H

DEFENDANT'S EXHIBIT NO. R FOR IDENTIFICATION DATE: 1/9/07 RPTR:

# ACTION PLAN

Associate: Barbara Antonucci
Date: 8/23/04
Department: N.3g
Department Head: Pamela Chawner, RN DNS

Date of most recent performance evaluation: 3/8/04

Type of Action Plan: ☑ 2 weeks ☐ 30 days ☐ 45 days

Document concerns/issues of associate's performance: Barbara was instructed on the first week of Aug. that she was to update & maintain nursing monthly schedule. On Thursday Aug. 19th during a phone conversation Barbara stated she can not & will not perform such duties as directed.

Document expectations required within the timeframe established for this action plan including a timeframe.

1. Will complete & maintain nursing monthly scheduling. — Expectation — ONGOING — Timeframe
2. Will not ignore requests by DNS — Expectation — ONGOING — Timeframe
3. Will fill & complete duties as assigned — Expectation — ONGOING — Timeframe
4. Review & sign updated Job description — Expectation — 8/23/04 — Timeframe
5. Starting Sept 8th 2004 will work 40° in 5 days/week — Expectation — 9/8/04 — Timeframe

Assistance available from: DNS

We will meet again for review of expectations on: 9/7/04 Date

In the event these expectations are not met, appropriate action will be taken up to and including termination as management feels appropriate.

X Associate Refused to Sign
Associate's Signature and Date

Pamela Chawner, RN DNS 8/23/04
Department Head's Signature and Date

[signature] 8/23/04
Executive Director's Signature and Date

Divisional PD Director's Signature & Date

*Copy to: 1) Associate 2) Personnel File*

Life Care Centers of America

# Competency-Based Position Description and Performance Review
## STAFFING COORDINATOR or SCHEDULER

Life Care Centers of America

Associate: BARBARA ANTONUCCI

Department: NSG

Date of Review: 8/23/04

Exemption Status: Nonexempt

Risk Exposure Category 3 = may not involve exposure to blood/body fluids

Date of Hire: 2/25/86

Supervisor: PAMELA CHARNOCK, NHA DNS

Purpose: ☐ Upon Hire ☐ 90-day eval ☐ Annual ☒ ~~Other~~: Redefining Job description

### POSITION SUMMARY

*The STAFFING COORDINATOR is responsible for daily, weekly and monthly work schedules for the nursing staff in accordance with all laws, regulations and LCC standards. Reports to Director of Nursing.*

### WORKING CONDITIONS

- Works in office as well as throughout facility (i.e., resident rooms, therapy rooms, dietary).
- Sits, stands, bends, lifts and moves intermittently during working hours.
- Subject to frequent interruptions.
- Involved with residents, associates, visitors, government agencies/personnel, etc. under all conditions and circumstances.
- Subject to hostile and emotionally upset residents, family members, etc.
- Works beyond normal working hours, on weekends and in other positions temporarily as necessary.
- Subject to falls, burns from equipment, odors, etc., throughout the work day.
- Possible exposure to infectious waste, diseases, conditions, etc., including exposure to the AIDS and Hepatitis B viruses.

### EDUCATION and EXPERIENCE

- Must be a high school graduate or equivalent.
- Must have basic computer skills.
- Prior staff scheduling in healthcare preferred.

### SPECIFIC REQUIREMENTS

- Must be able to read, write, speak and understand the English language.
- Must possess the ability to make independent decisions when circumstances warrant such action.
- Must be knowledgeable of scheduling practices and procedures as well as the laws, regulations and guidelines governing staffing functions in the long-term care facility.
- Must work harmoniously with other staff.

### PHYSICAL and SENSORY REQUIREMENTS
*(with or without the aid of mechanical devices)*

- Must be able to move intermittently throughout the work day.
- Must be able to cope with the mental and emotional stress of the position.
- Must possess sight/hearing senses or use prosthetics that will enable these senses to function adequately so that the requirements of this position can be fully met.
- Must be in good general health and demonstrate emotional stability.
- Must be able to lift, push, pull or transfer a minimum of 20 lbs.
- Must be able to assist in the evacuation of residents.

DEF 00033

## POSITION DESCRIPTION and PERFORMANCE REVIEW

*The ratings of this performance review are based upon the following criteria:*

Unsatisfactory (1 point) = *Performance needs improvement. Requires a performance improvement plan.*
Inconsistent/Marginal (2 points) = *Performance needs improvement. Requires more than normal supervision.*
Satisfactory (3 points) = *Performs skillfully on the standard. Requires normal amount of supervision.*
Good Role Model (4 points) = *Goes beyond expectations on occasion. Requires little or no supervision.*
Consistently Outstanding (5 points) = *Consistently goes beyond expectations. Requires little or no supervision.*

| PART ONE: CORE COMPETENCIES | Rating (1,2,3,4,5) | COMMENTS |
|---|---|---|
| **Life Care Mission/Values & Work Ethic** | | |
| 1. Supports Life Care's mission and values. | | |
| 2. Displays integrity and professionalism by adhering to Life Care's code of conduct. | | |
| 3. Demonstrates dependability. | | |
| 4. Takes pride in work. | | Score =____divided by 4 = ______ |
| | | |
| **Communication Skills** | | |
| 1. Communicates effectively and professionally both in writing and verbally with all types of personalities. | | |
| 2. Answers questions thoroughly and timely. | | |
| 3. Attentive listener. | | Score =_____divided by 3 = _____ |
| | | |
| **Problem-solving Skills** | | |
| 1. Demonstrates ability to solve problems independently. | | |
| 2. Displays ability to self-correct quickly. | | |
| 3. Solves problems fairly. | | Score =_____divided by 3 = _____ |
| | | |
| **Attention to Detail** | | |
| 1. Maintains organized systems. | | |
| 2. Meets deadlines. | | Score = _____divided by 2 =______ |
| | | |
| **Customer Focus** | | |
| 1. Treats all staff and residents with dignity and respect. | | |
| 2. Seeks to accommodate staffing needs of associates while not compromising resident care needs. | | Score =______divided by 2 = _____ |

## PART TWO: RESPONSIBILITIES, STANDARDS and COMPETENCIES

*Below is a description of basic job activities though other related duties and activities may become necessary as directed by the department head or supervisor.*

| | Rating *(1,2,3,4,5)* | COMMENTS |
|---|---|---|
| **Scheduling Responsibilities** | | |
| 1. Staffs facilities at levels determined by Director of Nursing. | | |
| 2. Utilizes overtime ~~and agency~~ only when approved by Director of Nursing or Assistant Director of Nursing. | | |
| 3. Prepares nursing schedules and modifies as needed. Ensuring compliance with PPD. | | |
| 4. Distributes revised schedules to appropriate associates and posts at designated areas. | | |
| 5. Processes requests for shift changes after DNS approval. | | |
| 6. Distributes the next day's assignment before the end of the shift. | | |
| 7. Devises a monthly schedule at least 2 weeks prior to month end of previous month. | | |
| 8. Maintains one to two weeks of daily schedules at all times. | | |
| 9. Recommends and utilizes most appropriate scheduling option (i.e., Baylor, 12-hour shifts). | | |
| 10. Maintains attendance and tardy records for all nursing services and notifies DNS when trends appear. | | |
| 11. Corrects mis-punches on clock-ins daily. | | |
| 12. Reviews and approves timesheets at end of each pay period. | | |
| 13. Makes necessary corrections to timesheets and returns to payroll clerk (including bonus pay, paid-time off, etc). | | |
| 14. Notifies Director of Nursing of trends noted in time-clock punches. | | |
| 15. Tabulates nursing hours/PPD daily and provides reports to DNS. | | |
| 16. Maintains current nursing roster with current home, cell and pager numbers. | | |
| 17. Prepares holiday schedules at least 2 months in advance. | | |
| 18. Provides creativity when compiling the schedule. | | |
| 19. Other duties as assigned by DNS. | | |
| | | Score =_____divided by 19 = ____ |
| **Resident Rights** | | |
| 1. Maintains confidentiality of all resident information. | | |
| 2. Respects resident's personal and property rights at all times. | | |
| 3. Reviews scheduling complaints and grievances and makes verbal/written reports to the Director of Nursing. | | |
| 4. Demonstrates a positive disposition when entering a resident's room and is willing to adjust schedule to meet the individual expectations or requests of the residents. | | Score = ____divided by 4 = ____ |
| **Safety and Sanitation** | | |
| 1. Follows established safety and sanitation procedures and policies. | | |
| 2. Maintains a clean, safe working environment. | | |

## PERFORMANCE REVIEW SUMMARY

**Goals met and improvements made during review period:**
1)
2)
3)

**Top Three (3) Strengths:**
1)
2)
3)

**Areas for Improvement:**
1) Will Comply with Job description
2)
3)

| Status of Improvement Plan (if applicable) | Follow-up Date |
|---|---|
| ☐ **New** performance improvement plan initiated with this review | ☐ Annual Performance Review<br>☐ 90-day from Review Date<br>☐ Other ___/___/___ |
| | ___/___/___ |
| ☐ Performance improvement plan **in progress** -- initiated ___/___/___ | Completed ___/___/___ |
| ☐ Performance improvement plan **completed successfully** in review period. | |

**Wage Impact?** ___Yes ___ No
*This improvement plan should delay any wage adjustment until the performance is fully improved (see follow-up date above) and documented in the personnel file.*

### Career Development Opportunities

| Goal/Objective | Measurement | Target Date |
|---|---|---|
| Goal/Objective: | Measurement: | Target Date: ___/___/___ |
| Goal/Objective: | Measurement: | Target Date: ___/___/___ |
| Goal/Objective: | Measurement: | Target Date: ___/___/___ |

Associate Comments:

Associate's Signature [signature] Date 8/23/04

Supervisor's Signature [signature], RN DNS Date 8/23/04

DEF 00036

*Staffing Coordinator*
*Revised 11/2001*

# EXHIBIT I

# CHERRY HILL MANOR

## EMPLOYEE TERMINATION NOTICE

Employee Name Barbara Antonucci Department NSG

Date of Termination 10/4/04 Last Day Worked ____________

Reason for termination unsatisfactory job performance

____________________________________________

Payout Vacation Accrual Yes (✓) No ( )

Continuation of health benefits Yes ( ) No (✓)

Supervisor's Signature Pamela Chouinard, RN Date 10/4/04

Please check one of the following:

| | | | |
|---|---|---|---|
| T01 | Deceased | | |
| T02 | Retirement | | |
| R01 | Higher Pay | R08 | Family Care |
| R02 | Better Position | R09 | Attend School |
| R04 | Preferred Industry | R10 | Leaving Area |
| R05 | Preferred Career | R11 | Personal |
| R06 | Better Location | R12 | Did not report |
| R07 | Personal Health | R13 | Did not return from LOA |
| | | R14 | Dissatisfied with Work (circled) |
| D01 | Absenteeism-Tardiness | | |
| D02 | Misconduct | | |
| D03 | Unsatisfactory Work Volume/Quality (circled) | | |
| D04 | Failed Performance Objective (circled) | | |
| D07 | Walked Out-No Notice | | |

DEFENDANT'S EXHIBIT NO. U FOR IDENTIFICATION DATE: 1/9/07 RPTR: RF PENGAD 800-631-6989

***For Business Office Use Only***

Terminated on Kronos ____________

Terminated on ADP ____________

Employee File Pulled ____________

Date COBRA form given (if applicable) ____________

Word [Terminations] 10/12/01

Cherry Hill Manor

2 Cherry Hill Road
Johnston, Rhode Island 02919

(401) 231-3102 / Fax (401) 232-5520

*Notice of Disciplinary Action*

Name Barbara Antonucci Job Title Staffing Coordinator Facility CHM

Nature of Violation: ____ Absenteeism ____ Dress Code ____ Attitude
____ Tardiness ____ Policy Violation ________ (Name Policy)

____ House Rule Violation ________ (House Rule #)

✓ Other Ongoing poor job performance

Dates (s) of Violation: Ongoing

Number of prior Disciplinary Action Notices on file: ________

Detail What, Where and How: Despite previous discussions & educations staff member not performing up to expectations

Employee Comments: Do not agree with the above - Work through breaks - sometimes lunch. Put every effort into getting staff not enough nurses in facility

Action Taken: ____ Documented Verbal Notice Suspension for ____ days, to start on ____ (date) and return to work on ____ (date)
____ Written Notice
✓ Termination

Action to be taken if same violation occurs: ____ Written Notice ____ Suspension ____ Termination

Important Note: If another type of violation occurs, the disciplinary action may be different than shown above. All the relevant facts would be taken into consideration, including this prior disciplinary action.

This notice was given on 10/4/04 (date)

Barbara Antonucci 10/4/04
Employee's Signature Date

[signature] 10/4/04
Supervisor's Signature & Job Title Date

[] Employee Refused to Sign - requires witness signature

[signature] 10/4/04
Dept. Head/Administrator Date

________
Witness Date