**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,**<br>***Plaintiff,***<br><br>**vs.**<br><br>**LIFE CARE CENTERS OF AMERICA, INC., et al.,**<br><br>***Defendants.*** | **C.A. No. 06-108 ML** |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Barbara Antonucci, ("Plaintiff"), and hereby objects to Defendants' Motion for Summary Judgment.

In support of this objection, Plaintiff relies on the memorandum submitted herewith.

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 16th day of July 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,**<br>***Plaintiff,***<br><br>**vs.**<br><br>**LIFE CARE CENTERS OF AMERICA, INC., et al.,**<br><br>***Defendants.*** | **C.A. No. 06-108 ML** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

***I. Brief Facts and Travel.*** After only eight weeks supervising Plaintiff Barbara Antonnuci ("Antonucci"), Director of Nurses ("DON") Pam Charron ("Charron"), along with Steve Haase ("Haase") (the nursing home's administrator) and Joe Pereira ("Pereira") (Charron's clinical supervisor) fired her. At the time, Plaintiff had been employed nearly nineteen years at Cherry Hill Nursing Home and was sixty-four-year-old.1 Although the reasons for her firing have repeatedly changed, Defendants initially claimed it was job performance. Plaintiff was immediately replaced by Donna Sweeting ("Sweeting"). Significantly, Sweeting was thirty-seven years old at the time who was trained by Antonucci and her only experience was filling in for Antonucci.2 Even assuming what Defendants claim is true with respect to Antonucci's job performance, like other similarly-situated substantially younger employees, Sweeting engaged in the same conduct and was never disciplined.

Contrary to Defendants' claim that Antonucci did not know what she was doing, Antonucci, after a period of unemployment, was able to secure another staffing coordinator

---

1 During Plaintiff's tenure at Cherry Hill, she had worked for about 7 different DONs. Antonucci, p. 270, Exhibit I.
2 An issue regarding the legitimacy of the reason provided for termination is raised by the subsequent hiring of a substantially younger person who is less qualified. See Paquin v. Federal Nat'l Mortgage Assoc., 119 F.3d 23, 31 (D.C. Cir. 1997).

position where she received positive evaluations.[3] For the following reasons, Defendants' motion should be denied.

## *II. Argument.*[4]

### A. Contrary to Defendants' Argument, there is Ample Evidence of Pretext.[5]

"There is 'no mechanical formula' for determining pretext." McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir. 2006) (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003)). The First Circuit has "recognized that pretext can be proven in many ways." Id. "One way is for the plaintiff to show that the employer gave 'different and arguably inconsistent explanations' for taking the adverse employment action." Id. (quoting Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000)). Among other things, shifting explanations provide a basis for a jury to conclude that the employer's stated reason is false. Id. at 18. In addition, pretext may be proven by showing "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons." Id. Inconsistent testimony regarding the motivating reasons for an employee's termination cast doubts on asserted, non-

---

3 Plaintiff was hired by Haven Health Center as the scheduler in August 2005. Antonucci, p. 34-35, 37. Haven is a "competing" nursing home to Cherry Hill. Haase, p. 106, Exhibit I.

4 Defendants have moved for summary judgment solely on the issue of pretext and/or whether there is any evidence to support discriminatory animus. This means that Defendants do not dispute that Plaintiff has satisfied the prima facie case required under McDonnell-Douglas. To establish the prima facie case of age discrimination for purposes of summary judgment, Plaintiff would have been required to establish that: (1) she was at least forty years of age; (2) her job performance met the employer' legitimate expectations; (3) the employer subjected her to an adverse job action; and (4) the employer had a continuing need for the services Plaintiff rendered. See, e.g., De La Vega v. The San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004). Since Defendants have not disputed that Plaintiff has sufficient evidence to establish the prima facie case (which includes meeting employer's job performance expectations), this motion should be denied insofar as Defendant now seeks to dispute the quality of Plaintiff's job performance.

5 The Defendants have failed to recognize that Plaintiff can proceed under a pretext theory or under mixed-motive, absent direct evidence of age discrimination. See Rossiter v. Potter, 2005 U.S. Dist. Lexis 10422, at *10 (D. Mass. 2005). Under the mixed-motive theory, Plaintiff need only demonstrate that "an illegitimate factor played a substantial role in a particular employment decision." Id. Here, Plaintiff incorporates all of her arguments to establish that age played a substantial role in the Defendants' decision to fire her. The burden then shifts to Defendants to "prove that it would have made the same decision even if it had not taken the protected characteristic into account." Id. (emphasis added). It is obvious from the following that Defendants cannot prove that it would have fired Plaintiff not considering her age.

discriminatory, legitimate reasons and may alone be sufficient to preclude summary judgment.6 EEOC v. D.C. Public Schools, 277 F. Supp.2d 44 (D.D.C. 2003). In addition, where a jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but also a lie, that provides even stronger evidence of discrimination. See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1293 (D.C. Cir. 1998) (providing also that courts traditionally treat explanations that rely heavily on subjective considerations with caution). The bottom line is that "[i]n assessing pretext, 'everything depends on the individual facts," and "[d]eterminations of motive and intent, particularly in discrimination cases, are questions better suited for the jury." McDonough, at 20.7

As the following demonstrates, Defendants' explanation for terminating Plaintiff is false because, among other things, the "history" of performance issues was created after-the-fact and the explanations for what constituted poor job performance have been inconsistent, constantly evolving, contradictory, and patently implausible.

1. Defendants Could Not Have Relied on a History of Poor Job Performance Because

---

6 For example, summary judgment was denied in the following cases due to varying and inconsistent justifications for termination. See, e.g., Abramson v. William Paterson College, 260 F.3d 265, 285 (3d Cir. 2001) (holding that there were genuine issues of material fact and reversing the district court's grant of summary judgment because, in part, 'the ever-changing nature of the proffered reasons' given for plaintiff's termination, could be 'viewed as evidence tending to show pretext * * *.'"); Starks v. George Court Co., 937 F.2d 311, 315 (7th Cir. 1991) (affirming magistrate judge's finding of discrimination given the inconsistencies in the employer's version of events surrounding plaintiff's departure from company); Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (reversing district court's grant of summary judgment to employer because plaintiff's allegations made in her affidavit that she had never been warned or disciplined about her performance directly contradicted her supervisor's stated reason that she was discharged in part for poor performance and raised genuine issue of material fact with respect to the reason for her discharge so as to preclude summary judgment); Ferguson v. Small, 225 F. Supp. 2d 31, 40-41 (D.D.C. 2002)(holding that the conflicting explanations given by defendant's agents for plaintiff's termination were also sufficient to raise a reasonable inference that defendant's proffered reasons for the termination were pretextual which precluded summary judgment).

7 As part of pretext, courts may consider the evidence supporting Plaintiff's prima facie case. See Dominguez-Cruz, 202 F.3d at 431. As noted above, Antonucci was terminated two months before she turned sixty-four years old, by Charron, who was thirty-six years old at the time. Charron, p. 25, Exhibit N. Plaintiff was replaced by Sweeting, who was thirty-seven years old when Charron selected her for the position. Sweeting, p. 6. Finally, it is critical that Plaintiff was employed by Defendants for nearly nineteen years, performed the staffing job for nearly six years, and had always received above-average evaluations, including the evaluation issued just seven months before her termination. Exhibit A, Exhibit I.

There Was None.

*Oral Counselings.* At various times during this litigation, Defendants have claimed that Plaintiff was given numerous, but vague, oral counselings, an action plan and a written warning on October 24, 2004. Taking the oral "counselings" first, Defendants claims it issued to Plaintiff numerous oral "counselings." Defendants' argument is without merit because (1) these were no more than casual discussions; (2) these discussions were part of her job; and (3) Charron had these same discussions with similarly-situated younger employees and did not characterize them as a form of discipline.

Charron testified at her deposition that she issued "oral warnings" to Plaintiff sometime in July and August 2004. Her statement is inconsistent with her own Further Answers in which she calls them "counselings." Ex. B, p. 3-5. In the instant motion, Defendants characterize them as "ongoing discussions." Motion, p. 6. "Ongoing discussions" do not constitute discipline either under the company policy on discipline or according to the testimony of any witness as described below. Ex. F. Accordingly, since Defendants have never alleged (until Charron's deposition), that Plaintiff was given 3-4 oral warnings prior to the August action plan, they could not have formed the basis of the decision to fire Plaintiff.

Even if one considers the testimony on the "warnings" it is obvious that they were not warnings and that no warnings formed the basis of the termination decision. Charron could not provide a date on which any of the oral warnings took place. Charron, p. 57. Charron could describe only three discussions. The first discussion between Charron and the Plaintiff concerned the monthly schedule. First, Plaintiff approached Charron to discuss how Charron wanted the monthly schedule done – she wanted to make sure that Charron expected the same

thing that prior DONs had expected with respect to updating the schedule.[8] Antonucci, p. 147. Charron acknowledges that Plaintiff initiated the discussion and essentially agrees with Plaintiff's version of events. Charron, p. 74. Charron never alleged that they had spoken about the monthly schedule before. Her complaint was essentially that Plaintiff told Charron that she had never had to update the schedule before (that before Charron, it was done by the DON).[9] In all events, Plaintiff had no problem updating the schedule - - it was a relatively minor task. Antonucci, p. 148-150. Since an "oral warning" is ordinarily designed to address a pre-existing performance problem there is no dispute there was no pre-existing performance problem since this is the first conversation on the topic according to both Plaintiff and Charron.

Furthermore, Charron admits that no "oral warning" was reduced to writing per Cherry Hill's policy on discipline.[10] Charron, p. 57-58. She further admits that she never told Plaintiff that the discussion constituted an "oral warning." Charron, p. 60. This is consistent with Sweeting's testimony who spoke to Plaintiff regularly about her interactions with Charron and Plaintiff never told her that she had been disciplined by Charron.[11] Sweeting, p. 157. In addition, Charron could not say that Plaintiff was not meeting her expectations during the time period when she supposedly issued one or more oral warnings to Plaintiff. Charron, p. 65. Charron expressly disclaimed the statement made in the position paper that there were "serious" issues with Plaintiff's performance during the first couple weeks of her employment. Charron, p.

8 Prior to Charron's tenure, the DON would keep a copy of the monthly schedule which was sometimes called the master schedule. Santin, p. 31. On the DON's master schedule, the DON would make changes such as putting in a new hire and the corresponding hours she would work, or changing the schedule of a current nurse who might want to switch from full-time to part-time or from one shift to another. Antonucci, p. 147-148.

9 For example, Defendants never said that in the first conversation regarding monthly schedule that Plaintiff refused to update the monthly schedule until April 2007. Ex. B. In all events, Charron admitted in her deposition that Plaintiff did not refuse to do it in the first conversation. Charron, p. 74, 79.

10 Haase explained that a counseling would not be put in writing if the employee operated with the best intentions and if it was a simple, not serious, problem. Haase, p. 111-112.

11 According to Sweeting, Plaintiff had told her that she was written up by Harris in December 2003, but she never told her that Charron had disciplined her. Sweeting, p. 211-212. Sweeting was surprised when Plaintiff was fired and she never saw her do anything that she thought she should be fired for. Sweeting, p. 214-215.

65, 209. Accordingly, it is totally implausible that Plaintiff was given an oral warning on or about August 2.

The next "oral warning" was supposedly given during a conversation about staffing. Charron, p. 81. Charron thinks the conversation had to do with filling vacancies, but cannot recall anything else about the encounter other than she was "trying to understand how [Plaintiff] went about this daily schedule." Charron, p. 81-82. Trying to find something out does not sound like a conversation in which a warning would have been given. Since the warning was not in writing and Charron cannot even describe its substance, then it could not have been part of the reason why Plaintiff was fired.

Finally, the only other conversation Charron testified about regarding Plaintiff and job performance issues before the August 23 action plan related to speaking to Plaintiff about being too reliant on bonus dollars. Charron never expressly called it a warning. Instead, when asked if this was counseling, Charron responded only that "I spoke to her, and I guess you could say it was a form of counseling." Charron, p. 86. If Charron had to guess that the discussion constituted counseling, then she obviously did not consider it either a warning or a counseling at the time of the firing. Again, Charron could not give the specifics of this discussion. Charron, p. 90. Charron did not describe any other "warning."

To further buttress the fact that these discussions were not oral warnings, Sweeting, Santin and Morang were all spoken to by Charron regarding the same things, yet Charron does not characterized any of those discussions as "counselings" or "warnings." Charron II, p.18-19. For example, Charron would ask Plaintiff "did you call people," and just like all directors would ask "did you try everyone." Antonucci, p. 160. Telling a scheduler to keep working on a schedule when there are openings is not counseling, it is part of the job. Sweeting, p. 151-152,

155-156. Santin testified that Charron would ask 1 or 2 times per day if there were any openings in the schedule. Santin, p. 182-183. Sweeting also explained that Harris used to tell her and Antonucci to try to be creative, etc., but that this was never a counseling or sign of a problem. Sweeting, p. 175. Pereira explained that one of the functions for the DON was to find out how the scheduling was going and to talk about the openings. Pereira, p. 211. Charron admitted that "it is always something I have to talk about scheduling," and she had to do this with Sweeting. Charron, p. 152. Charron herself admitted that although she told Pereira and Haase about these discussions, she never indicated that she gave any verbal warnings. Charron, p. 60. Again, when Plaintiff was fired, there was no indication of any prior oral warnings in the file or on the termination notice where there is an express opportunity for Charron to indicate what prior disciplinary history exists.

*Action Plan.* The only written document apart from the termination notice which arguably deals with Plaintiff's job performance is a two-week action plan dated August 23, 2004.[12] As the following demonstrates, the Defendants are again attempting to re-write history. Defendants' arguments are without merit because the action plan was (1) not a form of discipline; (2) it was vague and unsubstantiated; and (3) it dealt with only one "issue" that Defendant claimed Plaintiff had.

Contrary to Defendants' current arguments, the action plan was not a form of discipline. Def's Ex. H. The purpose of the action plan was <u>not</u> disciplinary in nature – it is not called a warning or disciplinary notice and action plans are not part of the company's disciplinary procedure. Def's Ex. H, Ex. F. Before Antonucci, Charron had never used an action plan as a disciplinary tool. When questioned about the nature or purpose of the action plan, Charron

12 At this point, Charron had been supervising Plaintiff for <u>less than a month</u> and Plaintiff had been doing the job for five years.

explained that it was to let Plaintiff know what her issues were; Pereira considered it a roadmap for expectations; and Haase stated that it was designed to put an employee on notice of shortcomings. Charron, p. 51, Pereira, p. 86-87, Haase, p. 203. This is consistent with Plaintiff's understanding of the purpose of the action plan – "It doesn't say anything about it being a criticism," it is "like what to do in the future," and "informative, like things she requested." Antonucci, p. 182.

A review of the action plan makes clear that it is limited in its "criticism" and does not even touch upon any of the substantive alleged job deficiencies for which she was fired. Def's Ex. H. There are several areas that Defendants claim she was deficient in. First, they claimed that she had problems with the monthly schedule, filling vacancies and over-relying bonuses. Instead, there are vague "expectations" like "will not ignore requests by DNS," and "Will follow up and complete duties as assigned." Def's Ex. H. However, Plaintiff never ignored a request and followed up "automatically." Antonucci, p. 185-186. Charron also elected to make it a two-week plan, as opposed to a thirty to ninety day plan. Charron, p. 46, 41. Melissa Bettencourt was the only other employee that Charron gave an action plan. Bettencourt, who was substantially younger than Plaintiff, got 90 days to improve. Horner Affidavit, Ex. A. In addition, it makes no sense that the action plan could have contributed to the firing since Defendants never followed up to determine if Plaintiff was in compliance. For example, the plan sets a date of September 7, 2004 to review expectations. Def's Ex. H. If Defendants actually sought to rehabilitate Plaintiff and were genuine in their claimed efforts, the follow up meeting would have taken place. Plaintiff was fired before anyone bothered to determine if she had, in fact, followed the plan.13

13 There is no dispute that Plaintiff did change her schedule to five days as required. Haase, p. 211, Antonucci, p. 187. In addition, the second expectation relating to not ignoring requests and performing duties, was, according to Haase, related to the monthly schedule. Haase, p. 206. There is no allegation that after August 23 Plaintiff continued to refuse to update the schedule. In all events, Plaintiff disputed that she refused to perform duties or

Haase, p. 209, 210-211. Accordingly, the plan was irrelevant to the termination decision.

There was no further evidence of any performance issues during the six week period from the time the action plan was given, to the time Plaintiff was fired.14 The bottom line is that the contemporaneous evidence demonstrates that when Charron made the decision to fire Plaintiff, she did not consider the 3-4 oral undocumented warnings, or the action plan.15 Pereira testified that he did not make the recommendation to fire anyone and that he was unaware of any incidents when Plaintiff was disciplined. Pereira, p. 143-145, 173. Haase stated that Charron was the one who decided to fire Plaintiff. Haase, p. 137. The motive becomes apparent by looking at Haase's testimony about what discipline Plaintiff got – he stated an action plan and termination notice – but was sure she received others. Haase, p. 120.16 When asked why he

---

ignored requests. Antonucci, p. 183, 185.

14 Twenty days after Plaintiff was fired, Charron filled out a disciplinary action notice and called it a "documented verbal notice." Exhibit G. The problem indicated on the form was "#1 Lack of creativity[;] #2 Too dependent on bonus dollars to fill open positions." Plaintiff was never shown this form before her termination and did not sign it. Antonucci, p. 306. Although Defendants' included this in earlier answers to interrogatories, Defendants' have totally abandoned this as evidence of any discipline, allowing a jury to infer that it was created after-the-fact. Consistent with this, Haase admitted that the first time he ever saw the 10/24 notice was after Plaintiff was fired. Haase, p. 218. The usual procedure is that Haase has to sign all disciplinary notices in order to know that the event actually took place. Haase, p. 216. Yet, Haase never signed this notice and did not know why Charron failed to present it to him. Haase, p. 218. The fact that Haase was surprised and the Defendants abandoned this document undermines Defendants' credibility.

In all events, as detailed below, Charron admitted that Plaintiff was not fired for over-reliance on bonus dollars. In addition, "lack of creativity" has never been cited as a basis for firing Plaintiff – not on the termination notice, not on the position paper, not in any Answers to Interrogatories, and not in the instant motion. Accordingly, the 10/24/04 notice (and the substance therein) could not have formed part of the reason why Plaintiff was fired or assist with establishing a prior history of discipline. Charron never told Plaintiff she was doing a poor job - - she just changed things. Antonucci, p. 169.

15 The "history" is not only completely inconsistent with the progressive discipline policy, but also completely inconsistent with witness' explanation of how the system should work. Haase explained that discipline begins with verbal counseling and it is documented and that the next step can be a written warning. Haase, p. 45. He also explained that he has suspended employees many times before resorting to termination. Haase, p. 47. For example, if an employee engages in patient abuse, they are oftentimes suspended and not fired. Haase, p. 47. Charron explained that she would start with a verbal warning in writing, yet it is not contested that this is not actually what happened. Charron, p. 37-38. In addition, Charron's testimony as to what discipline was given to Plaintiff changed over the course of her deposition.

16 Defendants also appear to be relying on a December 2003 written warning as evidence of Plaintiff's previous performance problems that supported the decision to fire her. Def's Ex. G. By Court order Defendants' were required to provide the reasons why Plaintiff was fired in response to an interrogatory. Exhibit B, p. 3-5. Defendants did not include anything about the December 2003 warning issued by prior DON Harris, over seven months before Charron even began working at Cherry Hill. Id. In addition, on Plaintiff's termination notice the section labeled "Number of prior Disciplinary Action Notices on file," was left completely blank, indicating that no prior discipline

thinks Plaintiff got "others," he responded because "it sounds good." Haase, p. 120. Significantly, Haase was recently fired, and both Pereira and Charron have since left Life Care.

Accordingly, Defendants efforts to re-write history in this regard should be rejected.

Even if one considers the substance of the issues that Plaintiff was supposedly counseled about, it is clear that they could not form the basis of the reason why Plaintiff was fired.

*Monthly and/or Master Schedule.* The Defendants have made two different claims regarding the monthly schedule. At the outset, the position paper alleged that Plaintiff refused to actually compile the monthly staffing schedule. Ex. C, p.3. According to the position paper, Plaintiff not only refused to compile the schedule on August 2 (the first "warning,") but when she was questioned about it during a phone call on August 19, she again refused to prepare the monthly schedule. Id. Significantly, even though Defendants initially cited this as a basis for the poor job performance which justified termination, during Charron's deposition, she testified that the monthly schedule issue was never about Plaintiff not actually doing the monthly schedule. Charron, p. 80.

Consistent with Charron's testimony, Plaintiff explained that completing the monthly schedules was part of her job that she always performed without a problem. Antonucci, p. 182-183, 189. Completing the monthly schedule basically involves plugging in the names of staff

---

factored into the termination. Def's Ex. I; Charron II, p. 6-7 (even at her deposition, Charron could not say how many prior disciplines should be in that box).

Significantly, the "warning" was the only form of discipline that was ever issued to Plaintiff in her nearly nineteen-year career at Cherry Hill before Charron's tenure. There is no correlation between the substance of the warning and the performance "deficiencies" later enunciated by Charron. The warning, which relates to Plaintiff's request for a day off, says nothing about problems with updating monthly schedule, filling vacancies, making phone calls, or bonus dollars and was not issued to address any of those alleged issues.16 Def's Ex. H. In all events, following the warning, Harris gave Plaintiff a glowing job evaluation in March 2004. Ex. A. Defendants gave Plaintiff the highest merit increase possible by Life Care standards (3%), which was approved by Haase, and nothing was mentioned about job performance issues suddenly present four months later when Charron shows up. Ex. A, Haase, p. 92. See, e.g., Green v. Safeway Stores, Inc., 98 F.3d 554, 564 (10th Cir. 1996) (a plaintiff can defeat summary judgment by demonstrating that an evaluation conflicts with other assessments of her work performance).

with their associated shifts and schedule on a four week basis.[17] Santin, p. 27. There was no policy on how long completing the monthly schedule should take, and Santin testified that she had never been told how long it should take. Santin, p. 156-157. Documents in this case confirm Plaintiff's position, since monthly schedules completed by Plaintiff ranging from December 2002 to September 2004, were produced by Defendants. Sweeting, testified that when she replaced Plaintiff in October 2004, the monthly schedule was complete through the end of October 2004 and Plaintiff never refused to do it. Sweeting, p. 57, 59, 319.

Defendants' later alleged that the problem with Plaintiff's performance was that she refused to <u>update</u> monthly schedules by putting in specific information on new hires as the need arose. The first time Defendants made this claim was in its Further Answers, nearly three years after Plaintiff's termination. Ex. B, p. 3. As part of this claim, Defendants allege that what Plaintiff actually refused to do (twice) was <u>update</u> the monthly schedule. With respect to the alleged refusals, Charron herself disputes that Plaintiff refused to update the monthly schedule when they first discussed the task (August 2), saying that Plaintiff did not refuse and also stating that she never told anyone that Plaintiff refused to update the schedule during this first conversation. Charron, p.74, 79. Plaintiff specifically denied that she <u>ever</u> refused to update the monthly schedules or ignored any request by Charron. Antonucci, p. 148-150, 183, 185. This makes sense since Charron never discussed adding names to the master schedule after early August 2004, nor did she tell Plaintiff that she was not doing it fast enough or needed to do more on the monthly schedule. Antonucci, p. 153-155. In addition, Sweeting testified that she cannot recall Plaintiff ever saying she would not add the names, and that when she replaced Plaintiff,

---

17 The job of the scheduler includes drafting monthly schedules for nursing staff, and then compiling daily schedules from the monthly schedule. The daily schedules would have openings to be filled because the monthly schedule does not reflect the fact that people are unavailable on specific days for various reasons (i.e., ill, absent, terminations, resignations, change in patient census) or the fact that there is a staff shortage. Santin, p. 55-56, 236.

Charron never required her to perform this task (adding the names) that supposedly formed at least part of the basis for Plaintiff's termination. Sweeting, p. 142, 145-146, 148.

Furthermore, Pereira, who according to Charron supposedly had "regular discussions with Ms. Charron" during which he was "kept apprised of Plaintiff's unsatisfactory work performance" including her failures relating to the "monthly schedule," could not ever recall having a discussion with Charron about Plaintiff and the monthly schedule and believes the only reason why Plaintiff was fired related to problems filling openings in the schedule. Pereira, p. 88, 194, 196, Exhibit G, p. 5.

*Making Phone Calls to Fill Openings.* Open shifts on the schedule can be caused by many things such as illness, resignation, termination, FMLA or maternity leave, and lack of nurses.18 Haase, p. 156, 159. None of these things is the fault of the staffing person and there is a lot that is outside the control of the scheduler. Haase, p. 156. To get people to work, a scheduler can call the people or approach them in person. Santin, p. 46, 48; Exhibit M. The position paper says <u>nothing</u> about Plaintiff and the "number" of phone calls (or about phone calls at all) being a reason for Plaintiff's termination. Ex. C, Sweeting, p. 280. Yet, in the motion for summary judgment Defendants allege that one of the reasons Plaintiff was fired was because of the "number of calls" she was making to fill the openings. Motion, p. 6. As part of this, Defendants have actually said that Plaintiff refused to call people more than once to fill an opening.

Plaintiff always called more than once and would call people back to see if they changed their mind – this was part of her job. Antonucci, p. 158-159, 161. Charron never had a problem with the calls Plaintiff made or the results - - she never gave up; she was insistent and would keep calling. Antonucci, p. 167-168. Sweeting confirmed that Charron did not discipline

18 As Haase testified, the problem with filling openings was limited to nurses, and not CNAs. Haase, p. 307.

Plaintiff for not making enough phone calls. Sweeting, p. 281-282. Plaintiff never said that she would not call people, that she had done all she could do or that she would not "badger" people to work. Antonucci, p. 158-159. To the contrary, Plaintiff would badger people and called them more than once. Antonucci, p. 158. She always called people back to see if they changed their mind. Antonucci, p. 159.

Sweeting explained that there was no way to put a number on how many times Plaintiff might have accepted a "no" in response to a request to pick-up a shift, compared to the number of times Sweeting accepted the same thing. Sweeting, p. 314-315.19 Santin explained that even she would accept a "no" from someone the first time, for example, if someone told her they cannot work at all during a particular week, then she would not bother them. Santin, p. 237. Sweeting admitted that if there is a last-minute call out, sometimes you cannot replace the person fast enough. Sweeting, p. 55. She explained that it "still happens" that she has to try to fill openings on the same day as the shift occurs and that she has more openings now than Plaintiff did. Sweeting, p. 126, 127-128; Santin, p. 47-48. There is no evidence that repeat calling leads to filling shifts faster, earlier or without bonuses. Sweeting, p. 160, Charron, p. 102-103 (could not say what number of calls would produce a nurse to fill a shift). She also explained that sometimes when she filled in for Plaintiff, there would be no openings to fill. Sweeting, p. 130. Santin could not say that she was better than Plaintiff at making phone calls. Santin, p. 222.

In all events, Plaintiff was never told by Charron to be more aggressive in making phone calls and she never counseled her regarding the need to pursue staff to fill shifts. Antonucci, p.

19 When Sweeting was asked what is the most number of times she would call one person to fill a shift, she responded that "There's been a time where I've called one person maybe four times." Sweeting, p. 162. This means that the best case scenario is that she called people three times in a week. Given that she had to pay bonuses, one has to assume that it is her lack of calling that caused bonuses. In addition, since Charron alleges she only paid bonuses at the end of the week (when no one would take the opening without a bonus) she either never asked how many times Sweeting had called or paid bonuses even though no repeat calls were made.

157-158, 167. Even though Defendants represented in the Further Answers that Pereira spoke to Plaintiff about her job performance and specifically about the need to be more aggressive in filling shifts, he does not ever recall doing that. Pereira, p. 33, 188. Pereira could not recall hearing that Plaintiff refused to call more than one time. Pereira, p. 198-199.

Plaintiff was creative in trying to fill the openings the same way Sweeting and Santin testified they were. Santin, p. 115, Sweeting, p. 161-163. Plaintiff called multiple times, offered nurses a day off, and split shifts in order to fill openings. Ex. M, Ex. E, Antonucci, p. 210, 195-196. Charron never told Plaintiff how many times she expected her to call people. Charron, p. 95. She could not answer with a yes or no when asked if Plaintiff was fired in part for not calling people back. Charron, p. 97. She did not ask Plaintiff how many times she was calling people and was not sure if she would call people back after leaving a message. Charron, p. 91-93. The bottom line is that if there were openings, it happened with all schedulers. Charron, p. 211. Charron could not even say how many times there were openings under Plaintiff or what number of vacancies Plaintiff had that were a problem. Charron, p. 218. Instead, she admitted there were times when Plaintiff's schedules had no openings. Charron, p. 218.

In addition, knowing a bonus might become available, staff members could refuse to pick-up a shift until the bonus was offered and neither Plaintiff, nor any other scheduler, could do anything about it. Sweeting, p. 318, Santin, p. 239-240. This means that no matter how many calls were placed, even Defendants' admit, because they decided to pay bonuses, nurses would not say yes until Defendants got desperate. If this is true then this happened to Sweeting since she had to give out bonuses.

Finally, relying on lack of phone calls is simply not believable considering Haase's explanation of why this was a problem. Haase explained that because Plaintiff's day off was

Friday (before they changed her work-week to five days), Sweeting would spend all day Friday filling in for Plaintiff and trying to fill weekend openings. Haase, p. 207. This was not true - - as Haase later was forced to admit, Plaintiff's day off was Wednesday. Haase, p. 207, 323. Haase did not allege that Sweeting had to spend all day Wednesday filling weekend openings.

*Bonuses.* The argument as it relates to bonuses has also changed over time. In the position paper, Defendants stated that Plaintiff's job performance was deficient because the amount of bonus money given to staff during Plaintiff's tenure was excessive. In fact, Defendants gave a specific example pointing out that in July 2004, bonus dollars ranged from $6,000 to $9,000 per week and that "due to Ms. Charron's efforts," the amounts dropped to $400 to $2,700 per week.[20] Ex. C. Before April 2004, Cherry Hill used outside temporary agencies to fill openings. Sweeting, p. 249, Santin, p. 87. Agency costs were astronomical. From October to December 2003, Cherry Hill paid $131,000 to temporary staffing agencies. From January to March 2004, Cherry Hill paid $232,000. Horner, p. 72-74. Plaintiff was never disciplined for agency costs.

Bonus money was instituted at Cherry Hill in or about April 2004 as a cheaper way to get its own staff to work open (and usually extra) shifts. Sweeting, p. 249, Horner, p. 78. Significantly, Plaintiff had no authority to offer bonuses to staff without prior approval by Charron and/or Haase. Sweeting, p. 178-179, 181, Santin, p. 197-198, Haase, p. 155, Antonucci,

20 In relying on these figures, Cherry Hill did not explain that a portion of bonus money is due to things like sign-on bonuses, on-call and call-log which have nothing to do with nurses necessarily picking up extra shifts. Sweeting, p. 332-333, 329. In addition, in 2005 during a period when Charron was still at Cherry Hill, bonuses far exceeded $2700 per week. Ex. L, Sweeting, p. 324-325 (gave out bonuses that exceed $2700 at least ten times). In addition, bonuses during the summer are typically higher than normal due to vacations. Santin, p. 250, Pereira, p. 17-18. In comparison to agency cost, the cost of bonuses for extra shifts during the last five months of 2004 was only $68,000. Ex. . Finally, staffing was so bad in 2007 (under Sweeting) that Cherry Hill had to return to agency use. Horner, p. 64. Sweeting was not disciplined for the fact that Cherry Hill had to resort to the costs associated with outside agencies. In addition, in Ex. H, Haase explains the reasons for the high bonuses in July and does not attribute it to Plaintiff.

p. 310, Charron, p. 82-83. In the current motion for summary judgment, filed after the agency documents were produced, Defendants no longer assert that excessive amounts of bonuses contributed to Plaintiff's termination. Instead, Defendants argue that Plaintiff "<u>over-relied</u>" on bonus money when trying to get staff to pick up open shifts. Yet, this position is totally absurd considering the following. Plaintiff was never accused of over-relying on agency, even though enormous amounts were being paid. Charron admitted <u>she did not consider the fact that Plaintiff over-relied on bonuses when she made the decision to fire Plaintiff</u>. Charron II, p. 27. Haase admitted that Plaintiff's performance problems <u>were not about bonuses</u>. Haase, p. 238-239. Pereira testified that he did not care if Cherry Hill spent a million dollars in bonus money as long as nurses were present to work. Pereira, p. 184-185. Just one month before Plaintiff was fired, Kate O'Connor, who was Haase's supervisor, expressed her <u>pleasure</u> with the reduction in bonus amount for August 2004. Exhibit H.

Defendants have argued that the problem is that Plaintiff wanted to give out bonuses too early in the week – that instead of making repeat phone calls, she would ask for bonus money instead. Yet, if this was the case Haase and/or Charron would have had to allow her to do this. Significantly, after Plaintiff was fired, Haase instituted a bonus program that mirrored exactly what they say Plaintiff did wrong. In the past, if a Saturday shift was open, nurses would wait until the end of the week to agree to work, knowing they might get a bonus. Haase, p. 214. Under the "reverse bonus program," Haase, offered $200 to any nurse who would agree on Monday to pick it up the open Saturday shift. Haase, p. 214. Each day closer to Saturday, the bonus would decrease. Haase, p. 214. The idea was to give the incentive earlier in the week, so that they could fill the hours earlier in the week. Haase, p. 214. This necessarily means that Sweeting did do any better than Plaintiff in securing people before the end of the week.

Defendants also allege that if Plaintiff worked harder at the schedule then she would not have had to pay so many bonuses. Critically, Sweeting admitted that even if she started working on schedules earlier or worked harder at getting them filled, she did not think there was a way to avoid giving bonuses. Sweeting, p. 183. A need for more staff could be due to a holiday or because there just aren't enough nurses. Sweeting, p. 327, Santin, 73-74 (explaining the difficulties of staffing because sometimes people just don't want to work); Charron, p. 84 (there are times when you have to say yes to bonuses), Haase, p. 158-159 (bonuses could go up due to lack of nurses). In addition, knowing a bonus might become available, staff members could refuse to pick-up a shift until the bonus was offered and neither Plaintiff, nor any other scheduler, could do anything about it. Sweeting, p. 318, Santin, p. 239-240. When Haase was asked if he really expected nurses to pick up shifts without bonuses, he said it would not go well in the beginning and it was behavior that would not change overnight and was unrealistic. Haase, p. 198-199. Haase did not know if nurses waited until the end of the week to pick up a shift in order to get a bonus under Sweeting. Haase, p. 313. Yet, this was the expectation they had put on Plaintiff which again demonstrates that they could not have really believed her performance was bad.

Sweeting, by her own admission, gave "way more" in bonus money after Plaintiff was fired, yet no one ever accused her of "over-reliance," or issued any discipline to her relating to bonus money. Sweeting, p. 182, 322-323; Haase, p. 201. Charron never gave Sweeting any instruction on how to avoid bonuses, never told her to calculate her bonus dollars to watch the amounts, and instead, only said to keep things "just the way it's been going." Sweeting, p. 172-174, 181, 322. Sweeting testified that she never though Plaintiff over-relied on bonuses and never heard Charron say anything in that regard with respect to Plaintiff. Sweeting, p. 317-318.

Also after Plaintiff was terminated Charron herself wrote that she "can't understand why the bonus dollars for extra shifts has been so high," and says "Am I missing something? Or am I still getting the process wrong?" Ex. H. When bonuses were high after Plaintiff was fired, Sweeting was not blamed for it and Defendants made no correlation between what Sweeting had or had not done and the bonuses. Sweeting, p. 337. In addition, Sweeting confirmed that if the staffing person went to the DON for bonuses, the DON could always have said "go work the schedule a little bit more," or "no." Sweeting, p. 313.

Finally, Haase admits that if there was a perception of over-reliance on bonuses, it would have made sense just to tell Plaintiff that there would be no bonuses, yet he did not know if that was ever done. Haase, p. 233. Furthermore, Haase admitted it was possible that the reason bonus dollars went down just before Plaintiff was fired was because of her efforts in making phone calls. Haase, p. 278, Sweeting, p. 330 (for the bonuses to go down, Plaintiff had to have filled the spot without bonuses). The simple fact is if Pereira didn't care if bonuses were a million dollars, and Charron and Haase both acknowledge that Plaintiff was not fired for bonus dollar issues, there is no way bonus dollars can form the basis of Defendants' decision to fire Plaintiff for "poor performance."[21]

2. Openings on the Weekend of October 2-3 Cannot Support Termination Based on Poor Job Performance.

The Defendants allege that Plaintiff was fired because there were allegedly a "significant

21 In the position paper, there was no mention of PPD – patient per day – which is a mathematical computation to ensure that there is the right number of staff hours in relation to the number of patients. Ex. C. It never arose as a supposed performance deficiency until April 2007. Ex. B. Specifically, Defendants asserted that PPD refused to learn how to compute the PPD. Ex. B, p. 4. In the instant motion, there is nothing about PPD. Perhaps this is because Charron acknowledged in her deposition that she could not recall PPD being a problem with Plaintiff. Charron, p. 184. In all events, Plaintiff did ensure that staffing was done according to the census. Antonucci, p. 171, 190. Charron never discussed with her the need to take patient census into account or spend more time making sure that was done. Antonucci, p. 171, 173. In all events, even if the PPD is planned for correctly, it still can be off due to factors beyond the scheduler's control such as someone staying later than they are supposed to work. Sweeting, p. 112, Santin, p. 108-109.

number" of unfilled vacancies in the schedule for the weekend of October 2 and 3, 2004. Yet, there was no indication before October 1 that there was a problem with filling openings unique to Plaintiff. It is not reflected in any written document as being a performance issue for Plaintiff.

The evidence regarding filling openings the weekend of October 2-3 is as follows. Staffing is a difficult job - "sometimes you just cannot fill all the holes. You can't always – some people just don't want to work * * *" and sometimes there are just not enough people to work. Santin, p. 73-74,[22] Pereira, p. 158, 50 (staffing person cannot force nurses to work). As the staffing person, you end up "working short" and "you're blamed for that." Sweeting, p. 55. Staffing is a difficult job, an ongoing process, and a daily struggle. Sweeting, p. 164-165. In fact, Sweeting did not even want the job because she "didn't know what it was about.[23] And I know everywhere you go everybody said the staffing position is a hard position, it's a tough position." Sweeting, p. 68; Pereira, p. 158.

It is always more difficult to find staff to work on the weekend. Haase, p. 201. In fact, Friday was a "desperate" day. Haase, p. 215, 201 (weekends were always worse, even under Sweeting). Sweeting, Santin, and Dawn Morang ("Morang"),[24] have all had schedules on Friday where not all the openings were filled for the weekend. Santin, p. 165. It is not uncommon to have weekend openings on a Friday. Santin, p. 166, Sweeting, p. 133. Schedulers can sometimes be at work late on a Friday fixing the weekend schedule and nurses can often call the scheduler on the weekend about openings that have arisen. Sweeting, p. 133, 152, Charron II, p.17. It is not uncommon for schedulers to have to call staff to fill openings on the day of the

---

22 Rebecca Santin ("Santin") works as the staffing coordinator at Life Care's nursing home in Raynham, MA. Charron supervised Santin before coming to work at Cherry Hill.

23 Essentially, Sweeting is admitting that she did not know what the job was about even though she had been filling in one day a week for Plaintiff. Sweeting explained that because she only did the job one day a week, Antonucci did more because she was there the majority of the time. Sweeting, p. 184.

24 Dawn Morang is the staffing person that Charron supervised after Sweeting at another Life Care nursing home.

actual opening. Sweeting, p. 126-127 (filling on the same day happens as much to her as it did when she was filling in for Plaintiff).25 According to Santin, the number of openings on Plaintiff's schedules looked "average." Santin, p. 159. There was no company policy that set forth any time within which openings had to be filled (i.e., that all openings for a Saturday had to be filled by Thursday). Sweeting, p. 184-185. Despite the fact that it is not uncommon to have openings on a weekend on a Friday, no scheduler other than Plaintiff has been disciplined or fired for too many openings. Santin, p. 166, 193, Sweeting, p. 133.

Against this background, Defendants set forth in the position paper submitted to the Commission for Human Rights that Plaintiff was fired because there were at least 21 vacancies on the weekend schedule as of 3 p.m. on Friday, October 1 and that Plaintiff told Charron that she had done all she could do to fill the positions. Exhibit C. According to the Defendants at that time, Charron and another associate were able to fill the vacancies within an hour. Ex. C. The account of the events of October 1 then changed. In their April 2007 Further Answers to Interrogatories, Defendants alleged that it was 2 p.m. when Plaintiff presented Charron with the incomplete schedule; that the schedule had a "significant number" of unfilled slots (not "21"), and that within "two or three hours," Charron and "one or two other staff members" were able to "fill all or substantially all of the open shifts." Exhibit B, p. 5.

In her deposition, Charron was not clear on the circumstances which led to Plaintiff's firing. She first alleged that there were "numerous" openings, and that "we" proceeded to call a "couple people" to fill the slots. Charron, p. 136. It goes without saying that it would be impossible for only "a couple" (meaning two) people to fill "numerous" openings. If it only took a couple people to fill the openings, then it could not have taken Charron and two others 2-3

25 As Sweeting explained, "Every day I work on staffing for the following day; and once that's fixed, I go into the next couple of days." However, even if she gets the schedule "set" for the following day, someone could call in sick and she could then be working on the same schedule. Sweeting, p. 311-312.

hours to fill the openings. In fact, Charron alleged that because it took so long she missed a wake. Later on in the deposition, Charron estimated there were "close to 20" openings, but she could not say how many people she called or how many she got to come in. Charron, p. 137.

Pereira is someone who supposedly participated in the decision to fire Plaintiff. Pereira said that a "bad" weekend was "double digits," but he could not remember how many openings there were on October 1 – he ultimately estimated 10 or 11. Pereira, p. 134, 139, 141. Pereira never sought to find out why openings were not being filled, did not know what was causing the openings, and never sought to find out if after Plaintiff was fired, openings were being filled, or what the number of openings were at any given time. Pereira, p. 90, 112-115, 129. Pereira stated that it would not be a surprise to receive the schedule for the weekend at 2 p.m. Pereira, p. 139. Critically, when Pereira was asked if the number of vacancies on October 1 caused Plaintiff to be fired in any way, he responded "Well, not that I know of." Pereira, p. 143.

Charron confirmed that it was not unusual to have "those issues" on a Friday afternoon and that there was not enough staff at Cherry Hill. Charron, p. 116, 138. She testified that she would be "concerned" about 10 openings on a Friday, but said that this has happened with Morang, Santin and Sweeting. Charron, p. 50. This essentially means that Plaintiff was fired for having 3 more openings than has occurred with other schedulers who have not even been disciplined. This is especially troubling since Sweeting admitted that she has more openings to fill than Plaintiff used to have. Sweeting, p. 127-128.[26]

Charron never even asked Plaintiff how many people she called, how many times she called them or any other questions that would have given her any information on what efforts Plaintiff had already made. Charron, p. 138-139, 91-92, 94 (she is not sure if Plaintiff said she

26 Steve Haase ("Haase"), Cherry Hill's administrator testified that the most acute nursing shortage was in late 2003 and 2004. Haase, p. 38. Despite the fact that the shortage was so bad, there were no survey problems relating to staffing like there were in 2005. Pereira, p. 33-35; Sweeting, p. 29-31.

was not calling people back). Charron admits that there are in fact times when you make calls and still cannot get the openings filled. Charron, p. 138. Charron did not seek to find out if Sweeting had any involvement in preparing the weekend schedule before attributing all the problems to Plaintiff and terminating her. Charron, p. 170.

Significantly, the only way that Charron was able to fill the openings was by increasing the bonus amount (which she did not give Plaintiff authorization to do) and using med-techs instead of LPNs or RNs. Antonucci, p. 216-218, 221-222. Charron admitted that she could not tell how many bonuses had to be paid that weekend and that she could not convince nurses to take the openings without bonuses. Charron, p. 156-158. She could not identify anyone that she got to fill an opening without a bonus. Charron, p. 160. Charron could not even convince Melissa DeCosta ("DeCosta"), who was helping her make phone calls, to fill an opening without offering her $200 per shift. Charron, p. 158. If the situation was so dire, Charron herself would have worked as DONs do at times. Antonucci, p. 293. The practice and preference was to try and get nurses to work extra shifts, not med-techs, and as Plaintiff explained, Charron did not authorize her to use med-techs. Haase, p. 307, Antonucci, p. 216-218, 221-222.

The schedules and the bonus sheets themselves do not corroborate Defendants' position that there were 21 or a "significant number" of openings. Exhibit E. There were 130 individuals on the schedule for the weekend of October 2-3. Ex. E. Of the 130 staff members, the worst case scenario is that Plaintiff was unable to fill 13 openings, even after offering a bonus of $100. Ex. E, Antonucci, p. 210-217 (acknowledging that only 13 individuals were written on the schedule not in her handwriting). Even with respect to the 13 openings, it is possible that some were filled due to Plaintiff's efforts. Antonucci, p. 213-214, Exhibit E. For example, if Plaintiff placed the call to the employee, but the employee did not call back until after Sweeting or Charron had the

schedule, there would be no way to know from the document that Plaintiff placed the call. In addition, if Plaintiff had secured someone and then Charron moved that person to another slot, one would not be able to tell that Plaintiff had originally secured that person. The bonus sheets reflect that bonuses in the amount of $200 (the amount given by Charron after she took the schedule) were given for only <u>seven</u> open positions. Exhibit E. The remainder of the bonuses for nurses were given at the $100 rate – which was the rate Charron allowed Plaintiff to give. Exhibit E. In addition, if it took 3 individuals up to 3 hours to fill 13 openings, then that means it takes 9 man hours to fill 13 openings, something that Charron somehow expected Plaintiff to do alone and at a lower bonus amount. Finally, there was an on-call nurse for the weekend who must have been utilized, meaning there may have been even less openings. Santin, p. 193.

Defendants also argued that part of the reason why Plaintiff's behavior was so unacceptable was because she allegedly did not keep Charron informed of openings before Friday. This issue was not in the position paper and not set forth until April 2007. Exhibit B. In all events, Plaintiff expressly disputes this account. First, Plaintiff testified that her practice was to always let the DON know where they stand and would give the DON a copy of daily sheets at the beginning of the week if the schedule was bad for the weekend. Antonucci, p. 162-164, 166. Plaintiff would highlight the openings and put how many nurses and CNAs were needed at the top. <u>Id.</u> At that point, most DONs would start asking people to fill openings and Plaintiff would continue making calls. Antonucci, p. 162-164. Later in the week, Plaintiff would report back with her progress and again, let the DON know how many openings there still were. Antonucci, p. 162-164. According to Plaintiff, Charron never indicated there was a problem with the calls Plaintiff made and never had a problem with her results - - she knew that it was not Plaintiff's fault if there was not enough staff. Antonucci, p. 167-168.

With respect to the week of September 27, 2004, Plaintiff explained that consistent with her practice, she brought copies of the daily sheets, with the openings highlighted, to Charron and Haase in the beginning of the week. Antonucci, p. 207-208, 291-293. Neither Charron, nor Haase came to her on Monday, Tuesday, or Wednesday with concerns about the number of openings. Antonucci, p. 207-208. At some point, (either Wednesday or Thursday), Charron authorized Plaintiff to give $100 per shift to nurses who would pick up a weekend shift. Antonucci, p. 209, Charron, p. 140-141. This was after Plaintiff went to Charron to tell her she still had openings. Antonucci, p. 207-208. Plaintiff disputed Defendants' allegation that there were numerous openings. Antonucci, p. 208.

Accordingly, Charron held Plaintiff's fate in her hands when she decided not to increase the bonus, not to authorize med-techs for Plaintiff, and allow Plaintiff to continue making calls. She only increased the bonus when she was trying to fill the schedule. Antonucci, p. 292-293. In addition, considering that Charron alleged that she only authorized bonuses at the last minute, and only after all other options were exhausted, if she authorized bonuses earlier than Friday during the week of 9/27, then problems on October 1 could not be the fault of Plaintiff. Charron, p. 86-87, 140-141. Significantly, Charron never even asked Plaintiff what she had done to get staff when Plaintiff came to her on Friday. Charron, p. 138-139. She fired Plaintiff based on an assumption that Plaintiff did not do enough due to the number of openings – which at this point, Defendants cannot even define. Charron, p. 138-139.

Defendants also point to the fact that Charron had to assist in filling the schedule herself.27 However, having to go to the DON for assistance with filling openings is not

27 Haase actually says that Charron had to spend a lot of time doing Plaintiff's job. Yet, Sweeting testified that Charron spent the majority of her day on the floor, in meetings, handling paperwork, on family issues and staff meetings. Sweeting, p. 135-136. Charron testified that this just related to calling people and that she could not give specifics on how often this happened. Charron, p. 212. Charron acknowledged she had to do the same thing with

uncommon and does not mean the staffing person is doing a bad job. Sweeting, p. 277-278. In fact, Sweeting and Santin admitted to having to go to Charron needing help with the schedule, including help making phone calls. Sweeting, p. 277-278, Santin, p. 64. Charron admits that she assisted Morang, Santin, and Sweeting with making phone calls, and she did not consider the fact that she had to place phone calls for Plaintiff a sign that Plaintiff could not do her job. Charron II, p.41-43, Charron, p. 100. Charron could not say how many times she had to help Morang or Antonucci, but said she helped Santin "frequently." Charron II, p. 41-43, Charron, p. 100. In fact, previous DONs had helped Plaintiff with making calls, and this was never a problem. Antonucci, p. 292. Haase acknowledged that both Harris and Charron had to help make calls at times. Haase, p. 62. It could have been the same amount of times under both Harris and Charron, and Charron had to do the same for Sweeting after Plaintiff was fired. Haase, p. 62-63.

Finally, Charron claimed she only reached the conclusion that Plaintiff had to be fired after speaking with Haase and Pereira. Charron, p. 144. Haase directly contradicts this by stating that Charron made the decision to fire Plaintiff; and Pereira testified he only found out after the fact. Pereira, p. 173, Haase, p. 137. Accordingly, Charron, Haase, and Pereira, could not have believed that Plaintiff needed to be fired. When asked if she knew enough about Plaintiff's performance to fire her, having only worked with her for about eight weeks, Charron did not respond unequivocally – but only said "to a certain extent, yes." Charron, p. 68.

The incident on October 1 was of Charron's own making – she brushed Plaintiff off and failed to address the problem and then turned it around on Plaintiff when Plaintiff went to her for help. She quickly raised the bonuses, used med-techs, and "substantially" filled the openings, not giving Plaintiff the tools to do it on her own. Based on the foregoing, it is clear that Defendants' reason for firing Plaintiff cannot stand.

---

Sweeting, and could not say how many times it happened with either Plaintiff or Sweeting, p. 213.

B. There is Additional Evidence of Animus[28]

*Plaintiff's replacement was less-qualified.* Sweeting only began working at Cherry Hill in September 2001. She had no previous staffing or scheduling experience. Sweeting, p. 8-9, 48-49. She was trained by Plaintiff. Sweeting, p. 8-9, 57, 67, Antonucci, p. 317-318. Although she filled in for Plaintiff, she was not responsible for completing all the staffing coordinator tasks. Antonucci, p. 84-85, 319; Sweeting, p. 184. In August 2004, Charron changed Plaintiff's schedule from a four-day work week to five-days, taking Sweeting off the job on Wednesdays. Similarly, in December 2003 when Harris told Plaintiff she could not have a day off, she explained that if Plaintiff had the day off, they would have a difficult time finding someone to do her job. Def's Ex. G, Haase, p.143-144. If Sweeting was qualified, she would not have been taken off the job in 2004, and she would have been the easy choice to fill in for Plaintiff in December 2003.

By Sweeting's own admission, the staffing job was so difficult that she did not want to replace Plaintiff. Sweeting, p. 50, 54. Even after she was performing the job, Sweeting would not consider herself better than Antonucci at the staffing position. Sweeting, p. 48-49, 194, 204. Just days before Plaintiff was fired, Sweeting was given her annual evaluation by Harris and Charron. Sweeting, p. 223-225; Exhibit J. Harris had evaluated Plaintiff earlier that year. Sweeting ranked lower than Plaintiff and Harris commented that she needed to "increase organizational skills/meeting deadlines." Ex. J.[29] In addition, Sweeting's performance rating further decreased from 2005 to 2006 in staffing levels, agency and overtime use, preparing

28 Introduction of additional evidence beyond pretext is not required. Dominguez-Cruz, 202 F.3d at 430 n. 5. Furthermore, Defendants seem to rely on the fact that there is no direct evidence of discrimination. However, all this means is that Plaintiff must rely on circumstantial evidence under either McDonnell-Douglas or a mixed-motive approach. See, e.g., EEOC v. D.C. Public Schools, 277 F. Supp.2d 44 (D.D.C. 2003) and fn.4.
29 Haase though that Harris and Charron were about the same in terms of being fair evaluators and that their expectations of the scheduler were the same. Haase, p. 97.

nursing schedules and modifying as needed, and maintaining 1-2 weeks of schedules. Haase, p. 150, 152, 160, Ex. J. Charron wrote that Sweeting still needed to improve her "organization," as well as "completing daily schedules two weeks at a time," and "better tracking system for call-outs." Ex. J. Organization and maintaining schedules continued to be a problem for Sweeting in 2006. Ex. J. Significantly, maintaining monthly schedules was supposedly a problem for Plaintiff, yet Sweeting was criticized on her evaluation over the course of two years for not maintaining two weeks of scheduling, but was never disciplined or given an action plan. When comparing her job evaluations to Plaintiff's, Sweeting admitted that Plaintiff could have done a better job on five separate tasks, including distributing schedules before the end of the shift, and maintaining the necessary schedules 1-2 weeks in advance. Sweeting, p. 251-255. Even more significant is the fact that when Haase was asked if Sweeting was qualified for the job he could only respond with a "maybe." Haase, p. 145; Horner, p. 131-132 (could not say Sweeting was more qualified).

*Similarly-situated younger employees performing the same job as Plaintiff were not treated the same way.* 30 *Donna Sweeting.* Sweeting was spoken to by Charron a couple of times about not having two weeks of daily schedules completed. Sweeting, p. 237, 239. This was a problem on both her 2005 and 2006 evaluations. Sweeting, however, disagreed with Charron's definition of "two weeks." Sweeting had problems tracking call-outs which was something Charron wanted her to do and was also criticized on her evaluation for it. Sweeting,

---

30 Defendant appears to argue that neither Santin or Sweeting are similarly-situated to the Plaintiff. In fact, Defendants incredulously argue that both Santin and Sweeting would have had to engage in the identical alleged conduct (having 21 openings on a weekend schedule as of 2 p.m. on a Friday when the DON had to leave early for a funeral) to compare the treatment. Among other things, this argument is inconsistent with the applicable law. See, e.g., Briddell v. Saint-Gobain Abrasives, Inc., 2007 U.S. Dist. Lexis 26829, at *24 ("The comparison cases need not be perfect replicas * * * The test is 'whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."'). Defendants made no such argument as to Morang. Proof of discriminatory motive can be inferred from the mere fact of differences in treatment. Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

p. 245-246. She was spoken to by both Harris and Charron for not having good organizational skills when she left piles of paperwork on her desk that sometimes remained for weeks. Sweeting, p. 246-247. Charron allegedly disciplined Antonucci for not adding names to the monthly schedule, yet, she did not even require Sweeting to do this as part of the same job. Sweeting, p. 148.

Sweeting gave out "way more" bonus money than was given in 2004, yet she has never been disciplined for giving out too much bonus money or relying too much on bonus dollars. Sweeting, p. 181-182, 322-323. Sweeting was counseled by Charron and Harris for not putting incident reports in within the required time period. Sweeting, p. 79, 227. Haase had to speak with Sweeting on "several occasions" about PPD problems. Sweeting explained that this happened on at least seven different occasions and at one point it was non-stop. Sweeting, p. 115-116. She was also spoken to about PPD by Harris and by the current DON. Sweeting, p. 115-116. Harris spoke to Sweeting about trying to be more creative in filling the openings without bonuses and about being more aggressive. Sweeting, p. 174, Haase, p. 162 (lack of aggressiveness was an issue at times with Sweeting).

In fact, there were more staffing problems when Sweeting was scheduler. According to Sweeting, it started to get real bad in 2005. Sweeting, p. 33, Antonucci, p. 319-320. In fact, in 2005, Pereira had to appoint a DeCosta, then a unit manager, to oversee staffing. Pereira, p. 34. Pereira had not visited Cherry Hill prior to 2005 due to staffing concerns. Pereira, p. 101. Sweeting blamed the problems with staffing on an exodus of nurses (about 15) and less staff overall. Sweeting, p. 34-35. Yet, she could not identify more than 3 nurses who might have left and her testimony directly conflicted with Horner's and Haase's on the same subject. Horner, p.60, Haase, p. 38. In addition, Haase testified that he was fired because patient census was very

low in 2007. Haase, p. 32. If census was low, then Sweeting should not have a problem staffing since she would not need as many nurses. Sweeting, p. 101-102. Haase believed Sweeting had issues with giving nurses too much time off which created scheduling problems. Haase, p. 150-151. Although he admitted that Harris came to him about the problem, he had no idea if she was disciplined or put on an action plan because of it. Haase, p. 151. He also believed that Sweeting's poor job performance as reflected on her 2006 evaluation might have been attributed to difficulties with staffing because it was a problem at that time. Haase, p. 154.

Despite all of these issues, Sweeting was never issued any written discipline and her job was not changed in any way. Sweeting, p. 78. Instead, Charron, Harris and Haase would give her the benefit of the doubt and an opportunity to explain and correct the situation. Sweeting, p. 83 (Charron would sit down and talk with her about it), 113-114, 117-118. This is something they never afforded Plaintiff.

*Rebecca Santin.* During Santin's employment she has been spoken to about problems with the PPD about three times. Santin, p. 109. Santin has never been disciplined by Charron. Charron did not require her to prepare the holiday schedule two months in advance as she did of Plaintiff. Santin, p. 113. She also had a problem with giving DON proper notice re: poor staff attendance. Santin, p. 123-124. The solution was to set up a new system. Santin, p. 123-124. She was also spoken to and criticized on her evaluation for not doing reference checks fast enough. Santin, p. 130-132. Santin admitted that the DON has had to help her with staffing, including making phone calls. Santin, p. 146-147. Santin was rated lower on her evaluation than Plaintiff in 2004. Santin, p. 138. In fact, Santin's score was lower than Plaintiff's just five months before she was asked to train Plaintiff. Ex. K. Charron sent Plaintiff for "training" with Santin, despite the fact that Santin had only been performing the job for a year and a half.

Santin, p. 18. Santin was thirty-six years old at the time. Santin, p. 18. Despite the issues Santin had, she was never disciplined.

*Dawn Morang.* Dawn Morang was the scheduler Charron supervised after she left Cherry Hill and went to work at Evergreen (also a Life Care facility).31 Morang's evaluation was worse than Plaintiff's in the same job. Ex. K. In addition, in the "areas for improvement" section, Charron noted that Morang needed to be less negative during difficult times. Morang responded in her evaluation in the same manner that Plaintiff did on her termination form. Ex. K, Def's Ex. I. Morang wrote "I am very offended" by the comment regarding less negativity. Ex. K. "I work at home and on weekends to fill staffing needs for which I get no compensation. My negativity in stressful situations comes from feeling that there is no support from my supervisors, and I am left to fend for myself, when I am looking for guidance." Ex. K. It was during this time, according to Charron, that there were difficulties filling the schedule. Charron II, p. 38. Morang, like Plaintiff, blamed the problems on lack of staff. As noted above, Charron acknowledged that every coordinator has difficulty filling vacancies and she would assist Morang in making phone calls. Charron II, p. 40-41. With Morang, however, Charron always knew she was doing her best and did not question her. Charron II, p. 46. Morang was counseled by Charron 1-2 times for not completing the schedules. Charron, p. 149. Morang also had issues with completing two weeks of daily sheets and PPD. Charron, p. 150. Furthermore, Charron acknowledged that Morang has had problems filling vacancies and that she had "all those issues." Charron, p. 150-151. Morang has never been disciplined.

*Charron Had a Plan to Fire Plaintiff from the Beginning, Which was Not Contingent on Job Performance at all.* First, Plaintiff's position was posted before she was given the action

31 Morang's age was not supplied by Defendants. A search of the internet reveals that her birth date is July 15, 1964, making her age 40 at the time Plaintiff was fired. See Exhibit P.

plan. Sweeting, p. 199-200 (explaining that it was posted during the time when she was still filling in); Ex. M. Plaintiff's job description was changed in August 2004 as part of the action plan, yet when Sweeting took over about five weeks later, she was given the original job description and not the changed version. Sweeting, p. 267, Charron, p. 189. Accordingly, she was not evaluated on at least seven different criteria that Plaintiff was required to follow. Sweeting, p. 262-266. This included things like maintaining the PPD, completing the monthly schedule two weeks in advance of the coming month, providing creativity when compiling the schedule, and other duties as assigned by the DON. Sweeting, p. 262-266. Santin's job description was also the same as Plaintiff's original job description, and the one given to Sweeting after Plaintiff was fired. Santin, p. 95. Charron's explanation for changing the job description was not credible. She stated that the only reason that she would not have used the changed job description with Sweeting was if she already had one (a job description for staffing coordinator) on file for Sweeting previously. Charron, p. 180. Yet, it is undisputed that Sweeting's first review for staffing coordinator was done in 2005 by Charron.

In addition, when Sweeting took over in October 2004, Sweeting continued to perform the job exactly as Plaintiff had trained her to perform it - - and Charron assured her that she should continue to do the job "the way it's been going." Sweeting, p. 172-173. Charron did not teach her anything about staffing, because she already knew how to do the job from Antonucci, p. 100-101. Charron never told her that she should do anything differently than how Plaintiff had taught her to do it. Sweeting, p. 173. When she first started full-time, Sweeting was never told to avoid giving bonuses, was not given any ideas on how to be creative, and was not told to be aggressive when filling openings. Sweeting, p. 174, 181.

*Other Reasons.* Charron sent Sweeting for training "for the same reasons" as Plaintiff.

Sweeting, p. 61, 64. Sweeting's training lasted two-three days. Santin, p. 205. Yet, with Sweeting, this was not considered a performance problem. By comparison, Plaintiff was trained for only one day. Santin, p. 216. According to Santin, she was never told that it was going to be longer than one day. Santin, p. 216, Antonucci, p. 176. Neither Plaintiff nor Santin viewed Plaintiff's visit as training. Santin, p. 215-216, 174. Santin explained that it was just about showing Plaintiff what she did on a daily basis. Santin, p. 215-216. Charron did not even tell Santin about any specific thing that she wanted her trained and did not tell Santin that Plaintiff was having any job performance problems. Santin, p. 215. Haase did not know what Plaintiff was supposed to learn at the training. Haase, p. 59. Plaintiff noted that Santin did not even know what she was supposed to be showing her, and that in the end, they were doing the same things. Antonucci, p. 174-175. Plaintiff disputes not being receptive to Santin or that she told her that she was not going to do as Charron directed. Antonucci, p. 177-178.

Charron changed Plaintiff's work schedule from four days per week to five days per week. Yet, as Santin explained, there was no reason to work five days if someone is filling in for you on the fifth day. Santin, p. 168. Although Plaintiff did not resist this change, it was not justified in any way. Antonucci, p. 187, 307. According to Plaintiff, she thought Charron was trying to upset her to the point where she would leave. Antonucci, p. 295.

At Haase's deposition, he set forth an entirely new (and inconsistent) reason why Plaintiff had to be fired, because she allegedly engaged in misconduct by intentionally not being aggressive in making phone calls and because she refused to do the monthly schedule. Haase, p. 132. Although Haase said she was fired for misconduct, that reason appears nowhere on the termination form or documents submitted to unemployment or in any subsequent writing. Haase, p. 138-140. Haase had no explanation for why misconduct was not put down at the time

of termination, if in fact, it was misconduct and admits he told Horner to write "poor job performance," only on the unemployment form. Haase, p. 141, Horner, p. 171-172.

Another inconsistency arose when Haase was asked the problem was with Plaintiff and the bonuses. Out of blue he alleged that the problem was that Plaintiff was directing the bonus money to particular nurses. Haase, p. 313. Yet, Charron never indicated this was a problem and Haase never spoke to Plaintiff about it. Haase, p. 310, 313, Pereira, p. 33. He admitted it was a serious allegation but no one spoke to Plaintiff because "she was already on an action plan." Haase, p. 313-314. As Haase explained, the purpose of putting things in writing was to establish a "paper trail." Haase, p. 110.

While there may not be direct evidence of discrimination, the following circumstantial evidence clearly demonstrates that Defendants discriminated against Antonucci based upon her age. In May, 2004 – before Charron came on board -- Irene Ferruccio, who was fifty-six at the time, was re-hired by Celeste Harris. Ex. O. She assumed the position of Unit Manager.32 From the time that she was hired until at least the summer of 2005, there were two other Unit Managers who worked the same shift as Ferruccio: Melissa DeCosta and Linda Norden.33 As of May, 2004, DeCosta and Norden were thirty-four and forty-nine, respectively. Def's Ex. A (Horner).

After Charron began working at Cherry Hill, she was also subjected to age discrimination. In fact, she had many of the same problems with Charron that plaintiff had. Ex. O. On February 9, 2005, Ferruccio was fired for poor job performance.34 Defendants claim that

32 The duties of Unit Managers include conducting rounds, assessing and evaluating residents, administering resident medications as ordered by the physician, reporting all discrepancies noted concerning physicians' orders, diet changes, charting errors, attending management meetings, directing the day-to-day functions of the nursing assistants, completing quarterly reviews and monthly summaries, and responding to requests related to running the unit.

33 DEF 466, 579, 585, 629, 630, 658 and 670 (daily sheets produced by Defendants).

34 More specifically, Defendants claim that Ferruccio "compromised resident care" by among other things: failing

this was necessary because a Unit Manager is "held to a higher standard than her subordinates, because she is responsible for setting the standards for quality resident care and for ensuring compliance with all state, federal and facility regulations." Ex. O.

After Ferruccio was fired – during the period May to August, 2005 -- the State Department of Health ("DOH") found that Cherry Hill had failed to comply with a number of state and federal regulations which resulted in the compromise of resident care. Ex. R. In fact, the incidents which gave rise to the deficiencies appear to be much more serious than those for which Ferruccio was allegedly held responsible.

Yet, DeCosta, one of the other unit managers received any discipline for any of the incidents which gave rise to the deficiencies. Pereira, p. 58.35 For example, Pereira testified that there is a direct connection between quality of care and staffing. Pereira, p. 43. Yet, the persons responsible for staffing at the time -- Sweeting and DeCosta who were both in their thirties and substantially younger than plaintiff and Ferruccio -- were not disciplined.36 Moreover, unlike Ferruccio who was held to a higher standard than her subordinates and who was fired for failing to comply with state and federal regulations – DeCosta– who is substantially younger than plaintiff and Ferruccio – were not even disciplined. Charron, who was also substantially younger than Plaintiff was also not disciplined. Afterwards, DeCosta was promoted to Assistant Director of Nurses and Norden was ultimately fired, also for patient care issues.

There is also evidence of stereotypes at work in this case. Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on

---

to monitor the completion of nursing notes, failing to follow up on missing resident skin checks, being unable to identify concerns with residents on her unit, failing to follow up with residents who had experienced weight variances, and failing to follow up on psychiatric and pharmaceutical recommendations for residents. See Ex. O.

35 Pereira testified that Cherry Hill had a very difficult time clearing these deficiencies. Pereira, p. 34. In fact, after the initial deficiencies, the State returned and Cherry Hill still did not clear the deficiencies. It was only after Pereira spent two weeks at Cherry Hill that it was able to clear the deficiencies. Pereira, p. 38-54.

36Because of the severity of the 2005 surveys, Pereira made DeCosta responsible for staffing and the person to whom Sweeting reported. Pereira, p.44-6, 116.

the basis of inaccurate and stigmatizing stereotypes. Biggins v. Hazen Paper Co., 953 F.2d 1405, 1411 (1st Cir. 1992), aff'd in part and vacated in part, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed. 2d 338 (1993) (it is very essence of age discrimination for older employee to be fired because employer believes that productivity and competence decline with older age); see also EEOC v. Wyoming, 460 U.S. 226, 75 L.Ed. 2d 18, 103 S.Ct. 1054 (1983) (age discrimination rarely based on sort of animus motivating other forms of discrimination; it is based in large part on stereotypes unsupported by objective fact). Courts have found unlawful stereotyping where, as here, employers have described older workers as lacking energy and creativity and incapable of change or "set in their ways." See, e.g., Tenenholtz v. Powell, 2004 U.S. Dist. LEXIS 30198 (E.D.Va. 2004) (court found requisite bias where witnesses made statements about older workers having less energy and not working as hard as younger workers and where younger employees received better treatment); Sperling v. Hoffman-LaRoche, Inc., 924 F.Supp. 1396, 1408-09 (D.N.J. 1996) (denying defendant employer's motion to dismiss and nothing that, reading plaintiff's complaint liberally as the court was obliged to do, plaintiffs' claims that they were terminated because they were perceived to be less productive or less energetic stated cause of action under ADEA because consideration of stereotypes such as these in making employment decisions is precisely what the ADEA was intended to eradicate); Abrams v. Millikin & Fitton Law Firm, 267 F. Supp. 2d 868 (S.D.Oh. 2003) (court found age-related animus and direct evidence of discrimination precluding summary judgment where employer stereotyped plaintiff as being less creative and energetic than when she was a younger person and as being unable to adapt to new environment); Richter v. Hook-SupeRX, Inc., 142 F.3d 1024 (7th Cir. 1998)(court found that comments that plaintiff had low energy level and was resistant to change did not, standing alone, raise inference of age discrimination).

In this case, Plaintiff testified about Ferruccio and the incident where Charron made age-related comments. When discussing an interview with Ferruccio, Charron said that the nurse she interviewed asked Charron's age and Charron responded with something like "oh, that's what I need, somebody else questioning that I'm young as a director, I'm too young." Antonucci, p. 322, Ex. M. This person was not hired. Id. Charron also asked Ferruccio her age and when she refused to tell, Charron said she would just look it up. Ex. M. Haase knew the ages of virtually all of the employees and was able to tell who was over 40 "from working with them for three years and - - you know, having access to their records and all that," * * * "I know how old people are over a course of time." Haase, p. 333-335. Horner processed paperwork for new hires which would indicate employee ages. Horner, p.30-31. Yet, Horner initially responded that she could not identify any employees over 40. Horner, p. 36. Haase obviously made a point of finding out.

Haase testified that Plaintiff was "stuck in the belief that the way things have always been done is the right way." Haase, p. 50. Plaintiff had a lack of "energy." Haase, p. 191-193. Sweeting testified that Plaintiff was "set in her ways." Sweeting, p. 280. Pereira was asked if he was aware of Charron hiring any nurses older than he (age 42 in 2007, age 39 when Plaintiff was fired). Pereira, p.22. He responded, "Oh, I don't think they make nurses that old." Pereira, p. 166.

Defendants also argue that they are entitled to summary judgment because Plaintiff has failed to provide any evidence of age animus.37 In support of their argument, Defendants point

37 Defendants make several arguments in this section. First, Defendants point to statistical evidence. Second, Defendants point to the interactions between Antonucci and Haase including that plaintiff testified he was generally pleasant to her and never did anything that caused Antonucci to conclude that he did not like her. Third, Defendants point to the fact that Antonucci fails to provide any evidence that Charron targeted older individuals or treated older individuals unfavorably. Antonucci has fully addressed these issues in previous sections and, therefore, will not again address them here.

to the fact that:

> "of the 233 employees, 120 are over the age of 40 and only 113 are under the age of 40 . . . . In addition, 13 of the then current employees were in their 60s . . . . Similarly, since Ms. Charron commenced as DNS in late July 2004, roughly equal numbers of employees over the age of 40 (approximately 11 out of 131) and under the age of 40 (approximately 9 out of 122) were involuntarily separated . . . . Moreover, none of the other employees aged 63 (Plaintiff's age at discharge) or older were discharged during this period . . . . Given this information, Plaintiff's claim that Defendants targeted her because of her age is unsupported."

For the following reasons, Defendants argument is without merit. First, Defendants err by including all persons over the age of forty because the ADEA concept of age discrimination includes favoring a younger worker also over age 40. See O'Connor v. Consol. Coin Caterers, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (allowing a 56 year old worker to claim age discrimination when replaced by a forty year old). Thus, the fact that there were one hundred twenty employees over the age of forty is of no consequence. Second, statistical evidence must compare employees that are "similarly situated." Timmerman v. U.S. Bank, 483 F.3d 1106 (10th Cir. 2007) (this means that the situation of the employees in the protected class must have been comparable to the situation of the employees in the non-protected class who were allegedly treated more favorably). Thus, Defendants attempts to use, not only the ages of the nursing staff but the janitors and kitchen workers as well, is similarly unconvincing. In fact, the only relevant comparison may be the other staffing coordinators – Sweeting, Morang and Santin. When this is done, it is clear that Antonucci has demonstrated the requisite animus because these substantially younger employees were treated much more favorably by Charron, Haase and Pereira. Third, Defendants' statistical evidence is unreliable in that it is missing key information and is replete with errors. For example, in the Horner Affidavit, Defendants claim that all codes beginning with a "D" are involuntary separations. Yet, the D07 code is "walked

out-no notice." Also, there were many instances in which two different lists included the same names but different information such as dates of birth. Finally, the comparison which should be made is not <u>all</u> involuntary terminations but, rather, terminations for the same reason that Antonucci was fired: unsatisfactory job performance. A close examination of this information reveals that, during Charron's tenure, she fired six employees for unsatisfactory job performance. Of those, only two were under forty and, even more significantly, the rest were all over fifty. Moreover, before Charron began working at Cherry Hill, the lists reflect that no employees over forty were fired for unsatisfactory job performance.

### *III. Conclusion.*

For the foregoing reasons, Plaintiff respectfully requests that the Defendants' motion for summary judgment be denied.

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 16th day of July 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate