**EXHIBIT F**

Life Care Centers of America®

# Employment Guidelines *Handbook*

which will be considered irresponsible, unacceptable or negligent.

21. Indecent or illegal conduct. Soliciting persons for illegal purposes or the aiding and/or abetting of illegal activity; possession or transportation onto facility premises of weapons or firearms.

22. Leaving your department or work area without permission from your supervisor, or being in a work area other than your assigned work area without permission.

23. Failure to maintain proper standards of personal hygiene and grooming.

24. Posting, removing or tampering with bulletin board notices without proper approval.

25. Sexual harassment or act of illegal discrimination against associates, residents or visitors to the center.

## DISCIPLINARY PROCEDURES

The facility has no desire to discipline any associate. Good management, however, demands that certain procedures are followed to correct or eliminate problems, since they can and do affect resident care. It is our assumption that most offenses are committed without forethought or destructive intent. However, a series of minor infractions suggests a continuing problem, and must be viewed as a source of major concern. **The facility reserves the right, depending on the severity of the offense and the associate's history of other infractions, to terminate an associate after either the first or second offense.** Generally, though, an associate will be subject to the following stages of progressive discipline:

1. First written warning.

2. Second written warning.

3. Suspension without pay, documented in the associate's file pending investigation. If investigation revealed no such offense occurred, the associate will be paid for the suspension period, will receive a formal apology from administration and will have the third offense and notice of suspension stricken from his/her personnel file. If the investigation substantiates the offense, the associate will be terminated.

**This will be our usual and preferred process for administering discipline. However, conduct of any type which causes the center to lose confidence in your ability to perform adequately your assigned job may result in immediate discharge.**

## RESIGNATION NOTICE

If you feel dissatisfied with your work or working condition, you are encouraged to discuss the matter with your department head or immediate supervisor before deciding to resign. Every possible effort will be made to correct problems causing such dissatisfaction.

If you wish to resign from your position at the facility, reasonable notice (at least

EXHIBIT G

**SUPPLEMENTAL ANSWER NO. 1**

In addition to the information already identified, we provide the following supplemental information regarding persons with knowledge of the facts concerning this case:

Madeline Horner has knowledge of the documents maintained by Cherry Hill Manor, including the personnel documents, nursing schedules and staff bonus information. Ms. Horner also has information as to the bonus amounts paid by Life Care as an incentive for employees to work additional shifts.

Steve Haase has knowledge of documents maintained by Cherry Hill Manor, including personnel documents, nursing schedules, and staff bonus information. Mr. Haase has knowledge of Plaintiff's employment, including her poor job performance in 2004, and Pamela Charron's attempts to counsel Plaintiff regarding her job performance. Mr. Haase was consulted regarding Ms. Charron's efforts, and was present at the August 23, 2004 meeting with Plaintiff, as well as her discharge meeting on October 4, 2004. Mr. Haase was also informed of Ms. Charron's decision to send Plaintiff to the Life Care facility in Raynham, MA for additional training. Mr. Haase is also aware of Life Care's personnel policies, including its policy preventing discrimination against employees.

Pamela Charron was Plaintiff's direct supervisor and has knowledge about Life Care's attempts to counsel Plaintiff regarding her unsatisfactory job performance. Examples of these counseling are contained within the personnel documents produced to Plaintiff, including 10/24/04 Counseling (Bates No. DEF00174); 08/23/04 Written Warning (Bates Nos. DEF00032 - DEF00036);

10/04/04 Termination letter (Bates Nos. DEF00171 – DEF00172). Ms. Charron was principally involved with preparing these documents reflecting Plaintiff's unsatisfactory performance.

In addition to the written counselings, Ms. Charron has knowledge of her attempts to counsel Plaintiff orally during August and September 2004. While Ms. Charron does not recall each of the conversations with particularity, at a minimum, Ms. Charron counseled Plaintiff regarding the need for Plaintiff to take responsibility for completing and maintaining all aspects of the Master Schedule. Ms. Charron also counseled Plaintiff about her need to take the patient census into account when scheduling licensed employees. Ms. Charron also counseled Plaintiff about her need to be more persistent in seeking staff to fill shifts, to be more creative in filling the schedule, and the need to rely less on bonus dollars. Ms. Charron also counseled Plaintiff that certain of Plaintiff's communications with and/or responses to the direction from Ms. Charron were disrespectful, uncooperative and unprofessional. In response, Plaintiff claimed, at various times, that she was doing the best that she could or that she did not intend to "badger" employees to accept additional work shifts. Plaintiff would also indicate that certain tasks raised by Ms. Charron were not a part of Plaintiff's job responsibilities (e.g. taking responsibility for all aspects of maintaining the monthly schedule). Ms. Charron also communicated with Plaintiff about the need to complete daily schedules, including the weekend schedule for October 2-3, 2004.

Ms. Charron does not recall the precise dates of each of the conversations, but believes that they occurred regularly during the two month period she supervised Plaintiff, including but not limited to the week prior to the August 23, 2004 written warning, prior to Plaintiff attending training at the Raynham, MA facility in or about September 2004, in or about September 24, 2004, during the week of September 27, 2004, and on October 4, 2004.

Celeste Harris has knowledge of Plaintiff's argumentative and insubordinate response to Ms. Harris, when Ms. Harris denied Plaintiff's request to take vacation time. Details of this incident are set forth in the 12/08/03 Written Warning (Bates Nos. DEF00030 – DEF00031), which was prepared by Ms. Harris. Ms. Harris also prepared the 03/04/04 Evaluation (Bates Nos. DEF00037 – DEF00041).

Joseph Pereira provided clinical supervision of Ms. Charron and, through regular discussions with Ms. Charron, was kept apprised of Plaintiff's unsatisfactory workplace performance, including but not limited to the need for Plaintiff to take responsibility for completing and maintaining all aspects of the Master Schedule, the need to take the patient census into account when scheduling licensed employees, the need for Plaintiff to be more persistent in seeking staff to fill shifts, to be more creative in filling the schedule, to rely less on bonus dollars. Mr. Pereira also was aware of Ms. Charron attempts to counsel Plaintiff throughout August and September 2004, including the written warning in August 2004, the oral counseling in or about September 24, 2004, and Plaintiff's discharge on October 4, 2004.

**INTERROGATORY NO. 2**

For the last ten years, has any current or former employee (including plaintiff) or any applicant for employment ever alleged, insinuated, suggested, implied, stated, grieved or complained, whether or not in a lawsuit or charge of discrimination, that he or she was harassed, discriminated against, disciplined, penalized, treated unfairly, differently, or adversely based upon his or her age? If the answer is yes, please set forth each instance in which this has happened. Your answer should include, but not be limited to, the identity of all persons involved including any supervisors, managers and/or officers who have knowledge of each claim, allegation, insinuation, suggestion, implication, statement, complaint, charge and/or lawsuit, the identity of the person or persons making or initiating any such claims, allegations, insinuations, suggestions, implications, statements, complaints, charges, and/or lawsuits, the date, substance, status, and/or disposition of each allegation, claim, insinuation, suggestion, implication, statement, complaint, charge and/or lawsuit, the names of all complainants, respondents, plaintiffs and defendants, and where any such complaints were made, filed or are pending.

Pamela Charron on numerous occasions in or about August, September and October 2004, including but not limited to August 23, 2004, September 24, 2004 and October 1, 2004. Throughout this period of time, Ms. Charron consulted individuals, including Steve Haase and Joseph Periera, regarding Plaintiff's unsatisfactory performance.

**SUPPLEMENTAL ANSWER NO. 14**

As set forth above, Ms. Charron does not recall the precise date or circumstances of each communication she had with other individuals regarding Plaintiff's poor performance. Nonetheless, Ms. Charron recalls ongoing discussions with Mr. Pereira regarding the performance issues described above, including communications prior to the August 23, 2004 warning. In addition, Ms. Charron communicated with Mr. Pereira in or about September 2004 regarding the oral counselings of Plaintiff that she had been forced to administer, and that Mr. Pereira recommended that Ms. Charron keep a record of the oral counselings. Ms. Charron also recalls discussing her plan to have Plaintiff work with Rebecca Santin in Life Care's Raynham, MA facility, and Plaintiff's reported actions and demeanor during that training. Ms. Charron also had similar conversations with Mr. Haase during this time period.

Ms. Charron also had discussions with Mr. Pereira and Mr. Haase regarding Plaintiff's poor performance during the week of September 27, 2004, Plaintiff's unsatisfactory work on the weekend schedule for October 2 - 3, 2004, and Ms. Charron's conclusion that Plaintiff's ongoing poor performance warranted Plaintiff's discharge from employment. Ms. Charron explained her decision, and the reasons for the decision, to Mr. Pereira and Mr. Haase, who concurred with Ms. Charron's decision and rationale.

**INTERROGATORY NO. 16**

Please set forth in complete detail, the entire basis for Plaintiff's termination.

**ANSWER NO. 16**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, especially with regard to the phrase "complete detail". Subject to and without waiving its objections, Defendant refers Plaintiff to Defendant's Position Statement, which provided a general description of relevant instances of Plaintiff's unsatisfactory workplace performance, and details the events leading to Plaintiff's discharge from employment.

**SUPPLEMENT ANSWER NO. 16**

As set forth above, Plaintiff was terminated for her ongoing unsatisfactory performance. Plaintiff was counseled regarding the need to improve her performance but failed to improve. Because of Plaintiff's failure to perform her position in a satisfactory manner, Ms. Charron determined that she should be discharged. Additional information responsive to this request is set forth in Response Nos. 1 and 14 and, pursuant to Fed. R. Civ. P. 33(d), in the documents identified in Response No. 3.

**INTERROGATORY NO. 17**

Identify the persons who filled in for Plaintiff when she was absent from work.

**ANSWER NO. 17**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, Defendant states that Ms. Sweeting assisted with performance of the staffing coordinator's duties.

I, Pamela Charron, state under the penalty of perjury that: I have read the foregoing Defendant Life Care's Supplemental Answers To Plaintiff's First Set Of Interrogatories and know the contents thereof; that these answers were prepared with the assistance and advice of counsel; that the answers set forth herein, subject to inadvertent or undiscoverable errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these answers; that I reserve the right to make any changes in the answers if it appears at any time that omissions or errors have been made there or that more accurate information is available; that subject to the limitations set forth herein these answers are true to the best of my knowledge; information and belief.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7th DAY OF March, 2007.

Pamela Charron, wpos
Pamela Charron

AS TO OBJECTIONS:

CJC
Christopher J. Campbell, R.I. Bar No. 6611
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, MA 02116
617-367-0025

DATE: 3/8/07

EXHIBIT H

15

**From:** Haase, Steven
**Sent:** Friday, February 13, 2004 11:23 AM
**To:** O'Connor, Kate
**Subject:** Followup on issues before vacation

January financials: I took my valium and reviewed them. Nursing agency costs including $23,000 worth of accruals were $86,000. In other words $63,000 were actual posted invoices, $23,000 Madeline submitted as accruals. We missed our ops margin by $9k due to expenses over budget, mainly the difference between agency nurse cost of $86K versus nurse salary under budget by $28K, a net over budget by $58K.

Agency free goals: Looks like we will hit our goal, we are projecting that agency hours for week ending midnight 2/14 will be: 152 hours. However, next week Celeste and Barbara have alot of work to do because we have 30 shifts to fill!

Medicaid prior period adjustment: RI medicaid paid us in Jan. 04 for the increase in our Medicaid rate effective 10/1. They paid us the difference $14.37 per patient per day. The old rate as of 9/30 was $151.35, the 10/1 rate is now $165.72, a $33,000 retro rate adjustment. Nov and Dec medicaid R&B will be paid at the $165.72/day rate.

I'll update you with info later today.
Steve

CONFIDENTIAL

14

From: Haase, Steven
Sent: Monday, July 19, 2004 2:26 PM
To: O'Connor, Kate
Subject: RE:

Kate:

In response to your concerns of bonus dollars, we have a number of unforseen vacancies in the facility during the month of July. All of these vacancies with the exception of L. MacMillian are temporary. In addition, Celeste and I tried to grant summer time vacation requests. We have had some hard working associates who prior to July were picking up alot of extra shifts who had requested vacations out of state, and in one case, out of the country. In return for the hard work and loyalty, we felt it appropriate to grant as many requests as we could. We are anticpating that this situation will greatly improve going into August. We still actively recruit staff through word of mouth, recruitment and signon bonuses, newspaper advertising.

Here is the info:

Melissa Agosto, FMLA from mid-June to at least 7/23 (11-7) full time
Tina Desmaris- maternity leave began 7/9 full time, 7-3
Corrine Mclaughlin on FMLA for surgery full time out since June, expected return in August
Bill Gbatu- full time 3-11 also picks up 11-7 he is the reserves, on military leave, Bill is due back on 7/26

Terminations:
Terry Auger- LPN, moved away- no forwarding address or phone # avail
Kevin Gwozdz- resigned, admitted he had relapse of drug/alcohol problem ph#
Linda MacMillan- took and used up all of her FMLA time to care for sick mother, initially returned per diem, then resigned. Linda said she wants to be re-hire contigent upon mother's health status.

Coverted from fulltime status to perdiem:

Marie Brodeur was full time 11-7, left CHM for a hosp. job and works here per diem. However, she has given us several nurse referrals.

Frank Crowley: was full time 11-7, converted to Baylor, and has become per diem.

I am very passionate about my work and will always stay focused on whatever it takes to get the job done. I will do whatever it takes to change this perception. I know who I am and I truly care about my co-workers. Therefore, I would appreciate any feedback/suggestions from you on how I can change my "bad guy" image.

thank you
Steve

-----Original Message-----
**From:** O'Connor, Kate
**Sent:** Fri 7/16/2004 12:36 PM
**To:** Haase, Steven
**Cc:**
**Subject:** RE:

CONFIDENTIAL

Noticiably you did not respond explaining your bonus dollars which are more than twice as much as any other home. Neither Joe or myself were made aware of the money you and Celeste decided to give away.
With the amount of money we must accrue for bad debt, we cannot afford this.

Kate

-----Original Message-----
**From:** Haase, Steven
**Sent:** Fri 7/16/2004 11:53 AM
**To:** O'Connor, Kate
**Cc:**
**Subject:** RE:

Kate:

**From:** O'Connor, Kate
**Sent:** Tuesday, August 31, 2004 10:26 AM
**To:** Horner, Madeline; Charron, Pamela; Haase, Steven
**Subject:** RE: Bonus $ Paid for Week Ending 8/28/04

REALLY GREAT WORK!!! Thank you!!!!!! Cherry Hill can swing our region from making margin to not making it. We really need to make our expectations for August. These savings will help you tremendously this month. THANK YOU!!! Pam, Thankyou for setting your expectations high!! Great job. Kate

-----Original Message-----
**From:** Horner, Madeline
**Sent:** Mon 8/30/2004 12:10 PM
**To:** O'Connor, Kate
**Cc:** Haase, Steven; Charron, Pamela
**Subject:** Bonus $ Paid for Week Ending 8/28/04

| | |
|---|---|
| Extra Shift | $200.00 |
| Referral | $500.00 |
| SignOn | $ 0.00 |
| Med Tech | $ 71.00 |
| On Call | $ 93.00 |
| Call Log | $ 25.00 |
| Adjustment (prior week) | ($ 39.00) |

**Total Bonus $ Paid = $850.00**
**for week ending 8/28/04**

Madeline Horner
Cherry Hill Manor
401-231-3102

CONFIDENTIAL

**From:** Haase, Steven
**Sent:** Friday, September 10, 2004 11:39 AM
**To:** Horner, Madeline; Williams, Gina
**Subject:** RE: August Short Close Questions and Requests

Answers to short questions:

Nursing salary decreases- extra shift bonuses, were greatly reduced during the month, vacation pay was down.

Steve naase

-----Original Message-----
**From:** Horner, Madeline
**Sent:** Fri 9/10/2004 9:30 AM
**To:** Haase, Steven
**Cc:**
**Subject:** FW: August Short Close Questions and Requests

Madeline Horner
Cherry Hill Manor
401-231-3102

CONFIDENTIAL

-----Original Message-----
**From:** Williams, Gina
**Sent:** Fri 9/10/2004 9:25 AM
**To:** Horner, Madeline
**Cc:** Spaziano, Phyllis
**Subject:** August Short Close Questions and Requests

Here is my list of questions and requests for the August Short Close.

4. Why did Cert Nursing Salaries decrease $35,561?

This is everything that I have for this month. I need these back by 12:00 today if at all possible.

**From:** Charron, Pamela
**Sent:** Wednesday, November 10, 2004 4:37 PM
**To:** Horner, Madeline
**Cc:** Haase, Steven
**Subject:** RE: Bonus Dollars

Madeline,

I can't understand why the bonus dollars for extra shifts has been so high. I have approved bonuses for weekend shifts but not nearly as much as they were getting and not to everyone. Am I missing something? Or am I still getting the process wrong?

Pam Charron, RN DNS

-----Original Message-----
**From:** Horner, Madeline
**Sent:** Tue 11/9/2004 10:24 AM
**To:** O'Connor, Kate
**Cc:** Haase, Steven; Charron, Pamela
**Subject:** Bonus Dollars

Madeline Horner
Cherry Hill Manor
401-231-3102

CONFIDENTIAL

EXHIBIT I

EXHIBIT
Hesse
Pltf's 6A
4/30/07 Jch

# HAVEN HEALTHCARE
## JOB DESCRIPTION/PERFORMANCE EVALUATION

**Job Title:** ~~Nursing Office Manager~~ Scheduler

**Department:** Nursing **Reports to:** Director of Nursing Services

**PRIMARY FUNCTION:** Coordinates activities affecting the operations of the Nursing Department, with special emphasis on coordinating the functions of Certified Nursing Assistants and scheduling of Nursing personnel.

**REPRESENTATIVE RESPONSIBILITIES:** The following description of job responsibilities and standards are intended to reflect the major responsibilities and duties of the job, but is not intended to describe minor duties or other responsibilities as may be assigned from time to time.

*4=Exemplary; 3=Commendable; 2=Quality; 1=Needs Development. (See instructions for definition.)*

| | 90-day | Ann. Rev. | Ann. Rev. | Ann. Rev. |
|---|---|---|---|---|
| 1. Takes responsibility for day to day scheduling of nursing personnel under the supervision of the Assistant Director. | | 3 | | |
| 2. Assumes responsibility for the monthly scheduling of all nursing personnel; coordinates call out replacements. | 4 | 4 | | |
| 3. Assists the Director of Nursing Service in the maintenance and the staffing budget for the nursing staff. | | 4 | | |
| 4. Assumes responsibility regarding troubleshooting systems and functions as they impact the nursing business operation. | | N/A | | |
| 5. Participates in quality assurance activities as needed; assists in interdepartmental projects as assigned by the Director of Nursing. | | N/A | | |
| 6. Assumes any duties, special tasks and responsibilities that are assigned by the Director of Nursing Service in order to provide optimal achievable quality resident care. | | 3 | | |

| | 90-day | Ann. Rev. | Ann. Rev. | Ann. Rev. |
|---|---|---|---|---|
| 7. Assists and supports the Director of Nursing Service in assessing on an ongoing basis employee morale, quality of communications, both upward and downward, within nursing department, and in resolving any perceived employee relations issues regarding wages, hours, benefits, personnel policies, practices, attitudes and management-employee conflicts. | | N/A | | |
| 8. Understands responsibilities concerning resident rights, confidentiality, infection control, safety, accident and fire prevention and emergency preparedness. | | N/A | | |
| 9. Assumes responsibility for understanding, communicating and enforcing the policies and procedures of the facility. | | N/A | | |
| 10. Keeps record of attendance, noting illness and other absences. | | 4 | | |
| 11. Annually maintains competency standards for this position. | | N/A | | |
| 12. Adheres to JCAHO and OSHA State regulations. | | N/A | | |
| 13. Displays respect and appreciation for the ideals and philosophy for which Haven Healthcare was founded. | | 4 | | |

**OTHER DUTIES:** N/A

| | 90-day | Ann. Rev. | Ann. Rev. | Ann. Rev. |
|---|---|---|---|---|
| 1. Keep inventory of all medical supplies. | | | | |
| 2. Price and order medical supplies. | | | | |
| 3. Receive purchase orders in and compare purchase order prices with packing slips. | | | | |

**COMMENTS:** During the time that I have worked with Barbara, I have always found her to more than willing to do whatever was asked of her. She is well liked by her peers ~~and fellow~~. Barbara always is receptive to suggestions regarding the operation of the facility. Barbara is knowledgeable and continues to do a great job scheduling. Keep up the good work.

EXHIBIT
Haven
PHS-6B
4/30/07

# HAVEN HEALTH CARE

Jan 23 2007

## JOB DESCRIPTION/PERFORMANCE EVALUATION

| | | |
|---|---|---|
| Job Title: | Hospitality ~~Director~~ Barbara Antunucci | |
| Department: | Customer Service | Reports to: Regional Hospitality Director |

PRIMARY FUNCTION: Assures an ambiance of welcome and hospitality through a keen awareness of client, staff and community perception. Responsible for facilitating a facility appearance, which supports and enhances the Haven hospitality initiative. Interacts with patients, visitors and staff to promote client relations and a hospitality culture. Strives towards creating and improving programming standards that exceed industry standards for hospitality.

REPRESENTATIVE RESPONSIBILITIES & DUITIES: The following description of job responsibilities and standards are intended to reflect the major responsibilities and duties of the job, but is not intended to describe minor duties or other responsibilities as may be assigned from time to time.

*Enter one score in the appropriate box: 4=Exemplary; 3=Commendable; 2=Quality; 1=Needs Development. (See instructions for definition.)*

| | 90-day | Ann. Rev. | Ann. Rev. | Ann. Rev. |
|---|---|---|---|---|
| 1. Surveys facility and facility grounds from a customer service perspective, communicates deficiencies with Administrator and follows through with compliance. | 3 | | | |
| 2. Meets with residents and resident families within four hours of admission to welcome and verify that accommodations are meeting the expectations of the client. To the extent that the accommodations are not meeting expectations everything possible will be done to accommodate the residents needs.. | 3 | | | |
| 3. Interacts with visitors to ensure a positive experience during their visit and to encourage re-visit. | 4 | | | |
| 4. Takes responsibility to ensure record of residents' interests and concerns in an effort to meet the needs of the individual. EXAMPLE (If a resident watched a particular television program on Saturday night,. Hospitality would work to find a video or to make sure the programming was available to them. If the resident enjoys fishing, Hospitality would facilitate a Field & Stream Magazine, etc.) | 3 | | | |
| 5. Interacts with staff to instill an awareness of the importance of customer service and hospitality. Coordinates customer service seminars. | 4 | | | |
| 6. Documents written testimonials of satisfactory | | | | |

| | 90-day | Ann. Rev. | Ann. Rev. | Ann. Rev. |
|---|---|---|---|---|
| awareness of the positive outcomes that occur when a customer service focus is utilized | 4 | | | |
| 7. **Fine Dining Program:** The Director of Hospitality will invite between 7 and 10 residents per day for lunch and dinner. The Director will personally host and serve dinner to the residents. The Director works Wednesday through Sunday. | 4 | | | |
| 8. **Afternoon Cookie Break:** The Director of Hospitality will bake and distribute the cookies by going room to room and offering them to residents .Beverages should be offered at the same time. | N/A | | | |
| 9. **The Warm Welcome Program:** The Director of Hospitality will be notified prior to any admission. The director will verify that the resident room is ready and meets the expectations of the hospitality program. In the event the room does not meet the expectations hospitality will contact the Administrator who will be responsible to facilitate room readiness. The Director will welcome the new resident at the door and do all they can to meet the residents needs as they pertain to accommodations. The Director will also assure that a warm welcome card from the staff is in the room when the resident arrives, the welcome card should be signed by the Administrator, DNS and the staff on that unit. The cards should **NOT** be signed in advance. The Director will also provide a gift bag, which will contain toiletries, facility program information, etc. Through a series of questions the Director will determine things that are truly important to the resident and facilitate a post admission gift i.e. Sports Illustrated, Movie, Book, etc. | 4 | | | |
| 10. **Farewell Program:** Upon any discharge The Director of Hospitality will be responsible for finding out and providing a resident with Her or His favorite dessert. The resident will also be presented with a farewell card singed by all the residents participating in the meal. A Haven pin will be attached to the farewell card. | 4 | | | |
| 11. **Atmosphere:** The Hospitality Director will be responsible for creating family like atmosphere. Remember your job is to make their stay as comfortable as possible. | 4 | | | |

COMMENTS: Barbara enjoyed her position and brings a lot of enthusiasm to her position. She is well liked by the residents and their families. An area that needs improvement is the afternoon cookie break which will be re-instated as time permits. Barbara continues to bring [illegible]

QUALIFICATION

- Possesses leadership ability and a willingness to cooperate with other department heads.
- Has the ability to plan and organize social activities.
- Possesses an understanding of the social and psychological needs of the aged as well as other residents requiring convalescent care.
- Works hours as needed by the requirements of the position assignment.

Barbara Antonucci 1/25/07

R. L. Patteault, NHA 1/25/07

# West View Health Care Center

We Care For Those You Love

EXHIBIT
House
Pl's 3
4/26/07

239 Legris Avenue
West Warwick, R.I. 02893
Telephone 401-828-9000

November 10, 2004

To Whom It May Concern:

I am writing this letter of reference for Ms. Barbara Antonucci.

Barbara worked as the staffing coordinator at Cherry Hill Manor for many years and during my almost six years as Administrator.

I found Barbara to be a dedicated, conscientious and hard worker.

She took her responsibilities very seriously and you were assured the job would be done at the highest level of satisfaction.

I am quite comfortable recommending Barbara for any position where the above stated skills and excellent work ethic are desired.

Sincerely,

Hugh J. Hall

EXHIBIT
Haacu
Pltfs- 4
4/31/07 Jule

November 2, 2004

Dear Sir or Madam:

I had the pleasure to work with Barbara Antonucci for five years as her Director of Nursing. Barbara functioned as my staffing coordinator, clerical assistant, and human relations specialist. In our time together, I found her to be loyal, prompt, efficient, and detail-oriented.

She was an asset to the facility and an integral part of the team. It is my pleasure to recommend her for employment in any related capacity. I only wish I had a place for her at my present company.

I would be happy to discuss this in more detail if you would like to give me a call.

Sincerely,

Pamela L. Quinn

Pamela L. Quinn
(401) 433-4753 @ home
(401) 438-2250 @ work