**UNITED STATE DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,**<br>***Plaintiff,***<br><br>**vs.**<br><br>**LIFE CARE CENTERS OF AMERICA, INC., et al.,**<br><br>***Defendants.*** | **C.A. No. 06-108 ML** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56 STATEMENT OF UNDISPUTED FACTS**

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Disputed to the extent that patients are also cared for by Med-Techs. Sweeting, p. 98. A med-tech is a CNA who can distribute medication and is sometimes used to replace a nurse. Sweeting, p. 98, Haase, p. 307. The remaining portion of #5 is undisputed.

6. Disputed. There must be at least one R.N. in the building at all times. Sweeting, p. 88. In addition, nursing homes are subject to strict state and federal regulation in the area of staffing and if the nursing home does not maintain the staffing levels required by state and federal governments, it faces significant liability. Exhibit C. Med-techs can also work one of the three shifts. Sweeting, p. 98, 307. The remaining portion of #6 is undisputed.

7. Disputed to the extent that the reasons set forth for varying numbers of staff is not limited to shift, patient acuity and number of residents. The number of staff can vary depending on staff availability. Staff availability is dependent on number of nurses on staff, medical leave (including maternity leave), illness, resignations, terminations, vacation, military leave, other absence, and whether staff are willing to work. Sweeting, p.103 (even though you are supposed to have certain numbers of staff, it is sometimes "doable" with less); Haase, p. 156, 159, Sweeting, p. 327, Santin, p. 73-74, 55-56, 236, Sweeting, p. 318, Santin, p. 239-240, Pereira, p. 18, 50, 53; Exhibit H, Charron, p. 116 (there was not enough staff when she came to Cherry Hill in 2004).

8. Undisputed.

9. Undisputed.

10. Disputed. Bonuses were not offered "periodically," they were offered virtually every week. Exhibit L, E. Life Care, the corporate entity, did not authorize payment of any bonuses. Haase, p. 236-237. Bonuses were authorized by Cherry Hill's DON and Administrator. Bonuses were not an issue for CNAs (which includes med-techs). Haase, p. 227, 306.

11. Disputed. Plaintiff does not dispute that in 2004, Life Care employed her as the full-time scheduler whose job it was to schedule nursing staff. Plaintiff disputes that it was solely her responsibility to schedule and that it was her responsibility to provide appropriate patient care. This was the responsibility of the DON, and sometimes of other nurses. Haase, p. 62-63, 245-246, Pereira, p. 34, 43, 49, 211, Exhibit H, Antonucci, p. 166, 222., 163, 292, Charron II, p. 40-43, 100, Sweeting, p. 277-278, Santin, p. 64; Charron II, p. 43 (having to place calls for Antonucci did not mean Antonucci was not doing her job); Exhibit A (job description does not provide that scheduler must schedule staff in order to provide appropriate patient care).

12. Disputed, but only to the extent that per diem nurses do not typically have a set schedule of hours and CNAs include med-techs. Haase, p. 307, Santin, p. 55-56.

13. Disputed to the extent that the reason why there were openings in the scheduler could be due to a number of reasons. See #7 above.

14. Disputed to the extent that the DON and other nurses would help fill openings as part of their job. See #11. Disputed to the extent that people can be approached personally to fill openings. Exhibit M; Santin, p. 47-48.

15. Disputed because even if a scheduler makes multiple calls, he or she might still be unsuccessful. Sweeting, p. 160, Charron, p. 101-102. It is irrelevant whether the scheduler is aggressive or persistent because it all depends on whether the person being contacted is willing to pick up a shift or not. For example, a staffing person can be successful if they know the dislikes and likes of the nurses and just calls the right people, they can be successful if there is sufficient staff employed, they can be successful if bonuses are being offered, and they can be successful if they are lucky. None of that depends on making a certain number of calls or being "aggressive" and "persistent." Exhibit A (noting that it was a strength of Plaintiff's that she knew the dislikes and likes of the staff), Haase, p. 156, Sweeting, p. 314-315, 237, 55, 162, 160, 130, Charron, p. 218, Santin, 55-56, 236, 73-74; Pereira, p. 158, 50, Charron II, p. 48 (Morang was good at her job because she knew which nurses to call first because they liked certain shifts). Both Charron and Sweeting admitted that sometimes Plaintiff had no openings in the schedule. Charron, p. 218, Sweeting, p. 130. If that is the case, and Defendants allege that Plaintiff refused to make repeat calls, then her success at filling schedule must have depended on other factors. In addition, if repeat calls led to success, then bonuses would never have to be given out, all staffing people would have to do is just keep calling. Charron, p. 157-158 (admitting that she could not get people to work without giving bonuses on the weekend of October 1).

A staffing person might decide to call a person who has already refused to pick up a shift to see if they have changed their mind or a scheduler might call a person again if they were only

able to leave a message the first time. However, there is no policy about whether this should be done, or how many times it should be done, or evidence that it leads to success at filling openings. Antonucci, p. 167-168, Sweeting, p. 218-282, 314-315, 160, Santin, p. 237, Charron, p. 95, 91-93, 101-102. Charron never told Plaintiff what was expected in terms of the number of phone calls that should be made. Charron, p. 95. In all events, Plaintiff did these things to fill shifts. Antonucci, p. 158-159, 161, 167-168.

16. Disputed. As noted above in #15, even if a scheduler is "creative" and "accommodating," when attempting to fill shifts, this does not necessarily lead to success. See #15. In all events, Plaintiff did these things to fill openings. Antonucci, p. 210, 195-196, Ex. E.

17. Disputed. Bonus dollars were given only after April 2004. See #10. There was no policy for when bonuses would be offered and bonuses could only be authorized by the DON and/or executive director. Charron, p. 82-83, Sweeting, p. 178-179, 181. There is no evidence that persistent calling was a pre-condition to bonuses being offered. Haase, p. 214 (explaining reverse bonus program where bonuses given in beginning of week for nurses who picked up weekend shifts, no requirement that staffing coordinator make certain number of calls before bonuses offered); Charron, p. 95, 84, Haase, p. 158-159, Sweeting, p. 183, 172-174. If there was a last-minute call-out a bonus might be given and it would not matter if repeat calls made were first made. Charron did not testify that persistent calling was a necessary pre-condition to offering bonuses. Charron, p. 89. Sweeting did not deny that she might have given bonuses out on a Wednesday for a Sunday shift. Sweeting. p. 180.

18. Disputed, but only to the extent that prior to 1998 or 1999, Plaintiff was not the staffing coordinator.

19. Disputed. Life Care has a disciplinary procedure. Exhibit F. Haase and Charron each employed a different procedure for imposing discipline. Haase explained that discipline begins with verbal counseling and it is documented and that the next step can be a written warning. Haase, p. 45. He also explained that he has suspended employees many times before resorting to termination. Haase, p. 47. Charron explained that she would start with a verbal warning in writing, yet it is not contested that this is not actually what happened. Charron, p. 37-38. Action plans were not part of the disciplinary procedure. Charron, p. 52. Discipline had to be authorized by Haase. Haase, p. 216. Charron allegedly consulted Pereira before imposing discipline. Ex. B, G.

20. Undisputed.

21. Undisputed.

22. Disputed. The warning was issued for "misconduct/insubordination." Def's Ex.G, Ex. C (warning issued for "staffing and insubordination"); Ex. B (nothing about warning contributing to the reasons why Plaintiff was fired), Ex. G (warning was for argumentative and insubordinate response). The remaining portion of #22 is undisputed.

23. Disputed. The statements made by Celeste Harris in the warning (attributed to Plaintiff) are not true. Plaintiff, p.125-126 ("I don't believe I did [make the statements]. That's why I never

signed it." The warning does not say that Plaintiff yelled. Def's Ex. G. Sweeting testified that she did not hear the exact words said during this incident. Sweeting, p. 213. Harris told Antonucci that she "was a wonderful staffing coordinator. She said [Plaintiff] did a great job." Antonucci, p. 123. Harris gave Plaintiff an excellent review after this warning. Ex. A.

24. Disputed. Plaintiff denies she made the statements. Plaintiff, p. 125-126. Plaintiff does not dispute that she may have been loud, but the warning does not say she yelled. Def's Ex. G. The previous DON had always given her the particular day off in question, and the reason why Harris would not give the day off was because she wanted to take the day off herself. Antonucci, p. 122, 128.

25. Undisputed.

26. Undisputed.

27. Disputed. Harris gave Plaintiff a good evaluation during the time that she supervised Plaintiff. Def's Ex. G. Harris rated Plaintiff satisfactory in the following areas: following code of conduct; professionalism; respect. Harris did not tell Charron that Plaintiff was insubordinate during the entire period she supervised Plaintiff or that she always had problems with her. Charron, p. 126. Harris did not tell Charron how she felt about Plaintiff's job performance. Charron, p. 126-127. Other than this one incident, Plaintiff was never written up for anything while supervised by Harris. Harris rated Plaintiff satisfactory or above on "displays integrity and professionalism by adhering to Life Care's code of conduct," "communicates effectively and professionally both in writing and verbally with all types of personalities," and "treats all staff and residents with dignity and respect." Ex. A.

28. Undisputed.

29. Plaintiff does not dispute that Charron was not friendly from the very first meeting. Plaintiff does dispute that the only reason she felt that way was due to a "feeling." Ex. N (charges of discrimination recite how Charron belittled Plaintiff, set her up to fail, unjustifiably criticized her, changed her job duties, changed her hours, changed her workload, etc.). Antonucci, p. 72, 74-75. Charron did not speak with Plaintiff in the morning (such as saying good morning or hello). Plaintiff, p. 145. Charron did not talk to Plaintiff in the elevator. Plaintiff, p. 145. Charron never came into Plaintiff's office to discuss anything; Charron ignored Plaintiff, Charron "brushed her off." Antonucci, p. 146, 292, 270-271. Charron did excluded Plaintiff from a job fair, whereas in the past, she was always involved in job fairs. Antonucci, p. 271-272. Charron treated Donna Sweeting more favorably, along with other younger people. Plaintiff, p. 73.

30. Disputed. Charron stated that the first "discussion" regarding the master schedule occurred within the first "couple of weeks." Charron, p. 54-55. Charron also said there were issues during this time, but would not say that Antonucci was not meeting her expectations. Charron, p. 65. Lastly, Charron disputed the position paper statement that there were "serious" issues in the first week. She said issues were not serious. Charron, p. 209. Disputed to the extent that the "discussions" have also been called "oral warnings," "counselings" and "discipline" by

Defendants at various times. See Ex. B, p. 3-5, Motion, p. 6 and Charron, p. 86. Disputed that the discussion were about "maintaining" the master schedule. Charron, p. 80. The "discussions" were about updating the monthly schedule which constitutes adding nurses names and schedules to the schedule. Antonucci, p. 147-148. It is not disputed that Plaintiff approached Charron about updating the monthly schedule. Charron did indicate that Plaintiff should update the monthly schedule. Plaintiff agreed to do it, and did it from that point forward. Antonucci, p. 148-150. Charron never spoke to her about updating the monthly schedule again. Antonucci, p. 151-152. Antonucci did not refuse to update the monthly schedule during the first couple of weeks when this first conversation occurred. Charron, p. 74, 79.

31. Disputed. Plaintiff did not refuse add the names (update the schedule). Antonucci, p. 148-150, Charron, p. 74, 79, Sweeting, p. 142, 145-146, 148. Sweeting was never required to update the monthly schedule after she replaced Plaintiff. Id. Pereira, who according to Charron supposedly had "regular discussions with Ms. Charron" during which he was "kept apprised of Plaintiff's unsatisfactory work performance" including her failures relating to the "monthly schedule," could not ever recall having a discussion with Charron about Plaintiff and the monthly schedule. Pereira, p. 88, 194, 196, Exhibit G, p. 5. Plaintiff only said that before Charron, she never had to update the schedule, but had no problem doing so. Sweeting, p. 142, Antonucci, p. 147-150. She did not resist doing it. Antonucci, p. 150.

32. Disputed that Plaintiff testified about how Sweeting "treated" her. Antonucci, p. 256-257. She testified that there wasn't anything she "could think of," to make her think Sweeting was dishonest. Sweeting replaced Plaintiff in the scheduling position and continued to hold that position at the time of her deposition. Sweeting borrowed money from Cherry Hill on more than one occasion. Haase, p. 85-86.

33. Disputed. Plaintiff was not "counseled" regarding insufficient phone calls. Antonucci, p.160, 167, Sweeting, p. 281-282. Charron spoke to Plaintiff about the status of openings in the schedule just like she did with other staffing people, and just like previous DONs had discussed this daily job task with Plaintiff in the past. Antonucci, p. 160-161. It was part of their job and a routine thing. Antonucci, p. 160-161, Pereira, p. 211. For example, Charron would ask Plaintiff "did you call people," and just like all directors would ask "did you try everyone." Antonucci, p. 160. Sweeting testified that telling a scheduler to keep working on a schedule when there are openings is not counseling, it is part of the job. Sweeting, p. 151-152, 155-156. Santin testified that Charron would ask 1 or 2 times per day if there were any openings in the schedule. Santin, p. 182-183. Sweeting also explained that Harris used to tell her and Antonucci to try to be creative, etc., but that this was never a counseling or sign of a problem. Sweeting, p. 175. Pereira explained that one of the functions for the DON was to find out how the scheduling was going and to talk about the openings. Pereira, p. 211. Charron admitted that "it is always something I have to talk about scheduling," and she had to do this with Sweeting. Charron, p. 152. Plaintiff did badger people to fill openings. Antonucci, p. 158. This included calling people more than once "to see if they changed their mind, sometimes they think they're going out and they're not going out. So I always called people more than once." Antonucci, p. 158-159, 168 (I'm the type that's very insistent, so I kept calling and calling * * * I never gave up on it.). Antonucci would mark down on a sheet "times one, times two, what time I called, the dates I called." Antonucci, p. 159. Plaintiff also disputes this was a counseling. Antonucci, p. 157-

158, 182-185, 222-223, Ex. C (nothing about counseling for insufficient phone calls). Plaintiff also disputes that this was only when there were openings on the schedule. As noted above, these discussions were part of the job no matter what the situation was with openings. Charron did not ask Plaintiff how many times she had called individuals. Charron, p. 91-93, 95, Antonucci, p. 167.

34. Disputed. See #33. Charron never told Plaintiff to go back and do more work (making calls to fill the schedule). Antonucci, p. 164. Charron did not have to tell her to go back and call people again because it was part of Plaintiff's job and she did it. Antonucci, p. 161. Plaintiff "did it on [her] own because [she] had done it long enough before she came to know what [she] had to do." Antonucci, p. 161, 162-163. Charron never had a problem with the calls Plaintiff made. Antonucci, p. 167.

35. Disputed. See #33. Plaintiff was not disciplined for not making enough phone calls. Ex. C, Sweeting, p. 281-282, Antonucci, p. 167. According to Sweeting, the discussions between Charron and Plaintiff were routine discussions about things like the staffing pattern. Sweeting, p. 139-140. Plaintiff discussed many things with Sweeting and she never got an indication that Plaintiff's job was on the line or that she had been disciplined. Sweeting, p. 139-140, 211-212, 214-215.

36. Disputed. Pereira could not recall ever speaking to Plaintiff about her job performance or specifically about the need to be more aggressive in filling shifts. Pereira, p. 188, 33. Pereira could not recall hearing that Plaintiff refused to call more than one time. Pereira, p. 198-199. Pereira was never asked to speak with Plaintiff. Pereira, p. 107.

37. Disputed. Charron did not "counsel" Plaintiff about over-reliance on bonuses. Ex. C (nothing in position paper about Plaintiff being counseled for over-reliance on bonus dollars); Ex. B (further answers do not say Plaintiff was counseled regarding "over-reliance" on bonus dollars), Antonucci, p. 170-171. When Charron was asked if she "counseled" Plaintiff about over-reliance on bonus dollars, she responded only that "I spoke to her, and I guess you could say it was a form of counseling." Charron, p. 86. Plaintiff explained that if relying on bonus dollars was discussed, it was common knowledge – "any director knows you don't want to pay bonus dollars unless you're in a bind. There's no way - - in other words, you don't want to do that. That's the last resort. * * * [I]t's an understood thing." Antonucci, p. 170-171. The only written document that referenced bonus dollars in the form of disciplinary action is the 10/24 warning which Defendants' have abandoned. Plaintiff was never shown this form, did not sign it, and it was not signed by Haase. Antonucci, p. 308, Haase, p. 216, 218. Plaintiff did call individuals repeatedly. See #33-34. Plaintiff did not over-rely on bonuses. Haase, p. 214 (explaining reverse bonus program which gave out bonuses purposely in the beginning of the week), Antonucci, p. 170-171. Over-reliance on bonuses did not factor into why Plaintiff was fired. Charron II, p. 27, Haase, p. 238-239, Pereira, p. 184-185. Life Care management expressed its pleasure with the bonuses a month before Plaintiff was fired. Ex. H. Sweeting gave out more bonus money than Plaintiff but was not disciplined or fired. Sweeting, p. 182, 322-323; Haase, p. 201 (admitting that with Sweeting they gave comparable amounts in bonus money). Even if Plaintiff started working on schedules earlier or worked harder at getting them filled, there is no way to avoid giving bonuses. Sweeting, p. 183. Charron continued to authorize bonuses after Plaintiff was

fired. Sweeting, p. 181, 322. Plaintiff had no authority to offer bonuses unless they were approved by Haase and/or Charron. Charron, p. 82-83, Sweeting, p. 178-179, 181. When asked if Sweeting over-relied on bonuses, Haase responded that it would be "hard to say." Haase, p. 155.

38. Disputed. The action plan was not a form of discipline. Charron, p. 51, Pereira, p. 86-87, Haase, p. 203. Charron explained that the action plan was to Plaintiff know what her issues were; Pereira said he was not sure if it was discipline – he considered it a roadmap for expectations; and Haase stated that it was designed to put an employee on notice of shortcomings. Charron, p. 51, Pereira, p. 86-87, Haase, p. 203. This is consistent with Plaintiff's understanding of the purpose of the action plan – "It doesn't say anything about it being a criticism," it is "like what to do in the future," and "informative, like things she requested." Antonucci, p. 182. The action plan states that it was for "re-defining the job description." Def's Ex. H, p. 2. Action plans are not part of the company's disciplinary procedure. Ex. F. The plan did not relate to multiple "performance deficiencies," but referred only to the issue of updating the monthly schedule. Haase, p. 206. It is not disputed that the plan was issued on 8/23 and that Plaintiff received the document. Plaintiff refused to sign the plan. Def's Ex. H.

39. Disputed. The "particular performance deficiencies" were not listed. There is nothing about bonus dollars, making phone calls or filling openings on the action plan. Def's Ex. H. One of the directives was that Plaintiff "not ignore requests by DNS." Def's Ex. H. Plaintiff never ignored a request and followed up "automatically." Antonucci, p. 185-186. The word workplace is not on the form. The form reads "will f/u + complete duties as assigned." The word counseling is not on the form. Def's Ex. H. The form says "updated job description," but this is actually a <u>changed</u> job description since it was never used after Plaintiff was fired with the next scheduler. Sweeting, p. 267, Charron, p. 179-180, 189, Santin, p. 95. The written form includes the last sentence regarding termination, that was not written by Haase or Charron. Def's Ex. H. There is no dispute that Plaintiff did change her schedule to five days as required. Haase, p. 211, Antonucci, p. 187. In addition, the second expectation relating to not ignoring requests and perform duties, was, according to Haase, related to the monthly schedule. Haase, p. 206. There is no allegation that after August 23 Plaintiff continued to refuse to update the schedule. In all events, Plaintiff disputed that she refused to perform duties or ignored requests. Antonucci, p. 183, 185. Defendants never followed up to determine if Plaintiff was in compliance. For example, the plan sets a date of September 7, 2004 to review expectations. Def's Ex. H. Plaintiff was fired and no one bothered to determine if she had, in fact, followed the plan. Haase, p. 209, 210-211.

40. Undisputed that Plaintiff denies that she refused to follow any directives or otherwise had performance problems. Plaintiff disputes that she does not know why the action plan was issued. Plaintiff was asked if age motivated Charron to give Plaintiff the two-week action plan and responded "Definitely." Antonucci, p. 199, Ex. N (charges set forth that unjustified criticism of work was because of age, including increase work load, work hours, and changing job description). Antonucci never testified that the plan "reflected Ms. Charron's concerns regarding Plaintiff's performance." Antonucci, p. 186-188. She testified that "I don't know what it means because I've never, ever had anything like this." Antonucci, p. 188.

41. Disputed that the session with Santin was "training." Plaintiff does not dispute that she was sent

for one-day to "go meet with Becky. It wasn't so much a training thing. It was to go up and see if she did something different than what I did. But, Becky was only doing it for a year-and-a-half, so when I got there, Becky said, "I don't know what you are doing here, because if you've been doing it five years, six years, whatever, I've been doing it only a year-and-a-half, so I don't know what I'm supposed to show you that you wouldn't know." Antonucci, p. 174, Santin, p. 215-216, 174. "We were both doing it the same way." Antonucci, p. 175. Santin rated lower than Antonucci on her job performance evaluation. Ex. A, Ex. K, Santin, p. 138. Santin needed Charron to help her with her job duties. Santin, p. 64, 146-147, Charron, p. 100, Charron II, p. 41-43 (could not say how many times she had to help Plaintiff as compared to another scheduler). Charron never told Santin what to show Plaintiff (never told her or Plaintiff that the purpose was to see how Ms. Santin enlisted staff to pick up open shifts). Santin, p. 215, Haase, p. 59, Antonucci, p. 174-175. Even if Santin has no written incidents, Charron still had to speak with her regarding staffing, PPD, giving proper notice re: poor attendance, and doing reference checks fast enough. Santin, p. 182-183, 109, 123-124, 130-132. "It is always something I have to talk about scheduling." Charron, p. 152. Santin, p. 146-147.

42. Disputed. Plaintiff did not concede that Charron "felt" the training was necessary. Antonucci, p. 180, see #41. If Charron felt the training was necessary, she would have explained to Santin what she expected her to show Plaintiff, which she did not. Santin, p. 215. Plaintiff testified that any help would have been valuable, but that when she discussed the job with Santin, they were both doing the "same thing." Antonucci, p. 179. Plaintiff and Santin did not view the training as necessary. Antonucci, p. 180, 181. Plaintiff was receptive to "anything [Santin] wanted to tell her." Antonucci, p. 177.

43. Disputed. The pages cited by Defendants refer to what Santin showed Donna Sweeting, not Antonucci. Santin, p. 209-212. Santin did not show Plaintiff how to call individuals multiple times in the same day. Antonucci, p.179 ("she was getting phone calls, and I had said, yeah, it's the same old thing, people call out, you replace, so we were kind of back and forth, saying we did everything kind of the same way. And, that was it." Plaintiff never told Santin that she was not going to do what Charron directed. Antonucci, p. 177. She never refused to make multiple phone calls. See #15, 33, 34, 42. Santin said Antonucci was friendly. Santin, p. 219.

44. Disputed. When Plaintiff was asked if Santin did anything to make her think she was a dishonest person, Plaintiff responded "Not that I can think of. * * * I really wasn't with her that long." Antonucci, p. 257. There is no question about taking action against Plaintiff because of her age. Santin worked with Charron before Charron worked with Plaintiff and Santin was friendly with Charron. Santin, p. 69-70, 169.

45. Disputed. The funeral was really a wake (visitation hours) and took place after 5 p.m. Pereira, p. 137. There is nothing about having to leave early in the position paper. There is nothing about this until the Further Answers in April 2007. Ex. B. As Plaintiff testified, she did not recall Charron telling her that she needed to leave early on October 1, "she didn't usually talk to me that much to say that." Antonucci, p. 207.

46. Disputed. Plaintiff brought Charron the schedule for the weekend of October 2-3, for the first time, in the beginning of the week (Monday). "I turned in that week's schedule at the beginning

of the week. * * * I gave a copy to Steve and a copy to Pam, and I noted all the openings and what they were for * * *. She never got back to me on it. Nothing was said about the scheduling * * * she kind of just always brushed me off, so she didn't get into it. It was, like, like, I'm not going to talk about it right now. So, on Friday morning again, I said, Pam, we still have openings and I haven't been able to fill them, and that's when she, like I guess got all upset, like, she didn't know that they were there, but that was her reaction, like this was something new I was telling her." Antonucci, p. 291-292. Plaintiff gave Charron the schedule early in the week to show her "how bad the weekend would be." Antonucci, p. 207. She would "highlight all the openings for all nurses and all the openings for aids and then at the top I would put need, 30 nurses, * * * then when it gets toward the end of the week, I may go to her and say, here is the sheets of everyone I called, and we still have X number of openings." Antonucci, p. 163. Defendants initially stated that the schedule was brought to Charron around 3 p.m. and that Charron and one other person were able to fill 21 open positions within an hour. Ex. C. Charron changed this to getting the schedule at 2 p.m., with a "significant" number of openings, and Charron and two others taking 2-3 hours to fill the openings. Ex. B, p. 5. Charron changed again when she testified that there were "numerous" openings, but only a "couple" people had to be called. Charron, p. 136. She later said that there were "close to 20" openings. Charron, p.137. Charron should have been able to attend the visitation if it took 2-3 hours beginning at 2 p.m. because it took place after 5 p.m. Pereira, p. 137, #45. Of 130 individuals on the schedule for the weekend of October 2-3, the worst case scenario is that Plaintiff was unable to fill 13 openings, even offering a bonus of $100. Ex. E (highlighted are the individual names that Plaintiff testified were not written in her hand-writing). Charron admitted that she spoke with Plaintiff to authorize bonuses before Friday, so she must have known about the openings. Charron, p. 140-141. If Charron only authorized in a desperate, last-minute situation, then she must have already realized the situation was not good. Charron, p.86-87, 141 (Charron only authorizes bonuses if they are really desperate, and is not sure if she waited until the end of the week of September 27 to authorize bonuses).

47. Disputed. See #46. There were 130 individuals ultimately scheduled for the weekend of October 2-3, there were only 13 openings when Plaintiff went to Charron on October 1. Defendants' now do not allege that they completed the schedule, but only that they were able to "substantially" complete it which means that they did not have the right amount of staff. This contradicts the position paper and Further Answers. Ex. C, Ex. B. Charron had to increase the bonus to "substantially" complete the schedule. Antonucci, p. 209.

48. Disputed. See #46 and #47. Charron never indicated there was a problem with the calls Plaintiff made and never had a problem with her results - - she knew that it was not Plaintiff's fault if there was not enough staff. Antonucci, p. 167-168. Charron said she felt Plaintiff should have done more, could not say how many people she called or how many she got to come in. Charron, p. 137. She did not see how many times BA called. Charron, p. 138. She admitted that even if Plaintiff called more, there are times when you can call and not get it filled. Charron, p. 138. "You always have those issues on a Friday afternoon." Charron, p. 138. She never sought to find out what BA efforts were on the October 2-3 schedule. Charron, p. 139. She does not know for sure if she waited to the end of that week to give BA bonuses. Charron, p. 141-142. When Plaintiff showed Charron the schedule on Friday, she had already filled a lot of the openings that existed in the beginning of the week. Antonucci, p. 208.

49. Disputed to the extent that Plaintiff "did not know if [Charron] was disappointed * * * because I know if I work as hard as I can on it and there's still openings, there is not much more I can do. Now, if she had said to me, Barbara, make calls again and increase the bonus to 200, that could make a difference, just like it made a difference when she increased it for herself to fill it. Plus, she used med techs. I can't use med techs like she did unless the director tells me to. It's her license, not mine." Antonucci, p. 221-222.

50. Disputed. What Plaintiff testified to was that "It's hard to believe, but I believe that's the incident, * * *I don't know. It just seems unfair that staffing is bad and she gets all bent out of shape about it, when she had all week to address it." Antonucci, p. 293. Although this is the incident that Defendants' are relying on, the reason why Plaintiff was fired was because of her age. Ex. N (charges detail that Plaintiff believes her discharge was motivated by her age). Plaintiff also incorporates all the reasons set forth in her Memorandum in Support of Objection to Defendants' Motion for Summary Judgment ("Objection").

51. Disputed. Plaintiff's termination was not based on a history of prior poor job performance. See Objection, pp. 12-29. Haase stated that Charron made the decision to fire Plaintiff, he just rubber-stamped it. Haase, p. 137, Pereira said he did not make any recommendation to fire Plaintiff. Pereira, p. 143, 173.

52. Undisputed that Plaintiff was fired on October 4, and that she was provided with a copy of the termination notice. Disputed that Plaintiff testified that the reason provided by Charron and Haase to Plaintiff was poor job performance. The form indicates that, Def's Ex. I, but when Plaintiff was asked if she thought that was the real reason she responded "Not at all. My job performance was excellent, as six or seven other directors can testify to." Antonucci, p. 284-285. Plaintiff wrote on the form "Do not agree with the above – work through breaks – sometimes lunch. Put every effort into getting staff not enough nurses in facility." Def's Ex. I. Even though it appears nowhere on the termination form, Haase stated that the reason for Plaintiff's firing was misconduct. Haase, p. 132, 138-140.

53. Undisputed.

54. Undisputed that Sweeting replaced Plaintiff. Disputed that when Sweeting was scheduler, Charron spent less time on scheduling and more time on clinical issues. When asked about this, Charron testified that this just related to calling people and that she could not give specifics on how often this happened. Charron, p. 212. Charron acknowledged she had to do the same thing with Sweeting, and could not say how many times it happened with either Plaintiff or Sweeting. Charron, p. 213. According to Sweeting, staffing started to get real bad in 2005. Sweeting, p. 33, Antonucci, p. 319-320. In fact, in 2005, Pereira had to appoint a unit manager to oversee staffing. Pereira, p. 34. Pereira had not visited Cherry Hill prior to 2005 due to staffing concerns. Pereira, p. 101. Sweeting was ranked lower than Plaintiff on her evaluation. Ex. A, Ex. J. Sweeting's job performance declined in several areas from 2005 to 2006. Sweeting had to be spoken to about not having two weeks of daily schedules completed, tracking call-outs, having bad organizational skills, piles of paperwork, PPD, not putting incident reports in, filling openings and being more aggressive. Sweeting, p. 79, 115-116, 174, 227, 237, 239. 246-247.

115-116, Haase, p. 162.

55. Undisputed.

56. Undisputed.

57. Disputed. Horner's affidavit reports that all codes beginning with "D" on Exhibit A attached to her affidavit are involuntary terminations. However, the code D07 is "walked out-no notice" which would not be considered involuntary. DEF 2055. Furthermore, the code R08 is "unsatisfactory job performance," which should have been included as an involuntary terminations. DEF 2055. There were 206 new hires between July 26, 2004 and the end of December 2005. Less than 1/3rd were over 40, and only 31 were over 50. DEF 2930-2935, 2912-2916, DEF 2055-2060, DEF 2053-2054A, DEF 1636-1939, Defendants' New Hires List (no bates stamp). Three codes represented subjective reasons for termination, unsatisfactory job performance, failed performance objectives and unsatisfactory work volume/quality). See also, p.37-39 of Plaintiff's objection.

58. Disputed. Plaintiff testified about Irene Ferruccio, who was another older employee who was fired and that they both suspected age motivated their firings. Antonucci, p. 321-322; Ex. M (Ferruccio Affidavit). Ferruccio recounted to Plaintiff an incident where Charron made age-related comments. When discussing an interview with Ferruccio, Charron said that the nurse she interviewed asked Charron's age and Charron responded with something like "oh, that's what I need, somebody else questioning that I'm young as a director, I'm too young." Antonucci, p. 322, Ex. M. This person was not hired. Id. Charron also asked Ferruccio her age and when she refused to tell, Charron said she would just look it up. Ex. M. Haase knew the ages of virtually all of the employees and was able to tell who was over 40 "from working with them for three years and - - you know, having access to their records and all that," * * * "I know how old people are over a course of time." Haase, p. 333-335. Horner processed paperwork for new hires which would indicate employee ages. Horner, p.30-31. Yet, Horner initially responded that she could not identify any employees over 40. Horner, p. 36. Haase obviously made a point of finding out.

Stereotypical comments were made that can indicate animus. Haase testified that Plaintiff was "stuck in the belief that the way things have always been done is the right way." Haase, p. 50. Plaintiff had a lack of "energy." Haase, p. 191-193. Sweeting testified that Plaintiff was "set in her ways." Sweeting, p. 280. Pereira was asked if he was aware of Charron hiring any nurses older than he (age 42 in 2007, age 39 when Plaintiff was fired). Pereira, p.22. He responded, "Oh, I don't think they make nurses that old." Pereira, p. 166.

59. Undisputed.

60. Undisputed.

61. Disputed. See #58. At the time of his deposition, Haase had been fired by Cherry Hill, but had not yet received a promised recommendation from his boss, Kate O'Connor. Haase, p. 69.

62. Undisputed that Plaintiff did not complain about age discrimination to Haase. Disputed that he

was involved in Plaintiff's supposed performance issues, he left those decisions to Charron. Haase, p. 137. Plaintiff complained in action plan and on termination form. Def's Ex. H, I. Haase and Plaintiff did not "really interact much." Antonucci, p. 262.

63. Disputed. Haase approved the highest merit increase possible by Life Care standards (3%), for Plaintiff, and nothing was mentioned about job performance issues before Charron was hired. Ex. A, Haase, p. 92. Haase testified that a person with performance and attitude issues would get less than a 3% raise. Haase, p. 94. "[H]e didn't seem to have a problem with my work," "I never had any complaint to him about my staffing or any correction on what I did. Nothing like that. He seemed to be more than satisfied with the job I was doing." Antonucci, p. 263-264. With respect to the action plan meeting, Haase "didn't say anything. [Charron] kind of handled the whole meeting, to be honest with you." Antonucci, p. 265. Haase did not participate in the decision to send Plaintiff for training. Haase, p. 58. He did not know what she was supposed to learn there. Haase, p. 59. Haase did not concur in the decision to fire Plaintiff, but he allowed it. Haase, p. 137 (it was Charron's decision).

64. Disputed to the extent that the only reasons are set forth in #64. Plaintiff incorporates her objection which lists numerous reasons why Plaintiff's firing was the product of age discrimination. For example, there was no previous disciplinary history that Defendants' relied on in making the decision to fire Plaintiff, the reasons why she supposedly had poor job performance have shifted, been inconsistent and are implausible. These inconsistencies, shifting explanations and implausibilities show that Defendants did not truly believe that Plaintiff's performance was bad enough to fire her, but have tried to re-write history after-the-fact to support a decision that was predicated on age. In addition, similarly-situated younger staffing coordinators with similar problems were not even disciplined. Defendants' fired other older employees during Charron's tenure. Charron made age-related comments, and others made comments stereotyping older persons.

65. See #64.

66. Undisputed that Charron was friendlier to Sweeting. Disputed that Plaintiff testified that the reason why she was friendlier was because they had things in common. Plaintiff testified that she treated her better because of her age (p. 275), and that she was "a lot friendlier with Donna, discussing different things. [Charron] never really spoke to me. But, if I were to go in the office and Donna was in there with her, sometimes they would be discussing things, like they're both divorced, more of a social type thing, where with me she didn't even speak with me, so." Antonucci, p. 277. Charron was also friendlier with Melissa DeCosta, a younger LPN. Antonucci, p. 275.

67. Disputed. Sweeting was spoken to by Charron a couple of times about not having two weeks of daily schedules completed. Sweeting, p. 237, 239. This was a problem on both her 2005 and 2006 evaluations. Sweeting had problems tracking call-outs which was something Charron wanted her to do and was also criticized on her evaluation for it. Sweeting, p. 245-246. She was spoken to by both Harris and Charron for not having good organizational skills when she left piles of paperwork on her desk that sometimes remained for weeks. Sweeting, p. 246-247.

Sweeting gave out "way more" bonus money than was given in 2004. Sweeting, p. 181-182, 322-323. Sweeting was counseled by Charron and Harris for not putting incident reports in within the required time period. Sweeting, p. 79, 227. In fact, Charron told her that if she had a problem with incident reports again, she would write her up. Sweeting, p. 79. Haase had to speak with Sweeting on "several occasions" about PPD problems. Sweeting explained that this happened on at least seven different occasions and at one point it was non-stop. Sweeting, p. 115-116. She was spoken to about PPD by Harris and by the current DON. Sweeting, p. 115-116. Harris spoke to Sweeting about trying to be more creative in filling the openings without bonuses and to be more aggressive. Sweeting, p. 174, Haase, p. 162 (lack of aggressiveness was an issue at times with Sweeting).

In fact, there were more staffing problems when Sweeting was scheduler. According to Sweeting, it started to get real bad in 2005. Sweeting, p. 33, Antonucci, p. 319-320. In fact, in 2005, Pereira had to appoint a unit manager (Melissa DeCosta) to oversee staffing. Pereira, p. 34. Haase believed Sweeting had issues with giving nurses too much time off which created scheduling problems. Haase, p. 150-151. He also believed that Sweeting's poor job performance as reflected on her 2006 evaluation might have been attributed to difficulties with staffing because it was a problem at that time. Haase, p. 154.

68.Undisputed that Plaintiff denies that her performance warranted discipline or that she refused any directives issued by Charron. Disputed that Charron discussed Plaintiff's "performance" with her. Defendants cite pages 147-148 of Plaintiff's deposition. Plaintiff says nothing about being spoken to about her performance, but describes a conversation during which Plaintiff went to Charron to talk about updating the monthly schedule. Defendants cite pages 157-158 of Plaintiff's deposition. Plaintiff says nothing about being spoken to about her performance, but describes a conversation during which Charron asked her about the schedule. Defendants cite pages 160-164 of Plaintiff's deposition. Plaintiff says nothing about being spoken to about her performance. She is asked if she was counseled about needing to pursue staff to fill shifts. She responds "I don't recall her counseling me about that, when it's something I was doing regularly. Antonucci, p. 160. On pages 161-164, Plaintiff discusses scheduling. She does not say she was spoken to about performance issues. Finally, on page 170, Plaintiff is asked if Charron ever discussed with her the fact that she was dissatisfied with the job she was doing. Plaintiff responds "No. She made changes on a lot of things with me, but never said you're not doing a good job, that type of thing." It is also disputed that the action plan regarded performance. When questioned about the nature or purpose of the action plan, Charron explained that it was to let Plaintiff know what her issues were; Pereira considered it a roadmap for expectations; and Haase stated that it was designed to put an employee on notice of shortcomings. Charron, p. 51, Pereira, p. 86-87, Haase, p. 203. This is consistent with Plaintiff's understanding of the purpose of the action plan – "It doesn't say anything about it being a criticism," it is "like what to do in the future," and "informative, like things she requested." Antonucci, p. 182. Plaintiff was discharged because of her age, not because of the weekend schedule. See #64.

69. Undisputed that Plaintiff claims her discharge is pretextual and part of the reason is that Charron only supervised her for two months. Disputed that those are the only reasons. See #64.

Plaintiff,

By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 16th day of July 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate