UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI,
Plaintiff,

v.

LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity,
Defendants.

C.A. No. 06-108-ML

**DEFENDANTS' AMENDED RULE 56 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule Cv 56, Defendants, Life Care Centers Of America ("Life Care"), Pamela Charron, and Steve Haase (collectively "Defendants") submit Defendants' Amended Rule 56 Statement of Undisputed Facts, with record Appendix, in support of their Motion for Summary Judgment, in compliance with this Court's Order of July 18, 2007.[1]

**Relevant Background Information On Cherry Hill Manor**

1. Defendant Life Care is a corporation incorporated in Tennessee and has its principal place of business at 3570 Keith Street, Cleveland, Tennessee. Life Care owns and operates nursing homes throughout the United States, including Cherry Hill Manor ("Cherry Hill"), a nursing home located in Johnston, Rhode Island. (Affidavit of Cindy

[1] Defendants have complied with this Court's requirement that the total number of pages supporting this Amended Rule 56 Statement of Undisputed Facts not exceed 10 pages. In doing so, Defendants respectfully submit that this strict page limitation hampers Defendants' ability to demonstrate the lack of disputed material facts in the summary judgment record.

Cross para 1-2). The Affidavit of Cindy Cross was submitted to this Court on March 8, 2006 with Defendants' Notice of Removal, (Document No. 1).

2. In 2004, the Executive Director of Cherry Hill was Defendant Steve Haase. Mr. Haase held this position from approximately September 2003 until April 2006. (The facts in this paragraph and other paragraphs without record cites have been expressly acknowledged as undisputed, pursuant to Local Rule Cv 56(a)(2)).

3. From the end of July 2004 until approximately October 2005, the Director of Nursing Services ("DNS") at Cherry Hill was Defendant Pamela Charron. (The facts in this paragraph and other paragraphs without record cites have been expressly acknowledged as undisputed, pursuant to Local Rule Cv 56(a)(2)).

4. Prior to Ms. Charron, the DNS was Celeste Harris, who held the position for less than a year and then voluntarily transferred to an alternate position at Cherry Hill. (The facts in this paragraph and other paragraphs without record cites have been expressly acknowledged as undisputed, pursuant to Local Rule Cv 56(a)(2)).

5. (Formerly ¶ 11)[2] In 2004, Life Care employed a full-time Scheduler at Cherry Hill whose job it was to schedule nursing staff to provide appropriate patient care. (Charron Affidavit ¶ 1).[3] The Scheduler reports to the DNS, who has the authority to assign work-related duties to the Scheduler. (Charron Affidavit ¶ 1).

---

[2] In order to comply with this Court's July 18, 2007 Order, Defendants have removed a number of paragraphs from its Rule 56 Statement of Undisputed Facts, because the record support for the paragraphs could not be contained within the 10 page limitation on the Appendix. Because Defendants' Motion And Memorandum in Support of Summary Judgment referenced the original Rule 56 Statement of Facts, the former paragraph numbers corresponding all or part of Defendants' original Rule 56 Statement of Facts are set forth herein for the Court's ease of reference.

[3] Reference is made to the Affidavit of Pamela Charron, attached hereto as Exhibit 2.

**<u>Discipline Of Plaintiff's Under The Supervision Of Celeste Harris, The DNS Prior To Ms. Charron</u>**

6. (Formerly ¶ 21) For part of 2003 and from January to July of 2004, Plaintiff was supervised by Celeste Harris, who held the position of DNS at the time. (The facts in this paragraph and other paragraphs without record cites have been expressly acknowledged as undisputed, pursuant to Local Rule Cv 56(a)(2)).

7. (Formerly ¶ 22) In December 2003, Ms. Harris issued Plaintiff a written warning for insubordinate and disrespectful behavior. A copy of the warning is attached to the Charron Affidavit as <u>Exhibit A</u>.

8. (Formerly ¶ 23) The warning indicates that, in connection with the rejection of Plaintiff's request for a particular holiday off, Plaintiff told Ms. Harris "I don't get paid enough to put up with this aggravation," and "If I got paid as much as you do, I would do your job." (<u>Exhibit A</u>). The warning also indicates that Plaintiff raised her voice to Ms. Harris. (<u>Exhibit G</u>). Plaintiff's actions toward Ms. Harris were witnessed by Ms. Sweeting, who saw Plaintiff yelling at Ms. Harris as Plaintiff followed Ms. Harris down the hall. (Charron Affidavit ¶ 1).

9. (Formerly ¶ 25) Plaintiff claims to not know what motivated Ms. Harris to provide the warning for insubordination, but does not allege that it was because of age.

10. (Formerly ¶ 26) Plaintiff concedes that Ms. Harris was generally fair and reasonable in her dealings with Plaintiff, except for the instance described above, when Ms. Harris would not allow Plaintiff to take a particular holiday off day. Plaintiff does not know of any action that Ms. Harris ever took against Plaintiff that was motivated by unlawful age-animus.

11. (Formerly ¶ 27) At the time Ms. Charron began as DNS, she was aware that Plaintiff had been insubordinate during the period Ms. Harris supervised Plaintiff. (Charron Affidavit ¶ 1).

**Ms. Charron Begins As DNS In Late July 2004 And Counsels Plaintiff Regarding Unsatisfactory Performance As A Scheduler**

12. (Formerly ¶ 28) In July 2004, Ms. Charron was promoted from her position as Assistant DNS at Life Care's facility in Raynham, MA (the "Raynham Facility"), to DNS of Cherry Hill. As DNS, Ms. Charron reported to the Executive Director, Mr. Haase, and to the Regional Clinical Coordinator, Joseph Pereira.

13. (Formerly ¶ 30) Within a week of Ms. Charron commencing as DNS, Plaintiff and Ms. Charron had a discussion over maintaining the Master Schedule. (Charron Affidavit ¶ 2). Plaintiff told Ms. Charron that under the supervision of previous DNSs, she had not maintained the Master Schedule and that she did not know how she would be able to complete the task. (Charron Affidavit ¶ 2). Plaintiff described this interaction as the "first real bad encounter" with Ms. Charron. (Pl. Tr. 148).[4]

14. (Formerly ¶¶ 31, 33) Following the interaction regarding the Master Schedule, Ms. Charron counseled Plaintiff, because Ms. Charron believed that Plaintiff was making insufficient telephone calls to fill the schedule, and Plaintiff would respond that she was "doing the best she could" but that she was not willing to "badger" staff by making repeated calls to have them agree to work open shifts. (Charron Affidavit ¶ 2). The per

[4] Reference is made to the deposition of Plaintiff, conducted on January 9, 2007 (pp. 1-234) and February 5, 2007 (pp. 235-326). True and accurate copies of relevant excepts of the transcript of Plaintiff's deposition are attached hereto as Exhibit 1.

diem Scheduler, Donna Sweeting, also informed me about Plaintiff's resistance to aggressively making telephone calls to fill open shifts. (Charron Affidavit ¶ 2).

15. (Formerly ¶ 34) Plaintiff claims to "not remember" the particular conversations with Ms. Charron regarding Plaintiff's calling activities, but does not deny they could have occurred. (Pl. Tr. 165). Plaintiff generally agrees that Ms. Charron had discussions with Plaintiff regarding openings in the daily schedule. (Pl. Tr. 160-161). Plaintiff also contends that she had done the scheduler job long enough such that she knew what to do and did not need Ms. Charron to tell her what to do. (Pl. Tr. 161, 163, 165).

16. (Formerly ¶ 37) Ms. Charron counseled Plaintiff about over-reliance on bonuses to get staff to pick up shifts. (Charron Affidavit ¶ 2). Rather than calling individuals repeatedly, Plaintiff would overly rely on payment of bonus dollars to fill the schedule. (Charron Affidavit ¶ 2). Plaintiff also concedes that Ms. Charron "may have" told her that she needed to rely less on bonuses to fill shifts. (Pl. Tr. 170).

**Plaintiff Is Issued A Written Action Plan Regarding Her Performance**

17. (Formerly ¶ 38) On August 23, 2004, Ms. Charron and Mr. Haase, Cherry Hill's then Executive Director, presented Plaintiff with a written Action Plan regarding her performance deficiencies as Scheduler. A copy of the August 23, 2004 Action Plan is attached to the Charron Affidavit as Exhibit B. The Action Plan was disciplinary in nature, and that it was provided to Plaintiff to detail what Ms. Charron expected of Plaintiff and what Plaintiff needed to work on. (Charron Affidavit ¶ 3, Exhibit B).

18. (Formerly ¶ 39) In the Action Plan, Ms. Charron listed particular performance deficiencies that she needed Plaintiff to remedy. Exhibit B. One of the directives was

that Plaintiff was not to "ignore workplace requests of the DNS." (Exhibit B). The Action Plan also counseled Plaintiff to "F/U [follow up] + complete duties as assigned," and "review + sign updated job description." (Exhibit B). The Action Plan also indicated that "In the event these expectations are not met, appropriate action will be taken **up to and including termination** as management feels appropriate." Id. (emphasis added).

19. (Formerly ¶ 40) Plaintiff claims to "not know" why Ms. Charron issued the Action Plan, and admitted that the Action Plan reflected Ms. Charron concerns regarding Plaintiff's performance. (Pl. Tr. 186).

**Ms. Charron Sends Plaintiff For Training With The Scheduler At The Life Care Nursing Home In Raynham, Massachusetts**

20. (Formerly ¶ 41) Following the August 23, 2004 Action Plan, Ms. Charron sent Plaintiff for training with a Scheduler at a different Life Care facility, Rebecca Santin. (Charron Affidavit ¶ 4).

21. (Formerly ¶ 43) Following the training, Ms. Santin reported to Ms. Charron that Plaintiff had been "surprised" at the number of times that Ms. Santin contacted employees, and that Plaintiff told Ms. Santin that she (Plaintiff) would not telephone individuals on multiple occasions. (Charron Affidavit ¶ 4).

**Plaintiff Is Discharged For Turning In A Weekend Schedule With A Significant Number Of Unfilled Openings**

22. (Formerly ¶ 45) On Friday, October 1, 2004, Ms. Charron sought to leave work early to attend a funeral with Mr. Haase, and had previously informed Plaintiff of her need to leave. (Charron Affidavit ¶ 5; Pl. Tr. 207).

23. (Formerly ¶ 46) At approximately 2 p.m., Plaintiff brought Ms. Charron the schedule for the weekend (October 2-3, 2004) with a significant number of vacancies. (Charron Affidavit ¶ 5). Plaintiff had not previously informed Ms. Charron that there was such significant problem with the schedule. (Charron Affidavit ¶ 5). Charron was unable to attend the funeral with Mr. Haase, because the schedule was not sufficiently complete. (Charron Affidavit ¶ 5).

24. (Formerly ¶ 47) Ms. Charron and two other employees were able to substantially complete the schedule. (Charron Affidavit ¶ 5).

25. (Formerly ¶ 48) Based on the manner in which Plaintiff presented the incomplete schedule (i.e. late in the afternoon, with significant vacancies, without sufficient prior notice on a day when Ms. Charron was scheduled to attend a funeral), Ms. Charron concluded that Plaintiff had not put sufficient effort into completing the schedule. (Charron Affidavit ¶ 5).

26. (Formerly ¶ 49) Plaintiff concedes that there were openings on the schedule when she presented it to Ms. Charron, and that Ms. Charron was upset when she saw the condition of the schedule provided by Plaintiff. (Pl. Tr. 208; 293).

27. (Formerly ¶ 50) Plaintiff also concedes that the schedule she turned in on October 1, 2004 was the event that precipitated her discharge. (Pl. Tr. 293).

28. (Formerly ¶ 51) Based on the events of October 1, 2004 – and in light of the prior attempts by Ms. Charron to have Plaintiff remedy her performance deficiencies – Ms. Charron believed Plaintiff's performance was not acceptable and warranted discharge. (Charron Affidavit ¶ 5). Ms. Charron consulted with her clinical supervisor,

Joseph Pereira, and the Executive Director, Steve Haase, and thereafter made the decision that Plaintiff should be discharged. (Charron Affidavit ¶ 5).

29. (Formerly ¶ 52) On Monday, October 4, 2004, Plaintiff was called in to a meeting with Ms. Charron and Mr. Haase, and her employment was terminated. (Charron Affidavit ¶ 5). The reason provided by Ms. Charron and Mr. Haase was Plaintiff's poor job performance. (Exhibit C to the Charron Affidavit). At the meeting, Plaintiff was provided a Notice of Termination, which she signed. (Exhibit C).

30. (Formerly ¶ 53) On the Notice of Termination, Plaintiff indicated that the inability to fill the schedule was a result of insufficient nurses employed at the facility. (Exhibit C).

**Plaintiff's Allegations Of Age Discrimination Are Not Supported By Evidence**

31. (Formerly ¶ 55) Plaintiff's complaint alleges that Ms. Charron was motivated by unlawful age-discrimination when she discharged Plaintiff. Plaintiff's First Amended Complaint, ¶¶ 17-18.

32. (Formerly ¶ 56) As of March 4, 2005, Cherry Hill employed approximately 233 employees. Of those, 120 employees were over the age of 40, and 113 employees were under the age of 40. Thirteen employees were aged 60 or older. Affidavit of Madeline Horner ("Horner Affidavit")[5], ¶ 2.

33. (Formerly ¶ 57) From late July 2004 until February 23, 2005, approximately 20 employees were involuntarily terminated from employment at Cherry Hill. Nine of those employees were under 40 years old and eleven of those employees were over 40

---

[5] Reference is made to the Affidavit of Madeline Horner, attached hereto as Exhibit 3.

years old. None of the other employees aged 63 (Plaintiff's age at discharge) or *older* were discharged during this period. Horner Affidavit ¶ 3.

34. (Formerly ¶ 58) Ms. Charron did not make any comments regarding Plaintiff's age, or which otherwise suggested that Ms. Charron harbored age-animus. (Charron Affidavit ¶ 6).

35. (Formerly ¶ 59) Plaintiff never made any complaints regarding age discrimination while employed at Cherry Hill. (The facts in this paragraph and other paragraphs without record cites have been expressly acknowledged as undisputed, pursuant to Local Rule Cv 56(a)(2)).

36. (Formerly ¶ 60) Plaintiff's complaint also alleges that Mr. Haase engaged in age discrimination. Plaintiff's First Amended Complaint, ¶¶ 17-18.

37. (Formerly ¶¶ 61, 62) Plaintiff testified that, on the few occasions that she interacted with Mr. Haase, he was generally pleasant to Plaintiff, and that he never did anything that caused Plaintiff to conclude that Mr. Haase did not like her. (Pl. Tr. 260-261). While Mr. Haase was also available to meet with Plaintiff regarding employment-related concerns, Plaintiff never complained regarding age or otherwise. (Pl. Tr. 265-266). Plaintiff has not alleged that Mr. Haase made any age-related comments. Mr. Haase signed off on the termination of Plaintiff by Ms. Charron (Exhibit C to Charron Affidavit) and agreed with the August 23, 2004 Action Plan (Exhibit B; Pl. Tr. 285).

38. (Formerly ¶ 64) Plaintiff's belief regarding age-discrimination is a result of her belief that Ms. Charron was friendlier to younger individuals. (Pl. Tr. 277-278).

39. (Formerly ¶ 65) As to Plaintiff's conclusion that the alleged difference in friendliness was age-related, Plaintiff testified "That's just what I feel, that it was because

of my age that she wasn't friendly with me and she was with other people that were younger." (Pl. Tr. 277-278). Plaintiff was unable to provide any additional facts to support her conclusion. (Pl. Tr. 278).

40. (Formerly ¶ 67) Ms. Sweeting never engaged in conduct that warranted being issued a written warning. (Charron Affidavit ¶ 6).

41. (Formerly ¶ 68) Plaintiff concedes that Ms. Charron discussed Plaintiff's performance with her. (See e.g. Pl. Tr.160-164, 170, 186). Plaintiff does not dispute that Ms. Charron and Mr. Haase provided Plaintiff with a written Action Plan on August 23, 2004 regarding her performance, and that Ms. Charron and Mr. Haase discharged Plaintiff in October 2004 because of her work on a weekend schedule. (Exhibit B, Exhibit C, Pl. Tr. 285, 293).

Respectfully submitted,

LIFE CARE CENTERS, INC.,
By its attorneys,

/s/ Christopher J. Campbell
Christopher J. Campbell, R.I. Bar No. 6611
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, MA 02116
617-367-0025

Dated: July 20, 2007

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document with Exhibits 1-3 has been filed electronically on July 20, 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Patricia E. Andrews, Esquire
peandrews@verizon.net

and

Carly B. Iafrate, Esquire
ciafrate@verizon.net

/s/ Christopher J. Campbell