Page 147

****

So, when she first started working there, I went in one day and I had said, I had a change for the schedule, and I didn't know if she would like me to erase things on hers, what I call her master schedule, I didn't know other nurses, if they did something on it, they usually did it and put a little sticky and I would change what I had to change on my copy, my photocopy of the original, and I had said to her in

Page 148

a nice way, "I have a change for your master schedule," I said, "did you want me to mark it," or, she was new to me, I didn't know what her procedure would be, I said, "or do you prefer to mark it?" She said, "I don't have a master schedule," very rude, just like. And I'll never forget that day because I was trying to be extra nice, would she like me to help her, or would she like to do it on her own. That was the first real bad encounter,

Page 160

****

Like I say, she may have questioned me on, like directors say, did you try everyone, did I call the nurses, she questioned me on did you try everyone.

Q And she did that because you would give her a schedule that wasn't complete?

A Of course, schedules were never complete. There was such a shortage.

Q So you gave her a schedule with vacancies?

A Yes.

Page 161

Q And she would tell you you need to go back and call people again?

A Like I say, she didn't have to tell me. I would do that on my own. That was part of my job.

Q If there were still vacancies, you still need to go back and call people, wouldn't you?

A Of course, and I would, without being told.

Q But would she tell you?

MS. BEAUVAIS IAFRATE: Objection as to form.

A I don't recall her saying that to me. I mean, she may have looked over what I wrote and who I called and said, try them again. That would be just not like -- I don't know how to explain it. If there were openings and I had tried everybody twice, she may have said, try again, maybe somebody will work.

Q You believe that's what she told you?

MS. BEAUVAIS IAFRATE: Objection to form.

A I don't even recall her doing that, but I am saying, you keep insisting, so maybe she did. I don't recall. I did it on my own because I had done it long enough before she came to know what I had to do.



Page 163

****

Q So, you would go to her and you would say, I have done all that I can, but there's still openings?

A Right, and a lot of times, if the director calls people, even though they don't want to work, they're more embarrassed to say no and they will work. That has happened. Sometimes they still say no.

Page 165

****

Q No. What I'm asking you, if she indicates that she did tell you to go back and work on it some more, do you deny that could have occurred?

MS. BEAUVAIS IAFRATE: Objection as to form.

A I deny that she could have. No, I don't deny it, but I don't remember it.

Page 170

****

Q Did she ever give you an indication you needed to rely less on bonus dollars?

A It may have been discussed, and, of course, any director knows you don't want to pay bonus dollars unless you're in a bind. There's no way -- in other

Page 186

MS. BEAUVAIS IAFRATE: Objection as to form.
A She had concerns for the two weeks she worked with me, didn't she?
Q So, she did have concerns?
A I guess, according to this.
Q And, according to this in number three, "Will follow-up and complete duties as assigned," would you agree with me that she wrote this down?
A Yes.
Q And she gave it to you?
A Uh-hum.
Q You have to say yes or no.
A Oh, yes. She wrote it down, yes.
Q And that she needed you to do this, correct?
MS. BEAUVAIS IAFRATE: Objection as to form.
A She needed me to complete and -- complete my duties?
Q As assigned.
A Well, that's -- nothing is assigned to me. It's just my duties. I know what I do. I did it automatically, so I don't know what she meant by that.
Q Well, you agree with me that she could have meant

Page 207

****

Q You don't recall that she told you she needed to leave early?
A Maybe she did. I don't recall it. But, she never

****

Page 208

Q Do you know whether or not there were openings in the schedule when you gave it to her?
A There were still openings, that's why I let her know that we hadn't filled it completely.
Q And you had discussions with her during the week that it wasn't full?
A That I don't remember during the week at all. I don't remember if she discussed it with me during the week.

Page 261

Q And how were your interactions with Mr. Haase?
MS. IAFRATE: Objection as to form.
A We really didn't interact that much. I mean, say good morning, hi, you know.
Q So, you would exchange pleasantries?
A Right, right.
Q Was he generally pleasant to you?
A Yes, I mean.
Q Was he generally agreeable?
MS. IAFRATE: Objection as to form.
A I really don't have anything to base that on.
Q Fair enough. Did he ever do anything or say anything to you that would lead you to believe that he was a disagreeable sort of fellow?
MS. IAFRATE: Objection as to form.
A No. Because, like I said, we didn't really interact that much. Sometimes he would stay later in the evening and I would still be there working and I would see him then, if I went down to the office to make kind of something, but, like, we never really had a lot of conversation.
Q Was he generally pleasant when you did converse with him?
A Yes, never had a problem with him.

Page 262

Q Okay. Would you agree with me that he was generally a reasonable executive director?
MS. IAFRATE: Objection as to form.
THE WITNESS: As far as with me or in general?
MR. CAMPBELL: Well, let's start with you.
A I never had a problem with him.
Q How about in general?
A I don't really know --
Q No real basis --
A -- as far as how he treated other people.
Q No real basis for knowing?
A Right.
Q But so far as he treated you, it was generally reasonably?
MS. IAFRATE: Objection as to form.
A Yes.
Q He was reasonably fair?
MS. IAFRATE: Objection as to form.
A Like I said, we didn't really interact that much.
Q Sure. But, when you did interact, was he generally fair?
MS. IAFRATE: Objection as to form.

Page 265

MS. IAFRATE: Objection as to form.
A He really didn't say anything. She kind of handled the whole meeting, to be honest with you.
Q And during that meeting did he interact at any point in time to give you the understanding that he disagreed with Ms. Charron's assessment of your work?
MS. IAFRATE: Objection as to form.
A Not that I recall.
Q You never complained to Mr. Haase about age discrimination while you were at Life Care, did you?
MS. IAFRATE: Objection as to form.
A No.
Q In fact, you didn't complain to anybody about age discrimination while you were there, did you?
MS. IAFRATE: Objection as to form.
A I didn't complain to anyone about anything really.
Q Including age discrimination?
MS. IAFRATE: Objection as to form.
A Right.
Q In fact, the first time you raised a complaint of age discrimination was after your discharge; is that right?
A That I don't remember if it came up before the

Page 266

discharge.
Q You don't recall reporting it to anybody?
THE WITNESS: An authority, you mean, someone in authority that I would go to complain to?
MR. CAMPBELL: Yes.
A No.
Q If you asked to meet with Steve Haase about something, was it your understanding that he would agree to do that?
MS. IAFRATE: Objection as to form.
A I believe so. I don't think he could refuse.
Q Do you know if he was supervised by anybody?
A I imagine there's someone over him.
Q Do you know if Ms. Charron were supervised by anybody?
A I really don't know who, you know, who directs them. I don't know that.
Q Have you ever heard the name Kate O'Connor?
A Oh, yes.
Q What position do you understand that she fills in Life Care?
A I really don't remember. I can't remember her title, to be honest with you.

Page 277

****

Q Well, you explained that she was more friendly.

Page 278

****

What I want to know is why you formed the conclusion that it was because of your age?
MS. IAFRATE: Objection as to form.
A Well, that's just what I feel, that it was because of my age that she wasn't friendly with me and she was with other people that were younger.
Q Have you any other information?
A No.

Page 285

six or seven other directors can testify to.
Q Would you agree with me that Pam Charron and Steve Haase have indicated that your discharge is because of ongoing poor job performance on this form, would you agree with me that they have indicated that?
MS. IAFRATE: Objection as to form.
A They did indicate that.
Q Do you think they made that up?
A Well, I know it's not true. My job performance was excellent, according to all the other people I had worked for, and according to Steve, apparently. He never said a word to me prior to her being there.
Q Well, didn't he sit in on the August 23rd counseling?
A Right. And, I don't know why he was going along with her, if he never found a problem with my work prior to that.
Q You didn't know why he was doing that?
A I have no idea.

Page 293

whatever she did to fix it. Sometimes the director herself would come to work if it was that bad. But, of course, she didn't offer to do that. And, she settled for the med techs and for increasing the bonus.
Q Do you remember anything else from that Friday?
MS. IAFRATE: Objection as to form.
A Not that I can think of.
Q And you would agree with me that was the event that led Pam Charron to discharge you?
MS. IAFRATE: Objection as to form.
A It's hard to believe, but I believe that's the incident, because she wanted to work on the staffing, I guess. I don't know. It just seems very unfair that staffing is bad for a week and she gets all bent out of shape about it, when she had all week to address it.
Q And she did get bent out of shape?
MS. IAFRATE: Objection to form.
A I think so. She just snubbed me, ignored me like I wasn't supposed to be making the calls, and I just stood there in case she needed me. I never said a word.
Q Do you recall anything else from that Friday --