**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,**<br>***Plaintiff,***<br><br>**vs.**<br><br>**LIFE CARE CENTERS OF AMERICA, INC., et al.,**<br><br>***Defendants.*** | **C.A. No. 06-108 ML** |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Barbara Antonucci, ("Plaintiff"), and hereby objects to Defendants' Motion for Summary Judgment.

In support of this objection, Plaintiff relies on the memorandum submitted herewith.

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 26th day of July 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,**<br>***Plaintiff,***<br><br>**vs.**<br><br>**LIFE CARE CENTERS OF AMERICA, INC., et al.,**<br><br>***Defendants.*** | **C.A. No. 06-108 ML** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## *I. Introduction.*

In this lawsuit, Plaintiff, Barbara Antonucci ("Antonucci"), alleges that, on October 4, 2004, Defendants, Pam Charron ("Charron") and Steve Haase ("Haase"), fired her because of her age. In short, Defendants argue that summary judgment is proper because Antonucci cannot prove that Defendants' reason for taking this action – a history of poor job performance – is a pretext for age discrimination.1

By way of background, Antonucci began working for Cherry Hill Nursing Home in February, 1986. At the time of her hire, Antonucci was forty-six years old. She assumed the position of Administrative Secretary.2 In 1999, Antonucci was promoted to Staffing Coordinator.3 As of July, 2004, Antonucci had reported to seven Director of Nurses ("DON"). From the date of her hire until July, 2004, Antonucci's job performance evaluations were all at least satisfactory – including the one she received on March 8, 2004 – only about six months

1 Defendants concede that Antonucci has satisfied the prima facie case required under McDonnell-Douglas.
2 Significantly, none of the individuals who participated in the decision to fire Antonucci were employees at the time.
3 By all accounts, the Staffing Coordinator position is a difficult and stressful job. In short, the Staffing Coordinator is responsible for preparing monthly and daily schedules and filling vacancies created by things like vacations, absences, and lack of staff.

before she was fired. See Exhibit A. As significantly, during this period of time, Antonucci had never been disciplined except for one minor exception.4

This case centers on the period beginning July 26, 2004, – when Charron became Antonucci's immediate supervisor and the new DON at Cherry Hill.5 Excluding the two weeks that Charron and Antonucci took for their respective vacations, the two worked together a mere seven weeks before Antonucci's firing on October 4. Contrary to Defendants' newly-concocted claims and as is amply demonstrated below, Antonucci was never disciplined during this time. In their motion for summary judgment, Defendants first argue that Charron issued repeated, oral "counselings" to Antonucci from just about the time she started until August 23 – the date Charron first issued something in writing.6 Yet, as is demonstrated below, these were not counselings. Rather, as Charron did with Antonucci's "thirty-something" replacement, Donna Sweeting ("Sweeting"), Charron only had on-going, routine discussions with Antonucci about staffing issues.7 This was not because Antonucci's job performance was deficient but because these discussions were indisputably part of Charron's responsibilities. Defendants next rely on an Action Plan issued on August 23. Contrary to their self-serving arguments here and as is demonstrated below, the Action Plan was not a form of discipline. Rather, it was merely a "roadmap for expectations." Even if it were, the Action Plan relates to a task which was a minor

---

4In December, 2003, DON Celeste Harris (hereinafter "Harris") issued a written warning to Antonucci. Significantly, this was over one incident. Moreover, after this warning, Harris evaluated Antonucci and rated her overall job performance as more than satisfactory. See Ex. A. Although Defendants now claim that this played a part in Antonucci's firing, the evidence is strongly to the contrary.

5 Charron was in her mid-thirties when she came to Cherry Hill; she is twenty-seven years younger than Antonucci.

6 The number and substance of these discussions has also changed over time. Although the position paper, written discovery and deposition testimony include many more topics which were supposedly discussed during these alleged oral counseling sessions, in their motion for summary judgment, Defendants appear to have limited their imaginations to only three: updating monthly schedules, insufficient telephone calls to nurses, and over-reliance on bonuses.

7 Charron had the same kinds of discussions with thirty-something Staffing Coordinator, Rebecca Santin ( "Santin") and 40-year-old Dawn Morang ("Morang"). Santin reported to Charron before she worked at Cherry Hill; Morang reported to Charron at Evergreen after she left Cherry Hill in October, 2005. Morang's age was not supplied by Defendants. A search of the internet reveals that her birth date is July 15, 1964, making her age 40 at the time Antonucci was fired.

part of the staffing job, was something which other DONs had never made Antonucci do and – as importantly – was a task which Charron never made Antonucci's "thirty-something" replacement do after Antonucci's firing.[8] Ironically, the one discipline form which one would expect Defendants to parade before this Court is conspicuously missing. This is because it makes clear that Defendants were, not just negligent or wrong in their decision to fire Antonucci, but downright dishonest. It is a document entitled "Notice of Disciplinary Action" which is dated October 24 – twenty days <u>after</u> Antonucci was fired. As the evidence below makes clear, it is clear that Charron obviously created this document after the fact.

Even assuming Antonucci performed badly in the areas claimed by Defendants – which we amply refute -- the discussion below makes clear summary judgment is still not warranted. This is because the substantially younger Staffing Coordinators – including Antonucci's "thirty-something" replacement – did the same things. Yet, unlike Antonucci, they were not disciplined let alone fired. Next, as Plaintiff makes clear, summary judgment is not proper because the articulate reasons for the firing are fraught with falsities, inconsistencies, and implausibilities.

## *II. Argument.*

### A. <u>Contrary to Defendants' Argument, there is Ample Evidence of Pretext.</u>[9]

---

8As is shown below, this Action Plan creates more problems for Defendants. For example, apart from the fact that Antonucci successfully refutes that she was insubordinate, it demonstrates how differently Antonucci was treated in that, for some inexplicable reason, Defendants took this as an opportunity to change Antonucci's job description by <u>adding</u> a number of new duties; these new duties were conspicuously missing from Sweeting's job description when she replaced Antonucci. Second, there are conflicting stories about the Action Plan. At least one version is that in the first week of August, Charron told Antonucci that she had to update the monthly schedules and that Antonucci told Charron she was not going to do this. However, although the Action Plan makes reference to this discussion the first week of August, there is no mention of the fact that Antonucci refused to do it. Instead, the Action Plan reflects that Antonucci refused on August 19. Charron later admitted that Antonucci did not refuse during that first week.

9 Presumably realizing the plethora of evidence demonstrating falsity, Defendants argue that falsity is not enough to survive summary judgment. However, this Circuit has made clear that introduction of additional evidence beyond falsity is not required, depending on the circumstances. <u>Dominguez-Cruz</u>, 202 F.3d at 430 n. 5. Only out of an abundance of caution, Plaintiff has presented additional evidence, but does not concede this is required. Defendants also assume that this is purely a case under <u>McDonnell-Douglas</u>. However, since direct evidence is not required in a mixed-motive case, Plaintiff is not so limited. Under the mixed-motive theory, Antonucci need only demonstrate that "an illegitimate factor played a substantial role in a particular employment decision." <u>See</u> <u>Rossiter v. Potter</u>, 2005 U.S. Dist. Lexis 10422, at *10 (D. Mass. 2005). In support of a mixed-motive argument, Antonucci

Pretext can be shown in many ways, including evidence of different and inconsistent explanations, weaknesses, implausibilities, and incoherencies. McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir. 2006) (citing Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000)). Pretext can also be shown when similarly-situated persons outside the protected class are treated more favorably.10.

1. Openings on the Weekend of October 2-3 Cannot Support Termination.

The Defendants allege that Antonucci was ultimately fired because there were allegedly a "significant number" of unfilled openings in the nursing schedule for this weekend. As the following makes clear, summary judgment is not proper because the Defendants story on this point constantly changed, and even if it were true, all the other substantially-younger schedulers were very often in the same predicament on Fridays and were never disciplined.

The position paper by Defendants establishes the falsity of Defendants' claim. In it, Defendants' argued that there were at least 21 vacancies on the weekend schedule as of 3 p.m. on Friday, October 1 and that Antonucci told Charron that she had done all she could do to fill the positions.11 Ex. B. Defendants also argue that Charron and another associate were able to fill the vacancies within an hour. Ex. B. In stark contrast, in April 2007 Further Answers to Interrogatories, Defendants completely backed off the initial account of the events, and alleged

---

incorporates all of her arguments. The burden then shifts to Defendants to "prove that it would have made the same decision even if it had not taken the protected characteristic into account." Id. (emphasis added).

10 Because of page limitations, Plaintiff cannot explore all of the other ways to prove pretext, which are present here. For example, pretext can be shown when the Defendant sets the Plaintiff up to fail. Plaintiff reserves the right to make these arguments at oral argument. As part of pretext, courts may consider the evidence supporting Antonucci's prima facie case. See Dominguez-Cruz, 202 F.3d at 431.

11 During the time that she worked at Cherry Hill, and especially in late 2003 and 2004, there was a nursing shortage. Haase, p. 38. The daily schedules would have openings to be filled because the monthly schedule does not reflect the fact that people are unavailable on specific days for various reasons (i.e., ill, absent, terminations, resignations, change in patient census) or the fact that there is a staff shortage. Santin, p. 55-56, 236. Accordingly, once the scheduler would put the regularly scheduled nurses on the daily sheets, there were still openings to fill. A scheduler would have to try to find a nurse to work more hours than they were regularly scheduled to fill the openings.

that it was <u>2 p.m.</u> when Antonucci presented Charron with the incomplete schedule; that the schedule had a "<u>significant number</u>" of unfilled slots (not "21"), and that within "<u>two or three hours</u>," Charron and "<u>one or two</u> other staff members" were able to "fill all or <u>substantially all</u> of the open shifts." Ex. C, p. 5.

In her deposition, Charron was again inconsistent. She first alleged that there were "numerous" openings, and that "we" proceeded to call a "<u>couple</u> people" to fill the slots. Charron, p. 136. It goes without saying that it would be impossible for only "a couple" (meaning two) people to fill "numerous" openings and that if this was the case, then it could not have taken Charron and two others 2-3 hours to fill the openings. Charron could not say how many people she called or how many she got to come in. Charron, p. 137. For the first time, Charron alleged that because it took so long she missed a wake.

Even assuming that this is the case, it is simply implausible that this event led to Antonucci's firing when Charron confirmed that it was not unusual to have "those issues" on a Friday afternoon and that there was an insufficient amount of staff at Cherry Hill. Charron, p. 116, 138. Significantly, Santin, Sweeting, and Morang have had schedules where not all the weekend openings were filled. Santin, p. 165.12 Charron admitted that all three have had schedules with as many as 10 openings on a Friday for the coming weekend. Charron, p. 50. Even Sweeting admitted that she has more openings to fill than Antonucci used to have. Sweeting, p. 127-128. Haase confirmed that "[i]t is always more difficult to find staff to work on the weekend and that Friday was a "desperate" day. Haase, p. 201, 215 (weekends were always

12 Both Santin and Sweeting, who performed the same job as Antonucci, testified that filling openings was difficult. For example, Santin testified that "sometimes you just cannot fill all the holes. You can't always – some people just don't want to work * * *" and sometimes there are just not enough people to work. Santin, p. 73-74, Pereira, p. 158, 50 (staffing person cannot force nurses to work). As the staffing person, you end up "working short" and "you're blamed for that." Sweeting, p. 55, 164-165. In fact, Sweeting did not even want the job because she "didn't know what it was about.12 And I know everywhere you go everybody said the staffing position is a hard position, it's a tough position." Sweeting, p. 68; Pereira, p. 158.

worse, even under Sweeting). In addition, there was no company policy that set forth any time within which openings had to be filled (i.e., that all openings for a Saturday had to be filled by Thursday). Sweeting, p. 184-185. This essentially means that the Defendants must have believed that termination was warranted for a nineteen-year employee for having three[13] more openings than have existed for other younger schedulers who were not even disciplined, when it was common to have weekend openings on a Friday. Santin, p. 166, Sweeting, p. 133.[14]

There is more evidence that demonstrates inconsistencies and implausibilities which would allow a jury to conclude that the Defendants' assertions are false. Joe Pereira ("Pereira"), Charron's supervisor, supposedly participated in the decision to fire Antonucci. Pereira said that a "bad" weekend was "double digits," but he could not remember how many openings there were on October 1 – he ultimately estimated 10 or 11. Pereira, p. 134, 139, 141. If this is true, Antonucci was fired for having the same number of openings that similarly-situated younger schedulers had who were not even disciplined. Yet, Pereira never sought to find out why openings were allegedly not being filled, did not know what was causing the openings, and never sought to find out if after Antonucci was fired, openings were being filled, or what the number of openings were at any given time. Pereira, p. 90, 112-115, 129. Furthermore, Pereira stated that

13 The schedules and the bonus sheets do not corroborate Defendants' position that there were either twenty-one or even a "significant number" of openings. There were 130 individuals on the schedule for the weekend of October 2-3. Ex. E. Of the 130 staff members, the worst case scenario is that Antonucci was unable to fill 13 openings, even after offering a bonus of $100. Ex. E, Antonucci, p. 210-217 (acknowledging that only 13 individuals were written on the schedule not in her handwriting). Even with respect to the 13 openings, it is possible that some were filled due to Antonucci's efforts. Antonucci, p. 213-214. The bonus sheets reflect that bonuses in the amount of $200 (the amount given by Charron after she took the schedule) were given for only seven open positions. DEF 1597-1598. In addition, if it took 3 individuals up to 3 hours to fill 13 openings, then that means it takes 9 man hours to fill 13 openings, something that Charron somehow expected Antonucci to do alone and at a lower bonus amount.

14 According to Santin, the number of openings on Antonucci's schedules looked "average." Santin, p. 159. Schedulers can sometimes be at work late on a Friday fixing the weekend schedule. Sweeting, p. 133, 152, Charron II, p.17. It is not even uncommon for schedulers to have to call staff to fill openings on the day of the actual opening. Sweeting, p. 126-127 (filling on the same day happens as much to her as it did when she was filling in for Antonucci). As Sweeting explained, "Every day I work on staffing for the following day; and once that's fixed, I go into the next couple of days." However, even if she gets the schedule "set" for the following day, someone could call in sick and she could then be working on the same schedule. Sweeting, p. 311-312.

it would not be a surprise to receive the schedule for the weekend at 2 p.m. Pereira, p. 139. Critically, when Pereira was asked if the number of vacancies on October 1 caused Antonucci to be fired in any way, he responded "Well, <u>not that I know of</u>." Pereira, p. 143.

Charron could not have actually believed that Antonucci should be fired because of openings on the weekend of October 2-3 because Charron never even asked Antonucci how many people she called, how many times she called them or any other questions that would have given her any information on what efforts Antonucci had already made. Charron, p. 138-139, 91-92, 94 (she is not sure if Antonucci said she was not calling people back). Charron admits that there are in fact times when you make calls and still cannot get the openings filled. Charron, p. 138. Charron did not seek to find out if Sweeting had any involvement in preparing the weekend schedule before attributing all the problems to Antonucci and terminating her. Charron, p. 170.

Significantly, Charron actually manipulated the system to give herself an unfair advantage so that she could fill the schedule and then fire Antonucci for not doing the same. First, Charron increased the bonus amount. Antonucci, p. 216-218, 221-222. Bonuses were used as an incentive to get nurses to pick up a shift. Charron had authorized Antonucci to offer $100 per shift to nurses, but when she took over the schedule on Friday afternoon, she increased the bonus amount to $200.[15] If the situation was so dire, Charron herself would have worked as DONs do at times. Antonucci, p. 293. Second, Charron used med-techs in place of nurses. A med-tech is a Certified Nursing Assistant ("CNA"), who can distribute medication. However, the practice and preference was to try and get <u>nurses</u> to work extra shifts, not med-techs, and as

15 Charron admitted that she could not tell how many bonuses had to be paid that weekend and that she could not convince nurses to take the openings without bonuses. Charron, p. 156-158. She could not identify anyone that she got to fill an opening without a bonus. Charron, p. 160. Charron could not even convince Melissa DeCosta ("DeCosta"), who was helping her make phone calls, to fill an opening without offering her $200 per shift. Charron, p. 158. This demonstrates the futility of only authorizing Antonucci to give $100.

Antonucci explained, Charron did not authorize her to use med-techs. Haase, p. 307, Antonucci, p. 216-218, 221-222.

Defendants also argued that part of the reason why Antonucci's behavior was so unacceptable was because she allegedly did not keep Charron informed of openings before Friday. Yet, Defendants never claimed this was the case until April 2007. Ex. B. In all events, Antonucci expressly disputes this account. With respect to the week of September 27, 2004, Antonucci explained that consistent with her practice,16 she brought copies of the daily sheets, with the openings highlighted, to Charron and Haase in the beginning of the week. Antonucci, p. 207-208, 291-293. Neither Charron, nor Haase came to her on Monday, Tuesday, or Wednesday with concerns about the number of openings. Antonucci, p. 207-208. At some point, (either Wednesday or Thursday), Charron authorized Antonucci to give $100 per shift to nurses who would pick up a weekend shift. Antonucci, p. 209, Charron, p. 140-141. This was after Antonucci went to Charron to tell her she still had openings. Antonucci, p. 207-208.

Considering the fact that Charron alleged that she only authorized bonuses at the last minute, and only after all other options were exhausted, if she authorized bonuses earlier than Friday during the week of 9/27, then she had to be aware of any openings for the weekend. Charron, p. 86-87, 140-141. Significantly, Charron never even asked Antonucci what she had done to get staff when Antonucci came to her on Friday. Charron, p. 138-139. She fired Antonucci based on an assumption that Antonucci did not do enough due to the number of

16 Antonucci testified that her practice was to always let the DON know where they stand and would give the DON a copy of daily sheets at the beginning of the week if the schedule was bad for the weekend. Antonucci, p. 162-164, 166. Antonucci would highlight the openings and put how many nurses and CNAs were needed at the top. Id. At that point, most DONs would start asking people to fill openings and Antonucci would continue making calls. Antonucci, p. 162-164. Later in the week, Antonucci would report back with her progress and again, let the DON know how many openings there still were. Antonucci, p. 162-164. According to Antonucci, Charron never indicated there was a problem with the calls Antonucci made and never had a problem with her results - - she knew that it was not Antonucci's fault if there was not enough staff. Antonucci, p. 167-168.

openings – which at this point, Defendants cannot even define. Charron, p. 138-139.

Defendants also point to the fact that Charron had to assist in filling the schedule herself.17 However, having to go to the DON for assistance with filling openings is not uncommon and does not mean the staffing person is doing a bad job. Sweeting, p. 277-278. In fact, Sweeting and Santin admitted to having to go to Charron needing help with the schedule, including help making phone calls. Sweeting, p. 277-278, Santin, p. 64. Charron admits that she assisted Morang, Santin, and Sweeting with making phone calls, and she did not consider the fact that she had to place phone calls for Antonucci a sign that Antonucci could not do her job. Charron II, p.41-43, Charron, p. 100. Charron could not say how many times she had to help Morang or Antonucci, but said she helped Santin "frequently." Charron II, p. 41-43, Charron, p. 100. In fact, previous DONs had helped Antonucci with making calls, and this was never something that indicated a problem with the scheduler as compared to the result of insufficient staff. Antonucci, p. 292, Haase, p. 62-63 (admitting that Charron could have assisted Antonucci the same number of times as previous DON Harris – who never disciplined Antonucci, and that Charron had to assist Sweeting after Antonucci was fired).

Finally, Charron claimed she only reached the conclusion that Antonucci had to be fired after speaking with Haase and Pereira. Charron, p. 144. Yet, Haase directly contradicted this by stating that Charron made the decision to fire Antonucci; and Pereira testified he only found out after the fact. Pereira, p. 173, Haase, p. 137. Accordingly, Charron, Haase, and Pereira, could not have believed that Antonucci needed to be fired. When asked if she knew enough about Antonucci's performance to fire her, having only worked with her for about eight weeks,

17 Yet, Sweeting testified that Charron spent the majority of her day on the floor, in meetings, handling paperwork, on family issues and staff meetings. Sweeting, p. 135-136. Charron testified that helping staffing people involved calling people and that she could not give specifics on how often this happened. Charron, p. 212. Charron acknowledged she had to do the same thing with Sweeting, and could not say how many times it happened with either Antonucci or Sweeting, p. 213.

Charron did not respond unequivocally – but only said "to a certain extent, yes." Charron, p. 68.

The incident on October 1 was of Charron's own making – she brushed Antonucci off and failed to address the problem and then turned it around on Antonucci when Antonucci went to her for help. She quickly raised the bonuses, used med-techs, and "substantially" filled the openings, not giving Antonucci the tools to do it on her own. Based on the foregoing, it is clear that Defendants' reason for firing Antonucci cannot stand.

2. Plaintiff did not have a history of performance issues before October 1.

*Monthly and/or Master Schedule.* The Defendants have made two different claims regarding the monthly schedule. At the outset, the position paper alleged that Antonucci refused to actually compile the monthly staffing schedule. Ex. B, p.3. According to the position paper, Antonucci not only refused to compile the schedule on August 2, but when she was questioned about it during a phone call on August 19, she again refused to prepare the monthly schedule. Id. Significantly, even though Defendants initially cited this as a basis for the poor job performance which justified termination, during Charron's deposition, she testified that the monthly schedule issue was never about Antonucci not actually doing the monthly schedule. Charron, p. 80. 18

Defendants' then completely changed positions and alleged that Antonucci refused to update monthly schedules by putting in specific information on new hires as the need arose. The first time Defendants made this claim was in its Further Answers, signed by Charron, nearly three years after Antonucci's termination. Ex. C, p. 3.19 As part of this claim, Defendants

18 Consistent with Charron's testimony, Antonucci explained that completing the monthly schedules was part of her job that she always performed without a problem. Antonucci, p. 182-183, 189. Documents in this case confirm Antonucci's position, since monthly schedules completed by Antonucci ranging from December 2002 to September 2004, were produced by Defendants. Sweeting, testified that when she replaced Antonucci in October 2004, the monthly schedule was complete through the end of October 2004 and Antonucci never refused to do it. Sweeting, p. 57, 59, 319.

19 In fact, during her deposition Charron stated that she had to issue Antonucci an "oral warning" during the first conversation regarding the monthly schedule. This is simply not true. First, Plaintiff approached Charron to discuss how Charron wanted the monthly schedule done – she wanted to make sure that Charron expected the same thing

allege that what Antonucci actually refused to do (twice) was update the monthly schedule. With respect to the alleged refusals, Charron herself disputes that Antonucci refused to update the monthly schedule when they first discussed the task (August 2), saying that Antonucci did not refuse and also stating that she never told anyone that Antonucci refused to update the schedule during this first conversation. Charron, p.74, 79. Antonucci specifically denied that she ever refused to update the monthly schedules or ignored any request by Charron. Antonucci, p. 148-150, 183, 185. This makes sense since Charron never discussed adding names to the master schedule after early August 2004, nor did she tell Antonucci that she was not doing it fast enough or needed to do more on the monthly schedule. Antonucci, p. 153-155. In addition, Sweeting testified that she cannot recall Antonucci ever saying she would not add the names, and that when she replaced Antonucci, Charron never required her to perform this task (adding the names) that supposedly formed at least part of the basis for Antonucci's termination. Sweeting, p. 142, 145-146, 148. Furthermore, Pereira, who according to Charron supposedly had "regular discussions with Ms. Charron" during which he was "kept apprised of Antonucci's unsatisfactory work performance" including her failures relating to the "monthly schedule,"

---

that prior DONs had expected with respect to updating the schedule. Antonucci, p. 147. Charron acknowledges that Plaintiff initiated the discussion and essentially agrees with Plaintiff's version of events. Charron, p. 74. Charron never alleged that they had spoken about the monthly schedule before. Her complaint was essentially that Plaintiff told Charron that she had never had to update the schedule before (that before Charron, it was done by the DON). In all events, Plaintiff had no problem updating the schedule - - it was a relatively minor task. Antonucci, p. 148-150. Since an "oral warning" is ordinarily designed to address a pre-existing performance problem there is no dispute there was no pre-existing performance problem since this is the first conversation on the topic according to both Plaintiff and Charron.

Furthermore, Charron admits that no "oral warning" was reduced to writing per Cherry Hill's policy on discipline. Charron, p. 57-58. She further admits that she never told Plaintiff that the discussion constituted an "oral warning." Charron, p. 60. This is consistent with Sweeting's testimony who spoke to Plaintiff regularly about her interactions with Charron and Plaintiff never told her that she had been disciplined by Charron. Sweeting, p. 157. In addition, Charron could not say that Plaintiff was not meeting her expectations during the time period when she supposedly issued one or more oral warnings to Plaintiff. Charron, p. 65. Charron expressly disclaimed the statement made in the position paper that there were "serious" issues with Plaintiff's performance during the first couple weeks of her employment. Charron, p. 65, 209. Accordingly, it is totally implausible that Plaintiff was given an oral warning on or about August 2.

Finally, Defendants never characterized these alleged August 2 or August 19 conversations about the monthly schedule as a form of discipline until well after Antonucci was fired.

could not ever recall having a discussion with Charron about Antonucci and the monthly schedule and did not believe it contributed to her termination. Pereira, p. 88, 194, 196, Supplemental Answers to Interrogatories, p. 5.

*Making Phone Calls to Fill Openings.* Defendants have also alleged that Antonucci did not make a sufficient number of phone calls to secure nurses to fill openings. Again, they never alleged that this was a performance issue until April 2007. Nowhere in the position paper do the Defendants allege that the number of phone calls Antonucci made contributed to her firing. Ex. B, Sweeting, p. 280. As part of this argument, Defendants have actually said that Antonucci refused to call people more than once to fill an opening.

This argument is not only inconsistent with other positions taken by Defendants, but implausible for the following reasons. The fact that there are insufficient nurses to fill openings is not supposed to be the fault of the staffing person because it is outside of her control. Haase, p. 156. To get people to work, a scheduler can call the people or approach them in person. Santin, p. 46, 48; Ex. F. Antonucci always called more than once and would call people back to see if they changed their mind – this was part of her job. Antonucci, p. 158-159, 161. Charron never had a problem with the calls Antonucci made or the results because Antonucci never gave up - she was insistent and would keep calling. Antonucci, p. 167-168. Sweeting confirmed that Charron did not discipline Antonucci for not making enough phone calls. Sweeting, p. 281-282. Antonucci never said that she would not call people, that she had done all she could do or that she would not "badger" people to work. Antonucci, p. 158-159. To the contrary, Antonucci would badger people and called them more than once. Antonucci, p. 158. She always called people back to see if they changed their mind. Antonucci, p. 159.

Sweeting explained that there was no way to put a number on how many times Antonucci

might have accepted a "no" in response to a request to pick-up a shift, compared to the number of times Sweeting accepted the same thing. Sweeting, p. 314-315. Santin explained that even she would accept a "no" from someone the first time, for example, if someone told her they cannot work at all during a particular week, then she would not bother them. Santin, p. 237. Sweeting admitted that if there is a last-minute call out, sometimes you cannot replace the person fast enough. Sweeting, p. 55. She explained that it "still happens" that she has to try to fill openings on the same day as the shift occurs and that she has more openings now than Antonucci did. Sweeting, p. 126, 127-128; Santin, p. 47-48. There is no evidence that repeat calling leads to filling shifts faster, earlier or without bonuses. Sweeting, p. 160, Charron, p. 102-103 (could not say what number of calls would produce a nurse to fill a shift). She also explained that sometimes when she filled in for Antonucci, there would be no openings to fill. Sweeting, p. 130.Santin could not say that she was better than Antonucci at making phone calls. Santin, p. 222.

In all events, Antonucci was never told by Charron to be more aggressive in making phone calls and she never counseled[20] her regarding the need to pursue staff to fill shifts. Antonucci, p. 157-158, 167. Even though Defendants represented in the Further Answers that Pereira spoke to Antonucci about her job performance and specifically about the need to be more aggressive in filling shifts, he does not ever recall doing that. Pereira, p. 33, 188. Pereira could not recall hearing that Antonucci refused to call more than one time. Pereira, p. 198-199.

---

20 Defendants actually allege that Antonucci had to be counseled for not making sufficient phone calls. At various times, Defendants have characterized this conversation as a "discussion" or a "counseling," yet Charron went so far in her deposition (but not her answers to interrogatories) to call it an "oral warning." Charron, p. 81. Charron thinks that she had a conversation that had to do with filling vacancies, that she called an "oral warning," but cannot recall anything else about the encounter other than she was "trying to understand how [Plaintiff] went about this daily schedule." Charron, p. 81-82. Trying to find something out does not sound like a conversation in which a warning would have been given. Since the warning was not in writing and Charron cannot even describe its substance, then it could not have been part of the reason why Plaintiff was fired.

Antonucci was just as creative in trying to fill the openings as Sweeting and Santin. Santin, p. 115, Sweeting, p. 161-163. Antonucci called multiple times, offered nurses a day off, and split shifts in order to fill openings. Ex. F, Antonucci, p. 210, 195-196. Charron never told Antonucci how many times she expected her to call people. Charron, p. 95. She could not answer with a yes or no when asked if Antonucci was fired in part for not calling people back. Charron, p. 97. She did not ask Antonucci how many times she was calling people and was not sure if she would call people back after leaving a message. Charron, p. 91-93. The bottom line is that if there were openings, it happened with all schedulers. Charron, p. 211. Charron could not even say how many times there were openings under Antonucci or what number of vacancies Antonucci had that were a problem. Charron, p. 218. Instead, she admitted there were times when Antonucci's schedules had no openings. Charron, p. 218.

In addition, knowing a bonus might become available, staff members could refuse to pick-up a shift until the bonus was offered and neither Antonucci, nor any other scheduler, could do anything about it. Sweeting, p. 318, Santin, p. 239-240. This means that no matter how many calls were placed, even Defendants' admit, because they decided to pay bonuses, nurses would not say yes until Defendants got desperate. If this is true then this happened to Sweeting since she had to give out bonuses. Finally, relying on lack of phone calls is simply not believable considering Haase's explanation of why this was a problem. Haase explained that because Antonucci's day off was Friday (before they changed her work-week to five days), Sweeting would spend all day Friday filling in for Antonucci and trying to fill weekend openings. Haase, p. 207. This was not true - - as Haase later was forced to admit, Antonucci's day off was Wednesday. Haase, p. 207, 323. Haase did not allege that Sweeting had to spend all day Wednesday filling weekend openings.

*Bonuses.* Defendants also initially claimed that Antonucci had a problem with bonuses that contributed to her firing. Bonus money was instituted at Cherry Hill in or about April 2004 as a cheaper way to get its own staff to work open (and usually extra) shifts. Sweeting, p. 249, Horner, p. 78.21 Significantly, Antonucci had no authority to offer bonuses to staff without prior approval by Charron and/or Haase. Sweeting, p. 178-179, 181, Santin, p. 197-198, Haase, p. 155, Antonucci, p. 310, Charron, p. 82-83. In the position paper, Defendants stated that Antonucci's job performance was deficient because the amount of bonus money given to staff during Antonucci's tenure was excessive. In fact, Defendants gave a specific example pointing out that in July 2004, bonus dollars ranged from $6,000 to $9,000 per week and that "due to Ms. Charron's efforts," the amounts dropped to $400 to $2,700 per week.22 Ex. B. In the current motion for summary judgment, filed after the agency documents were produced, Defendants no longer assert that excessive amounts of bonuses contributed to Antonucci's termination. Instead, Defendants argue that Antonucci "over-relied" on bonus money when trying to get staff to pick up open shifts. Yet, this position is totally absurd considering the following. Antonucci was never accused of over-relying on agency, even though enormous amounts were being paid. Charron admitted she did not consider the fact that Antonucci over-relied on bonuses when she

21 Before April 2004, Cherry Hill used outside temporary agencies to fill openings. Sweeting, p. 249, Santin, p. 87. Agency costs were astronomical. From October to December 2003, Cherry Hill paid $131,000 to temporary staffing agencies. From January to March 2004, Cherry Hill paid $232,000. Horner, p. 72-74. Antonucci was never disciplined for agency costs.

22 In relying on these figures, Cherry Hill did not explain that a portion of bonus money is due to things like sign-on bonuses, on-call and call-log which have nothing to do with nurses necessarily picking up extra shifts. Sweeting, p. 332-333, 329. In addition, in 2005 during a period when Charron was still at Cherry Hill, bonuses far exceeded $2700 per week. Sweeting, p. 324-325 (gave out bonuses that exceed $2700 at least ten times). In addition, bonuses during the summer are typically higher than normal due to vacations. Santin, p. 250, Pereira, p. 17-18. In comparison to agency cost, the cost of bonuses for extra shifts during the last five months of 2004 was only $68,000. Finally, staffing was so bad in 2007 (under Sweeting) that Cherry Hill had to return to agency use. Horner, p. 64. Sweeting was not disciplined for the fact that Cherry Hill had to resort to the costs associated with outside agencies. In addition, in e-mails produced by Defendants, Haase explains the reasons for the high bonuses in July and does not attribute it to Antonucci.

made the decision to fire Antonucci. Charron II, p. 27. Haase admitted that Antonucci's performance problems were not about bonuses. Haase, p. 238-239. Pereira testified that he did not care if Cherry Hill spent a million dollars in bonus money as long as nurses were present to work. Pereira, p. 184-185. Just one month before Antonucci was fired, Kate O'Connor, who was Haase's supervisor, expressed her pleasure with the reduction in bonus amount for August 2004.

Defendants have argued that the problem is that Antonucci wanted to give out bonuses too early in the week – that instead of making repeat phone calls, she would ask for bonus money instead. Yet, if this was the case Haase and/or Charron would have had to allow her to do this. Significantly, after Antonucci was fired, Haase instituted a bonus program that mirrored exactly what they say Antonucci did wrong. In the past, if a Saturday shift was open, nurses would wait until the end of the week to agree to work, knowing they might get a bonus. Haase, p. 214. Under the "reverse bonus program," Haase, offered $200 to any nurse who would agree on Monday to pick it up the open Saturday shift. Haase, p. 214. Each day closer to Saturday, the bonus would decrease. Haase, p. 214. The idea was to give the incentive earlier in the week, so that they could fill the hours earlier in the week. Haase, p. 214. This necessarily means that Sweeting did do any better than Antonucci in securing people before the end of the week.

Defendants also allege that if Antonucci worked harder at the schedule then she would not have had to pay so many bonuses. Critically, Sweeting admitted that even if she started working on schedules earlier or worked harder at getting them filled, she did not think there was a way to avoid giving bonuses. Sweeting, p. 183. A need for more staff could be due to a holiday or because there just aren't enough nurses. Sweeting, p. 327, Santin, 73-74 (explaining the difficulties of staffing because sometimes people just don't want to work); Charron, p. 84 (there are times when you have to say yes to bonuses), Haase, p. 158-159 (bonuses could go up

due to lack of nurses). In addition, knowing a bonus might become available, staff members could refuse to pick-up a shift until the bonus was offered and neither Antonucci, nor any other scheduler, could do anything about it. Sweeting, p. 318, Santin, p. 239-240. When Haase was asked if he really expected nurses to pick up shifts without bonuses, he said it would not go well in the beginning and it was behavior that would not change overnight and was unrealistic. Haase, p. 198-199. Haase did not know if nurses waited until the end of the week to pick up a shift in order to get a bonus under Sweeting. Haase, p. 313. Yet, this was the expectation they had put on Antonucci which again demonstrates that they could not have really believed her performance was bad.

Sweeting, by her own admission, gave "way more" in bonus money after Antonucci was fired, yet no one ever accused her of "over-reliance," or issued any discipline to her relating to bonus money. Sweeting, p. 182, 322-323; Haase, p. 201. Charron never gave Sweeting any instruction on how to avoid bonuses, never told her to calculate her bonus dollars to watch the amounts, and instead, only said to keep things "just the way it's been going." Sweeting, p. 172-174, 181, 322. Sweeting testified that she never though Antonucci over-relied on bonuses and never heard Charron say anything in that regard with respect to Antonucci. Sweeting, p. 317-318. Also after Antonucci was terminated Charron herself wrote that she "can't understand why the bonus dollars for extra shifts has been so high," and says "Am I missing something? Or am I <u>still</u> getting the process wrong?" When bonuses were high after Antonucci was fired, Sweeting was not blamed for it and Defendants made no correlation between what Sweeting had or had not done and the bonuses. Sweeting, p. 337. In addition, Sweeting confirmed that if the staffing person went to the DON for bonuses, the DON could always have said "go work the schedule a little bit more," or "no." Sweeting, p. 313.

Finally, Haase admits that if there was a perception of over-reliance on bonuses, it would have made sense just to tell Antonucci that there would be no bonuses, yet he did not know if that was ever done. Haase, p. 233. Furthermore, Haase admitted it was possible that the reason bonus dollars went down just before Antonucci was fired was because of her efforts in making phone calls. Haase, p. 278, Sweeting, p. 330 (for the bonuses to go down, Antonucci had to have filled the spot without bonuses). The simple fact is if Pereira didn't care if bonuses were a million dollars, and Charron and Haase both acknowledge that Antonucci was not fired for bonus dollar issues, there is no way bonus dollars can form the basis of Defendants' decision to fire Antonucci for "poor performance."23

To further buttress the fact that there was no history of poor job performance, Sweeting, Santin and Morang were all spoken to by Charron regarding the <u>same things</u>, yet Charron does not characterized any of those <u>discussions</u> as "counselings" or "warnings." Charron II, p.18-19. For example, Charron would ask Plaintiff "did you call people," and just like all directors would ask "did you try everyone." Antonucci, p. 160. Telling a scheduler to keep working on a schedule when there are openings is not counseling, it is part of the job. Sweeting, p. 151-152, 155-156. Santin testified that Charron would ask 1 or 2 times per day if there were any openings in the schedule. Santin, p. 182-183. Sweeting also explained that Harris used to tell her and Antonucci to try to be creative, etc., but that this was never a counseling or sign of a problem. Sweeting, p. 175. Pereira explained that one of the functions for the DON was to find out how the scheduling was going and to talk about the openings. Pereira, p. 211. Charron admitted that

23 Finally, the only other conversation Charron testified about regarding Plaintiff and job performance issues before the August 23 action plan related to speaking to Plaintiff about being too reliant on bonus dollars. Charron never expressly called it a warning. Instead, when asked if this was counseling, Charron responded only that "I spoke to her, and <u>I guess</u> you could say it was a form of counseling." Charron, p. 86. If Charron had to guess that the discussion constituted counseling, then she obviously did not consider it either a warning or a counseling at the time of the firing. Again, Charron could not give the specifics of this discussion. Charron, p. 90. In all events, even Charron admitted Antonucci was not fired for over-relying on bonuses.

"it is always something I have to talk about scheduling," and she had to do this with Sweeting. Charron, p. 152. Charron herself admitted that although she told Pereira and Haase about these discussions, she never indicated that she gave any verbal warnings. Charron, p. 60. Again, when Plaintiff was fired, there was no indication of any prior oral warnings in the file or on the termination notice where there is an express opportunity for Charron to indicate what prior disciplinary history exists. Instead, the only written document apart from the termination notice which arguably deals with Plaintiff's job performance is a two-week action plan dated August 23, 2004.24 As the following demonstrates, the Defendants are again attempting to re-write history. Defendants' arguments are without merit because the action plan was (1) not a form of discipline; (2) it was vague and unsubstantiated; and (3) it dealt with only one "issue" that Defendant claimed Plaintiff had.

The purpose of the action plan was not disciplinary in nature – it is not called a warning or disciplinary notice and action plans are not part of the company's disciplinary procedure. Before Antonucci, Charron had never used an action plan as a disciplinary tool. Instead "it was a roadmap for expectations." Pereira, p. 86-87. This is consistent with Plaintiff's understanding of the purpose of the action plan – "It doesn't say anything about it being a criticism," it is "like what to do in the future," and "informative, like things she requested." Antonucci, p. 182.

A review of the action plan25 makes clear that it does not even touch upon any of the substantive alleged job deficiencies for which Antonucci was allegedly fired. Instead, the plan only lists vague "expectations" like "will not ignore requests by DNS," and "Will follow up and

24 At this point, Charron had been supervising Plaintiff for less than a month and Plaintiff had been doing the job for five years.

25 Charron elected to give Plaintiff only two weeks to improve, even though it is the first written document ever given to Plaintiff regarding her job duties. Charron, p. 46, 41. Charron had the option of giving her more time. For example, Melissa Bettencourt was the only other employee that Charron gave an action plan. Bettencourt, who was substantially younger than Plaintiff, got 90 days to improve.

complete duties as assigned." However, Antonucci never ignored a request and followed up "automatically." Antonucci, p. 185-186. In addition, it makes no sense that the action plan could have contributed to the firing since Defendants <u>never followed up</u> to determine if Plaintiff was in compliance. For example, the plan sets a date of September 7, 2004 to review expectations. If Defendants actually sought to rehabilitate Plaintiff and were genuine in their claimed efforts, the follow up meeting would have taken place. Plaintiff was fired before anyone bothered to determine if she had, in fact, followed the plan.26 Haase, p. 209, 210-211. Since there is no dispute that failure to follow the plan was not the reason for the termination, it is irrelevant.

There simply is no contemporaneous evidence of any performance issues during the eight week period during which Charron supervised Antonucci.27. The fact that this series of events was generated after-the-fact becomes apparent by Haase's testimony about what discipline Plaintiff supposedly received – he stated an action plan and termination notice – but was sure she

26 There is no dispute that Plaintiff did change her schedule to five days as required. Haase, p. 211, Antonucci, p. 187. In addition, the second expectation relating to not ignoring requests and performing duties, was, according to Haase, related to the monthly schedule. Haase, p. 206. There is no allegation that after August 23 Plaintiff continued to refuse to update the schedule. In all events, Plaintiff disputed that she refused to perform duties or ignored requests. Antonucci, p. 183, 185.

27 Twenty days <u>after</u> Plaintiff was fired, Charron filled out a disciplinary action notice and called it a "documented verbal notice." The problem indicated on the form was "#1 Lack of creativity[;] #2 Too dependent on bonus dollars to fill open positions." Plaintiff was never shown this form before her termination and did not sign it. Antonucci, p. 306. Although Defendants' included this in earlier answers to interrogatories as a basis for establishing Antonucci's supposed poor job performance, Defendants' have since totally abandoned this as evidence of any discipline, allowing a jury to infer that it was created after-the-fact. Consistent with this, Haase admitted that the first time he ever saw the 10/24 notice was after Plaintiff was fired. Haase, p. 218. The usual procedure is that Haase has to sign all disciplinary notices in order to know that the event actually took place. Haase, p. 216. Yet, Haase never signed this notice and did not know why Charron failed to present it to him. Haase, p. 218. The fact that Haase was surprised and the Defendants abandoned this document undermines Defendants' credibility.

In all events, Charron admitted that Plaintiff was not fired for over-reliance on bonus dollars. In addition, "lack of creativity" has never been cited as a basis for firing Plaintiff – not on the termination notice, not on the position paper, not in any Answers to Interrogatories, and not in the instant motion. Accordingly, the 10/24/04 notice (and the substance therein) could not have formed part of the reason why Plaintiff was fired or assist with establishing a <u>prior</u> history of discipline. Charron never told Plaintiff she was doing a poor job - - she just changed things. Antonucci, p. 169.

received others. Haase, p. 120.28 When asked why he thinks Plaintiff got "others," he responded because "it sounds good." Haase, p. 120. 29

3. There is Additional Evidence of Animus

*Similarly-situated younger employees performing the same job as Antonucci were not treated the same way.*30 *Donna Sweeting.*31 Sweeting was spoken to by Charron a couple of

---

28 Defendants also appear to be relying on a December 2003 written warning as evidence of Plaintiff's previous performance problems that supported the decision to fire her. DEF 30. By Court order Defendants' were required to provide the reasons why Plaintiff was fired in response to an interrogatory. Ex. C, p. 3-5. Defendants did not include anything about the December 2003 warning issued by prior DON Harris, over seven months before Charron even began working at Cherry Hill. Id. In addition, on Plaintiff's termination notice the section labeled "Number of prior Disciplinary Action Notices on file," was left completely blank, indicating that no prior discipline factored into the termination. DEF 172; Charron II, p. 6-7 (even at her deposition, Charron could not say how many prior disciplines should be in that box). In all events, following the warning, Harris gave Plaintiff a glowing job evaluation in March 2004. Ex. A. Defendants gave Plaintiff the highest merit increase possible by Life Care standards (3%), which was approved by Haase, and nothing was mentioned about job performance issues suddenly present four months later when Charron shows up. Ex. A, Haase, p. 92. See, e.g., Green v. Safeway Stores, Inc., 98 F.3d 554, 564 (10th Cir. 1996) (a plaintiff can defeat summary judgment by demonstrating that an evaluation conflicts with other assessments of her work performance).

29 The "history" is not only completely inconsistent with the progressive discipline policy, but also completely inconsistent with witness' explanation of how the system should work. Haase explained that discipline begins with verbal counseling and it is documented and that the next step can be a written warning. Haase, p. 45. He also explained that he has suspended employees many times before resorting to termination. Haase, p. 47. For example, if an employee engages in patient abuse, they are oftentimes suspended and not fired. Haase, p. 47. Charron explained that she would start with a verbal warning in writing, yet it is not contested that this is not actually what happened. Charron, p. 37-38. In addition, Charron's testimony as to what discipline was given to Plaintiff changed over the course of her deposition.

30 Defendant appears to argue that neither Santin nor Sweeting are similarly-situated to the Antonucci. In fact, Defendants incredulously argue that both Santin and Sweeting would have had to engage in the identical alleged conduct (having 21 openings on a weekend schedule as of 2 p.m. on a Friday when the DON had to leave early for a funeral) to compare the treatment. Among other things, this argument is inconsistent with the applicable law. See, e.g., Briddell v. Saint-Gobain Abrasives, Inc., 2007 U.S. Dist. Lexis 26829, at *24 ("The comparison cases need not be perfect replicas * * * The test is 'whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."). Defendants made no such argument as to Morang. Proof of discriminatory motive can be inferred from the mere fact of differences in treatment. Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

31 There is ample evidence demonstrating that Sweeting was less-qualified than Antonucci. Sweeting only began working at Cherry Hill in September 2001. She had no previous staffing or scheduling experience. Sweeting, p. 8-9, 48-49. She was trained by Antonucci. Sweeting, p. 8-9, 57, 67, Antonucci, p. 317-318. Although she filled in for Antonucci, she was not responsible for completing all the staffing coordinator tasks. Antonucci, p. 84-85, 319; Sweeting, p. 184. In August 2004, Charron changed Antonucci's schedule from a four-day work week to five-days, taking Sweeting off the job on Wednesdays. Similarly, in December 2003 when Harris told Antonucci she could not have a day off, she explained that if Antonucci had the day off, they would have a difficult time finding someone to do her job. Haase, p.143-144. If Sweeting was qualified, she would not have been taken off the job in 2004, and she would have been the easy choice to fill in for Antonucci in December 2003.

By Sweeting's own admission, the staffing job was so difficult that she did not want to replace Antonucci. Sweeting, p. 50, 54. Even after she was performing the job, Sweeting would not consider herself better than Antonucci at the staffing position. Sweeting, p. 48-49, 194, 204. Just days before Antonucci was fired, Sweeting was given her annual evaluation by Harris and Charron. Sweeting, p. 223-225; DEF 420-423. Sweeting ranked

times about not having two weeks of daily schedules completed. Sweeting, p. 237, 239. This was a problem on both her 2005 and 2006 evaluations. Sweeting, however, disagreed with Charron's definition of "two weeks." Sweeting had problems tracking call-outs which was something Charron wanted her to do and was also criticized on her evaluation for it. Sweeting, p. 245-246. She was spoken to by both Harris and Charron for not having good organizational skills when she left piles of paperwork on her desk that sometimes remained for weeks. Sweeting, p. 246-247. Charron allegedly disciplined Antonucci for not adding names to the monthly schedule, yet, she did not even require Sweeting to do this as part of the same job. Sweeting, p. 148.

Sweeting gave out "way more" bonus money than was given in 2004, yet she has never been disciplined for giving out too much bonus money or relying too much on bonus dollars. Sweeting, p. 181-182, 322-323. Sweeting was counseled by Charron and Harris for not putting incident reports in within the required time period. Sweeting, p. 79, 227. Haase had to speak with Sweeting on "several occasions" about PPD problems.32 Sweeting explained that this happened on at least seven different occasions and at one point it was non-stop. Sweeting, p. 115-116. She was also spoken to about PPD by Harris and by the current DON. Sweeting, p. 115-116. Harris spoke to Sweeting about trying to be more creative in filling the openings

---

lower than Antonucci and Harris commented that she needed to "increase organizational skills/meeting deadlines." DEF 420-423.31 In addition, Sweeting's performance rating further decreased from 2005 to 2006 in staffing levels, agency and overtime use, preparing nursing schedules and modifying as needed, and maintaining 1-2 weeks of schedules. Haase, p. 150, 152, 160, DEF 413-417, DEF 2202-2206. Charron wrote that Sweeting still needed to improve her "organization," as well as "completing daily schedules two weeks at a time," and "better tracking system for call-outs." Id. Organization and maintaining schedules continued to be a problem for Sweeting in 2006. Id. Significantly, maintaining monthly schedules was supposedly a problem for Antonucci, yet Sweeting was criticized on her evaluation over the course of two years for not maintaining two weeks of scheduling, but was never disciplined or given an action plan. Sweeting admitted that Antonucci could have done a better job on five separate tasks, including distributing schedules before the end of the shift, and maintaining the necessary schedules 1-2 weeks in advance. Sweeting, p. 251-255. Even more significant is the fact that when Haase was asked if Sweeting was qualified for the job he could only respond with a "maybe." Haase, p. 145; Horner, p. 131-132 (could not say Sweeting was more qualified).

32 PPD is a formula for determining the right amount of staff compared to the number of patients.

without bonuses and about being more aggressive. Sweeting, p. 174, Haase, p. 162 (lack of aggressiveness was an issue at times with Sweeting).

In fact, there were more staffing problems when Sweeting was scheduler. According to Sweeting, it started to get real bad in 2005. Sweeting, p. 33, Antonucci, p. 319-320. In fact, in 2005, Pereira had to appoint a DeCosta, then a unit manager, to oversee staffing. Pereira, p. 34. Pereira had not visited Cherry Hill prior to 2005 due to staffing concerns. Pereira, p. 101. Sweeting blamed the problems with staffing on an exodus of nurses (about 15) and less staff overall. Sweeting, p. 34-35. Yet, she could not identify more than 3 nurses who might have left and her testimony directly conflicted with Horner's and Haase's on the same subject. Horner, p.60, Haase, p. 38. In addition, Haase testified that he was fired because patient census was very low in 2007. Haase, p. 32. If census was low, then Sweeting should not have a problem staffing since she would not need as many nurses. Sweeting, p. 101-102. Haase believed Sweeting had issues with giving nurses too much time off which created scheduling problems. Haase, p. 150-151. Although he admitted that Harris came to him about the problem, he had no idea if she was disciplined or put on an action plan because of it. Haase, p. 151. He also believed that Sweeting's poor job performance as reflected on her 2006 evaluation might have been attributed to difficulties with staffing because it was a problem at that time. Haase, p. 154.

Despite all of these issues, Sweeting was never issued any written discipline and her job was not changed in any way. Sweeting, p. 78. Instead, Charron, Harris and Haase would give her the benefit of the doubt and an opportunity to explain and correct the situation. Sweeting, p. 83 (Charron would sit down and talk with her about it), 113-114, 117-118. This is something they never afforded Antonucci.

*Rebecca Santin.* During Santin's employment she has been spoken to about problems

with the PPD about three times. Santin, p. 109. Santin has never been disciplined by Charron. Charron did not require her to prepare the holiday schedule two months in advance as she did of Antonucci. Santin, p. 113. She also had a problem with giving DON proper notice re: poor staff attendance. Santin, p. 123-124. The solution was to set up a new system. Santin, p. 123-124. She was also spoken to and criticized on her evaluation for not doing reference checks fast enough. Santin, p. 130-132. Santin admitted that the DON has had to help her with staffing, including making phone calls. Santin, p. 146-147. Santin was rated lower on her evaluation than Antonucci in 2004. Santin, p. 138. In fact, Santin's score was lower than Antonucci's just five months before she was asked to train Antonucci. Despite the issues Santin had, she was never disciplined.

*Dawn Morang.* Morang's evaluation was worse than Antonucci's in the same job. DEF 3148-3151. In addition, in the "areas for improvement" section, Charron noted that Morang needed to be less negative during difficult times. Morang responded in her evaluation in the same manner that Antonucci did on her termination form. Id., DEF 172. Morang wrote "I am very offended" by the comment regarding less negativity. DEF 3148-3151. "I work at home and on weekends to fill staffing needs for which I get no compensation. My negativity in stressful situations comes from feeling that there is no support from my supervisors, and I am left to fend for myself, when I am looking for guidance." Id. It was during this time, according to Charron, that there were difficulties filling the schedule. Charron II, p. 38. Morang, like Antonucci, blamed the problems on lack of staff. Morang was counseled by Charron 1-2 times for not completing the schedules. Charron, p. 149. Morang also had issues with completing two weeks of daily sheets and PPD. Charron, p. 150. Furthermore, Charron acknowledged that Morang has had problems filling vacancies and that she had "all those issues." Charron, p. 150-151. Morang

has never been disciplined.

*Charron Had a Plan to Fire Antonucci from the Beginning, Which was Not Contingent on Job Performance at all.* First, Antonucci's position was posted before she was given the action plan. Sweeting, p. 199-200 (explaining that it was posted during the time when she was still filling in); Ex. F. Antonucci's job description was changed in August 2004 as part of the action plan, yet when Sweeting took over about five weeks later, she was given the original job description and not the changed version. Sweeting, p. 267, Charron, p. 189. Accordingly, she was not evaluated on at least seven different criteria that Antonucci was required to follow. Sweeting, p. 262-266. This included things like maintaining the PPD, completing the monthly schedule two weeks in advance of the coming month, providing creativity when compiling the schedule, and other duties as assigned by the DON. Sweeting, p. 262-266. Santin's job description was also the same as Antonucci's original job description, and the one given to Sweeting after Antonucci was fired. Santin, p. 95. Charron's explanation for changing the job description was not credible. She stated that the only reason that she would not have used the changed job description with Sweeting was if she already had one (a job description for staffing coordinator) on file for Sweeting previously. Charron, p. 180. Yet, it is undisputed that Sweeting's first review for staffing coordinator was done in 2005 by Charron.

In addition, when Sweeting took over in October 2004, Sweeting continued to perform the job exactly as Antonucci had trained her to perform it - - and Charron assured her that she should continue to do the job "the way it's been going." Sweeting, p. 172-173. Charron did not teach her anything about staffing, because she already knew how to do the job from Antonucci, p. 100-101. Charron never told her that she should do anything differently than how Antonucci had taught her to do it. Sweeting, p. 173. When she first started full-time, Sweeting was never

told to avoid giving bonuses, was not given any ideas on how to be creative, and was not told to be aggressive when filling openings. Sweeting, p. 174, 181.

*Other Reasons.33*

While there may not be direct evidence of discrimination, the following circumstantial evidence clearly demonstrates that Defendants discriminated against Antonucci based upon her age. In May, 2004 – before Charron came on board -- Irene Ferruccio, who was fifty-six at the time, was re-hired by Celeste Harris. Ex. F. She assumed the position of Unit Manager. From the time that she was hired until at least the summer of 2005, there were two other Unit Managers who worked the same shift as Ferruccio: Melissa DeCosta and Linda Norden.34 As of May, 2004, DeCosta and Norden were thirty-four and forty-nine, respectively.

After Charron began working at Cherry Hill, she was also subjected to age

---

33 Charron sent Sweeting for training "for the same reasons" as Antonucci. Sweeting, p. 61, 64. Sweeting's training lasted two-three days. Santin, p. 205. Yet, with Sweeting, this was not considered a performance problem. By comparison, Antonucci was trained for only one day. Santin, p. 216. Neither Antonucci nor Santin viewed Antonucci's visit as training. Santin, p. 215-216, 174. Santin explained that it was just about showing Antonucci what she did on a daily basis. Santin, p. 215-216. Charron did not even tell Santin about any specific thing that she wanted her trained and did not tell Santin that Antonucci was having any job performance problems. Santin, p. 215. Haase did not know what Antonucci was supposed to learn at the training. Haase, p. 59. Antonucci noted that Santin did not even know what she was supposed to be showing her, and that in the end, they were doing the same things. Antonucci, p. 174-175. Antonucci disputes not being receptive to Santin or that she told her that she was not going to do as Charron directed. Antonucci, p. 177-178.

Charron changed Antonucci's work schedule from four days per week to five days per week. Yet, as Santin explained, there was no reason to work five days if someone is filling in for you on the fifth day. Santin, p. 168. Although Antonucci did not resist this change, it was not justified in any way. Antonucci, p. 187, 307. According to Antonucci, she thought Charron was trying to upset her to the point where she would leave. Antonucci, p. 295.

At Haase's deposition, he set forth an entirely new (and inconsistent) reason why Antonucci had to be fired. Haase alleged that Antonucci was fired because she allegedly engaged in misconduct by intentionally not being aggressive in making phone calls and because she refused to do the monthly schedule. Haase, p. 132. Although Haase said she was fired for misconduct, that reason appears nowhere on the termination form or documents submitted to unemployment or in any subsequent writing. Haase, p. 138-140. Haase had no explanation for why misconduct was not put down at the time of termination, if in fact, it was misconduct and admits he told Horner to write "poor job performance," only on the unemployment form. Haase, p. 141, Horner, p. 171-172.

Another inconsistency arose when Haase was asked the problem was with Antonucci and the bonuses. Out of blue he alleged that the problem was that Antonucci was directing the bonus money to particular nurses. Haase, p. 313. Yet, Charron never indicated this was a problem and Haase never spoke to Antonucci about it. Haase, p. 310, 313, Pereira, p. 33. He admitted it was a serious allegation but no one spoke to Antonucci because "she was already on an action plan." Haase, p. 313-314. As Haase explained, the purpose of putting things in writing was to establish a "paper trail." Haase, p. 110.

34 DEF 466, 579, 585, 629, 630, 658 and 670 (daily sheets produced by Defendants).

discrimination. In fact, she had many of the same problems with Charron that Antonucci had. Ex. O. On February 9, 2005, Ferruccio was fired for poor job performance.35 Defendants claim that this was necessary because a Unit Manager is "held to a higher standard than her subordinates, because she is responsible for setting the standards for quality resident care and for ensuring compliance with all state, federal and facility regulations."

After Ferruccio was fired – during the period May to August, 2005 -- the State Department of Health ("DOH") found that Cherry Hill had failed to comply with a number of state and federal regulations which resulted in the compromise of resident care. In fact, the incidents which gave rise to the deficiencies appear to be much more serious than those for which Ferruccio was allegedly held responsible.36

For example, Pereira testified that there is a direct connection between quality of care and staffing. Pereira, p. 43. Yet, the persons responsible for staffing at the time -- Sweeting and DeCosta who were both in their thirties and substantially younger than Antonucci and Ferruccio -- were not disciplined.37 Moreover, unlike Ferruccio who was held to a higher standard than her subordinates and who was fired for failing to comply with state and federal regulations – DeCosta– who is substantially younger than Antonucci and Ferruccio – were not even disciplined. Charron, who was also substantially younger than Antonucci was also not disciplined. Afterwards, DeCosta was promoted to Assistant Director of Nurses and Norden was ultimately fired, also for patient care issues.

---

35 More specifically, Defendants claim that Ferruccio "compromised resident care" by among other things: failing to monitor the completion of nursing notes, failing to follow up on missing resident skin checks, being unable to identify concerns with residents on her unit, failing to follow up with residents who had experienced weight variances, and failing to follow up on psychiatric and pharmaceutical recommendations for residents.

36 Pereira testified that Cherry Hill had a very difficult time clearing these deficiencies. Pereira, p. 34. In fact, after the initial deficiencies, the State returned and Cherry Hill still did not clear the deficiencies. It was only after Pereira spent two weeks at Cherry Hill that it was able to clear the deficiencies. Pereira, p. 38-54.

37Because of the severity of the 2005 surveys, Pereira made DeCosta responsible for staffing and the person to whom Sweeting reported. Pereira, p.44-6, 116.

There is also evidence of stereotypes at work in this case. Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.38 Courts have found unlawful stereotyping39 where, as here, employers have described older workers as lacking energy and creativity and incapable of change or "set in their ways."40

In this case, Antonucci testified about Ferruccio and the incident where Charron made age-related comments. When discussing an interview with Ferruccio, Charron said that the nurse she interviewed asked Charron's age and Charron responded with something like "oh, that's what I need, somebody else questioning that I'm young as a director, I'm too young." Antonucci, p. 322, Ex. F. This person was not hired. Id. Charron also asked Ferruccio her age and when she refused to tell, Charron said she would just look it up. Ex. F. Haase knew the ages of virtually all of the employees and was able to tell who was over 40 "from working with them for three years and - - you know, having access to their records and all that," * * * "I know how old

---

38 See Biggins v. Hazen Paper Co., 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed. 2d 338 (1993) (it is very essence of age discrimination for older employee to be fired because employer believes that productivity and competence decline with older age); see also EEOC v. Wyoming, 460 U.S. 226, 75 L.Ed. 2d 18, 103 S.Ct. 1054 (1983) (age discrimination rarely based on sort of animus motivating other forms of discrimination; it is based in large part on stereotypes unsupported by objective fact).

39 See, e.g., Tenenholtz v. Powell, 2004 U.S. Dist. LEXIS 30198 (E.D.Va. 2004) (court found requisite bias where witnesses made statements about older workers having less energy and not working as hard as younger workers and where younger employees received better treatment); Sperling v. Hoffman-LaRoche, Inc., 924 F.Supp. 1396, 1408-09 (D.N.J. 1996) (denying defendant employer's motion to dismiss and nothing that, reading Antonucci's complaint liberally as the court was obliged to do, Plaintiff's claims that they were terminated because they were perceived to be less productive or less energetic stated cause of action under ADEA because consideration of stereotypes such as these in making employment decisions is precisely what the ADEA was intended to eradicate); Abrams v. Millikin & Fitton Law Firm, 267 F. Supp. 2d 868 (S.D.Oh. 2003) (court found age-related animus and direct evidence of discrimination precluding summary judgment where employer stereotyped Plaintiff as being less creative and energetic than when she was a younger person and as being unable to adapt to new environment); Richter v. Hook-SupeRX, Inc., 142 F.3d 1024 (7th Cir. 1998)(court found that comments that Plaintiff had low energy level and was resistant to change did not, standing alone, raise inference of age discrimination).

40 Haase testified that Antonucci was "stuck in the belief that the way things have always been done is the right way." Haase, p. 50. Antonucci had a lack of "energy." Haase, p. 191-193. Sweeting testified that Antonucci was "set in her ways." Sweeting, p. 280. Pereira was asked if he was aware of Charron hiring any nurses older than he (age 42 in 2007, age 39 when Antonucci was fired). Pereira, p.22. He responded, "Oh, I don't think they make nurses that old." Pereira, p. 166.

people are over a course of time." Haase, p. 333-335. Haase obviously made a point of finding out.

Defendants also argue that they are entitled to summary judgment because Antonucci has failed to provide any evidence of age animus.41 For the following reasons, Defendants argument is without merit. First, Defendants err by including all persons over the age of forty because the ADEA concept of age discrimination includes favoring a younger worker also over age 40. See O'Connor v. Consol. Coin Caterers, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (allowing a 56 year old worker to claim age discrimination when replaced by a forty year old). Thus, the fact that there were one hundred twenty employees over the age of forty is of no consequence. Second, statistical evidence must compare employees that are "similarly situated." Timmerman v. U.S. Bank, 483 F.3d 1106 (10th Cir. 2007) (this means that the situation of the employees in the protected class must have been comparable to the situation of the employees in the non-protected class who were allegedly treated more favorably). Thus, Defendants' attempt to use, not only the ages of the nursing staff, but the janitors and kitchen workers as well, is similarly unconvincing. In fact, the only relevant comparison may be the other staffing coordinators – Sweeting, Morang and Santin. When this is done, it is clear that Antonucci has demonstrated the requisite animus because these substantially younger employees were treated much more favorably by Charron, Haase and Pereira. Third, Defendants' statistical evidence is unreliable in that it is missing key information and is replete with errors. For example, in the Horner Affidavit, Defendants claim that all codes beginning with a "D" are involuntary

41 Defendants make several arguments in this section. First, Defendants point to statistical evidence. Second, Defendants point to the interactions between Antonucci and Haase including that Antonucci testified he was generally pleasant to her and never did anything that caused Antonucci to conclude that he did not like her. Third, Defendants point to the fact that Antonucci fails to provide any evidence that Charron targeted older individuals or treated older individuals unfavorably. Antonucci has fully addressed these issues in previous sections and, therefore, will not again address them here.

separations. Yet, the D07 code is "walked out-no notice." Also, there were many instances in which two different lists included the same names but different information such as dates of birth. Finally, the comparison which should be made is not <u>all</u> involuntary terminations but, rather, terminations for the same reason that Antonucci was fired: unsatisfactory job performance. A close examination of this information reveals that, during Charron's tenure, she fired six employees for unsatisfactory job performance. Of those, only two were under forty and, even more significantly, the rest were all over fifty. Moreover, before Charron began working at Cherry Hill, the lists reflect that no employees over forty were fired for unsatisfactory job performance.

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 26th day of July 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate