**EXHIBIT A**

# Competency-Based Position Description and Performance Review
## STAFFING COORDINATOR or SCHEDULER

Life Care Centers of America

Associate: Barbara Antonucci  
Date of Hire: 2/25/1986  
Department: Staffing (Nursing)  
Supervisor: Celeste Harris  
Date of Review: 3/1/04  
Purpose: ☐ Upon Hire ☐ 90-day eval ☑ Annual ☐ Other: ______  
Exemption Status: Nonexempt  
Risk Exposure Category 3 = may not involve exposure to blood/body fluids

### POSITION SUMMARY

*The* STAFFING COORDINATOR *is responsible for daily, weekly and monthly work schedules for the nursing staff in accordance with all laws, regulations and LCC standards. Reports to Director of Nursing.*

### WORKING CONDITIONS

- Works in office as well as throughout facility (i.e., resident rooms, therapy rooms, dietary).
- Sits, stands, bends, lifts and moves intermittently during working hours.
- Subject to frequent interruptions.
- Involved with residents, associates, visitors, government agencies/personnel, etc. under all conditions and circumstances.
- Subject to hostile and emotionally upset residents, family members, etc.
- Works beyond normal working hours, on weekends and in other positions temporarily as necessary.
- Subject to falls, burns from equipment, odors, etc., throughout the work day.
- Possible exposure to infectious waste, diseases, conditions, etc., including exposure to the AIDS and Hepatitis B viruses.

### EDUCATION and EXPERIENCE

- Must be a high school graduate or equivalent.
- Must have basic computer skills.
- Prior staff scheduling in healthcare preferred.

### SPECIFIC REQUIREMENTS

- Must be able to read, write, speak and understand the English language.
- Must possess the ability to make independent decisions when circumstances warrant such action.
- Must be knowledgeable of scheduling practices and procedures as well as the laws, regulations and guidelines governing staffing functions in the long-term care facility.
- Must work harmoniously with other staff.

### PHYSICAL and SENSORY REQUIREMENTS
*(with or without the aid of mechanical devices)*

- Must be able to move intermittently throughout the work day.
- Must be able to cope with the mental and emotional stress of the position.
- Must possess sight/hearing senses or use prosthetics that will enable these senses to function adequately so that the requirements of this position can be fully met.
- Must be in good general health and demonstrate emotional stability.
- Must be able to lift, push, pull or transfer a minimum of 20 lbs.
- Must be able to assist in the evacuation of residents.

## POSITION DESCRIPTION and PERFORMANCE REVIEW

*The ratings of this performance review are based upon the following criteria:*

Unsatisfactory (1 point) = *Performance needs improvement. Requires a performance improvement plan.*
Inconsistent/Marginal (2 points) = *Performance needs improvement. Requires more than normal supervision.*
Satisfactory (3 points) = *Performs skillfully on the standard. Requires normal amount of supervision.*
Good Role Model (4 points) = *Goes beyond expectations on occasion. Requires little or no supervision.*
Consistently Outstanding (5 points) = *Consistently goes beyond expectations. Requires little or no supervision.*

| PART ONE: CORE COMPETENCIES | Rating (1,2,3,4,5) | COMMENTS |
|---|---|---|
| **Life Care Mission/Values & Work Ethic** | | |
| 1. Supports Life Care's mission and values. | 4 | |
| 2. Displays integrity and professionalism by adhering to Life Care's code of conduct. | 3 | |
| 3. Demonstrates dependability. | 4 | |
| 4. Takes pride in work. | 5 | |
| | | Score = 16 divided by 4 = 4 |
| **Communication Skills** | | |
| 1. Communicates effectively and professionally both in writing and verbally with all types of personalities. | 3 | |
| 2. Answers questions thoroughly and timely. | 5 | |
| 3. Attentive listener. | 3 | |
| | | Score = 11 divided by 3 = 3.6 |
| **Problem-solving Skills** | | |
| 1. Demonstrates ability to solve problems independently. | 4 | |
| 2. Displays ability to self-correct quickly. | 5 | |
| 3. Solves problems fairly. | ~~4~~ 5 | |
| | | Score = 14 divided by 3 = 4.6 |
| **Attention to Detail** | | |
| 1. Maintains organized systems. | 4 | |
| 2. Meets deadlines. | 5 | |
| | | Score = 9 divided by 2 = 4.5 |
| **Customer Focus** | | |
| 1. Treats all staff and residents with dignity and respect. | 3 | |
| 2. Seeks to accommodate staffing needs of associates while not compromising resident care needs. | 4 | |
| | | Score = 7 divided by 2 = 3.5 |

## PART TWO: RESPONSIBILITIES, STANDARDS and COMPETENCIES

*Below is a description of basic job activities though other related duties and activities may become necessary as directed by the department head or supervisor.*

| Scheduling Responsibilities | Rating (1,2,3,4,5) | COMMENTS |
|---|---|---|
| 1. Staffs facilities at levels determined by Director of Nursing. | 5 | ✓ |
| 2. Utilizes overtime and agency only when approved by Director of Nursing or Assistant Director of Nursing. | 5 | ✓ |
| 3. Prepares nursing schedules and modifies as needed. | 4 | ✓ |
| 4. Distributes revised schedules to appropriate associates and posts at designated areas. | 5 | |
| 5. Processes requests for shift changes. | 5 | |
| 6. Maintains nursing assistant sign-in sheets on a daily basis. | N/A | ✓ |
| 7. Distributes the next day's assignment before the end of the shift. | 5 | ✓ |
| 8. Maintains one to two weeks of scheduling at all times. | 3 | ✓ |
| 9. Recommends and utilizes most appropriate scheduling option (i.e., Baylor, 12-hour shifts). | 5 | |
| 10. Maintains attendance and tardy records for all nursing services. | 4 | |
| 11. Corrects mis-punches on clock-ins daily. | N/A | |
| 12. Reviews and approves timesheets at end of each pay period. | 5 | |
| 13. Makes necessary corrections to timesheets and returns to payroll clerk (including bonus pay, paid-time off, etc). | 5. | |
| 14. Notifies Director of Nursing of trends noted in time-clock punches. | 4 | |
| 15. Tabulates SNF, ICF and agency hours daily and provides reports to appropriate managers. | 5 | |
| 16. Maintains current nursing roster with current home, cell and pager numbers. | N/A | |
| 17. Maintains current certification and licenses for nursing staff. | N/A | |
| 18. Schedules driver when needed for resident's medical appointments. | N/A | |
| 19. Maintains in-service log for all nursing staff. | NA | |
| | | Score = 62 divided by ~~19~~ 13 = 4.7 |

| Resident Rights | | |
|---|---|---|
| 1. Maintains confidentiality of all resident information. | 5 | |
| 2. Respects resident's personal and property rights at all times. | 5 | |
| 3. Reviews scheduling complaints and grievances and makes verbal/written reports to the Director of Nursing. | 5 | |
| 4. Demonstrates a positive disposition when entering a resident's room and is willing to adjust schedule to meet the individual expectations or requests of the residents. | N/A | |
| | | Score = 15 divided by ~~4~~ 3 = 5 |

| Safety and Sanitation | | |
|---|---|---|
| 1. Follows established safety and sanitation procedures and policies. | 4 | |
| 2. Maintains a clean, safe working environment. | 4 | |
| | | Score = 8 divided by 2 = 4 |

**TOTAL SCORE** *(add all averaged scores from previous page):* 33.9

Maximum Score = 40

*Sample Pay Adjustment Table*

| *Score* | *Increase* |
|---|---|
| Up to 20 | 0% |
| 21 to 25 | 1% |
| 26 to 30 | 2% |
| 31 to 35 | 3% |
| 36 to 40 | 4% |

***NOTE***: *Should an "Improvement Plan" be initiated, any wage adjustment may be delayed until the performance is fully improved (please see following page).*

## PERFORMANCE REVIEW SUMMARY

**Goals met and improvements made during review period:**
1) more cooperative w/ supervisor in meeting scheduling needs than previously noted
2)
3)

**Top Three (3) Strengths:**
1) Knows likes/dislikes of staff related schedule
2) Maintains documentation for monthly billing & agency tracking
3)

**Areas for Improvement:**
1) could improve on being a bit more receptive to change at times
2)
3)

| Status of Improvement Plan (if applicable) | Follow-up Date |
|---|---|
| ☐ New performance improvement plan initiated with this review | ☐ Annual Performance Review<br>☐ 90-day from Review Date<br>☐ Other __/__/__ |
| ☐ Performance improvement plan **in progress** -- initiated __/__/__ | __/__/__ |
| ☐ Performance improvement plan **completed successfully** in review period. | Completed __/__/__ |

**Wage Impact?** ___Yes ___ No
*This improvement plan should delay any wage adjustment until the performance is fully improved (see follow-up date above) and documented in the personnel file.*

### Career Development Opportunities

| Goal/Objective: | Measurement: | Target Date: __/__/__ |
|---|---|---|
| Goal/Objective: | Measurement: | Target Date: __/__/__ |
| Goal/Objective: | Measurement: | Target Date: __/__/__ |

Associate Comments:

Associate's Signature [signature] Date 3/9/04

Supervisor's Signature [signature] Date 3/4/04

EXHIBIT B

## I. Background

### A. Ms. Antonucci's Employment

Cherry Hill is a long-term care nursing facility. Ms. Antonucci was hired on or about February 25, 1986 as an administrative secretary.[1] In or around January 1999, Ms. Antonucci was promoted to staffing coordinator.[2]

As a staffing coordinator, Ms. Antonucci's duties included staffing the facility at levels determined by the director of nursing ("DON"); preparing nursing schedules (daily, weekly, and monthly) and modifying them as needed; distributing revised nursing schedules to the appropriate personnel and posting the schedules at designated areas; processing requests for shift changes after DON approval; recommending and utilizing the most appropriate scheduling options; and any other duties as assigned by her supervisor. (A copy of Ms. Antonucci's personnel file is attached as Exhibit A.) Pamela Charron, DON, last supervised Ms. Antonucci.

### B. Ms. Antonucci's Inappropriate Work Behavior

On or about July 25, 2004, Ms. Charron became the new DON at Cherry Hill. Because of concerns in the past related to quality of resident care at the facility, Ms. Charron immediately implemented an aggressive approach aimed at improving resident care, which included ensuring that the facility was staffed at the appropriate levels.[3]

During her first week as DON, Ms. Charron noticed that there were serious issues with Ms. Antonucci's ability to effectively staff the facility. Likewise, Ms. Charron also had concerns about Ms. Antonucci's willingness to accept direct supervision.

For example, the schedules prepared by Ms. Antonucci often did not have sufficient staff. Even when Ms. Charron instructed Ms. Antonucci to call every available LPN to fill the available slots, they remained vacant. Due to Ms. Antonucci's lack of effort, Ms. Charron had to complete this task herself. Ms. Antonucci reason for not filling the necessary slots was that she knew the likes and dislikes of staff related to scheduling and she didn't feel comfortable "badgering" those she knew would not pick up the shifts.

Another area of particular concern to Ms. Charron was Ms. Antonucci's over-reliance on paying bonuses to nurses who picked up extra shifts. Several staff members told Ms. Charron that one of the reasons they didn't pick up shifts when first asked is because they knew that they would get extra bonus dollars when the facility became desperate enough to fill the shift.[4]

---

[1] Ms. Antonucci was 45 when she was hired.

[2] Ms. Antonucci was 58 when she was promoted.

[3] Proper staffing is an issue of utmost concern to nursing homes, which are subject to strict state and federal regulation in this area. If a nursing home does not meet the staffing levels required by the state and federal governments, it faces significant liability, ranging from monetary penalties to loss of licensure.

[4] In July, Prior to Ms. Charron's appointment, Cherry Hill paid $6,000 to $9,000 per week in bonus dollars. Due to Ms.



DEF 00184

In spite of Ms. Charron's efforts to verbally address concerns with Ms. Antonucci regarding scheduling and her expectations regarding staffing, issues remained unresolved. In fact, Ms. Antonucci's response to Ms. Charron was that she had been doing the scheduling job for several years and she did not need to be told how to do her job.

On or around August 2, Ms. Charron requested that Ms. Antonucci put together the monthly staffing schedule so she could see what shifts were vacant for licensed and non-licensed staff. Ms. Antonucci responded by telling Ms. Charron it was not her job—that it was Ms. Charron's job, and that she would not follow her supervisor's direction.

Ms. Charron explained to Ms. Antonucci that monthly schedules were indeed Ms. Antonucci's responsibility, regardless of how things had been done in the past. Because Ms. Antonucci told Ms. Charron she had never done a monthly staffing schedule before, Ms. Charron provided her with additional time to complete the task.

On August 19, Ms. Antonucci called in to report her intentions of not working that day. Ms. Charron asked Ms. Antonucci about the monthly schedule, and Ms. Antonucci replied that she had not prepared the monthly schedule because it was not her responsibility to do so.

Due to Ms. Antonucci inability to effectively staff the facility and her resistance to direction from Ms. Charron, on August 23 Ms. Antonucci was placed on a two-week action plan.[5] Ms. Charron and Steve Haase, executive director of the facility, made this decision in an attempt to rehabilitate Ms. Antonucci's work performance. Ms. Antonucci was provided a list of performance expectations to meet and was told that if she failed to meet the established objectives she could be terminated.[6]

As part of the action plan, Ms. Antonucci was also provided another copy of her job description for review and acknowledgment.[7] To ensure better efficiency with the scheduling of staff, Ms. Antonucci's working hours were changed to a five day/eight hour workweek as opposed to her previous five day/ten hour workweek. Ms. Charron also arranged for Ms. Antonucci to receive two days of training at one of Cherry Hill's sister facilities.

---

Charron's efforts, the amounts dropped to $400 to $2,700 per week. (See Exhibit B.)

[5] This was not the first time Ms. Antonucci had received disciplinary action related to staffing and insubordination. On December 8, 2004 Ms. Antonucci was counseled for being insubordinate to the prior DON. Apparently, Ms. Antonucci became infuriated when her request for vacation was denied and made several inappropriate comments to her supervisor in a loud and disrespectful voice. The reason her request was denied was because at that time there were a significant number of vacancies on the schedule that Ms. Antonucci needed to help fill.

Furthermore, the prior DON had noted on Ms Antonucci's performance evaluation in March 2004 that she was resistant to supervision and there was also indication that there had been prior concerns regarding Ms. Antonucci not meeting scheduling needs. (A copy of the disciplinary action and performance evaluation are included as part of Exhibit A.)

[6] These expectations included (i) completing and maintaining monthly nursing schedules, (ii) not ignoring requests from her supervisor, the DON, and (iii) following up and completing duties as assigned.

[7] This is the same job description that was in place when Ms Antonucci received her performance evaluation from the prior DON. (A copy of the job description is included as part of Exhibit A.)

Instead of rising to the challenge and meeting her job expectations, Ms. Antonucci's work performance still did not improve. On Friday, October 1 there were at least twenty-one vacancies on the weekend schedule as of 3:00 that afternoon. Ms. Antonucci told Ms. Charron that she felt that she had done all she could in trying to fill the positions. Ms. Charron and another associate were able to fill the vacancies within an hour.

On October 4, 2004 a decision was made to terminate Ms. Antonucci due to her inability to perform her job duties to meet Cherry Hill's expectations.

## II. <u>Law and Argument</u>

In order to prevail on her claim of age discrimination, Ms. Antonucci must first establish a *prima facie* case. *Rivera-Aponte v. Restaurant Metropol #3, Inc.*, 338 F.3d 9, 11 (1st Cir. 2003). However, if Cherry Hill produces evidence that it had a legitimate, nondiscriminatory reason for its employment action, the *prima facie* case is defeated. *Id.*

Assuming *arguendo* that Ms. Antonucci has established a *prima facie* case of age discrimination, she cannot prevail on his claim because Cherry Hill terminated her for a legitimate nondiscriminatory reason—her failure to adequately perform her job duties, even after an opportunity to correct her performance—as outlined above.[8] For this reason, Cherry Hill requests that the Rhode Island Commission for Human Rights issue a finding of "no cause" with respect to Ms. Antonucci's charge.

Sincerely,

[signature]

Alison Shaw
Corporate Legal Counsel

cc: Steven Haase, Executive Director
Carly B. Iafrate, Esq.
Barbara Antonucci

---

[8] Cherry Hill currently employs 120 employees who are forty or older, and fifteen employees who are sixty or older



DEF 00186

**EXHIBIT C**

Plaintiff's Complainant are conclusory and self-serving – e.g. Plaintiff's claim that similarly situated younger employees were treated more favorably. Consequently, Plaintiff's request that Defendant identify facts which support Defendant's denial is akin to requesting that Defendant "prove a negative." Plaintiff's request is especially absurd, given that Plaintiff was unable to identify any such employees with particularity at her deposition. As to Plaintiff's unsatisfactory employment, Defendant refers Plaintiff to Defendant's initial discovery responses, the information and documents referenced in this letter, and to the information provided by Plaintiff the first day of her deposition on January 9, 2007. Defendants reserve the right to supplement this response as further facts are discovered in the course of discovery in this matter.

**FURTHER SUPPLEMENTAL ANSWER NO. 21**

The Court has required that Defendant provide the reasons why Plaintiff was disciplined and discharged. To supplement Defendant's answer to Paragraph 17 of Plaintiff's Complaint, Defendant provides the following information.

Ms. Charron first orally counsel Plaintiff because Plaintiff would not add new hires to the master schedule. This occurred within a week of Ms. Charron starting employment. Within the first two to three weeks of Ms. Charron's employment, Ms. Charron also counseled Plaintiff that she needed to more aggressively call the individuals on the staff lists, and not allow vacancies in the schedule to remain unaddressed until the end of the week when bonus dollars were needed.

In a telephone conversation on August 19, 2004, Plaintiff continued to refuse to update and maintain the monthly schedule. As a result of this call and of prior disputes regarding Plaintiff's job duties, Ms. Charron met with Plaintiff on August 23, 2004, to explain precisely what Plaintiff's duties were, and to have Plaintiff agree to perform the duties. These duties were specifically listed

on Life Care's job description form (see Bates-stamped document DEF00035). Ms. Charron modified three or four of the seventeen duties ordinarily contained in Life Care's job description, to reflect more closely the tasks for which Plaintiff was responsible.

Ms. Charron provided the document to the Plaintiff, together with Mr. Haase at a meeting on August 23, 2004. Plaintiff read the job description and agreed, reluctantly, to comply. Plaintiff was also informed that her schedule was going to be changed from four days to five days per week, and that Plaintiff would have two weeks to transition to the new schedule. Plaintiff expressed her disappointment with the new schedule, and was argumentative with Ms. Charron and Mr. Haase regarding the need to re-define or clarify her job description or duties.

At the meeting, Plaintiff was also informed that she was to go for training with Rebecca Santin at the Life Care facility in Raynham, where Ms. Charron had previously worked. In response, Plaintiff indicated that she did not need any further training.

When Plaintiff went for the training in September 2004, Ms. Santin showed Plaintiff how she would call individuals several times a day, throughout the week, in order to have employees pick up open shifts. Plaintiff told Ms. Santin that she would only contact employees once, and if the employees said "no," or if the employee did not call back, Plaintiff would generally accept that the employee did not want to work the available shift. Ms. Santin also showed Plaintiff how to calculate PPD – a measurement of the staff-to-residents ratio – and Plaintiff showed no interest in learning this procedure from Ms. Santin. Ms. Santin communicated with Ms. Charron regarding the training, including Plaintiff's statement regarding her unwillingness to telephone staff more than once.

In the last week of September 2004, Ms. Charron approached Plaintiff at the beginning of the week, and asked her about the daily schedules, particularly for the upcoming weekend. In response,

Plaintiff indicated she was working on it. Ms. Charron told Plaintiff that she would be leaving early on Friday and that the schedule needed to be completed. As the week progressed, Ms. Charron asked Plaintiff about the schedule several more times. In response, Plaintiff was defensive and told Ms. Charron that she "knew what she was doing" and that she "was doing the best she could." Ms. Charron would remind Plaintiff that she would be leaving early on Friday to go to a funeral with Steve Haase, and that the schedule needed to be completed by the time Ms. Charron left.

On Friday, October 1, 2004, at approximately 2:00 p.m., Plaintiff gave Ms. Charron the schedule for the weekend. The schedule has a significant number of unfilled shifts. Within two or three hours, Ms. Charron, with the assistance of one or two other staff members, was able to fill all or substantially all of the open shifts.

Based on the number of absences on the schedule when it was give to Ms. Charron, the manner in which Plaintiff had failed to provide any ongoing information as the status of the vacancies throughout the week, the relatively straightforward and expedient manner in which Ms. Charron and others were able to fill the schedule, and Plaintiff's awareness of Ms. Charron's need to leave work, Ms. Charron concluded that Plaintiff's performance was not acceptable. Ms. Charron consulted with her clinical supervisor, Joseph Periera, and the Executive Director, Steve Haase. Both these individuals agreed with Ms. Charron that Plaintiff's conduct warranted discharge. As a result, on October 3, 2004, Plaintiff's employment was terminated.

As to Paragraph 19 of Plaintiff's Complaint, Ms. Sweeting was born on December 13, 1966. She worked as a CNA at Cherry Hill beginning on September 11, 2001, and assisted with staffing during part of that time. Ms. Sweeting was generally cooperative and demonstrated a willingness to take direction from Ms. Charron in a constructive fashion.

EXHIBIT D

EXHIBIT
Haase
Eff.- 22
4/30/07 JLK

FEB-23-2005 WED 12:30 PM FAX NO. P. 04

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

☐ FEPA 05EAG 151-22/22
☐ EEOC 16JA500085

Rhode Island Commission for Human Rights and EEOC
(State or local Agency, if any)

| | | |
|---|---|---|
| NAME (Indicate Mr., Ms., or Mrs.) BARBARA ANTONUCCI | | HOME TELEPHONE NO. (Include Area Code) |
| STREET ADDRESS 135 Scenery Lane, Johnston, | CITY, STATE AND ZIP CODE RI 02919 | COUNTY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| | | |
|---|---|---|
| NAME See Exhibit A | NO. OF EMPLOYEES/MEMBERS 15+ | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))
☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ AGE ☐ RETALIATION ☐ OTHER (Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) 10/ 4/04

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

SEE EXHIBIT B

FEB 17 2005
R.I.C. H.R.

R.I.C H.R.

| | |
|---|---|
| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
| I declare under penalty of perjury that the foregoing is true and correct. x Barbara Antonucci Date 1/4/05 Charging Party (Signature) | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT x Barbara Antonucci SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) [signature] 1/4/05 |

# EXHIBIT B

1. I was born on December 29, 1940. I am sixty-four years old.

2. I have been working at Cherry Hill Manor since approximately February 1986. I held the position of staffing coordinator since approximately January 1999.

3. I have been subjected to discriminatory terms and conditions of employment, based upon my age, including but not limited to:

a. My immediate supervisor, Pamela Charron (Charron) increased my duties and responsibilities, including increasing my work load, work hours and changing my job description.

b. Charron also ignored me, belittled me, and set me up to fail.

c. Charron unjustifiably criticized my work.

4. On or about October 4, 2004, I was terminated.

5. I was replaced by a substantially younger female. Upon information and belief, the substantially younger female who replaced me is not as experienced or as qualified as I am.

6. My employer's stated reason for my termination was poor performance.

7. The reasons advanced by my employer for my termination are a pretext for discrimination.

8. I always performed my duties and responsibilities in at least a satisfactory manner.

9. These discriminatory actions are in violation of both federal and state law and have caused me to suffer a loss of income, work-related benefits and mental anguish.

**EXHIBIT E**

# CHERRY HILL MANOR DAILY SCHEDULE

DATE: Saturday 10/2/04

DRIVER

MEDICAL RECORDS

REHABILITATION AIDES: L Rickett

ON CALL(PHONE/PAGER): Dawn Connolly 581-1082

AA [illegible]
DNS [illegible]
ADN
DSD
CCC
MD
MD
MDS ✓

| DAYS | EVENINGS | NIGHTS |
|---|---|---|
| **7-3 Subacute Unit 2nd Floor DAYS** | **3-11 Subacute Unit 2nd Floor EVES** | **11-7 Subacute Unit 2nd Fl NIGHTS** |
| Brillon RN; Macauley LPN; McLaughlin LPN 7-11; [illegible] 12-3 | Brillon 3-7 [illegible] RN 7-11; DeCosta 3 [illegible]; G. Pearson CNT 3-11; [illegible] CNT 3-11 | Lis RN; Russell RN |
| 1 McLaughlin; 2 Deshaies; 3 Benson; 4 Martinez 7-12 / Wiley 12-3; 5 J Messier 8-3; 6 ✓; Lisa Marinelli 9-5 Secretary | 1 Diaz; 2 Nunes; Benson; 4 Voley; Desjout; (+) 3-7 [illegible] 7P-11P | 1 Ouellette; 2 Morey; 3 Blanc |
| **7-3 Third Floor (3rd) DAYS** | **3-11 Third Floor (3rd) EVES** | **11-7 Third Floor (3rd) NIGHTS** |
| Marie LPN; Ellison LPN | Felion LPN; Manzotilla RN / Norton LPN 3-7 7-11 | Norton LPN |
| 1 Viveiros; 2 Webb; 3 Ross; 4 Torres; 5 Grusso; 6 ✓ | 1 Gagnon; 2 Viveiros 3-5 / Martin 5-11; 3 Torres 3-7 [illegible]; 4 Rothe 3-7; 5 Ganigu 7-11 | 1 Dorsen; 2 Oredope; 3 Martin |
| **7-3 Fourth Floor (4th) DAYS** | **3-11 Fourth Floor (4th) EVES** | **11-7 Fourth Floor (4th) NIGHTS** |
| Lefebvre LPN; Atkins Squire CNT; Osiena CNT | McCabe RN; [illegible] | Marino, RN |
| 1 Gray; 2 O'Neill; 3 Massey; 4 DeJesus; A. Brown; 5 | 1 Sullivan; 2 [illegible] 3-5; 3 [illegible] 3-7; 4 Massey 3-11; 5 DeJesus 3-7 / Oyo 7-11 | 1 Oyo; 2 Brodeur; 3 Sullivan |

CHERRY HILL MANOR DAILY SCHEDULE

DATE: Sunday Oct 3, 2004

DRIVER: ____

MEDICAL RECORDS: ____

REHABILITATION AIDES: Rickett

ON CALL (PHONE/PAGER): D. Connelly 581-0082

AA ____
DNS ____
ADN ____
DSD
CCC ____
MDS ____
MDS ____
MDS ____

## DAYS

**7-3 Subacute Unit 2nd Floor DAYS**

Macquley LPN
DeCosta LPN
Martins 7-1 CMT
Moreira 8-2 CMT

1. Lambert
2. Deshaies
3. Pimentel
4. Gelston ILL
5. Benson
6. Martinez

**7-3 Third Floor (3rd) DAYS**

Boivert
CMT D'Alio 8-D CMT
Dagis CMT 7-3
Norden 7-11 Am

1. Ouellette
2. Webb
3. Rojas
4. Crasso
5. Torres
6.

**7-3 Fourth Floor (4th) DAYS**

Lebrixe LPN
Bruen RN

1. Massey
2. Gray
3. Angel
4. DeJesus
5. Dalpe 9-3
6.

## EVENINGS

**3-11 Subacute Unit 2nd Floor EVES**

Brillon 3-7 cal Jonyo RN
Day
DeCosta LPN

1. G. Nyan 3-11
2. Dimeo 3rd
3. Benson
4. Valey
5. Day
Diaz — CNA 3rd

**3-11 Third Floor (3rd) EVES**

McCabe RN
Khammavong LPN

1. Segarin
2. Dchalrom 2nd
3. [illegible]
4. Webb 3-10
5. Martin 5-11
Rojas 3-5

**3-11 Fourth Floor (4th) EVES**

K Falcone LPN
[illegible] RN

1. Sullivan
2. M. Lambert 3-10
3. Gomez 5-11
4. A. Brown 3-11
5. Gray 3-7

## NIGHTS

**11-7 Subacute Unit 2nd Fl NIGHTS**

Lu RN
Russell RN

1. Ouellette
2. Morey
3. Moore 11-7 — 2A

**11-7 Third Floor (3rd) NIGHTS**

Khammavong
Norden 11-7

1. Dagain
2. Dosdan
3. Martin

**11-7 Fourth Floor (4th) NIGHTS**

Tilian 11-6:30 AM
Ferruccio CMT RN

1. Ayer
2. W Diallo out
Brodeur

EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,** **Plaintiff,** | |
| **v.** | **C.A. No. 06-108 ML** |
| **LIFE CARE CENTERS OF AM., INC., et al.,** **Defendants.** | |

**AFFIDAVIT**

I, Irene Ferruccio, a resident of Cranston, RI, do hereby state and affirm that:

1. I am a registered nurse. I was employed by Cherry Hill Manor Nursing Home, Johnston, RI, from July 2001 to August 2003, when I voluntarily left for another position. I was rehired to work at Cherry Hill in May 2004 and fired in February 2005.

2. When I was rehired, I was unit manager on the 4th floor at Cherry Hill.

3. I was on medical leave from about December 23 to February 8. I was not working at Cherry Hill during this time.

4. I knew Barbara Antonucci while I was working at Cherry Hill. Barbara had a reputation of working very hard to fill openings. She called me repeatedly to see if I would pick up extra hours. She would call me again even if I had already said no.

5. Barbara would also approach me in person when I was at work. I saw her doing this with other nurses. She would either meet nurses in the lobby, or come up to the floors during the work day to see if anyone would pick up a shift. When we saw her we all walked away and tried to avoid her because we knew she would pressure us to take extra hours. We said things like "here comes Barbara."

6. Barbara offered days off in exchange for picking up a shift. I know this because

she did this with me when she tried to get me to pick up shifts by doing this.

7. After Pam Charron became DON, she made age-related comments to me and in my presence. On one occasion she asked me how old I was. I responded that "I'll never tell." She said she would just look it up in my file. On another occasion, I heard her say on smoke break, talking about an older person she had just interviewed, that all she needs is another person thinking she's too young for the job. Pam Charron did not hire the person.

8. I saw Pam Charron treat younger persons better than the older ones. For example, she treated a younger (in her 30s) nurse named Melissa DeCosta much better than she treated other older nurses. At one point, she promoted Melissa to the unit manager position, even though she was not even an R.N. I was one of the older nurses that she treated badly.

9. I believe I was fired by Pam Charron because of my age. I was fifty-six years old at the time I was fired. I was replaced by a younger nurse (in her 30s) who was not even an R.N., her name was Deb Lefebrve. She was not as qualified as I was.

10. I am aware of at least two other older women who have been fired from Cherry Hill, their names are Linda Norden and Linda McMillan.

11. When Pam Charron came to Cherry Hill to replace Celeste Harris, I had never heard that Celeste Harris was doing a bad job. Instead, I was told that Celeste just did not want the DON position anymore.

12. After Barbara Antonucci was fired, she was replaced by Donna Diallo, who is in her 30s. I had the same kind of interaction with Donna that I did with Barbara. I did not see Donna do anything in terms of staffing that Barbara did not do.

13. I saw a posting for a per diem staffing coordinator just before Barbara Antonucci was fired.

Subscribed and sworn to under the penalties of perjury this the 26th day of April 2007.

Irene Ferruccio 4-26-07 1:23 PM
Irene Ferruccio

Subscribed and sworn before me this 26th day of April 2007.
Notary Public

My Commission Expires:

CARLY B. IAFRATE • NOTARY PUBLIC • STATE OF RHODE ISLAND
My Commission Expires January 23, 2008

# EXHIBIT G

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

☐ EEOC

Rhode Island Commission for Human Rights and EEOC
(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.) | | HOME TELEPHONE NO. (Include Area Code) |
|---|---|---|
| Irene Ferruccio | | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
| 158 Fruit Hill Avenue, | Providence, RI 02911 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one list below.*)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| SEE EXHIBIT A | 15+ | |
| STREET ADDRESS | | CITY, STATE AND ZIP CODE |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS | | CITY, STATE AND ZIP CODE |

CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*)

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ AGE ☐ RETALIATION ☐ OTHER(*Specify*)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (*Month, day, year*) 2/9/05

THE PARTICULARS ARE (*If additional space is needed, attached extra sheet(s)*):

"SEE EXHIBIT B"

☒ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date 3-7-05 Irene C. Ferruccio
Charging Party (*Signature*)

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT Irene C. Ferruccio

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

NOTARY PUBLIC — STATE OF RHODE ISLAND

My Commission Expires [illegible]

**EXHIBIT B**

1. I was born on December 25, 1948. I am fifty-six years old.

2. I first began working at Cherry Hill Manor in 2001. I left Cherry Hill for another job at Fatima Hospital in 2003 and then was rehired by Cherry Hill in May 2004. Prior to my termination, I held the position of Unit Manager.

3. I have been subjected to discriminatory terms and conditions of employment, based upon my age, including but not limited to:

a. My supervisor, Pamela Charron (Charron) ignored me, belittled me, and set me up to fail.

b. Charron unjustifiably criticized my work.

c. Charron took away some of my duties and responsibilities.

d. Charron made several age-related comments, both directly to me, and in my presence.

e. For no legitimate reason, Charron was hostile and aggressive toward me.

4. On or about December 23, 2004, I was forced to take a medical leave because of the work-related stress.

5. On or about February 9, 2005, the day I returned from my medical leave, I was terminated.

6. Similarly-situated younger employees were not subjected to this treatment.

7. My employer's stated reasons for my termination was that they did not have to hold my job for me and/or poor job performance.

8. The reasons advanced by my employer for my termination are a pretext for discrimination.

9. I always performed my duties and responsibilities in at least a satisfactory manner.

10. These discriminatory actions are in violation of both federal and state law and have caused me to suffer a loss of income, work-related benefits and mental anguish.