**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**BARBARA ANTONUCCI,**
***Plaintiff,***

**vs.**

**LIFE CARE CENTERS OF AMERICA, INC., et al.,**
***Defendants.***

**C.A. No. 06-108 ML**

## ANTONUCCI'S AMENDED RESPONSE TO DEFENDANTS' RULE 56 STATEMENT OF UNDISPUTED FACTS

Paragraphs #1-4 - Defendant's Statement of Undisputed Facts, Paragraphs 1-4 are Undisputed.

Paragraph #5 - Disputed. Antonucci disputes that it was solely her responsibility to fill openings and that it was her responsibility to provide appropriate patient care. Scheduling was also done by the Director of Nurses, and sometimes other nurses. Haase, p. 62-63, 245-246, Pereira, p. 34, 43, 49, 211, DEF 1518, Antonucci, p. 166, 222., 163, 292, Charron II, p. 40-43 (having to place calls for Antonucci did not mean Antonucci was not doing her job), 100, Sweeting, p. 277-278, Santin, p. 64; Exhibit A (Antonucci's job description which is part of her evaluation does not indicate that scheduler must schedule staff in order to provide appropriate patient care). Antonucci does not dispute that in 2004, Life Care employed her as the full-time scheduler and part of her job was to schedule nursing staff.

Paragraph #6 - Undisputed.

Paragraph #7 - Disputed. The warning was issued for "misconduct/insubordination." DEF 30-31, Ex. B (warning issued for "staffing and insubordination"), Ex. C (Charron fails to assert that the warning contributed to the reasons why Antonucci was fired), Defendants' Supplemental Answers to Interrogatories, p. 3-5, 16-17.

Paragraph #8 - Disputed. The statements made by Celeste Harris in the warning that she attributes to Plaintiff are not true. Antonucci, p.125-126 ("I don't believe I did [make the statements]. That's why I never signed it." The warning does not say that Antonucci yelled. DEF 30-31. Sweeting testified that she did not hear the exact words said during this incident. Sweeting, p. 213. Harris told Antonucci that she "was a wonderful staffing coordinator. She said [Antonucci] did a great job." Antonucci, p. 123. Harris gave Antonucci an excellent review after this warning. Ex. A.

Paragraphs #9-10 – Undisputed.

Paragraph #11 - Disputed. Harris did not tell Charron how she felt about Antonucci's job

performance. Charron, p. 126-127. Harris gave Antonucci a good evaluation during the time that she supervised Antonucci. Ex. A. On this March 2004 evaluation, Harris rated Antonucci satisfactory or above on "displays integrity and professionalism by adhering to Life Care's code of conduct," "communicates effectively and professionally both in writing and verbally with all types of personalities," and "treats all staff and residents with dignity and respect." Ex. A. Harris did not tell Charron that Antonucci was insubordinate during the entire period she supervised Antonucci or that she always had problems with her. Charron, p. 126. Other than this one incident, Antonucci was never written up for anything while supervised by Harris.

Paragraph #12 - Undisputed.

Paragraph #13 - Disputed. Charron stated that the first "discussion" regarding the master schedule occurred within the first "couple of weeks." Charron, p. 54-55. Charron would not say that Antonucci was not meeting her expectations during this time period. Charron, p. 65. Charron disputed the position paper statement that there were "serious" issues with Antonucci in the first week. Ex. B, Charron, p. 209. This paragraph is also disputed because at various times, Defendants have also tried to call these discussions, "oral warnings," "counselings" and "discipline." Ex. B, Ex. C, Charron, p. 86. It is disputed that the discussion were about "maintaining" the master schedule. Charron, p. 80. The "discussions" were about updating the monthly schedule which constitutes adding nurses names and schedules to the schedule. Antonucci, p. 147-148. It is not disputed that Antonucci approached Charron about updating the monthly schedule. Charron did indicate that Antonucci should update the monthly schedule. Antonucci agreed to do it, and did it from that point forward. Antonucci, p. 148-150. Charron never spoke to her about updating the monthly schedule again. Antonucci, p. 151-152. Antonucci did not refuse to update the monthly schedule during the first couple of weeks when this first conversation occurred. Charron, p. 74, 79. Antonucci never stated that she did not know how to complete the task. Antonucci only said that before Charron, she never had to update the schedule, but had no problem doing so. Sweeting, p. 142, Antonucci, p. 147-150. She did not resist updating the schedule. Antonucci, p. 150. Antonucci did not refuse add the names to the schedule. Antonucci, p. 148-150, Charron, p. 74, 79, Sweeting, p. 142, 145-146, 148. Sweeting was never required to update the monthly schedule after she replaced Antonucci. Id. Pereira, who according to Charron supposedly had "regular discussions with Ms. Charron" during which he was "kept apprised of Antonucci's unsatisfactory work performance" including her failures relating to the "monthly schedule," could not ever recall having a discussion with Charron about Antonucci and the monthly schedule. Pereira, p. 88, 194, 196, Defendants' Supplemental Answers p. 5.

Paragraph #14 - Disputed. Antonucci was not "counseled" regarding insufficient phone calls. Antonucci, p.160, 167, Sweeting, p. 281-282. Charron spoke to Antonucci about the status of openings in the schedule just like she did with other staffing people, and just like previous DONs had discussed this daily job task with Antonucci in the past. Antonucci, p. 160-161. It was part of the job to have this routine discussion. Antonucci, p. 160-161, Pereira, p. 211. For example, Charron would ask Antonucci "did you call people," and "did you try everyone." Antonucci, p. 160. Sweeting testified that telling a scheduler to keep working on a schedule when there are openings is not counseling, it is part of the job. Sweeting, p. 151-152, 155-156. Santin testified that Charron would ask 1 or 2 times per day if there were any openings in the

schedule. Santin, p. 182-183. Sweeting also explained that Harris used to tell her and Antonucci to try to be creative, etc., but that this was never a counseling or sign of a problem. Sweeting, p. 175. Pereira explained that one of the functions for the DON was to find out how the scheduling was going and to talk about the openings. Pereira, p. 211. Charron admitted that "it is always something I have to talk about scheduling," and she had to do this with Sweeting. Charron, p. 152. Antonucci did badger people to fill openings. Antonucci, p. 158. Antonucci called people more than once "to see if they changed their mind, sometimes they think they're going out and they're not going out. So I always called people more than once." Antonucci, p. 158-159, 168 (I'm the type that's very insistent, so I kept calling and calling * * * I never gave up on it.). Antonucci would mark down on a sheet "times one, times two, what time I called, the dates I called." Antonucci, p. 159. Discussions about phone calls is not counseling. Antonucci, p. 157-158, 182-185, 222-223, Ex. B (there is nothing in the position paper about phone calls at all). Charron did not ask Antonucci how many times she had called individuals. Charron, p. 91-93, 95, Antonucci, p. 167.

Even if a scheduler makes multiple calls, he or she might still be unsuccessful. Sweeting, p. 160, Charron, p. 101-102. It is irrelevant whether the scheduler is aggressive or persistent because it all depends on whether the person being contacted is willing to pick up a shift or not. For example, a staffing person can be successful if they know the dislikes and likes of the nurses and just calls the right people, they can be successful if there is sufficient staff employed, they can be successful if bonuses are being offered, and they can be successful if they are lucky. None of that depends on making a certain number of calls or being "aggressive" and "persistent." Exhibit A (noting that it was a strength of Plaintiff's that she knew the dislikes and likes of the staff), Haase, p. 156, Sweeting, p. 314-315, 237, 55, 162, 160, 130, Charron, p. 218, Santin, 55-56, 236, 73-74; Pereira, p. 158, 50, Charron II, p. 48 (Morang was good at her job because she knew which nurses to call first because they liked certain shifts). Both Charron and Sweeting admitted that sometimes Plaintiff had no openings in the schedule. Charron, p. 218, Sweeting, p. 130. If that is the case, and Defendants allege that Plaintiff refused to make repeat calls, then her success at filling schedule must have depended on other factors. In addition, if repeat calls led to success, then bonuses would never have to be given out, all staffing people would have to do is just keep calling. Charron, p. 157-158 (admitting that she could not get people to work without giving bonuses on the weekend of October 1).

A staffing person might decide to call a person who has already refused to pick up a shift to see if they have changed their mind or a scheduler might call a person again if they were only able to leave a message the first time. However, there is no policy about whether this should be done, or how many times it should be done, or evidence that it leads to success at filling openings. Antonucci, p. 167-168, Sweeting, p. 218-282, 314-315, 160, Santin, p. 237, Charron, p. 95, 91-93, 101-102. Charron never told Plaintiff what was expected in terms of the number of phone calls that should be made. Charron, p. 95. In all events, Plaintiff did these things to fill shifts. Antonucci, p. 158-159, 161, 167-168.

<u>Paragraph #15</u> - Disputed. <u>See</u> #14. Charron never told Antonucci to go back and do more work on the schedule. Antonucci, p. 164. Charron did not have to tell her to go back and call people again because it was part of Antonucci's job and she did it. Antonucci, p. 161. Antonucci "did it on [her] own because [she] had done it long enough before she came to know what [she] had to do." Antonucci, p. 161, 162-163. Charron never had a problem with the calls Antonucci made. Antonucci, p. 167.

Paragraph #16 - Disputed. Charron did not "counsel" Antonucci about over-reliance on bonuses. Ex. B (there is nothing in position paper about Antonucci being counseled for over-reliance on bonus dollars); Ex. C (the further answers to interrogatories do not allege Antonucci was counseled regarding "over-reliance" on bonus dollars), Antonucci, p. 170-171. When Charron was asked if she "counseled" Antonucci about over-reliance on bonus dollars, she responded only that "I spoke to her, and I guess you could say it was a form of counseling." Charron, p. 86. Antonucci explained that if relying on bonus dollars was discussed, it was common knowledge – "any director knows you don't want to pay bonus dollars unless you're in a bind. There's no way - - in other words, you don't want to do that. That's the last resort. * * * [I]t's an understood thing." Antonucci, p. 170-171. The only written document that referenced bonus dollars in the form of disciplinary action is the 10/24 warning which Defendants' have abandoned. Antonucci was never shown this form, did not sign it, and it was not signed by Haase. Antonucci, p. 308, Haase, p. 216, 218. Antonucci did call individuals repeatedly. See #14-15. Antonucci did not over-rely on bonuses. Haase, p. 214 (explaining reverse bonus program which gave out bonuses purposely in the beginning of the week), Antonucci, p. 170-171. Over-reliance on bonuses did not factor into why Antonucci was fired. Charron II, p. 27, Haase, p. 238-239, Pereira, p. 184-185. Life Care management expressed its pleasure with the bonuses a month before Antonucci was fired. DEF 1488. Sweeting gave out more bonus money than Antonucci but was not disciplined or fired. Sweeting, p. 182, 322-323; Haase, p. 201 (admitting that with Sweeting they gave comparable amounts in bonus money). When asked if Sweeting over-relied on bonuses, Haase responded that it would be "hard to say." Haase, p. 155. Even if Antonucci started working on schedules earlier or worked harder at getting them filled, there is no way to avoid giving bonuses. Sweeting, p. 183. Charron continued to authorize bonuses after Antonucci was fired. Sweeting, p. 181, 322. Antonucci had no authority to offer bonuses unless they were approved by Haase and/or Charron. Charron, p. 82-83, Sweeting, p. 178-179, 181.

Paragraph #17 - Disputed. The action plan was not a form of discipline. Charron, p. 51, Pereira, p. 86-87, Haase, p. 203. Pereira said he considered the action plan a roadmap for expectations." Pereira, p. 86-87. This is consistent with Antonucci's understanding of the purpose of the action plan – "It doesn't say anything about it being a criticism," it is "like what to do in the future," and "informative, like things she requested." Antonucci, p. 182. The action plan states that it was for "re-defining the job description." DEF 32-36. Action plans are not part of the company's disciplinary procedure. DEF 220. The plan did not relate to multiple "performance deficiencies," but referred only to the issue of updating the monthly schedule. Haase, p. 206. It is not disputed that the plan was issued on 8/23 and that Antonucci received the document. Antonucci refused to sign the plan which included the changed job description. DEF 32-36.

Paragraph #18 - Disputed. The "particular performance deficiencies" were not listed. There is nothing about bonus dollars, making phone calls or filling openings on the action plan. DEF 32-36. One of the directives was that Antonucci "not ignore requests by DNS." DEF 32. Antonucci never ignored a request and followed up "automatically." Antonucci, p. 185-186. The word workplace is not on the form. The form reads "will f/u + complete duties as assigned." The word counseling is not on the form. DEF 32. The form says "updated job description," but

this is actually a changed job description since it was never used after Antonucci was fired with the next scheduler. Sweeting, p. 267, Charron, p. 179-180, 189, Santin, p. 95, DEF 32-36. The written form includes the last sentence regarding termination that was not written by Haase or Charron. DEF 32. There is no dispute that Antonucci did change her schedule to five days as required. Haase, p. 211, Antonucci, p. 187. In addition, the second expectation relating to not ignoring requests and perform duties, was, according to Haase, related to the monthly schedule. Haase, p. 206. There is no allegation that after August 23 Antonucci refused to update the schedule. In all events, Antonucci disputed that she refused to perform duties or ignored requests. Antonucci, p. 183, 185. Defendants never followed up to determine if Antonucci was in compliance. For example, the plan sets a date of September 7, 2004 to review expectations. DEF 32-36. Antonucci was fired and no one bothered to determine if she had, in fact, followed the plan. Haase, p. 209, 210-211.

Paragraph #19 - Antonucci disputes that she does not know why the action plan was issued. Antonucci was asked if age motivated Charron to give Antonucci the two-week action plan and responded "Definitely." Antonucci, p. 199, Ex. D (charge of discrimination sets forth that Charron's unjustified criticism of Antonucci's work was due to her age, and included an increase in her work load, work hours, and changes to her job description). Antonucci never testified that the action plan "reflected Ms. Charron's concerns regarding Antonucci's performance." Antonucci, p. 186-188. She testified that "I don't know what it means because I've never, ever had anything like this." Antonucci, p. 188.

Paragraph #20 - Disputed that the session with Santin was "training." Antonucci does not dispute that she was sent for one-day to "go meet with Becky. It wasn't so much a training thing. It was to go up and see if she did something different than what I did. But, Becky was only doing it for a year-and-a-half, so when I got there, Becky said, 'I don't know what you are doing here, because if you've been doing it five years, six years, whatever, I've been doing it only a year-and-a-half, so I don't know what I'm supposed to show you that you wouldn't know.'" Antonucci, p. 174, Santin, p. 215-216, 174. "We were both doing it the same way." Antonucci, p. 175. Santin rated lower than Antonucci on her job performance evaluation. Ex. A, Santin's 5/19/04 Review, Santin, p. 138. Santin needed Charron to help her with her job duties. Santin, p. 64, 146-147, Charron, p. 100, Charron II, p. 41-43 (could not say how many times she had to help Antonucci as compared to another scheduler). Charron never told Santin or Antonucci that the purpose of the meeting was to see how Ms. Santin enlisted staff to pick up open shifts. Santin, p. 215, Haase, p. 59, Antonucci, p. 174-175. Even if Santin had no written discipline, Charron still had to speak with her regarding staffing, PPD, giving proper notice re: poor attendance, and not doing reference checks fast enough. Santin, p. 182-183, 109, 123-124, 130-132. "It is always something I have to talk about scheduling." Charron, p. 152. Santin, p. 146-147.

Paragraph #21 - Disputed. See #20. Santin did not show Antonucci how to call individuals multiple times in the same day. Antonucci, p.179 ("she was getting phone calls, and I had said, yeah, it's the same old thing, people call out, you replace, so we were kind of back and forth, saying we did everything kind of the same way. And, that was it." Antonucci never told Santin that she was not going to do what Charron directed. Antonucci, p. 177. She never refused to make multiple phone calls. See #14, 15. Santin said Antonucci was friendly. Santin,

p. 219.

<u>Paragraph #22</u> - Disputed. The funeral was really a wake (visitation hours) and took place after 5 p.m. Pereira, p. 137. Defendants never asserted that Charron had to leave early on Friday, October 1, prior to the Further Answers to Interrogatories in April 2007. Ex. C. As Antonucci testified, regarding Charron's need to leave early that day, "she didn't usually talk to me that much to say that." Antonucci, p. 207.

<u>Paragraph #23</u> - Disputed. Antonucci brought Charron the schedule for the weekend of October 2-3, for the first time, in the beginning of the week. "I turned in that week's schedule at the beginning of the week. * * * I gave a copy to Steve and a copy to Pam, and I noted all the openings and what they were for * * *. She never got back to me on it. Nothing was said about the scheduling * * * she kind of just always brushed me off, so she didn't get into it. It was, like, like, I'm not going to talk about it right now. So, on Friday morning again, I said, Pam, we still have openings and I haven't been able to fill them, and that's when she, like I guess got all upset, like, she didn't know that they were there, but that was her reaction, like this was something new I was telling her." Antonucci, p. 291-292. This was consistent with Antonucci's practice to let the DON know what the status of weekend scheduling was at the beginning of the week. Antonucci, p. 163, 207. Charron admitted that she spoke with Antonucci to authorize bonuses before Friday, so she must have known about the openings. Charron, p. 140-141. If Charron only authorized bonuses in a desperate, last-minute situation, then she must have already known about the openings. Charron, p.86-87, 141 (Charron only authorizes bonuses if they are really desperate, and is not sure if she waited until the end of the week of September 27 to authorize bonuses).

Defendants initially stated that the schedule was brought to Charron around 3 p.m. and that Charron and one other person were able to fill 21 open positions within an hour. Ex. B. Charron's Further Answers to Interrogatories were different. She stated that she received the schedule at 2 p.m., with only a "significant" number of openings, and that she and two others took 2-3 hours to fill the openings. Ex. C. Charron's testimony changed again when she testified during her deposition that there were "numerous" openings, but only a "couple" people had to be called. Charron, p. 136. The reason why Charron did not attend the wake has nothing to do with the schedule since it took place after 5 p.m. Pereira, p. 137. For example, if her testimony is accurate that she was given the schedule at 2 p.m., and it took 2-3 hours to complete, then she would still have been able to attend the wake which took place after 5 p.m.

<u>Paragraph #24</u> - Disputed. <u>See</u> #23. There were 130 individuals ultimately scheduled for the weekend of October 2-3, 2004. Ex. E. Of the 130 openings on the schedule for the weekend of October 2-3, the worst case scenario is that Antonucci was unable to fill 13 openings. Ex. E, Antonucci, p. 210-217 Defendants' have changed their position – they no longer allege that Charron actually completed the schedule, but only that she was able to "substantially" complete it which means that they may have settled for a schedule with less than the right amount of staff. This contradicts the position paper and Further Answers. Ex. B, C. Charron had to increase the bonus to "substantially" complete the schedule. Antonucci, p. 209.

<u>Paragraph #25</u> - Disputed. <u>See</u> #23 and #24. Charron never indicated there was a problem with the calls Antonucci made and never had a problem with her results - - she knew

that it was not Antonucci's fault if there was not enough staff. Antonucci, p. 167-168. Charron said she felt Antonucci should have done more, but could not say how many people Antonucci called or how many Antonucci got to fill openings. Charron, p. 137. Charron did not determine how many phone calls Antonucci made. Charron, p. 138. Charron admitted that even if Antonucci called nurses more times, there are times when you can call and still not get the openings filled. Charron, p. 138. "You always have those issues on a Friday afternoon." Charron, p. 138. Charron never sought to find out what BA efforts were on the October 2-3 schedule. Charron, p. 139. Charron did not know for sure if she waited to the end of that week to give Antonucci authority to offer bonuses. Charron, p. 141-142. When Antonucci showed Charron the schedule on Friday, she had already filled a lot of the openings that existed in the beginning of the week. Antonucci, p. 208.

Paragraph #26 - Disputed to the extent that Antonucci "did not know if [Charron] was disappointed * * * because I know if I work as hard as I can on it and there's still openings, there is not much more I can do. Now, if she had said to me, Barbara, make calls again and increase the bonus to 200, that could make a difference, just like it made a difference when she increased it for herself to fill it. Plus, she used med techs. I can't use med techs like she did unless the director tells me to. It's her license, not mine." Antonucci, p. 221-222.

Paragraph #27 - Disputed. Antonucci testified that "It's hard to believe, but I believe that's the incident, * * *I don't know. It just seems unfair that staffing is bad and she gets all bent out of shape about it, when she had all week to address it." Antonucci, p. 293. Although this is the incident that Defendants' are relying on, the reason why Antonucci was fired was because of her age. Ex. D (charges detail that Antonucci believes her discharge was motivated by her age). Antonucci also incorporates all the reasons set forth in her Memorandum in Support of Objection to Defendants' Motion for Summary Judgment that support the conclusion that it was age that prompted her termination, and not an inability to fill openings, something that all schedulers had problems with.

Paragraph #28 - Disputed. See #27, 29. Antonucci's termination was not based on a history of prior poor job performance (memorandum details the reasons why). Haase stated that Charron made the decision to fire Antonucci, which means that he essentially only gave it his rubber-stamp. Haase, p. 137, Pereira said he did not make any recommendation to fire Antonucci and was only aware of it after the fact. Pereira, p. 143, 173.

Paragraph #29 – It is undisputed that Antonucci was fired on October 4, and that she was provided with a copy of the termination notice. It is disputed that Antonucci testified that the reason provided by Charron and Haase was poor job performance. When Antonucci was asked if she thought poor job performance was the real reason for her termination, she responded "Not at all. My job performance was excellent, as six or seven other directors can testify to." Antonucci, p. 284-285. Antonucci wrote on the form "Do not agree with the above – work through breaks – sometimes lunch. Put every effort into getting staff not enough nurses in facility." DEF Haase himself contradicted Defendants' position that the reason for Antonucci's termination was poor job performance when he stated that the reason for Antonucci's firing was misconduct. Haase, p. 132, 138-140.

Paragraph #30-32 – Undisputed.

Paragraph #33 - Disputed. Horner's original affidavit reports that all codes beginning with "D" on DEF 2053-2054A represent involuntary terminations. However, the code D07 is "walked out-no notice" which would not be considered involuntary. DEF 2055. Furthermore, the code R08 is "unsatisfactory job performance," which should have been included as an involuntary termination. DEF 2055. There were 206 new hires between July 26, 2004 and the end of December 2005. Less than 1/3rd were over 40, and only 31 were over 50. DEF 2930-2935, 2912-2916, DEF 2055-2060, DEF 2053-2054A, DEF 1636-1939, Defendants' New Hires List (no bates stamp). Three codes represent subjective reasons for termination: unsatisfactory job performance, failed performance objectives and unsatisfactory work volume/quality.

Paragraph #34 - Disputed. Antonucci testified about Irene Ferruccio, who was employee over 50 who was fired. Both Ferruccio and Antonucci believed that age motivated their firings. Antonucci, p. 321-322; Ex. F. Ferruccio recounted to Antonucci an incident where Charron made age-related comments. Charron was telling Ferruccio about a nurse she had just interviewed. Charron said that the nurse she interviewed asked Charron's age and Charron told Ferruccio something like "oh, that's what I need, somebody else questioning that I'm young as a director, I'm too young." Antonucci, p. 322, Ex. F. This person was not hired. Id. Charron also asked Ferruccio her age and when she refused to tell, Charron said she would just look it up. Ex. F. Haase knew the ages of virtually all of the employees and was able to tell who was over 40 "from working with them for three years and - - you know, having access to their records and all that," * * * "I know how old people are over a course of time." Haase, p. 333-335. Horner processed paperwork for new hires which would indicate employee ages. Horner, p.30-31. Yet, Horner initially responded that she could not identify any employees over 40. Horner, p. 36. Haase obviously made a point of finding out.

Stereotypical comments were made that can indicate animus. Haase testified that Antonucci was "stuck in the belief that the way things have always been done is the right way." Haase, p. 50. Antonucci had a lack of "energy." Haase, p. 191-193. Sweeting testified that Antonucci was "set in her ways." Sweeting, p. 280. Pereira was asked if he was aware of Charron hiring any nurses older than he (age 42 in 2007, age 39 when Antonucci was fired). Pereira, p.22. He responded, "Oh, I don't think they make nurses that old." Pereira, p. 166.

Paragraph #35-36 – Undisputed.

Paragraph #37 - Disputed. See #34. At the time of his deposition, Haase had been fired by Cherry Hill, but had not yet received a promised recommendation from his boss, Kate O'Connor. Haase, p. 69. Haase left the supposed discipline of Antonucci up to Charron. Haase, p. 137. Antonucci complained in action plan and on termination form. DEF 32-36, 171-172. Haase and Antonucci did not "really interact much." Antonucci, p. 262. Haase approved the highest merit increase possible by Life Care standards (3%), for Antonucci, and nothing was mentioned about job performance issues before Charron was hired. Ex. A, Haase, p. 92. Haase testified that a person with performance and attitude issues would get less than a 3% raise. Haase, p. 94. "[H]e didn't seem to have a problem with my work," "I never had any complaint to him about my staffing or any correction on what I did. Nothing like that. He seemed to be more than satisfied with the job I was doing." Antonucci, p. 263-264. With respect to the action plan

meeting, Haase "didn't say anything. [Charron] kind of handled the whole meeting, to be honest with you." Antonucci, p. 265. Haase did not participate in the decision to send Antonucci for training. Haase, p. 58. He did not know what she was supposed to learn there. Haase, p. 59. Haase did not concur in the decision to fire Antonucci, but he allowed it. Haase, p. 137 (it was Charron's decision).

Paragraph #38 - Disputed to the extent that the fact that Charron was friendlier to younger individuals is not the only reason why Antonucci believes she was subjected to age discrimination. Ex. D. Antonucci incorporates her memorandum and charges of discrimination which lists numerous reasons why Antonucci's firing was the product of age discrimination. For example, there was no previous disciplinary history that Defendants' relied on in making the decision to fire Antonucci, the reasons why she supposedly had poor job performance have shifted, been inconsistent and are implausible. These inconsistencies, shifting explanations and implausibilities show that Defendants did not truly believe that Antonucci's performance was bad enough to fire her, but have tried to re-write history after-the-fact to support a decision that was predicated on age. In addition, similarly-situated younger staffing coordinators with similar problems were not even disciplined. Defendants' fired other older employees during Charron's tenure. Charron made age-related comments, and others made comments stereotyping older persons.

Paragraph #39 – see #38. It is undisputed that Charron was friendlier to Sweeting. Antonucci testified that Charron treated Sweeting better because of her age (p. 275), and that she was "a lot friendlier with Donna, discussing different things. [Charron] never really spoke to me. But, if I were to go in the office and Donna was in there with her, sometimes they would be discussing things, like they're both divorced, more of a social type thing, where with me she didn't even speak with me, so." Antonucci, p. 277. Charron was also friendlier with Melissa DeCosta, a younger LPN. Antonucci, p. 275. [other stuff Charron did].

Paragraph #40 - Disputed. Sweeting was spoken to by Charron more than once about not having two weeks of daily schedules completed. Sweeting, p. 237, 239. This was a problem on both her 2005 and 2006 evaluations. DEF 420-423, 413-417, 2202-2206. Sweeting had problems tracking call-outs which was something Charron wanted her to do. Sweeting, p. 245-246. She was spoken to by both Harris and Charron for not having good organizational skills when she left piles of paperwork on her desk that sometimes remained for weeks. Sweeting, p. 246-247.

Sweeting gave out "way more" bonus money than was given in 2004. Sweeting, p. 181-182, 322-323. Sweeting was counseled by Charron and Harris for not putting incident reports in within the required time period. Sweeting, p. 79, 227. In fact, Charron told her that if she had a problem with incident reports again, she would write her up. Sweeting, p. 79. Haase had to speak with Sweeting on "several occasions" about PPD problems. Sweeting explained that this happened on at least seven different occasions and at one point it was non-stop. Sweeting, p. 115-116. She was spoken to about PPD by Harris and by the current DON. Sweeting, p. 115-116. Harris spoke to Sweeting about trying to be more creative in filling the openings without bonuses and to be more aggressive. Sweeting, p. 174, Haase, p. 162 (lack of aggressiveness was an issue at times with Sweeting), see also DEF 2917-2925 (spread sheets with bonus amounts from July 2004 to December 2005).

In fact, there were more staffing problems when Sweeting was scheduler. According to Sweeting, it started to get real bad in 2005. Sweeting, p. 33, Antonucci, p. 319-320. In fact, in 2005, Pereira had to appoint a unit manager (Melissa DeCosta) to oversee staffing. Pereira, p. 34. Haase believed Sweeting had issues with giving nurses too much time off which created scheduling problems. Haase, p. 150-151. He also believed that Sweeting's poor job performance as reflected on her 2006 evaluation might have been attributed to difficulties with staffing because it was a problem at that time. Haase, p. 154.

Paragraph #41 – It is disputed that Charron discussed Antonucci's "performance" with her. Defendants cite pages 147-148 of Antonucci's deposition. Antonucci says nothing about being spoken to about her performance, but describes a conversation during which Antonucci went to Charron to talk about updating the monthly schedule. Defendants cite pages 157-158 of Antonucci's deposition. Antonucci says nothing about being spoken to about her performance, but describes a conversation during which Charron asked her about the schedule. Defendants cite pages 160-164 of Antonucci's deposition. Antonucci says nothing about being spoken to about her performance. She is asked if she was counseled about needing to pursue staff to fill shifts. She responds "I don't recall her counseling me about that, when it's something I was doing regularly. Antonucci, p. 160. On pages 161-164, Antonucci discusses scheduling. She does not say she was spoken to about performance issues. Finally, on page 170, Antonucci is asked if Charron ever discussed with her the fact that she was dissatisfied with the job she was doing. Antonucci responds "No. She made changes on a lot of things with me, but never said you're not doing a good job, that type of thing." It is also disputed that the action plan regarded performance. See #. Antonucci was discharged because of her age, not because of the weekend schedule. See #27.

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 421-0964 (fax)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document has been filed electronically on this 26th day of July 2007, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate