UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI,
Plaintiff,

v. C.A. No. 06-108ML

LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity,
Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants' motion for summary judgment. Plaintiff pursues her claim solely under state law. She charges the Defendants with age discrimination in violation of the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws §§ 28-5-1 to -42, and the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1 to -2. Defendants removed to federal court on the basis of diversity jurisdiction. See Antonucci v. Cherry Hill Manor, No. 06-108, 2006 WL 2456488 (D.R.I. Aug. 22, 2006). Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

I. Background

Plaintiff, Barbara Antonucci, started working at Cherry Hill Manor in 1986. Cherry Hill Manor is a nursing home located in Johnston, Rhode Island and operated by Defendant Life Care Centers of America, Inc. ("Life Care"). Life Care operates other

nursing homes, including a facility in Raynham, Massachusetts (the "Raynham Facility") and Evergreen in East Providence, Rhode Island.

The Executive Director of Cherry Hill Manor was Defendant Steve Haase, who worked there from approximately September 2003 to April 2006. The Director of Nursing Services ("DNS") for part of 2003 until the end of July 2004 was Celeste Harris. At the end of July 2004, she was replaced by Defendant Pamela Charron, who remained in that position until approximately October 2005. Prior to taking the DNS position at Cherry Hill Manor, Charron had been the Assistant DNS at the Raynham Facility. After Charron left Cherry Hill Manor in 2005, she took a job at Evergreen.

In 1999, Plaintiff took on the Scheduler[1] job at Cherry Hill Manor. The Scheduler scheduled nurses to fill shifts in the schedule, typically by calling the nurses and asking them to work. If a shift could not otherwise be filled, the Scheduler would sometimes offer a bonus in the amount of about $100 to $200 as an incentive to work the shift. Bonuses, however, could only be offered with the approval of a manager, such as the DNS. The Scheduler reported to the DNS. As of July 2004, Donna Sweeting filled in one day a week as the Per Diem Scheduler. The Per Diem Scheduler scheduled nurses from nursing agencies working on a per diem basis, whereas the Scheduler typically scheduled salaried nurses employed by Life Care.

In December 2003, Harris, the DNS at that time, issued Plaintiff a written warning for insubordinate behavior. The warning stated that Plaintiff raised her voice to Harris when Harris rejected Plaintiff's request for leave and said: "I don't get paid enough to put up with this aggravation." (Defs.' Mot. for Summ. J. Ex. G.) Plaintiff denies that she

[1] The parties sometimes use the term "Staffing Coordinator" instead of "Scheduler."

made this statement but concedes that she might have been loud. Plaintiff does not allege that Harris was motivated by a discriminatory animus in giving her the warning.

Charron began work at Cherry Hill Manor as the new DNS and as Plaintiff's supervisor at the end of July 2004. She learned about Plaintiff's incident of insubordinate behavior from Harris at that time. On August 2, 2004, Charron and Plaintiff had a discussion in which Charron told Plaintiff it was now Plaintiff's responsibility to maintain the nursing monthly schedule. Previously, the DNS had maintained the nursing monthly schedule herself.

Not long afterwards, Charron orally counseled Plaintiff about the need to make more calls and rely less on bonuses to motivate staff to work open shifts. Plaintiff denies that these counselings occured. On August 23, 2004, Charron and Haase presented Plaintiff with a written Action Plan. The Action Plan noted that Plaintiff had said that "she can not and will not" "update [and] maintain [the] nursing monthly schedule" despite an instruction to do so. (Defs.' Mot. for Summ. J. Ex. H.) In response, the Action Plan included the expectation that Plaintiff "will not ignore requests by DNS," "will [follow up and] complete duties as assigned," and "review [and] sign updated job description." (Id.) At the end, the Action Plan states: "In the event these expectations are not met, appropriate action will be taken up to and including termination as management feels appropriate." (Id.) Plaintiff denies any performance deficiencies indicated in the Action Plan, but concedes that the Action Plan was issued to her.

The Action Plan also included an updated job description in which Charron had changed several criteria from Plaintiff's previous job description. Some criteria were added, including:

3. … Ensuring compliance with PPD.[2]

7. Devises a monthly schedule at least 2 weeks prior to month end of previous month.

17. Prepares holiday schedules at least 2 months in advance. (Charron Dep. 180, 189; Defs.' Mot. for Summ. J. Ex. H; Pl.'s Amended Resp. to Defs.' Mot. for Summ. J. Ex. A.)

Others were omitted, such as:

6. Maintains nursing assistant sign-in sheets on a daily basis. (Id.)

After issuing Plaintiff the Action Plan, Charron arranged for Plaintiff to spend a day training with Rebecca Santin, the Scheduler at the Raynham Facility where Charron had previously been Assistant DNS.

About a month later, on Friday, October 1, 2004, Plaintiff brought Charron the schedule for the upcoming weekend. The schedule presented by Plaintiff had a significant number of vacancies. Dissatisfied and upset with the schedule, Charron substantially completed the schedule without Plaintiff's help. Then, Charron consulted with Haase and Joseph Pereira[3] and concluded that Plaintiff should be dismissed. The following Monday, Charron and Haase called Plaintiff into a meeting where they fired her. Sweeting took over Plaintiff's job after she left.

## II. Discussion

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[2] Life Care used a formula called "PPD" to establish how many nurses should be on duty at a particular time. The PPD formula determined how many shifts the Scheduler had to fill with nurses.

[3] Pereira was a Regional Clinical Coordinator at Life Care.

An issue is "genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must … set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991).

The legal analyses for age discrimination under FEPA and RICRA are not only identical to each other, but also to the legal analysis of the federal cause of action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634. See, e.g., Bard v. Mark Steven CVS, Inc., 378 F.Supp.2d 33, 40 (D.R.I. 2005); Marley v. United Parcel Service, Inc., 665 F.Supp. 119, 127-28 (D.R.I. 1987). Accordingly, the Rhode Island Supreme Court has applied the analytical framework of federal Title VII cases to parallel state statutes. See Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights, 484 A.2d 893, 897-98 (R.I. 1984). Therefore, this Court will include federal case law in its analysis.

Plaintiff has not proffered any direct evidence of age discrimination. See, e.g., Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 41 (1st Cir. 2002) ("Although its exact contours remain somewhat murky, the term 'direct evidence' normally contemplates only those 'statements by a decisionmaker that directly reflect the

alleged animus and bear squarely on the contested employment decision.'" (emphasis omitted)). When direct evidence is lacking, the employee may use circumstantial evidence to prove discrimination. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007). In an employment discrimination case based on circumstantial evidence, as here, the parties must present their evidence within the familiar burden shifting framework established by the Supreme Court in McDonnell Douglas. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). First, the plaintiff bears the burden to prove her prima facie case. Id. In age discrimination, the plaintiff establishes a prima facie case by showing that she (1) was at least forty years of age, (2) was qualified for the position, (3) experienced adverse employment action, and (4) was replaced by a person with roughly equivalent job qualifications, thereby revealing a continued need for the same services and skills. Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 (R.I. 2004); Mesnick, 950 F.2d at 823. "This showing gives rise to an inference that the employer discriminated due to the plaintiff's advanced years." Mesnick, 950 F.2d at 823.

In the case at hand, Plaintiff has established her prima facie case. Plaintiff was 63 years old at the time of the adverse employment action, her dismissal from Cherry Hill Manor. She was qualified for her job as Scheduler because she had worked in that position about five years and had received satisfactory evaluations during that time. Plaintiff was replaced by another employee, Sweeting, who had been doing the same scheduling work as Plaintiff on a part time basis. As the new Scheduler, Sweeting performed essentially the same functions as Plaintiff had in that role.

The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. Casey, 861 A.2d at 1037; Thomas v. Sears, Roebuck & Co., 144 F.3d 31, 33 (1st Cir. 1998); LeBlanc v. Great American Insurance Co., 6 F.3d 836, 842 (1st Cir. 1993). "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." Mesnick, 950 F.2d at 823. Defendant must present, through admissible evidence, "'reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" LeBlanc, 6 F.3d at 845 (emphasis omitted).

Defendant has also met its burden. Defendant has presented evidence that Plaintiff was fired for unsatisfactory performance and insubordinate behavior. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003) (holding that unwillingness to work cooperatively with a supervisor, among other reasons, is a legitimate, nondiscriminatory reason for employer's adverse action); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 20 (1st Cir. 1999) (holding that unsatisfactory performance is a legitimate, nondiscriminatory reason for employer's adverse action).

Defendants presented the written evidence of the warning for insubordinate conduct from the prior DNS and the Action Plan. They have also offered deposition evidence of Charron's oral counseling of Plaintiff for her failure to make enough calls and her over-reliance on bonuses. Defendants assert that, in order to improve Plaintiff's performance, Charron arranged for her to be trained by a Scheduler at another Life Care facility. Finally, Defendants presented evidence that three days prior to her termination, Plaintiff had not filled the nursing schedule to her supervisor's satisfaction. Given that

the Defendant has articulated a legitimate, nondiscriminatory reason behind Plaintiff's discharge, the inference raised by the prima facie case dissolves. See Casey, 861 A.2d at 1037; Mesnick, 950 F.2d at 823.

At this stage, Plaintiff has the burden to produce evidence showing that the employer's articulated reason for firing her is a pretext and that the true reason is age discrimination. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999). This standard, however, "'does not necessarily require the introduction of additional evidence'" to show that the true reason is discrimination "beyond that required to show 'pretext.'" Id. at 57. In some cases, showing that the employer's articulated reason is a sham can be enough. Thomas v. Sears, 144 F.3d at 33. Therefore, the same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder "'reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" Thomas v. Eastman, 183 F.3d at 57; see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000); Casey, 861 A.2d at 1038. Even if the trier of fact disbelieves the nondiscriminatory explanation given by the employer, however, the trier is not compelled to find that the real reason was discrimination. Reeves, 530 U.S. at 147-48; Thomas v. Eastman, 183 F.3d at 57. In determining whether Plaintiff survives summary judgment, the court "must weigh all the circumstantial evidence of discrimination, including the strength of the plaintiff's prima facie case and the employer's proffered reasons for its action, mindful that 'everything depends on individual facts.'" Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 7 (1st Cir. 2000).

Plaintiff goes to great effort to show that Defendants did not discharge her for unsatisfactory performance and insubordinate conduct. In evaluating whether Defendants' stated reason for firing her was pretextual, the question is not whether Plaintiff was actually performing below expectations, but whether Defendants believed that she was. See Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1118 (1st Cir. 1993). Plaintiff calls into question whether Defendants believed that her job performance was unsatisfactory or that she was insubordinate, by denying that any unsatisfactory and insubordinate conduct occurred. Defendant presented evidence in the form of affidavits and deposition transcripts that Plaintiff did not make enough telephone calls and relied too much on handing out bonuses to fill shifts in the schedule. Plaintiff countered with her own deposition testimony denying everything. Plaintiff similarly challenges Defendants' evidence of insubordinate conduct by denying that she ever behaved disrespectfully to the prior DNS, refused to make more telephone calls, or declined to maintain or update the nursing monthly schedule. Again, Defendants' evidence in the form of depositions and affidavits is simply refuted by Plaintiff's deposition testimony. A nonmovant's deposition testimony setting forth specific facts, which are within her personal knowledge, and which, if proven, would affect the outcome of the trial, must be accepted as true for the purposes of summary judgment. Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st. Cir. 2007). Here, Plaintiff's statements about her own actions must be given full credit at this stage in the proceedings.

Just as Plaintiff denies the underlying conduct, Plaintiff also denies that Defendants displayed frustration with Plaintiff's performance and behavior. Defendants

offered evidence through affidavits and depositions that Charron orally counseled Plaintiff that she was making insufficient telephone calls and relied too much on bonuses. Plaintiff denies in her deposition that she was orally counseled. Again, at the summary judgment stage, this Court must accept Plaintiff's evidence that these counselings did not occur. See id.

After this, however, Plaintiff's argument runs up against more concrete evidence of counseling and discipline. Plaintiff does not deny that she was issued a written warning for insubordinate behavior in December 2003 by the prior DNS. Neither does Plaintiff deny that Charron and Haase provided her with a written Action Plan which Plaintiff signed. Plaintiff instead argues that the Action Plan was not disciplinary in nature, but merely "informative." (See Pl.'s Objection to Defs.' Mot. for Summ. J. 19.) The Action Plan, however, clearly shows dissatisfaction with Plaintiff's performance and a desire to change her behavior. It states that Plaintiff refused "to update [and] maintain [the] nursing monthly schedule" and instructs that Plaintiff "will not ignore requests by DNS" and "will [follow up and] complete duties as assigned." (Defs.' Mot. for Summ. J. Ex. H.) These are specific critiques and instructions for improvement, not just "vague" expectations as Plaintiff contends. (See Pl.'s Objection to Defs.' Mot. for Summ. J. 19.) Moreover, Plaintiff's argument that the Action Plan is not disciplinary is belied by the fact that the Action Plan warns: "In the event these expectations are not met, appropriate action will be taken up to and including termination as management feels appropriate." (Defs.' Mot. for Summ. J. Ex. H.)

Plaintiff also denies that Charron sent her for training with another Scheduler. She admits, however, that Charron sent her to work with another Scheduler, Santin, at the

Raynham Facility "to see if there was any difference in what we did." (Antonucci Dep. 176.) Plaintiff also concedes that Charron viewed the training as necessary. (Antonucci Dep. 180.) Even if a reasonable trier of fact accepted Plaintiff's account that she did not understand this incident to be training, the relevant issue is what the employer understood and believed. See Mulero-Rodriguez, 98 F.3d at 674; Mesnick, 950 F.2d at 824. Clearly, Charron wanted to improve Plaintiff's performance to the extent that she arranged for Plaintiff to miss a day of work in order to learn from another employee. This training, like the Action Plan, plainly indicates dissatisfaction with Plaintiff's performance.

Most significantly, Plaintiff concedes that she did not complete the schedule to Charron's satisfaction on Friday, October 1, 2004, and that this led to her discharge. Plaintiff makes this concession in the context of her argument that the various forms of discipline and counseling, including Defendants' reaction to the incident on October 1st, were manufactured, or at least absurdly disproportionate. Nevertheless, she admits that October 1st was the triggering event for her dismissal.

This Court is left with evidence that unquestionably supports a nondiscriminatory motive for discharging Plaintiff. Charron was notified about a previous act of insubordination by Plaintiff upon starting her job as Plaintiff's supervisor. Charron and Haase provided Plaintiff with an Action Plan which was clearly intended as counseling and was disciplinary in nature. Charron also sent Plaintiff for training to improve her performance. Finally, Charron was dissatisfied with the schedule Plaintiff provided on October 1, in which the number of unfilled shifts considerably exceeded what Charron considered acceptable. Charron and Haase were key decisionmakers, if not the key decisionmakers, in the decision to dismiss Plaintiff. This evidence shows that Defendants

believed they discharged Plaintiff for unsatisfactory performance and insubordinate conduct.

Thus far, Plaintiff has attacked Defendants' evidence of a nondiscriminatory motive piece by piece and succeeded in dislodging a great deal of it for the purposes of summary judgment. Still, enough evidence remains to support a nondiscriminatory motive. However, even if Plaintiff had succeeded in proving that Defendants did not discharge her for the stated nondiscriminatory reason, she still cannot withstand summary judgment unless she can show that Defendants fired her for a discriminatory reason. See Reeves, 530 U.S. at 146-47. In the next part, Plaintiff attempts to undermine Defendants' remaining evidence to show that Defendants' stated nondiscriminatory motive is a pretext for age-based animus. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id. at 147. Although "[e]vidence of age animus 'need not be of the smoking gun variety,' ... the totality of the circumstances must permit a reasonable inference that the employer's justification for the challenged action was a pretext for age discrimination." Goldman, 985 F.2d at 1119.

## A. Pretext

Plaintiff argues that Defendants' reason for dismissing her is pretextual on several grounds. Plaintiff contends that the inconsistency in Defendants' explanations for dismissing her indicates that their stated reasons are pretextual. Based on a more challenging job description Charron created specially for her, Plaintiff argues that Defendants purposefully set her up to fail. Plaintiff also argues that Defendants' better treatment of similarly situated younger employees shows disparate treatment. Plaintiff

offers statistical evidence purportedly showing disparate treatment by Defendants of members of the protected class. Finally, she points to three comments as evidence of discriminatory motive. See Mesnick, 950 F.2d at 824 ("circumstantial evidence ... include[s], but [is] by no means limited to, statistical evidence ..., comments by decisionmakers which denigrate those over forty, the incidence of differential treatment in the workplace, and the deployment of younger replacements." (internal citations omitted))

1. Inconsistent Explanations

Inconsistent explanations for terminating an employee may undermine the credibility of an employer's allegedly nondiscriminatory intent. Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000). The employer's reasoning can be inconsistent in the sense that the employer presents conflicting explanations or inconsistent in that an explanation does not make sense in light of the circumstances. See, e.g., Dominguez-Cruz, 202 F.3d at 432; Resare v. Raytheon Co., 981 F.2d 32, 43 (1st Cir. 1992); Quinones v. Puerto Rico Hospital Supply, Inc., 307 F.Supp.2d 352, 363 (D.P.R. 2004); Gibbons v. Burnley, 737 F.Supp. 1217, 1222 (D. Me. 1990).

With regard to the former, the First Circuit stated in Dominguez-Cruz, "when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual." 202 F.3d at 432. Here, Plaintiff points to several contradictions.

Defendants contradicted themselves in stating that over-reliance on bonuses was a reason for Plaintiff's dismissal. The Position Paper[4] alleges that one of the reasons for

[4] Defendants presented the Position Paper to the Rhode Island Commission for Human Rights and the Equal Employment Opportunity Commission in response to Plaintiff's Charge of Discrimination.

dissatisfaction with Plaintiff's performance was her "over-reliance on paying bonuses to nurses who picked up extra shifts." (Pl.'s Amended Response to Defs.' Mot. for Summ J. Ex. B.) Charron then states in her deposition that she didn't consider bonuses when she made her decision to fire Plaintiff. (Charron II Dep. 27.) Moreover, Pereira stated in his deposition that he did not care how much money was spent on bonuses. (Pereira Dep. 184-85.) This conflict could be explained by the fact that the number of bonuses was linked to the number of calls Plaintiff made, a concern mentioned consistently by Defendants. Since Charron believed that making more telephone calls to nurses filled the shifts, offering many bonuses at the end of the week was an indication that Plaintiff had made insufficient telephone calls. Nevertheless, a reasonable trier of fact could find the conflicting statements about bonuses to be problematic.

The trier of fact might be similarly suspicious about the confusion regarding whether Plaintiff refused on August 2, 2004 to prepare the nursing monthly schedule. The Position Paper states that Plaintiff refused on August 2nd and August 19th. In contrast, Charron states in her deposition that Plaintiff did not refuse on August 2nd and the Action Plan only states that Plaintiff refused on the 19th.

The number of shifts which Plaintiff allegedly left unfilled on October 1, 2004 also varies widely in Defendants' evidence. Plaintiff points out that Defendants' Position Paper states that the schedule had at least 21 unfilled shifts whereas Pereira, another manager, stated 10 to 12 in his deposition. (Pereira Dep. 140-41.)

Admittedly, these contradictions are minor compared to the inconsistencies the First Circuit identified in Dominguez-Cruz and McDonough. See McDonough, 452 F.3d at 18, 19; Dominguez-Cruz, 202 F.3d at 427. In Dominguez-Cruz, the employer gave

three fundamentally different reasons at different times for dismissing the plaintiff: a business restructuring plan, insubordination and violations of company policy, and, finally, job performance. 202 F.3d at 427. As a result of these conflicting explanations, the court in Dominguez-Cruz found sufficient evidence of pretext to withstand summary judgment. Dominguez-Cruz; 202 F.3d at 432; see also McDonough, 452 F.3d at 18, 19. In contrast, Defendants have consistently presented performance failure and difficulty accepting direction as the reasons for Plaintiff's dismissal.

Defendants' contradicting explanations, however, become more troubling when considered together with evidence of incongruity between their explanations and the evidence. "The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one." Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979). In Quinones, for example, the employee was purportedly fired because he failed to make a trip. 307 F.Supp.2d at 363. The court, however, found evidence of pretext because the employer never required the employee to make the trip in the first place. Id. At the same time, courts must be wary of sitting "as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Mesnick, 950 F.2d at 825 (citations omitted).

In this case, Defendants state that the reason for firing Plaintiff was poor performance and insubordination. Plaintiff has, however, presented evidence that Plaintiff's job was advertised within two weeks after Charron arrived and before Plaintiff was given the Action Plan. The evidence on this point, a statement in Sweeting's deposition, is not entirely clear. (See Sweeting Dep. 200.) Sweeting may have been

referring to a posting of her own position.[5] Nevertheless, making all inferences in favor of the Plaintiff, evidence that Plaintiff's job was posted before any evidence of discipline undermines Defendants' contention that Plaintiff's behavior was the reason for her dismissal.

2. Intent to Cause Underperformance

Plaintiff argues that Charron intentionally set her up to fail by giving her a more challenging job description. As part of the Action Plan which Charron and Haase gave Plaintiff on October 23, 2004, they included a job description which contained a number of different criteria than were previously listed in her job description. The new job description added several criteria, including:

> 3. ... Ensuring compliance with PPD.
>
> 7. Devises a monthly schedule at least 2 weeks prior to month end of previous month.
>
> 17. Prepares holiday schedules at least 2 months in advance. (Charron Dep. 180, 189; Defs.' Mot. for Summ. J. Ex. H; Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. A.)

At the same time, however, the new job description omitted some criteria included in the old description. Although the new job description is not obviously more challenging than the old, a reasonable trier of fact could find that it is more difficult. Furthermore, when Sweeting took over Plaintiff's job after Plaintiff was dismissed, Charron gave her the old job description which had applied to the job before Plaintiff received the Action Plan. It is hard to understand why Charron would add duties to the Scheduler job for Plaintiff, but

[5] If so, this evidence is not material to Plaintiff's case. The fact that Defendants might have been looking for someone to replace Sweeting in her job as the Per Diem Scheduler for the nurses working on a per diem basis has no apparent bearing on Plaintiff's job as the Scheduler for the regular nurses.

take them away again for Sweeting. Viewing these facts in the light most favorable to Plaintiff, Charron conceivably ratcheted up Plaintiff's duties in an effort to cause her to underperform.

3. Disparate Treatment

Discriminatory intent can be inferred from the mere fact of disparate treatment. Hazen Paper Co. v. Biggins, 507 US 604, 609 (1993). To show disparate treatment, Plaintiff must show that she was treated differently from "'persons situated similarly in all relevant aspects.'" See Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997). Plaintiff must show other employees had similar "performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations" in order to prove that they were similarly situated in all relevant aspects. See Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994). Plaintiff fails to make this showing.

Plaintiff seeks to compare her treatment with that of Sweeting, Rebecca Santin, and Dawn Morang. All three, like Plaintiff, worked as Schedulers at some point for Charron. All three were considerably younger than Plaintiff.[6] Unlike Plaintiff, however, none of them had a written warning on their record for insubordinate conduct. Neither did they receive an Action Plan instructing that they not "ignore requests." (Defs.' Mot. for Summ. J. Ex. H.) Plaintiff argues at great length that the fact that Sweeting, Santin, and Morang did not receive any discipline from Charron is itself indicative of age discrimination. According to Plaintiff, the other Schedulers engaged in the same conduct

---

[6] (Pl.'s Objection to Dfs.' Mot. for Summ. J. 2 n.7.) Assuming Plaintiff's evidence is correct, Sweeting and Santin were in their 30s and Morang was 40 when Plaintiff was fired. The fact that Morang was in the protected age bracket does not invalidate her from comparison for purposes of disparate treatment. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996); R.I. Gen. Laws §§ 28-5-5, 42-112-1(d), 28-5-6(1). An employer may be liable for age discrimination for treating a younger employer more favorably than an older employee even though both are older than 40. See O'Connor, 517 U.S. at 312.

but were never subjected to adverse action by Charron. The others, for example also had trouble completing the schedule. Charron talked to Sweeting repeatedly about only completing one week of the schedule ahead of time instead of two. Charron counseled Morang once or twice for not completing the schedules. Santin was spoken to about problems with the ratio of nursing staff to patients. Charron supposedly gave these other employees the benefit of the doubt, whereas Plaintiff was simply fired. Even if that were true, the fact remains that none of the other Schedulers were issued a written warning for insubordinate conduct from a previous supervisor either. Plaintiff cannot explain away this warning as further evidence of disparate treatment because she does not charge the prior DNS with discriminatory animus.

Upon arriving at the job, Charron learned about the incident from Harris, the prior DNS. Plaintiff may deny that the conduct occurred, but she does not present any evidence that Charron did not learn about or believe the story. Certainly, a history of insubordinate conduct would place Plaintiff in a different light than other employees without such a history. Kosereis v. Rhode Island, 331 F.3d 207, 214-15 (1st Cir. 2003) (finding that where instances of inappropriate behavior are not similar between employees, those employees are not similarly situated); Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling, 152 F.3d 17, 26 (1st Cir. 1998) (finding that two employees were not similarly situated where one had a history of inappropriate behavior whereas the other did not). Therefore, even giving Plaintiff the benefit of the doubt that Defendants disciplined her more harshly for the same conduct, Plaintiff is still not similarly situated to the others.

4. Statistical Evidence

Plaintiff entirely fails to raise an inference of discriminatory intent with her statistical evidence. Indeed, Plaintiff does not even succeed in rebutting Defendant's statistical evidence showing the absence of a discriminatory pattern. Defendants' evidence shows that the same proportion of employees over 40 years of age were involuntarily separated as those under 40 from the time Charron began working at Cherry Hill Manor. Plaintiff contests the evidence first on the grounds that the statistics do not focus on the relevant sample. Defendants include all employees of Cherry Hill Manor in its analysis, from nursing staff to kitchen workers. Plaintiff argues instead that the relevant sample only contains those who are similarly situated to Plaintiff: Morang, Sweeting, and Santin. As discussed above, however, the other three Schedulers are not similarly situated to Plaintiff. The fact that, in this group, only Plaintiff was fired does not show a discriminatory intent.

Plaintiff also finds errors in Defendants' evidence. Plaintiff points out that some of the employees counted as involuntarily separated actually left voluntarily and vice versa. This may be. Plaintiff, however, fails to take the next step of showing a discriminatory pattern in the data. At this third stage of the McDonnell Douglas test, the burden rests on Plaintiff to raise an inference of discriminatory intent. See Thomas v. Eastman, 183 F.3d at 57. She cannot rest after poking a few holes in Defendants' data. Rather, she must draw a conclusion. See Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 183 (1st Cir. 1989) ("A litigant has the duty to spell out her theories clearly and distinctly before the nisi prius court, on pain of preclusion.")

Similarly, Plaintiff fails to make a complete argument from the statistics of Charron's dismissal practices. Plaintiff offers evidence that, of the six employees whom

Charron dismissed, four were in the protected age category. This evidence is meaningless, however, without evidence of the number of employees within and without the protected age category that Charron had the authority to dismiss. See Mack, 871 F.2d at 184 ("[T]he naked numbers, standing unadorned and unexplained, lack[] sufficient convictive force to derail appellee's summary judgment initiative."). If, for example, 100 employees were over 40 and two employees were under 40, evidence that she fired two employees under 40 and four over 40 hardly shows a discriminatory pattern.

5. Discriminatory Comment

A discriminatory comment may be probative of pretext if made by a decisionmaker in the adverse action. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000). Ambiguous, isolated remarks, however, do not show pretext. See Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 329 (1st Cir. 1996) Here, Plaintiff alleges that Charron made a discriminatory comment in front of another employee. In that incident, Charron had allegedly just interviewed a nurse for a job who, during the interview, asked Charron how old she was. After the interview, the employee overheard Charron say something along the lines of, "oh, that's what I need, somebody else questioning that I'm young as a director, I'm too young." (Pl.'s Objection to Defs.' Mot. for Summ. J. 28; Pl.'s Amended Response to Defs.' Mot. for Summ. J. Ex. F ¶ 7.) Plaintiff further alleges that this applicant was not hired. (Id.)

Although this is a comment about age by a decision maker, it does not show pretext. See Santiago-Ramos, 217 F.3d at 55. At most, Charron is expressing a concern that others with whom she works think she is too young for her job. It goes too far to infer that, as a result, she had a discriminatory animus against older people. With regard

to the allegation that she did not hire the candidate, the lack of judgment the applicant showed by asking the interviewer's age is itself a nondiscriminatory reason not to hire that applicant. The comment is an ambiguous and isolated remark, not evidence of discriminatory intent. See Lehman, 74 F.3d at 329.

In any case, the admissibility of this hearsay is questionable. At most, the comment might be admitted as an admission by a party opponent. See Fed. R. Evid. 801(d)(2). It is not clearly, however, a statement against Defendants' interest in this case.

Plaintiff offers two other comments as evidence of discriminatory intent. Neither indicates the slightest discriminatory animus. In the first, Charron asked another employee her age and when that employee refused to tell, Charron said that she would just look it up. (Pl.'s Objection to Defs.' Mot. for Summ. J. 28; Pl.'s Amended Response to Defs.' Mot. for Summ. J. Ex. F ¶ 7.) A question about age and nothing more, the First Circuit has stated, is "a textbook example of an isolated remark which demonstrates nothing." Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998). The same can be said about Haase's comment that he knew the ages of virtually all the employees. (Haase Dep. 333-35.) These are stray remarks, which show no negative animus toward individuals in the protected class.

## III. Conclusion

Plaintiff withstands summary judgment by a hair. She has unearthed some evidence that Defendants' explanations are inconsistent and that Charron may have set her up to fail. A reasonable trier of fact, viewing this evidence in totality, could conclude that Defendants' nondiscriminatory reasons are a pretext.

Plaintiff's evidence is, however, very weak. None of the instances of inconsistency would be enough in itself to prove pretext. Together, they are just enough. See Mesnick, 950 F.2d at 824 ("Above all, courts will look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff.") Moreover, Plaintiff's evidence of disparate treatment, statistical evidence of discriminatory firing patterns, and discriminatory comments fails to raise a question of pretext or discriminatory motive altogether. Indeed, at no point has Plaintiff presented evidence showing a discriminatory motive. At most, she has shown that a reasonable trier of fact could infer a discriminatory motive from the falsity of Defendants' explanation and the prima facie evidence. See Reeves, 530 U.S. at 147.

Accordingly, Defendants' motion for summary judgment is denied on the arguments of inconsistent explanation and intent to cause underperformance. Plaintiff has failed to raise a genuine issue of material fact, however, on the grounds of disparate treatment, statistical evidence of discriminatory firing patterns, or discriminatory comments. Defendants' motion is granted on these grounds. Defendant's motion is therefore granted in part and denied in part.

SO ORDERED

Mary M. Lisi
Mary M. Lisi
United States District Judge
February 13, 2008