UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| BARBARA ANTONUCCI, Plaintiff, v. LIFE CARE CENTERS OF AMERICA, INC., PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity, Defendants. | C.A. No. 06-108-ML |

**DEFENDANTS' MOTION FOR RECONSIDERATION OF THE FEBRUARY 13, 2008 ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, Life Care Centers of America, Inc. ("Life Care"), Pamela Charron, and Steve Haase (collectively "Defendants"), hereby move for reconsideration of the portion of the Court's February 13, 2008 Memorandum and Order (the "Order") denying summary judgment, because Plaintiff's has misrepresented deposition testimony in order to artificially manufacture a purported inconsistency in Defendants' reasons for disciplining and discharging Plaintiff. In considering Plaintiff's arguments, this Court was forced to rely upon Plaintiff's mischaracterization of the testimonial evidence, because Plaintiff failed to include the relevant excerpts of the deposition testimony as required by Fed. R. Civ. Proc. 56 and LR Cv 56. When the *actual* deposition testimony relied on by Plaintiff is examined, however, it is clear that there are no inconsistencies in Defendants' reasons for discipline and discharge. Moreover, there is no evidence that Defendants set up Plaintiff to fail. Accordingly, Defendants request that the Court reconsider the February 13, 2008 Order and grant summary judgment in Defendants' favor.

**Summary of Relevant Facts and Procedural Status**

On June 28, 2007, Defendants moved for summary judgment (Document # 50) and, in connection with the motion, submitted a Statement of Undisputed Facts (Document #61). In response, on July 26, 2007, Plaintiff submitted an Opposition to Defendants' motion (Document # 64) and a Statement of Disputed Facts (Document # 65). Plaintiff's Statement of Disputed Facts failed to comply with Fed. R. Civ. Proc. 56 and LR Cv 56, because Plaintiff failed to attach the relevant excerpts from deposition transcripts relied upon by Plaintiff in her Opposition and her Statement of Disputed Facts.[1]

On February 13, 2008, this Court ruled that Plaintiff survived summary judgment "by a hair," based upon alleged inconsistent explanations by Defendants as to the reasons that Plaintiff was disciplined and then discharged. See Order, pp. 13-14. In particular, the Court noted that Defendants Position Paper cited over-reliance on bonus dollars as one of the concerns regarding Plaintiff's performance, and accepted Plaintiff's inaccurate assertion that the testimony of Ms. Charron and Mr. Pereira contradicted this concern. Id. The Court also relied on additional misstatements by Plaintiff as to the record evidence concerning: (1) the number of times Plaintiff refused to perform assigned duties, (2) the number of openings on the weekend schedule which precipitated Plaintiff's discharge, and (3) the alleged posting of a *per diem* scheduler position. See Order, pp. 14-15. In addition, the Court held that there was evidence that Ms. Charron may have set up Plaintiff to fail by giving her a more challenging job description.

---

[1] In addition, Plaintiff's Statement of Disputed Facts was a 10 page single-spaced document in violation of LR Cv 7(d)(1) which requires all pleadings to be double-spaced.

A. **The Record Evidence Does Not Demonstrate Inconsistent Explanations Of Plaintiff's Performance Problems**

This Court held that Plaintiff had identified evidence of pretext, based primarily on a misrepresentation that Ms. Charron contradicted one of the concerns regarding Plaintiff's performance set forth in Life Care's Position Paper. See Order, p. 14 (contrasting the Position Paper which listed Plaintiff's over-reliance on bonuses as a performance problem, with Plaintiff's claim that Ms. Charron testified that she did not consider Plaintiff's over-reliance on bonus payments in making her decision to fire Plaintiff), citing Charron II Dep. 27. Review of the actual testimony contained in the transcript of Ms. Charron's testimony, however, clearly demonstrates that Ms. Charron did not contradict the facts contained in the Position Paper. For instance, immediately prior to page 27, Ms. Charron testified:

> Q. Did you have an issue with the frequency with which she gave bonuses out?
> Mr. Campbell: Objection
> A. I guess you could say yes.
> Q. The number of bonuses that she gave out?
> A. How many times it was happening, yeah.
> Charron II Dep. 22-23.[2]

After establishing that Ms. Charron *was* concerned regarding Plaintiff's over-reliance on bonuses, Plaintiff's counsel asked whether Ms. Charron relied on bonus payments in the decision to discharge Plaintiff, and Ms. Charron testified, "Hum. Well, I guess it sort of relates to the whole disciplinary problem. It relates. I mean, I didn't fire her because she was offering bonuses, but it certainly relates. See Charron II Dep. 24. Ms. Charron further testified that "the bonus dollars related to the difficulties that we were having, but it wasn't the reason she got fired. If that makes any sense. It relates to the issues." See Charron II Dep. 25-26. Similarly, Ms. Charron testified at numerous points

[2] Copies of relevant excerpts of Ms. Charron's testimony are attached as Exhibit A.

throughout her deposition regarding her concerns that Plaintiff over-relied on bonus dollars. See, e.g., Charron I Dep. 84-86 discussing Charron's counseling of Plaintiff for over-reliance on bonus dollars; and Charron I Dep. 216, specifically affirming the factual basis for the portion of the Position Paper which referred to Plaintiff's over-reliance on bonus dollars.

Similarly, Plaintiff mischaracterized the testimony at page 185 of Mr. Pereira's deposition regarding the bonus issue. While Plaintiff is correct that Joseph Pereira did not care how much was spent on bonuses, Plaintiff omitted the critical fact that Mr. Pereira did not have any fiscal oversight or responsibility. As Mr. Pereira clearly testified in response to multiple questions, his responsibilities were solely clinical. For instance, Mr. Pereira testified:

> A. I'm not sure what the process is when it comes to issuing bonus dollars.
> Q. Was there a process?
> A. Not that I know of.
> Q. Was there a budget?
> Mr. Campbell: Objection
> A. Not that I'm aware of.
> Q. Did you ever think that there should be a budget --
> Mr. Campbell: Objection as to form.
> Q. -- for bonuses?
> A. I could care less if we issued a million dollars. I just wanted staff there. I did not get involved in that. Pereira Dep. 184-185.[3]

Similarly, Mr. Pereira testified:

> Q. Did you ever hear anything about Barbara Antonucci's use of bonus money?
> Mr. Campbell: Objection as to form.
> A. I did not get involved in that.
> Q. So, I take it the answer is no?

[3] Copies of relevant excerpts of Mr. Pereira's testimony are attached as Exhibit B.

A. Could have, but I didn't really get involved in that. I could not give any authority anyway, so I would not get involved. Pereira Dep. 92-93.

* * * * *

Q. Were you supposed to be kept aware of money that was being given away as bonus money?
A. Clinical here, no. I'm clinical. Pereira Dep. 176.

As Mr. Pereira's testimony establishes, he did not care about bonus dollars because he had no reason to care.

Once the actual testimony is reviewed – as opposed to Plaintiff's mischaracterization of the testimony – there is no inconsistency between Life Care's Position Statement and Ms. Charron's testimony regarding Plaintiff's over-reliance on bonus dollars or Mr. Pereira's lack of concern regarding non-clinical matters.

Plaintiff further distorts the record by claiming a false discrepancy as to whether Plaintiff was disciplined for disregarding Ms. Charron's instructions regarding the master schedule on August 2, 2004. See Order, p. 14 (comparing Position Statement with Ms. Charron's testimony). In fact, Ms. Charron's testimony – which Plaintiff failed to provide to this Court – demonstrates no such discrepancy. Rather, Ms. Charron clearly testified that while Plaintiff did not flatly refuse her directive on August 2, 2004, Plaintiff's response *insinuated* that she would not comply, and that Ms. Charron *understood* that Plaintiff had refused Ms. Charron's instructions. See Charron I Dep. 219. Moreover, Ms. Charron explained that the August 2 incident was not included in the August 23, 2004 warning because Ms. Charron had already addressed the incident. See Charron I Dep. 221. Simply put, Plaintiff has manufactured any confusion regarding the number of times Plaintiff

refused Ms. Charron's directives, by failing to provide this Court with the relevant excerpts from the deposition transcripts.

Similarly, there is no contradiction in the number of vacancies on the weekend schedule. Contrary to Plaintiff's claim, Mr. Pereira did not testify that there were 10 or 11 openings – he only testified that the number was in the "double digits." See Pereira Dep. 134. It was Plaintiff's counsel who suggested a possibility of 10 or 11, and Mr. Pereira simply agreed that the numbers suggested were a *possibility*. See Pereira Dep. 141.

Finally, Plaintiff's claim that her job of scheduler was posted within two weeks of Ms. Charron beginning as Director of Nursing Services is not supported by Ms. Sweeting's testimony. As Ms. Sweeting clearly testified, there was a posting for a *per diem* scheduler – the position held by Ms. Sweeting. See Sweeting Dep. 200.[4] Plaintiff never held the position as a *per diem* scheduler. Rather, she was the nursing home's full-time Scheduler and had held the position since 1999. See Order, p. 2. In addition, Ms. Sweeting's testimony makes no reference to the *per diem* position being posted within two weeks of when Ms. Charron started work in July 2004 – only that the *per diem* position was posted prior to Plaintiff's discharge in October 2004.

## B. Ms. Charron's Clarification Of Plaintiff's Job Duties Does Not Support A Finding Of Pretext

As part of the August 23, 2004 meeting regarding Ms. Charron's concerns as to Plaintiff's job performance, Ms. Charron provided Plaintiff with an updated job description. Order, p. 3. While the Court determined that it would be *conceivable* that the updated job description was more challenging, Plaintiff never made any such claim in her deposition testimony. Rather, Plaintiff testified that she signed the updated job description, but was not

[4] Copies of relevant excerpts of Ms. Sweeting's testimony are attached as Exhibit C.

sure why it was given, because she was already doing her duties as a Scheduler. See Plaintiff Dep. 186-187.[5]

In addition, any so-called additional duties in the updated job description (e.g., tracing PPD) had no bearing on the event precipitating her discharge – the vacancies on the weekend schedule. Rather, Plaintiff claimed that the vacancies were because there were not enough nurses in the facility. (Document No. 61, p. 5). As a result, the updated schedule is not evidence that the reason for Plaintiff's discharge was pretextual.

In any event, given that there is no evidence that Defendants reasons were inconsistent, (Section A, *supra*) the updated job description is not sufficient to overcome Plaintiff's burden at summary judgment. See Order, p. 22 "None of the instances of inconsistency would be enough to in itself to prove pretext." In light of the foregoing – and given that the record is devoid of any evidence of age animus - Defendants' motion for summary judgment should be granted in its entirety. See Feliciano De La Cruz v. El Conquistador Resort, 218 F.3d 1, 9 (1st Cir. 2000) (upholding summary judgment for employer, despite minimal showing of pretext, where the record was devoid of evidence that unlawful animus was the reason for plaintiff's discharge); Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47 (1st Cir. 2002) (upholding summary judgment for employer appropriate when plaintiff presents "weak issue of fact as to pretext" and there is "strong independent evidence that no discrimination occurred").

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court reconsider its February 13, 2008 Order partially denying summary judgment, and grant Defendants' motion in its entirety.

[5] Copies of relevant excerpts of Plaintiff's testimony are attached as Exhibit D.

Respectfully submitted,

Defendants,
LIFE CARE CENTERS OF AMERICA, INC.,
PAMELA CHARRON and
STEVE HAASE,
By their attorneys,

/s/ Christopher J. Campbell

Christopher J. Campbell, R.I. Bar No. 6611
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, MA 02116
617-367-0025

DATE: February 28, 2008

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on February 28, 2008, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Patricia E. Andrews, Esquire
peandrews@verizon.net

and

Carly B. Iafrate, Esquire
ciafrate@verizon.net

/s/ Christopher J. Campbell
Jackson Lewis LLP

# EXHIBIT A

COPY



UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI *

VS. * C.A. NO. 06-108-ML

LIFE CARE CENTERS OF AMERICA, INC, PAMELA CHARRON, in her personal and official capacity, and STEVE HAASE, in his personal and official capacity *

* * * * * * * * * * * * * * * * *

DEPOSITION OF PAMELA CHARRON, Defendant in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Mary Ann Sheridan-Woods, a Notary Public in and for the State of Rhode Island, at the offices of PATRICIA ANDREWS, ESQUIRE, 121 DYER STREET, PROVIDENCE, RHODE ISLAND, on April 11, 2007, commencing at 10:15 A.M.

APPEARANCES:

For the Plaintiff.........PATRICIA ANDREWS, ESQ.

For the Defendant.........JACKSON LEWIS LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ.

Page 82

generals.
Q. Can you recall anything that you said during that encounter?
A. Specifically, no.
Q. Generally?
A. Generally, it was just, you know, trying to understand how she went about this daily schedule, filling those daily schedules.
Q. Now, when you say "filling the daily schedules," you mean, not writing in the daily schedules but filling vacancies?
A. Correct.
Q. Filling vacancies, and what was your issue with her?
A. It was a matter of a concern that I had, and that scheduling is not an easy task. I acknowledge that to this day. I still knowledge it, but, you know, the way in which she was pursuing the filling of those vacancies was not very cost effective for the facility.
Q. What do you mean by that?
A. Instead of calling the people on several occasions, she could just try to give bonuses.
Q. Now, she didn't have the authority to give the bonuses; correct?
A. Correct.

Page 83

Q. Why do you blame her if management is giving her the bonus money; why is she blamed for taking it?
MR. CAMPBELL: Objection as to form.
MS. ANDREWS: Go ahead.
A. She wasn't being blamed for taking it. It was, you know, "how many times did you call this person?" "I already called them." "How many times?" "I left them a message." "How many times," you know, that sort of -- I'm not saying that's what happened verbatim, but that's the general gist of the conversation, you know, but "if I called and offered them bonuses they would come." "Well, did you try just again without offering"? That's where it came from.
Q. But she could not offer bonuses without getting approval first; correct?
A. Correct, for the most part, yes.
Q. So who would she go to to ask if she would get bonuses?
A. Usually she went to me or Steve.
Q. And you would either tell her yes or no; correct?
MR. CAMPBELL: Objection as to form.
Q. Correct?
A. Yes.
Q. And then you told her no on most occasions?
MR. CAMPBELL: Objection as to form.
A. Depending on the situation, I did tell her no.

Page 84

Q. But you told her yes as well?
A. There are times when you have to.
Q. But to the extent she offered someone a bonus on the phone, she had already gotten the authority from either you or Mr. Haase; correct?
A. For the most part, yes or to an extent, yes.
Q. How is she -- strike that. Why is she being blamed for offering bonus money when you're authorizing her to do it?
MR. CAMPBELL: Objection as to form. Asked and answered.
MS. ANDREWS: That's what I'm trying to understand.
MR. CAMPBELL: Please let me finish my objection. Asked and answered. Go ahead.
MS. ANDREWS: I'm just trying to understand that. It doesn't make a lot of sense to me.
MR. CAMPBELL: Wait for the question. If you still have in mind the former question, try to answer it.
Q. Did you ever blame Barbara Antonucci for giving out bonus money?
MR. CAMPBELL: Objection as to form. Go ahead.
A. The problem or the point of the whole conversation was that it was being relied on too much.

Page 85

Q. Did you ever...
MR. CAMPBELL: I'm sorry. She hasn't finished her answer. Please let her finish her answer.
MS. ANDREWS: Have you finished?
A. That was the conversation, you know, that you can't just ask for bonus dollars. You need to do more than that.
Q. My original question to you was, did you blame her for giving out bonus money?
MR. CAMPBELL: Objection as to form. Asked and answered three times -- asked and answered twice.
MS. ANDREWS: She didn't answer that question.
MR. CAMPBELL: Please don't shout at me, Pat.
MS. ANDREWS: Please abide by the judge's ruling, as well. That's not yelling.
Q. Do you have it in mind?
MR. CAMPBELL: Go ahead. If have an answer to any questions.
A. Did I blame her, I'm sorry -- did I blame her for the bonus dollars, is that what you're asking me?
Q. Yes.
A. As a general phrase. I didn't blame her. I thought she relied too heavily on it.
Q. Was she ever disciplined for giving out too much bonus money?

MR. CAMPBELL: Objection as to form.
A. She was spoken to about the reliance too much on bonus dollars.
Q. When you say "spoken to," was that counseling?
MR. CAMPBELL: Objection.
A. I spoke to her, and I guess you could say it was a form of counseling, as to what I expected.
Q. I'm asking you whether it was counseling.
MR. CAMPBELL: Objection as to form. Go ahead.
A. I guess you could say yes.
Q. And why?
MR. CAMPBELL: Objection as to form.
A. Because I thought she relied too heavily on the bonus dollars.
Q. Weren't you relying too heavily on them?
A. No.
Q. You authorized them though?
MR. CAMPBELL: Objection.
A. Only in the case of a last minute -- we had nothing left to do.
Q. Are you saying that you authorized bonuses at the last minute?
MR. CAMPBELL: Objection as to form.
A. Probably.



Q. I'm looking for your best recollection here.
MR. CAMPBELL: Wait for a question.
Q. Is that a guess on your part?
MR. CAMPBELL: Objection as to form. Go ahead.
A. For the most part, yes. I wouldn't offer bonus dollars to fill a slot three days from now, no.
Q. When do you believe that they should be authorized?
MR. CAMPBELL: Objection as to form.
A. As the end all.
Q. Pardon?
A. As the end all. I'm trying to think of a way to say it if you understand what I mean. Last minute, shift coming up in a couple of hours. There in nobody else to fill it. That's all we can do.
Q. What about Mr. Haase?
MR. CAMPBELL: Objection as to form.
A. You would have to ask him.
Q. You don't know the circumstances under which he did?
MR. CAMPBELL: Objection as to form.
A. I can only speak to what I authorized. He was under the same pressure that I was, so I'm assuming that he didn't jump the gun either.
Q. If you took the position that it should only be at the end, how is it that Barbara got money before the end?



MR. CAMPBELL: Objection as to form.
Q. How is it that she kept getting the money?
MR. CAMPBELL: Objection as to form. Go ahead.
A. She wasn't getting the money from me.
Q. Who was she getting it from?
A. When I arrived she was getting it from me, or from Steve, if I was unable to do it.
Q. But any time that she offered money at any time during the week, she either got authority from you or Steve; correct?
MR. CAMPBELL: Objection as to form. Asked and answered three times. Go ahead.
A. Correct.
Q. And to the extent that she offered a bonus on a Tuesday, for the following weekend, she had authority to do that; correct?
A. No, I never gave her authority to do that.
Q. What about Steve?
A. I don't know. I would think not, but I don't want to say absolutely no or I never gave it to her.
Q. What was your issue with her regarding the bonuses; you took the position that she was offering bonus money too early; correct?
MR. CAMPBELL: Objection as to form. Go ahead.



A. Too early, too often, yes.
Q. When was she offering those bonuses?
MR. CAMPBELL: Objection as to form.
A. She wasn't offering them. If it was Tuesday, let's go to your example of Tuesday, she didn't offer them for the week because she didn't get the authorization from me. What she would say do if you want to fill the schedule for Tuesday, I can get so and so, if we give them this bonus, so that was the scenario.
Q. You critiqued her, because she was giving out too much bonus money; correct?
MR. CAMPBELL: Objection as to form. Go ahead.
A. Because that's what she was using to schedule, fill the schedule.
Q. You thought that she was giving out bonus money too early; correct?
MR. CAMPBELL: Objection as to form.
A. Relying on it too much.
Q. So are you saying that she wasn't giving it out too early; she was just relying on it?
MR. CAMPBELL: Objection as to form.
A. Again she didn't have -- if it was Tuesday and we were trying to work on Friday's schedule, instead of continually calling somebody from Friday's schedule, she would wait

Page 214

MR. CAMPBELL: Objection as to form.
A. Well, I know she used the word badgering. I refer more to what I had spoken of earlier if if they wanted to pick up the shifts, they would have picked it up. Dislikes and likes, I don't know, the wording is a little different. She wouldn't call them. She wouldn't keep calling them. She would say "If they wanted it, they would pick it up."
Q. Did Miss Antonucci ever tell you the reason for not filling the necessary slots was that she knew the likes and dislikes of staff related to scheduling?
MR. CAMPBELL: Objection as to form.
Q. Did she ever tell you that?
MR. CAMPBELL: Objection.
A. Specifically I can't remember.
Q. Do you remember anything like that?
MR. CAMPBELL: Objection as to form.
A. Only as I stated previously, "If they wanted the shift, they would have picked it up." Those sorts of comments.
Q. Did you agree that knowing the likes and dislikes of the staff could be actually a strength for a staffing coordinator?
MR. CAMPBELL: Objection as to form.
A. In some respectives.
Q. In what way?

Page 215

A. Well, if you knew you had an opening on certain day and a certain shift, and you knew somebody that liked that shift or would be more apt to work that shift, you would want to call them first, and you would save a lot of time, but it wasn't a reason not to call them again, just because you knew they wouldn't like it.
Q. Did you ever come to the conclusion that was a strength for Barbara Antonucci?
A. No.
Q. That she knew...
A. No.
Q. Did Celeste Harris ever tell you that she viewed that as strength for her?
MR. CAMPBELL: Objection as to form.
A. I don't know. I don't remember that.
Q. Take a look at Plaintiff's 8, which is Celeste Harris'...
A. I got it.
Q. On the last page under three, Strength.
A. This the really light, so bear with me.
Q. I will read it for you. Number 1, Strengths, is "knows likes and dislikes for staff related schedule," do you see that?
A. Yes.

Page 216

Q. Did you ever hear Celeste say that was a strength for Barbara Antonucci?
MR. CAMPBELL: Objection, asked and answered.
MS. ANDREWS: Go ahead.
A. Again, not that I'm aware of.
Q. Now, it states here in the last paragraph on that page...
A. Which page?
Q. We're back to the Position Paper, Exhibit Number 9.
A. Thank you.
Q. It states here several staff members told Miss Charron that "one of the reasons that they didn't pick up shifts when first asked, is because they knew that they would get extra bonus dollars when the facility became desperate enough to fill the shifts;" okay?
A. Uh-hum.
Q. Identify for me the staff?
A. I can't.
Q. Did you ever hear that from any staff?
A. Yes.
Q. You can't identify one person sitting here today?
A. No.
Q. Is there anything that you can think of that would refresh your recollection as to staff that said that?

Page 217

A. No.
Q. It states here in the first paragraph, the next first full paragraph on the next page, "In fact Miss Antonucci's response to Miss Charron was that she had been doing the scheduling job for seven years and she did not need to be told how to do her job." Do you see that?
A. Yes.
Q Did she tell you that in response to your alleged counseling?
MR. CAMPBELL: Objection as to form. Go ahead.
A. She told me that on a couple of different occasions. Maybe not specifically those words, but in general.
Q. You said that -- strike that. Was the worst time for her filling vacancies, the time when she handed you the daily sheets on October 2?
MR. CAMPBELL: Objection as to form.
Q. Was that the largest amount of vacancies that she had ever left open?
MR. CAMPBELL: Same objection.
A. Yes, that I can recall, yes.
Q. Tell me, on any other occasions where she had vacancies, how many there were?
A. I couldn't tell you.
Q. There is no way to tell?

Page 218

A. I really can't. Honestly, I can't.
Q. Would it have been only one?
MR. CAMPBELL: Objection as to form.
A. There's a possibility. Absolutely. I'm not sure. There were times when there were none too.
Q. Do you recall how many times there were no vacancies?
MR. CAMPBELL: Objection as to form. Go ahead.
A. I'm talking during the week, like it-- maybe Tuesday. Never on the weekend, but during the week. How many times, I don't know.
Q. It states here in the next paragraph, "On or around August 2, Miss Charron requested Miss Antonucci put together the monthly staffing schedule so she could see what shifts were vacant for licensed and non-licensed staff. Miss Antonucci responded by telling Miss Charron it was not her job, that it was Miss Charron's job, and that she would not follow her supervisor's direction;" do you see that?
A. Yes.
Q. Do you agree with that?
A. Yes. We spoke about that earlier, yes.
Q. As I recall you said she did not refuse to it that first week?
MR. CAMPBELL: Wait for a question, Pam.
Q. Am I wrong about that?

Page 219

MR. CAMPBELL: Objection as to form. Answer it if you can.
A. It depends on how you're interpreting -- you know, how you're interpreting this statement. I mean it's the same thing I said to you earlier. It's just in different words.
Q. And did Miss Antonucci, around August 2, refuse to -- to tell you that she was not going to do the monthly schedule?
MR. CAMPBELL: Objection, asked and answered.
A. She told me that she never had to do it before. She didn't see why she had to do it. We spoke about that before.
Q. But she didn't say "I'm not going to do it," right?
A. "I don't see how I'm going to do it."
Q. But she never said "I'm not going to do it," do you agree with that?
MR. CAMPBELL: Objection as to form.
A. She didn't use those specific -- well, she insinuated that she wasn't, but she did not use those specific words.
Q. You understand her to be saying on or about August 2 that she wasn't going to do it?
A. Yes.
Q. Take a look at...
MR. CAMPBELL: Two.

Page 220

Q. Take a look at Plaintiff's Exhibit 2. It states "Barbara was instructed on the first week of August, that she was to update and maintain nursing monthly schedules. On Thursday August 19, during a phone conversation, Barbara stated she cannot and will not perform such duties as directed;" do you see that?
A. Correct.
Q. I don't see anything in here where you put that on or around August 2, she also said that she was not going to do it?
MR. CAMPBELL: Wait for a question, Pam.
Q. Do you agree with me that you don't mention anything about a refusal prior to August 19?
MR. CAMPBELL: Objection, asked and answered.
A. On this form, no.
Q. No what?
A. It's not here. Yes, I agree with you.
Q. But yet you claim that on August, around August 2 she refused to do it. You understood that she refused to do the master schedule; right?
MR. CAMPBELL: Objection, asked and answered
A. She didn't specifically say. She just insinuated that she wasn't.
Q. And yet you didn't put anything in there on August 2 on

Page 221

Plaintiff's Exhibit 2; correct?
MR. CAMPBELL: Objection, asked and answered. Three times.
Q. And I'm just wondering why you didn't mention that?
MR. CAMPBELL: There's a new question. Go ahead and answer that one.
A. This was a couple of weeks later. I had already spoken to her about it. This was the specific refusal. I had spoken to her in regards to it prior to that orally.
Q. Yes, but you...
MR. CAMPBELL: Let the witness finish her statement, please.
MS. ANDREWS: Could you let the record reflect that Mr...
MR. CAMPBELL: Campbell.
MS. ANDREWS: Is raising his voice.
MR. CAMPBELL: I haven't the slightest idea what you're talking about, Pam -- Pat. You need to let the witness finish her answer. This is at least the fifth time I've told you that. Stop interrupting her. Please continue, if you recall where we were.
MS. ANDREWS: May I have the question read back. Well, strike that and I'll ask it again.
Q. You, in this paragraph, talk about what transpired in

STATE OF RHODE ISLAND SUPERIOR COURT
PROVIDENCE, SC.

BARBARA ANTONUCCI
Plaintiff

v. C.A. NO.:06-108-ML

CHERRY HILL MANOR, et al

Defendants

DEPOSITION OF PAM CHARRON

in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Patricia E. Andrews, 129 Dyer Street, Providence, Rhode Island, on June 19th, 2007, convening at 5:30 p.m.

PRESENT:

FOR THE PLAINTIFF..... PATRICIA E. ANDREWS, ESQ.
LAW OFFICE OF PATRICIA E. ANDREWS

FOR THE DEFENDANT.... CHRISTOPHER J. CAMPBELL, ESQ.
JACKSON LEWIS LLP

Allied Court Reporters
115 Phenix Avenue
Cranston, Rhode Island 02920

MR. CAMPBELL : Objection as to form. Go ahead.
A. Again, you're asking me for something -- I don't know. I couldn't answer that.
Q. Well, was it a rarity? Was this rare that Barbara Antonucci did --
A. No. I felt that even in the beginning that she was relying on bonuses.
Q. Did you have a problem with her relying on bonuses, or over-relying on bonuses?
MR. CAMPBELL : Objection as to form. Go ahead.
A. They're two and the same. You're asking me, two are the same things.
Q. Did you have a problem with her giving any bonuses out at all?
MR. CAMPBELL : Objection as to form.
A. No. That was required at times.
Q. So, you expected that she would give bonuses out at certain times?
A. Absolutely.
Q. Did you have an issue with the frequency with which she gave bonuses out?
MR. CAMPBELL : Objection.
A. I guess you could say yes.



Q. The number of bonuses that she gave out?
A. How many times it was happening, yeah.
Q. You sound --
A. Yes.
Q. Okay. But sitting here today you can't recall how many times that you had that concern?
A. Oh, God, no. It was a concern, but --
Q. Was it a concern or a serious concern?
MR. CAMPBELL : Objection as to form.
A. I would say it was a concern.
Q. And did you have a concern regarding CNAs as well as nurses?
A. It was a general concern for anybody, but more than often -- more than usual it was the licensed staff that were getting the bonuses.
Q. So, am I -- strike that. Did you have a concern that Barbara Antonucci was over-relying on bonuses regarding CNAs?
MR. CAMPBELL : Objection as to form.
MS. ANDREWS: Do you understand my question?
A. It was a general concern concerning both, although I acknowledge that most of the time it was given to the licensed nurses more than the CNAs.
Q. Well, was Barbara Antonucci fired in any way



because of an over-reliance on giving bonuses to nurses?
MR. CAMPBELL : Objection as to form.
A. No. It was --
Q. Was that a no?
A. Can you repeat the question. I just want to make sure that I'm understanding what you're saying.
Q. Was Barbara Antonucci fired in part or whole because she over-relied on paying bonuses to nurses?
MR. CAMPBELL : Objection. Asked and answered.
MS. ANDREWS: Go ahead.
A. Hum. Well, I guess it sort of relates to the whole disciplinary problem. It relates. I mean, I didn't fire her because she was offering bonuses, but it certainly relates.
Q. Well, my question to you is did you fire her in part or whole because of the fact that you believed she was offering bonuses too often?
MR. CAMPBELL : Objection. Asked and answered.
Q. Do you understand my question?
A. Yeah. But that's the only way I can answer it



is that it relates. I mean, it relates to the disciplinary problems that I was having.
Q. I'm not talking about disciplinary problems; I asked you if she was fired for that in part or in whole.
MR. CAMPBELL: Wait for a question.
Q. Was she?
MR. CAMPBELL : Objection. Asked and answered two times, including multiple times the first day of the deposition. If you have further information to provide, by all means provide it.
Q. I'm talking about to the nurses.
MR. CAMPBELL: Wait for a question.
Q. Do you understand my question? I'm simply trying to find out whether she was fired in whole or in part because she overly-relied on paying bonuses to nurses. Okay? To nurses?
MR. CAMPBELL : Objection. Asked and answered today and the last time. If you have further information, by all means provide it.
MS. ANDREWS: I don't believe so. Go ahead.
A. Again, I have to tell you that it relates to what I was -- where the issues were, but it wasn't -- it relates to -- the bonus dollars related to

the difficulties that we were having, but it wasn't the reason that she got fired. If that makes any sense. It relates to the issues.
Q. Tell me, was Barbara Antonucci fired in whole or in part because she over-relied on the payment of bonuses to CNAs?
MR. CAMPBELL : Objection. Asked and answered.
A. Again, it's the same answer. That is, bonus dollars related to part of the issues that I had with Barbara. It wasn't the actual bonus dollars, it was the issues that came up with that.
MS. ANDREWS: We'll come back to that one.
Q. So, maybe I'll try to get at it like this: Did you consider the way that she paid bonuses when you were deciding to fire her?
MR. CAMPBELL : Objection as to form.
A. When this came about you mean, did I sit down and say, well, gee, the bonus dollars, too? Is that what you mean?
Q. Yes. At some point you were deciding whether or not she should be fired; correct?
MR. CAMPBELL : Objection as to form.
A. Correct.



Q. Did the fact that she overly-relied on paying bonuses to nurses and CNAs get considered by you --
MR. CAMPBELL : Objection as to form.
Q. -- when you made that decision?
A. No.
Q. Was she ever disciplined in whole or part for over-relying on bonuses to nurses and/or CNAs?
MR. CAMPBELL : Objection. Asked and answered extensively the first day at deposition.
A. I know that came up in conversations that we've had, whether it be oral. And I'm not sure, and I would really have to look at the written again, but I thought I made some notation in one of the written notices I've given. I'm almost positive I wrote it somewhere. I probably did. That we need to be less reliant on those. At least orally. I know I talked to her about being less reliant on it.
Q. Tell me --
MS. ANDREWS: Let's mark this as Plaintiff's 13.
(PLAINTIFF'S EXHIBIT 13 MARKED FOR IDENTIFICATION)
THE WITNESS: Do you want me to read this?
Q. Right now I just want you to identify it for me.



A. It's a evaluation, performance evaluation.
Q. For Dawn?
A. For Dawn, yes.
Q. That you prepared; correct?
A. I would have to read it. I'm sure I did.
Q. Is that your signature on the last page?
A. Yes, I did. That's what I said, I'm sure I did, but I wanted to make sure.
MS. ANDREWS: Before I get into that, let me go back to something.
Q. You sent Barbara Antonucci for training; correct?
A. Yes.
Q. And why did you do that?
MR. CAMPBELL : Objection. Asked and answered.
MS. ANDREWS: If you can point out where I did.
MR. CAMPBELL: I'd be glad to. Thank you for suggesting it. Would you like me to do that?
MS. ANDREWS: Yes. But I'm not going to waste the time. But if you can find it, I'd be happy -- I don't want to waste my time. I didn't think I had asked that.
MR. CAMPBELL: You most certainly did. If you would like me to find it, I'll find it. If



not --
MS. ANDREWS: You can find any questions that you want, but I'm just not going to waste the time here. I'm not going to eat up my time, in other words.
Q. So, you sent Barbara Antonucci for training?
A. Yes.
Q. And why did you do that?
MR. CAMPBELL : Objection as to form, and asked and answered.
A. Because I had worked with the previous scheduler, and we had -- I liked the way she did things. And it was working well for the organization. And Barbara, when I tried to show her and tell her what needed to be done, I just -- I never did that -- I got the responses, "I never did that, I don't know how to do this, I don't know how that to do." So, I sent her right to somebody who did the job every day, the same job she had, so she would understand what I was looking for.
THE WITNESS: Does that answer your question?
Q. Did you send her to Rebecca Santini because Rebecca knew the way that you liked things done?
A. I sent her there because I liked the way Rebecca

# EXHIBIT B

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, SC. SUPERIOR COURT

**************************
BARBARA ANTONUCCI *
*
VS. * C.A. NO.:06-108-ML
*
CHERRY HILL MANOR, *
et al *
**************************

DEPOSITION OF JOE PEREIRA, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Patricia E. Andrews, 129 Dyer Street, Providence, Rhode Island, on May 3, 2007, at 10:00 a.m.

APPEARANCES:
FOR THE PLAINTIFF: PATRICIA E. ANDREWS, ESQUIRE
FOR THE DEFENDANT: JACKSON LEWIS, LLP
BY: CHRISTOPHER J. CAMPBELL, ESQ.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Q. Was that the first time you ever knew about one for Barbara Antonucci?
MR. CAMPBELL: Objection.
A. When we spoke about role performance earlier, I can't remember what kind of a format I recommended that she put it in. It could have been an action plan.
Q. But sitting here today, you can't remember, specifically?
MR. CAMPBELL: Objection as to form.
A. No, I can't remember.
Q. Did you ever tell Pam Charron that she should discipline Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. Well, based on the calls regarding open vacancies, I could have very easily.
Q. What's your best recollection, sitting here today?
MR. CAMPBELL: Objection.
A. Logically, I would probably have said, yes.
Q. Did she -- do you know whether there were the same amount of vacancies after Barbara left at Cherry Hill?
MR. CAMPBELL: Objection as to form.
A. No one ever called her -- no one ever called me about them anymore.



Q. Did you ever hear anything about Barbara Antonucci's use of bonus -- bonuses?
A. You know, my role is clinical. You know, I could care less if they offered her a million dollars, or three million dollars, or a penny.
MR. CAMPBELL: Have you completed your answer?
THE WITNESS: I'm sorry.
MR. CAMPBELL: Have you completed your answer?
MS. ANDREWS: I think that he's fully capable of deciding whether or not he has completed his answer.
MR. CAMPBELL: I understand that.
MS. ANDREWS: No, you are not to do that, okay? You are not to make this person believe that he has given an inadequate answer, or that there is something more that he should be saying, because that's exactly what you are doing.
MR. CAMPBELL: Actually, that's not, and please don't interrupt me when I'm speaking. If you've completed your answer, I'd like to take the lunch break that we talked about. It's 12:16 and we talked about 12:15.
THE WITNESS: What was the question again?



MR. CAMPBELL: I assume that you had, I don't know if --
MS. ANDREWS: Let's let him hear this question again.
MR. CAMPBELL: If you have more that you want to add, by all means.
THE WITNESS: Okay.
MR. CAMPBELL: I assumed that you had.
MS. ANDREWS: Could you please read it back?
(Question read back as requested.)
Q. Did you --
MR. CAMPBELL: Hold on. No. I wanted to take a lunch break.
MS. ANDREWS: Okay. Then answer the question.
MR. CAMPBELL: I think he did. Can you read his answer because that's what your question was. Did you complete it?
(Answer read back as requested.)
Q. Did you ever hear anything about Barbara Antonucci's use of bonus money?
MR. CAMPBELL: Objection as to form.
A. I did not get involved in that.
Q. So, I take it the answer is no?



A. Could have, but I didn't really get involved in that. I could not give any authority anyway, so I would not get involved.
Q. I'm just simply trying to find out if you recall any discussions with Pam Charron about Barbara Antonucci's use of money?
MR. CAMPBELL: Objection as to form. Asked and answered.
A. Could have -- Pam could -- may have said that she would rely on bonuses, in the last minutes, to call staff rather than being creative and rather than taking some initiative earlier on. She could have.
Q. She could have, but is that a guess on your part, sir?
MR. CAMPBELL: Objection as to form.
A. It's the best I can do.
Q. But, do you recall that specifically, is what I'm trying to find out.
MR. CAMPBELL: Objection as to form.
A. Not 100 percent.
MR. CAMPBELL: Does it make sense to take lunch now?
MS. ANDREWS: I'm just going to finish this line of questioning.

Q. Why is it that that particular incident stands out in your mind?
MR. CAMPBELL: Objection as to form.
A. Because I remember the numbers were in the double digits and I put myself in the director's shoes for a moment.
Q. Okay. And that's why it stood out in your mind as being --
A. It was an, oh, my God situation.
Q. Okay. Were there ever any other, oh, my God situations during the first week of July?
MR. CAMPBELL: Objection as to form.
A. Not that I can remember.
Q. Okay. And what about August of 2004?
A. It could have been.
Q. Well, what's your best recollection?
MR. CAMPBELL: Objection as to form.
A. Could have been.
Q. Okay. But do you remember anything at all the way that you do with this last week in September?
MR. CAMPBELL: Objection as to form.
A. No, I don't.
Q. Okay. So, is it safe to say that with the one in September, you said that you recall that because there were vacancies in the double digits? Do you



remember you said that?
A. Yeah.
Q. And that's why it stood out in your mind?
A. Right.
Q. And I am asking you whether anything else stands out in your mind in August?
MR. CAMPBELL: Objection as to form.
A. The frequency of conversations, by Pam, stating that there's a lot of open vacancies on the schedule; the number of vacancies on the schedule.
Q. Well, let's take a look at 2A, which is the August calendar. Tell me on how many occasions you had that discussion with her?
MR. CAMPBELL: Objection. Asked and answered at least four times. If you have further testimony, by all means, give it.
A. No.
Q. Okay. And you said that you recall they were in the double digits for the week of -- last week of September. Were they in the double digits in August of 2004?
MR. CAMPBELL: Objection as to form.
A. It could have been.
Q. But nothing stands out in your mind?



A. No, nothing stands out in my mind.
Q. Not the way it does for the last week of September; correct?
MR. CAMPBELL: Objection. Asked and answered.
A. No.
Q. And other than the last week in September, is there anything that stands out in your mind at any other point in September of 2004?
MR. CAMPBELL: Objection as to form.
A. No.
Q. And what happened -- strike that. How did you find out about the vacancies that were in the double digits the last two weeks in September?
A. It was at a funeral from someone that we worked with.
Q. And who was that?
A. Deborah Ready's relative died. I think it was the father, I think.
Q. And who was there?
A. Steve Haase showed up at the funeral.
Q. Anyone else?
A. People that I work with.
Q. Right. Did Pam Charron?
A. No, she did not.



Q. Do you know why Pam Charron did not?
A. I was informed that she was filling in vacancies.
Q. And what time was this?
A. This was after my work hours. Typically, it's 5:00. I can't remember what time visitation was at.
Q. So you saw Steve Haase at this funeral; correct?
A. I believe so.
Q. And he told you that Pam Charron was not there because she was filling vacancies at work; is that right?
A. Yes, I believe so.
Q. Okay. And tell me, at that time, when were you getting out of work?
MR. CAMPBELL: Objection as to form.
Q. What were your hours?
A. What time?
Q. Uh-hum.
A. It depends on the day. Sometimes 3:00, sometimes 5:00, sometimes 7:00.
Q. Well, I'm going to represent to you that the funeral, at least according to the testimony in this case, was on Friday, October 1.
A. Okay.

Page 138

Q. Okay?
A. All right.
Q. So, can you tell me what your hours were on Friday in October 2004?
A. I couldn't. It varies, depending on where I was, depending on the issue. It would vary.
Q. Well, do you recall when you got to the funeral parlor that day?
MR. CAMPBELL: Objection to form.
A. No, I don't remember.
Q. Was it after 5:00?
A. I think so.
Q. Okay. And you saw Steve Haase; correct?
A. I'm pretty sure, yeah.
Q. And how did the subject of the vacancies come up?
A. Well -- how did it come up?
Q. Yeah.
A. I -- it just came up. I think -- I think he was making some excuse for the director not being there. I think he was saying something like, Pam can't come, she's working on the schedule for the weekend, or something like that.
Q. And what did you say?
A. I wasn't involved.
Q. Did you say anything in response to that?

Page 139

A. I did not.
Q. Now, would it surprise you if I told you that Pam Charron received the schedule from Barbara Antonucci at 2:00?
MR. CAMPBELL: Objection.
A. Would it surprise me?
Q. Yeah.
A. No.
Q. Okay. If she had received the schedule at 2:00, would you expect her to have made the funeral?
A. Depending on the number of open positions.
Q. And how long it took her to fill them?
A. Correct.
Q. If I told you that she received the vacancies at 2:00 and that in this litigation, Cherry Hill had said it only took one hour to fill them, would you have expected her to be at the funeral parlor?
MR. CAMPBELL: Objection as to form.
A. I -- I -- I don't know what she was thinking at the time.
Q. Well, did anyone ever tell you how many vacancies there were that day?
MR. CAMPBELL: Objection as to form. Asked and answered. Go ahead.
A. I can't remember.

Page 140

Q. Well, double digits can be 11; correct?
A. I can't remember if it was before or after the fact.
Q. If what was before or after the fact?
A. I can't remember if I knew it was twelve positions -- twelve open positions on that Friday or if it was the following weekend.
Q. Well, would you expect her not to go to a funeral on October 1 because there were vacancies the following weekend?
MR. CAMPBELL: Objection as to form.
A. What I'm saying is, I can't remember if I was informed of how many open positions there were that day.
Q. The day of the funeral?
A. That day of the funeral or if those numbers came to me after the weekend.
Q. Oh, I see, okay. But I thought you said that you had a discussion with Haase at the funeral and he told you that she wasn't there because there were vacancies?
A. Working on the schedule. I didn't ask how many. I didn't ask anything like that.
Q. Okay. Did you ever find out how many vacancies there were --

Page 141

MR. CAMPBELL: Objection as to form.
Q. -- for that weekend?
A. I remember there being, like I said, a weekend around a funeral, Deborah's funeral, that it was in the double digits. I just -- how I got the information, at this point in time, I couldn't tell you.
Q. Well, could it have been eleven vacancies?
MR. CAMPBELL: Objection as to form.
A. It could have been.
Q. Could it have been ten vacancies?
MR. CAMPBELL: Objection as to form.
A. Could have been.
Q. Did you ever have a discussion with Pam Charron about her need to fill vacancies for a weekend around the time of the funeral?
A. Can you say that again?
Q. Did you ever have any discussions with Pam Charron about the fact that there were vacancies in the double digits around the time of a funeral?
MR. CAMPBELL: Objection as to form.
A. There was only one funeral that I went to that I knew that she knew the same person.
Q. Okay. Did you ever have a discussion with her around the time of the funeral regarding the fact

was.
Q. Did you ever hold an opinion about whether or not she should be fired as opposed to suspended?
MR. CAMPBELL: Objection as to form.
A. No.
Q. Okay. Did you think that she should be suspended at any time?
MR. CAMPBELL: Objection as to form.
Q. As opposed to fired?
MR. CAMPBELL: Objection as to form.
A. Could have been.
Q. Well, let me ask you, why wasn't she suspended --
MR. CAMPBELL: Objection as to form.
Q. -- instead of fired?
A. I am not sure.
Q. Are you aware of any -- strike that. Were you privy to any discussions about whether or not Barbara Antonucci should be fired?
MR. CAMPBELL: Objection. Asked and answered.
A. Ask the question again.
Q. Were you privy to any conversations about whether she should be fired?
A. I could have been.
Q. But, sitting here today --



A. I really can't remember.
Q. Did Pam Charron ever tell you what she expected Barbara Antonucci to do to get the vacancies filled?
MR. CAMPBELL: Objection to form.
A. I believe she, you know, made reference about starting earlier in the week, particularly for weekend coverage, not to wait 'til Friday but to start earlier on it.
Q. Can you recall anything else?
MR. CAMPBELL: Objection as to form.
A. No.
Q. Can you identify for me the person at Cherry Hill who you believe had the most job performance problems?
MR. CAMPBELL: Objection as to form.
A. I really cannot.
Q. Okay. Did you ever hear that Steve Haase had a "bad guy" image?
MR. CAMPBELL: Objection as to form.
A. I think that all relates to the interpersonal skills that I alluded to earlier.
Q. Did he fire anyone that you're aware of?
MR. CAMPBELL: Objection as to form.
A. I'm sure he did.



Q. Can you identify anyone?
A. There was a case manager that he fired early on.
Q. And who was that?
A. I can't remember her name.
Q. And when was that, approximately?
A. When I had first started in my regional role, within the first couple of months.
Q. Do you know why he fired that person?
A. I think it was related to insubordination.
Q. What else do you know about that?
MR. CAMPBELL: Objection.
A. That's it, that's all.
Q. And when you say she was a caseworker --
A. Case manager.
Q. Case manager. Is that a nurse?
A. A nurse.
Q. Was she insubordinate to him, do you know?
MR. CAMPBELL: Objection as to form.
A. I don't know that.
Q. Okay. Do you know how old she is?
A. I have no idea.
Q. Were you supposed to be kept aware of money that was being given away as bonus money?
A. Clinical here, no. I'm clinical.



MS. ANDREWS: Let me mark this as Plaintiff's Exhibit 3.
(Plaintiff's Exhibit 3 marked for ID.)
Q. Plaintiff's 3 are a series of e-mails that begin with number 1515.
MR. CAMPBELL: Do you have an extra copy?
MS. ANDREWS: I don't have an extra copy. These are copies that -- nine million copies. So, I would ask that to the extent that we have any more depositions in this case, or the Ferrucio case, that rather than waste our resources making copy after copy of the same documents, that maybe we try to use the same documents and bring them to our respective offices.
MR. CAMPBELL: I think that's an excellent suggestion. In fact, I recall making it during the defendant's depo and suggested that we have one set of ongoing exhibits so we wouldn't have to remark each and every one and that suggestion was rejected by your colleagues.
MS. ANDREWS: That's not what I'm saying.
MR. CAMPBELL: Well, what I'm saying is, I think that's a great idea. Is this the same exhibit you used yesterday?
MS. ANDREWS: I didn't do yesterday.

MR. CAMPBELL: Objection as to form.
A. Well, I can't remember if this took place. I could have, you know -- I just don't have any memory of this.
Q. Can you think of any circumstances under which you would be talking to Kate O'Connor about what Pam told you regarding Barbara Antonucci's job performance?
MR. CAMPBELL: Objection as to form.
A. As a regional, we met weekly. The regional team -- we met weekly. We reviewed facilities.
Q. Any other reason why?
A. Pardon me?
Q. Any other reason that you can think of that you would be talking -- that you would think to mention to Kate O'Connor something that Pam Charron said about Barbara Antonucci?
MR. CAMPBELL: Objection as to form. Go ahead.
A. To keep her in the loop.
Q. Is that a guess?
MR. CAMPBELL: Objection as to form.
A. At this point, it's going to have to be a guess.
Q. Do you recall attending any meeting on August 19th



as reflected in the response above that e-mail?
A. I do not recall.
Q. You don't recall it happening?
MR. CAMPBELL: Objection as to form.
A. It could have happened.
Q. But you have no recall?
A. I can't remember if I did or did not.
Q. Take a look at 1499.
MR. CAMPBELL: It's out of order, just keep looking.
MS. ANDREWS: Yeah. It is out of order. Let me know if you find it.
THE WITNESS: Okay.
MS. ANDREWS: You found it before I did.
Q. Okay. Tell me, sir, it states here -- it's from Pam Charron to Madeline Horner and Steve Haase, and it states: I can't understand why the bonus dollars for extra shifts has been so high. I have approved bonuses for weekend shifts but not nearly as much as they were getting, and not to everyone. Am I missing something? Or, am I still getting the process wrong?
MR. CAMPBELL: No question.
Q. Do you see that?
A. I read it here, yes.



Q. Okay. Do you have any information about Pam Charron's ability to issue bonuses -- that's a bad question. Okay. Have you -- strike that. Have you ever had any discussions without -- with any person about what is reflected here in this e-mail?
MR. CAMPBELL: Objection as to form.
A. This is the first time I've seen this e-mail.
Q. Okay. What about the contents, have you ever had any discussions with any person about the contents?
MR. CAMPBELL: Objection.
A. Why the bonus dollars are so high?
Q. Or Pam Charron not getting the process right.
A. I'm not sure what the process is when it comes to issuing bonus dollars.
Q. Was there a process?
MR. CAMPBELL: Objection as to form.
A. Not that I know of.
Q. Was there a budget?
MR. CAMPBELL: Objection.
A. Not that I'm aware of.
Q. Did you ever think that there should be a budget --
MR. CAMPBELL: Objection as to form.



Q. -- for bonuses?
A. I could care less if we issued a million dollars. I just wanted staff there. I did not get involved in that.
MS. ANDREWS: Okay. Let me mark as Plaintiff's Exhibit 4 a document bearing Bates stamp 1495.
MR. CAMPBELL: Hold on a second here. I think we're all holding different documents. I've got one that has half of this and you have got the other half. I've got the one that's got both on it.
MS. ANDREWS: How the heck did that happen? I'm going to make a copy.
MR. CAMPBELL: Do you want to give him 1535?
MS. ANDREWS: No, I'm going to make a copy, hold on.
(A short recess was taken.)
Q. BY MS. ANDREWS: Okay. Let's mark as Plaintiff's Exhibit 4, an e-mail dated, October 4, 2004, bearing Bates stamp 1495.
(Plaintiff's Exhibit 4 marked for ID.)
Q. I take it you've never seen this e-mail before?
A. Correct.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA ANTONUCCI :
:
vs. : C.A. NO. 06-108 ML
:
CHERRY HILL MANOR, ET AL. :

**VOLUME II**

**PAGES 187-349**

**EXHIBITS 1-15**

***DEPOSITION OF DONNA L. SWEETING***

produced, sworn and examined on FEBRUARY 9, 2007, at 9:00 a.m. at LAW OFFICE OF PATRICIA E. ANDREWS, 129 Dyer Street, Providence, Rhode Island, before:

*CLAUDIA RATHBUN, RPR-RMR*
*CAPITOL COURT REPORTING, INC.*
A Notary Public in and for the State of Rhode Island taken on behalf of the Plaintiff

**— CAPITOL COURT REPORTING, INC. —**
**931 Jefferson Boulevard, Suite 2003**
**Warwick, RI 02886**
**401/739-3600**

per-diem staffing coordinator?
A. I believe I was filling in, but we all questioned that. We all questioned why was that job posted, and I forget what the answer was. There was a job posting for a staffing coordinator, and Barbara was in the building, and she said, "Is that my job?" She asked me was that her job. I said that was news to me, too. But I don't recall what the answer was for that position at all. I just know that there was a position posted at one time.
Q. Okay. Do you have any information that they were trying to replace you because it was a per-diem staffing coordinator?
A. I, at one time, thought they was trying to replace me because I did -- I did -- I helped practically every department in the building. So, at first I was like, "Oh, they don't want me to help anymore," but they didn't tell me. But then I said -- I don't know. I don't know. But I was questioning it because I knew I was doing so much in that building.

# EXHIBIT D

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

BARBARA ANTONUCCI *

*

VS. * C.A. NO. 06-108-ML

*

LIFE CARE CENTERS OF AMERICA, *
INC., PAMELA CHARRON, in her *
personal and official capacity, *
and STEVE HAASE, in his personal*
and official capacity *

* * * * * * * * * * * * * * * * *

DEPOSITION of BARBARA ANTONUCCI, taken on behalf of the Defendants on Tuesday, January 9, 2007, at the offices of Jackson Lewis, LLP, 127 Dorrance Street, Providence, Rhode Island, commencing at 9:30 A.M. before Rebecca J. Forte, Notary Public.

APPEARANCES

CARLEY BEAUVAIS IAFRATE, ESQUIRE....FOR THE PLAINTIFF

JACKSON LEWIS, LLP

BY: CHRISTOPHER J. CAMPBELL, ESQ..FOR THE DEFENDANTS

ALSO PRESENT

Pamela Charron

ORIGINAL

IRONS & ASSOCIATES

CERTIFIED PROFESSIONAL STENOGRAPHERS

11 South Angell Street #359

Providence, Rhode Island 02906

(401) 861-0909

MS. BEAUVAIS IAFRATE: Objection as to form.
A She had concerns for the two weeks she worked with me, didn't she?
Q So, she did have concerns?
A I guess, according to this.
Q And, according to this in number three, "Will follow-up and complete duties as assigned," would you agree with me that she wrote this down?
A Yes.
Q And she gave it to you?
A Uh-hum.
Q You have to say yes or no.
A Oh, yes. She wrote it down, yes.
Q And that she needed you to do this, correct?
MS. BEAUVAIS IAFRATE: Objection as to form.
A She needed me to complete and -- complete my duties?
Q As assigned.
A Well, that's -- nothing is assigned to me. It's just my duties. I know what I do. I did it automatically, so I don't know what she meant by that.
Q Well, you agree with me that she could have meant

that she had concerns that you weren't doing it?
MS. BEAUVAIS IAFRATE: Objection as form.
A I really don't know what she had in her mind.
Q She had you review and sign the updated job description, correct?
A Yes, that was the new thing, right, because I never had one.
Q And that you were to go five days instead of four, correct?
A Correct.
Q Did you mind doing that?
A No, not at all.
Q You were fine with that?
A Yes.
Q She gave you two weeks to ease into it, correct?
A Yes, because I think, too, there was a vacation coming up, my vacation, and that's what changed things. Originally it was going to be a different date, but then we discussed I wouldn't even be there.
Q Would you agree with me that getting an action plan from the supervisor reflects that the supervisor believes action is needed on your part?