**UNITED STATE DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BARBARA ANTONUCCI,**<br>***Plaintiff,***<br><br>**vs.**<br><br>**LIFE CARE CENTERS OF AMERICA, INC., et al.,**<br><br>***Defendants.*** | **C.A. No. 06-108 ML** |

**PLAINTIFF'S SUPPLEMENT TO FOOTNOTE 5 OF PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION FOR RECONSIDERATION**

The following should be added to the end of footnote 5 on page 4 of Plaintiff's Memorandum in Support of Objection to Defendants' Motion for Reconsideration:

> See also Pereira, p. 78, 81, 90, 187-188, Haase, p. 220, 263-264 (underscored excerpts regarding Pereira's role).

Plaintiff,
By her attorneys,

/s/ Carly Beauvais Iafrate

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document has been filed electronically on this 19th day of March 2008, and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Christopher J. Campbell, Esq.
campbelc@jacksonlewis.com

/s/ Carly Beauvais Iafrate

regional director of clinical services, I wasn't involved in terminations. I was primarily involved in supporting the director of nurses.
Q. Were you involved in the discipline of employees --
MR. CAMPBELL: Objection as to form.
Q. -- short of termination?
A. If someone said to me, this person is not performing, I've reviewed, reviewed, and reviewed, I would say then the logical step -- if they continue to not do their job, then the logical step would be, we need to terminate.
Q. Did you ever say that, regarding Barbara Antonucci, to anyone?
MR. CAMPBELL: Objection as to form.
A. To anyone?
Q. Yeah.
A. I could have.
Q. Well, sitting here today, do you recall telling Pam Charron that you should -- that she should be terminated?
A. I could have.
Q. Do you recall that or is that a guess on your part?
MR. CAMPBELL: Objection as to form. Go



ahead.
A. It would be a logical guess that I could have said that, based on her calling me, that there was all these vacancies.
Q. Okay. Did she ever speak -- strike that. Did Pam Charron ever speak to you about anything other than vacancies on the daily sheets --
MR. CAMPBELL: Objection as to form.
Q. -- regarding Barbara Antonucci?
A. Ask that question again.
Q. Other than there being vacancies on the daily sheets, did you and Pam Charron ever talk about Barbara Antonucci failing to do anything else?
MR. CAMPBELL: Objection as to form.
A. I could have.
Q. What's your best recollection?
A. Probably the same advice I've given to Celeste, to monitor PVD and callouts.
Q. Okay. We're just talking about Pam Charron right now. So, other than having some conversations with her about vacancies on the daily sheet, did you have any other discussions with Pam Charron about Barbara Antonucci failing to do anything else?
MR. CAMPBELL: Objection as to form.



Q. And, if there's nothing else, you can just tell me that.
MR. CAMPBELL: Objection as to form.
A. Not that I can remember.
Q. Did she ever tell you how she felt about Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. In relation to the open vacancies.
Q. What did she say?
A. She would be frustrated that there were so many open vacancies.
Q. And did she ever express to you how she felt about Barbara?
MR. CAMPBELL: Objection as to form.
A. The only recollection is the open vacancies or the numerous open vacancies.
Q. And did she like Barbara, do you know?
MR. CAMPBELL: Objection as to form.
A. That would not even be a discussion. I wouldn't even go there.
Q. Did she ever tell -- strike that. Did you -- strike that. Did she ever tell you that Barbara Antonucci -- strike that -- refused to do anything that she asked her to do?
MR. CAMPBELL: Objection as to form.



A. She could have and that could have been why I precipitated that you need to review role expectations.
Q. I thought you said that that related to filling the vacancies.
MR. CAMPBELL: Wait for a question.
Q. Is that not what you said?
MR. CAMPBELL: Objection as to form.
A. Could you repeat the whole question?
Q. Didn't you say that you had a discussion with her about reviewing the expectations with Barbara Antonucci in the context of the issue of vacancies?
MR. CAMPBELL: Objection as to form.
A. I said that, yes.
Q. Okay. Can you recall any other discussions that you had with her about reviewing expectations in the context of any other aspect of Barbara's job? Do you understand my question?
MR. CAMPBELL: Objection as to the form. Asked and answered. Go ahead.
A. No, I don't really.
Q. Okay. You had a discussion with Pam Charron in which you said -- in which Pam Charron talked about the fact that Barbara Antonucci was not

Page 90

Q. Was that the first time you ever knew about one for Barbara Antonucci?
MR. CAMPBELL: Objection.
A. When we spoke about role performance earlier, I can't remember what kind of a format I recommended that she put it in. It could have been an action plan.
Q. But sitting here today, you can't remember, specifically?
MR. CAMPBELL: Objection as to form.
A. No, I can't remember.
Q. Did you ever tell Pam Charron that she should discipline Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. Well, based on the calls regarding open vacancies, I could have very easily.
Q. What's your best recollection, sitting here today?
MR. CAMPBELL: Objection.
A. Logically, I would probably have said, yes.
Q. Did she -- do you know whether there were the same amount of vacancies after Barbara left at Cherry Hill?
MR. CAMPBELL: Objection as to form.
A. No one ever called her -- no one ever called me about them anymore.

Page 91

Q. Did you ever hear anything about Barbara Antonucci's use of bonus -- bonuses?
A. You know, my role is clinical. You know, I could care less if they offered her a million dollars, or three million dollars, or a penny.
MR. CAMPBELL: Have you completed your answer?
THE WITNESS: I'm sorry.
MR. CAMPBELL: Have you completed your answer?
MS. ANDREWS: I think that he's fully capable of deciding whether or not he has completed his answer.
MR. CAMPBELL: I understand that.
MS. ANDREWS: No, you are not to do that, okay? You are not to make this person believe that he has given an inadequate answer, or that there is something more that he should be saying, because that's exactly what you are doing.
MR. CAMPBELL: Actually, that's not, and please don't interrupt me when I'm speaking. If you've completed your answer, I'd like to take the lunch break that we talked about. It's 12:16 and we talked about 12:15.
THE WITNESS: What was the question again?

Page 92

MR. CAMPBELL: I assume that you had, I don't know if --
MS. ANDREWS: Let's let him hear this question again.
MR. CAMPBELL: If you have more that you want to add, by all means.
THE WITNESS: Okay.
MR. CAMPBELL: I assumed that you had.
MS. ANDREWS: Could you please read it back?
(Question read back as requested.)
Q. Did you --
MR. CAMPBELL: Hold on. No. I wanted to take a lunch break.
MS. ANDREWS: Okay. Then answer the question.
MR. CAMPBELL: I think he did. Can you read his answer because that's what your question was. Did you complete it?
(Answer read back as requested.)
Q. Did you ever hear anything about Barbara Antonucci's use of bonus money?
MR. CAMPBELL: Objection as to form.
A. I did not get involved in that.
Q. So, I take it the answer is no?

Page 93

A. Could have, but I didn't really get involved in that. I could not give any authority anyway, so I would not get involved.
Q. I'm just simply trying to find out if you recall any discussions with Pam Charron about Barbara Antonucci's use of money?
MR. CAMPBELL: Objection as to form. Asked and answered.
A. Could have -- Pam could -- may have said that she would rely on bonuses, in the last minutes, to call staff rather than being creative and rather than taking some initiative earlier on. She could have.
Q. She could have, but is that a guess on your part, sir?
MR. CAMPBELL: Objection as to form.
A. It's the best I can do.
Q. But, do you recall that specifically, is what I'm trying to find out.
MR. CAMPBELL: Objection as to form.
A. Not 100 percent.
MR. CAMPBELL: Does it make sense to take lunch now?
MS. ANDREWS: I'm just going to finish this line of questioning.

Page 186

Q. Okay. Can you tell me whether you have any information about the contents of this?
MR. CAMPBELL: Objection as to form.
A. What I'm reading here?
Q. Yes. Do you have any information independent of what you're reading here?
MR. CAMPBELL: Objection as to form.
A. I know that she did some off-site training and discussion of expectations of job duties.
Q. Okay. And what did you know about off-site training?
A. That -- simply, Pam asked me -- I believe this is how it went, I think: Pam asked me to call another building to see if we could set up training.
Q. And who did you call?
A. Life Care Center of Raynham.
Q. And why did you call Raynham?
A. Because the scheduler who was there, who I was best familiar with, I knew she did a good job. So, I thought she'd be a good mentor.
Q. And do you know how that training went?
A. I do not.
Q. You never heard?
A. I never called to check up on it.

Page 187

Q. Do you know how long she trained?
A. No, I don't.
Q. Well, how long did you set it for?
A. I merely asked the building if it was okay and then they took over from there.
Q. Do you know if Barbara was receptive to the training?
A. I have no idea.
Q. Did you ever hear that she was not receptive to the training?
A. No.
Q. Okay. Have you ever talked to Becky Santin about Barbara Antonucci?
A. No, not that I remember.
Q. Okay. Let me -- let's mark this Plaintiff's Exhibit 5.
(Plaintiff's Exhibit 5 marked for ID.)
Q. Plaintiff's Exhibit 5 are Defendants Further Supplemental Answers.
MR. CAMPBELL: I'm just going to grab the copy underneath, if that's all right.
Q. I'm going to direct your attention, sir, to Further Supplemental Answer number 21.
MR. CAMPBELL: You have it on page 3.
Q. Why don't you read the first three lines --

Page 188

MR. CAMPBELL: Well, he's reading the whole thing. I'd appreciate it if you'd let him do that. Continue, Jim.
MS. ANDREWS: Okay, fine.
A. Okay.
Q. Okay. Let me just first ask you about page 6. And you see at the top here it says: As to Paragraph 20 of Plaintiff's Complaint, Defendant refers Plaintiff to the earlier part of this response and it goes -- and then it states: Further answering, Mr. Pereira also communicated directly to Plaintiff regarding her performance, including the need to be more aggressive in calling staff to fill shifts. Do you see that?
A. I do.
Q. Did you do that?
A. Like I said earlier, I could have but I don't remember.
Q. You don't remember doing it?
A. I don't.
Q. Were you ever asked any questions about what you knew about -- strike that. Have you ever seen this document before?
A. No.
Q. At some point, did you learn that Barbara

Page 189

Antonucci had sued Life Care?
A. That's why I'm here.
Q. Okay. At some point you learned it?
A. Yes.
Q. Okay. And when did you?
A. I believe it was the beginning of this year.
Q. Prior to -- and how did you learn it?
A. I believe you called me.
MS. ANDREWS: Okay. Let the record reflect that he is pointing to counsel.
MR. CAMPBELL: That's okay.
Q. Prior to that discussion with Mr. Campbell, you did not know that Barbara Antonucci had sued Life Care?
A. Correct.
Q. Okay. Has -- and I just want a yes or a no, has any person ever called you to find out what information you had about the circumstances leading up to Barbara Antonucci's firing?
MR. CAMPBELL: I just want to caution here to listen to counsel to the extent that there was any inquiry, you're not to answer the substance just as counsel has directed, yes or no.
A. Who is anyone?
Q. Has any person ever asked you whether you had any

Page 218

me.
Q. Have you ever seen this document before?
A. Yes.
Q. When was the first time that you did?
A. Probably when the information was originally pulled for this case.
Q. And so this was after Barbara Antonucci left?
A. Yes.
Q. And did you know about this?
MR. CAMPBELL: Objection as to form.
A. No, not until after the fact.
Q. Were you surprised to see this document?
A. In the sense that it was in the record without my signature on it, I was surprised, but as far as the content goes, no.
Q. And so the first time that you saw this was in the context of searching for documents for this lawsuit?
MR. CAMPBELL: Objection as to form.
Go ahead.
A. Yes.
Q. And do you know why this was not presented to you?
A. No, I do not.
Q. Do you know why your signature does not appear on there?

Page 219

A. No, I have the same question as you do. I don't.
Q. Did you ever ask Pam Charron?
A. No, because when I discovered it, she wasn't at Cherry Hill anymore.
Q. Well, she was at Cherry Hill two years ago, wasn't she? Strike that. She was working for Life Care, though?
A. Yes, but she wasn't working in my building. She was working in another Life Care home.
Q. Okay. And it didn't dawn on you?
A. I didn't see the point in calling her at that point.
Q. Why not?
MR. CAMPBELL: Objection as to form.
A. I thought it was too late. I mean, what's done is done.
Q. What do you mean you thought it was too late, what's done is done?
A. Well, I discovered it after the event had already happened and after Barbara had been terminated. So I can't go back and change it, and I can't change the fact that Pam had done this, and say, "You know, look, Pam, the next time you do a disciplinary action notice, please have me

Page 220

sign it," because it was a moot point. She was no longer working for me.
Q. Well, do you know when she did this?
A. Well, I know it was wasn't done 10/24/04.
Q. And why is that?
A. Because Barbara was terminated 10/4/04.
Q. Okay. Other than that, is there any reason why you believe it was not done after the fact?
MR. CAMPBELL: Objection to the form.
A. No, I think it's just the wrong date on here.
Q. And why do you believe it was not done after the fact?
MR. CAMPBELL: Objection, asked and answered.
A. Well, Pam and I were working on this case with Joe Pereira as I had previously discussed. She was trying to be diligent with creating the necessary paperwork and documentation.
Q. How do you know that?
A. Because Pam said, "I'm going to try to be diligent with keeping up on this paperwork on Barbara Antonucci."
Q. When did she tell you that?
A. Sometime that December of '04.
Q. Why did she say that she was going to keep up with

Page 22

this paperwork on Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. Because Barbara was a problem. She wanted to establish a paper trail.
Q. When did she want to establish a paper trail?
MR. CAMPBELL: Objection as to form.
A. I'm not sure, as soon as Pam became aware of performance issues.
Q. Okay. And I'm asking you when was that.
A. I don't know when, shortly after she arrived.
Q. So shortly after she arrived, she wanted to establish a paper trail on Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. Because of work performance.
Q. Was that a yes?
MR. CAMPBELL: Objection as to form.
A. Yes.
MR. CAMPBELL: I think he didn't use those words. He used the words he used.
MS. ANDREWS: He just said yes.
(OFF THE RECORD)
Q. So was this document 174 done before or after the action plan?
MR. CAMPBELL: Objection as to form.
A. I can't tell. I --

Page 262

MR. CAMPBELL: Objection as to form.
Q. -- when you received this?
A. Three years ago, I probably did. I just don't remember.
Q. You don't remember anything, okay. What did you understand Kate to mean when she said, "So, we can nip this in the bud if we want"?
MR. CAMPBELL: Objection as to form.
A. I would have to assume it would be some form of progressive discipline.
Q. For Barbara Antonucci?
A. For Barbara Antonucci, yes.
Q. To begin the process?
MR. CAMPBELL: Objection as to form.
A. I would assume that would be -- yes.
Q. Okay. Was there a meeting on the 19th; do you know?
A. I don't remember.
Q. Okay. So take a look at the action plan.
MR. CAMPBELL: 15.
A. I have the action plan.
Q. Okay. If you notice, the action plan reflects that Pam Charron maintains that she had a conversation with Barbara Antonucci on August 19, 2004; do you see that?

Page 263

A. Yes.
Q. Okay. And does that refresh your recollection as to whether or not she did, in fact, mean nip it in the bud by issuing an action plan to Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. I don't know. I'm taking two thoughts and linking them together. I don't know.
Q. Did you have -- did you ever have a meeting with Kate O'Connor at which Barbara Antonucci's job performance was discussed?
MR. CAMPBELL: Objection as to form.
A. Probably.
Q. How many?
A. At least one.
Q. And who was present?
A. Again, it would be an assumption, myself, Pam Charron, Joe Pereira and Kate O'Connor.
Q. And was the purpose of the meeting to talk about Barbara Antonucci?
MR. CAMPBELL: Objection as to form.
A. I mean, I don't even remember the meeting, but I would have to assume it would have to be about her job performance, and what we've got to do to correct it.

Page 264

Q. Well, what is Kate O'Connor attending a meeting at which you're discussing Barbara Antonucci's job performance -- what is she doing there?
MR. CAMPBELL: Objection as to form.
A. That was her decision to get involved.
Q. Who's decision?
A. It was Kate's decision to get involved.
Q. You didn't ask her to get involved?
A. No.
Q. Do you know whether anyone else asked her to get involved?
MR. CAMPBELL: Objection as to form.
A. I know that she was aware of scheduling problems from Joe Pereira.
Q. How do you know that?
A. I think on occasion, Joe said I've had discussions with Kate about Barbara Pereira and her job performance.
Q. Barbara Antonucci?
A. I'm sorry, yes, Barbara Antonucci.
Q. And her job performance?
A. Yes, something along those lines.
Q. Did you ask him why he was talking to Kate O'Connor about that?
A. No.

Page 265

Q. Did you ever learn why he was speaking to Kate O'Connor about it?
MR. CAMPBELL: Objection as to form.
A. I know he was talking about the problems with the schedule.
Q. Do you know if he ever talked to Kate O'Connor about Donna Diallo?
A. No, I don't know.
Q. Do you know if anyone ever spoke to Kate O'Connor about Donna Diallo?
MR. CAMPBELL: Objection as to form.
THE WITNESS: In August of 2004?
MS. ANDREWS: At any time.
A. It would only be an assumption. Donna has been with Cherry Hill for a while. She probably did come up in a discussion with Kate.
Q. In the context of deficient job performance?
MR. CAMPBELL: Objection as to form.
A. In terms of the schedule in general.
Q. What do you mean "the schedule in general"?
A. How is the schedule going; how many open slots do we have; where do we stand as far as filling positions; who has been hired; when are they starting; those kinds of questions.
Q. Did Joe Pereira ever criticize Donna Diallo's job